## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | Case No. 23-12386 (EPK) |
| Debtors. | ) | (Joint Administration Pending) |

### DECLARATION OF GERARD A. MCHALE, JR. IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Gerard A. McHale, Jr., pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief, including the information included in the exhibit attached hereto:

### Background

1.      My name is Gerard A. McHale, Jr.  I am over the age of eighteen and am competent to testify.

2.      I act as the proposed chief restructuring officer ("CRO") of each of the above-captioned debtors and debtors in possession (the "Debtors").  I was retained on March 14, 2023, effective as of February 28, 2023 and have worked expeditiously with the Debtors to prepare for the commencement of these chapter 11 cases (the "Chapter 11 Cases").

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC (Case No. 23-12390); (ii) Banyan Cay Mezzanine Borrower, LLC (Case No. 23-11281); (iii) Banyan Cay Resort & Golf LLC (Case No. 23-12386); (iv) Banyan Cay Dev. LLC (Case No. 23-12387); (v) Banyan Cay Villas, LLC (Case No. 23-12388); and (vi) Banyan Cay Maintenance, LLC (Case No. 23-12389).  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

3.      The Debtors constitute a business enterprise that invests in, owns, and operates an approximately 200-acre resort and golf complex in West Palm Beach, Florida called Banyan Cay Resort & Golf Club, along with the ownership of certain real property incidental thereto and the provision of services related thereto (the "Development").  The Debtors are nearing completion of a 190-room hotel and resort portion of the Development (the "Hotel") and anticipate that, without the recent the interruptions in the Debtor's operations and construction, that a temporary certificate of occupancy ("TCO") would have been issued within two more months of construction.  As described more fully below, the Debtors are optimistic that with "debtor in possession" funding and the breathing room afforded to debtors under chapter 11, the Debtors will be in a prime position to engage in a robust sales process for the almost-completed Hotel, golf course, development site for 179 condominium units, villas, and all other real and personal property related thereto that will maximize recoveries for all parties in interest.

*A Rendering of the To-Be Completed Development*





4.      As the Debtors' organizational chart, attached hereto as **Exhibit A**, demonstrates, each of the Debtors are directly or indirectly owned by Debtor Banyan Cay Investment, LLC ("Banyan Cay Investment"), a Florida limited liability company.  Banyan Cay Investment is presently a joint endeavor between ConsultEnergy, Inc.; Rough Rider Enterprises, LLC; DJG Dev. LLC; Lexxcom LLC; 1900 Congress LLC; and Bellefrau Group, LLC.

5.      I am familiar with and knowledgeable of the Debtors' day-to-day operations, business, and financial affairs, and books and records as they exist, as well as the circumstances leading to the commencement of the Chapter 11 Cases.  I submit this declaration (this "Declaration") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Chapter 11 Cases and in support of the motions and applications that the Debtors filed with the Court contemporaneously herewith, including the "first-day" pleadings filed concurrently herewith (the "First Day Pleadings").  I am authorized to submit this Declaration on behalf of the Debtors.

6.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents as they exist, information provided to me by employees and/or management of the Debtors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the Debtors' proposed counsel, Pack Law.  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on the basis of the information that I have gleaned from the sources listed above.

7.      I am advised by counsel that this Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, and that venue is proper in the United States Bankruptcy Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1408 and 1409.

## Introduction[2]

8.      These bankruptcy cases are the culmination of a long and difficult process run by the Debtors in an attempt to maximize value for all of their constituencies in the exercise of appropriate fiduciary duties.  The decision to file did not come lightly and the Debtors have spent months exploring potential out-of-court and in-court solutions to maximize estate value. Unfortunately, after many months of false starts, potential sales, and time-consuming and expensive litigation prosecuted by the Debtors' prepetition secured lender and EB-5 mezzanine lender, it became clear that a chapter 11 filing and sale of assets pursuant to section 363 is the best and only available avenue under the circumstances to provide potential recovery for creditors.

9.      As described more fully below, "Banyan Cay" was conceptualized as a marque golf course, Hyatt Destination resort, and master-planned community, occupying an enviable location in West Palm Beach.  The club, featuring a Jack Nicklaus® signature golf course, has been open since 2017, with current golf course access membership of approximately 200 members. Unfortunately, the hotel and planned community were never fully completed.  A perfect storm of unexpected events, including the Covid-19 pandemic and concomitant supply chain and construction delays, contributed to cost-overruns, missed credit agreement milestones set forth by the Debtors' secured lender, Calmwater, causing financing and liquidity issues.

10.      The story of Banyan Cay to date is one of a series of investors, many of whom rest within one family, making whatever concessions were needed and undertaking any effort charged to them to see this vision come to pass and see all stakeholders realize value.  As explained herein, however, no amount of good faith effort can overcome overriding economic forces.

---

[2] Capitalized terms not otherwise defined in the Introduction have the meanings ascribed to such terms elsewhere herein.

11.    Faced with the economic realities of the situation, over a year ago, the Debtors began to develop and implement a sale process designed to pay their lenders in full, satisfy all creditors, return equity investment, and preserve the standards and level of service for the Development.  This process included the retention of HWE after hiring HotelAVE (a company ultimately installed at the request of the Debtors' prepetition lender, Calmwater) to run a process for which bids were due on or around July 2022 (at about the same time Calmwater initiated its Foreclosure Action).  That process resulted in a signed asset purchase agreement which would have satisfied all of their obligations, paying all creditors in full and providing a return to their preferred equity.  Unfortunately, the changing credit markets and rising interest rates contributed to the purchaser's decision to exercise its termination right.  The Debtors were left with few alternatives in light of Calmwater's  prosecution of the Foreclosure Action, despite requests of the Debtors to delay the litigation for a brief period of time to allow a constructive and cooperative sale process to continue.

12.    Although the Debtors thereafter entered into a reinstated asset purchase agreement with that same purchaser at a significant reduction, consummation of a transaction with that purchaser would ultimately prove impossible, particularly in light of the purchaser's refusal to post the required deposit, the continued accumulation of interest and fees caused by perpetual closing delays, and the EB-5 Lender's refusal to delay its UCC Sale of equity pledged thereto by Debtor Banyan Cay Mezz Borrower.  The Debtors' grand dream of selling out of court was again thwarted.

13.    While the Debtors' secured lender have commenced proceedings and actions that undoubtedly would benefit them if adjudicated to finality, the Debtors' focus has been, and continues to be, on a global strategy designed to maximize value for all stakeholders, including secured creditors, unsecured creditors, and the mezzanine lender.  To that end, after evaluating all

of their potential alternatives and mounting liquidity needs, the Debtors, in the exercise of their fiduciary duties, are firmly of the belief that a bankruptcy filing and sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code is the only way to maximize value for all constituencies.

**The Debtors' Prepetition Corporate and Capital Structure**

**I.      Corporate Structure and History.**

14.      As set forth more fully in the Debtors' organizational chart attached hereto as **Exhibit A**, the Debtors are comprised of six entities that collectively own and operate the Banyan Cay Resort & Golf Club in West Palm Beach, Florida.  The Debtors first acquired the property upon which the Development sits in August 2015 from Palm Tree Golf Management, LLC, managed by George Elmore, for approximately $28,000,000.

15.      Debtor Banyan Cay Resort & Golf, LLC is primarily responsible for the ownership, management, and operation of the golf club and restaurant portion of the Development, and oversaw the construction of the hotel portion of the Development.  The golf club has been operating since November 2017 in its current form and has garnered a reputation as a premier golf club and mainstay of the community.  For example, since opening in late 2017, the club has hosted professionally-sanctioned tournaments, including the Honda Classic Open Qualifier of the South Florida Section of the Professional Golfers' Association of America ("PGA"), has hosted the Royal Bank of Canada Wealth Management High Net Worth Tournament, attended by several PGA tour players including some of the best players in the world, and engaged in robust community work, including hosting first responders meetings for local fire fighters, police, and nurses, and extensive support of the Hope for Warriors program, through which the club allows wounded veterans to play on course and attend clinics and lessons sponsored by the club.  Before the most recent season renewal, the club supported an impressive 236 members, and despite the recent financial and

construction difficulties (and associated negative press), maintains a membership of approximately 200 members.  The Debtor entity has negotiated and secured a deal to flag the to-be-completed hotel property as a Hyatt under Hyatt Corporation's upper-upscale and luxury "Destination Hotels" brand, which program will allow the site to maintain the Banyan Cay name and associated market recognition, while simultaneously benefitting from the reservation and marketing resources Hyatt has to offer.

16.    Debtor Banyan Cay Villas, LLC is primarily responsible for the ownership and development of certain duplex units to-be constructed on the lots directly adjacent to the resort portion of the Development, called the "Villas."  The Villas are scheduled to be comprised of eleven total buildings, each with a pair of two-story units of 2,200 square feet each.

17.    Debtor Banyan Cay Dev. LLC was initially formed to accomplish the acquisition of the Development property and serve as the master developer.  Currently, the material assets of this Debtor entity include twenty-eight lots zoned for single-family development, and a "condo pad" zoned for 179 units.

18.    Debtor Banyan Cay Maintenance, LLC owns certain real property in the Development that is not encumbered by the Calmwater loan, including the maintenance parcel related thereto, and provides access to such maintenance parcel to the operating Debtors.

19.    Debtor Banyan Cay Investment directly owns Debtor Banyan Cay Mezz Borrower, and in its current form serves as a joint venture between two classes of members: (a) Class A members; DJG Dev. LLC,[3] a Florida corporation with a 70.25% total ownership interest in Banyan

---

[3] Member DJG Dev. LLC's ultimate beneficial owner is Domenic Gatto, Jr.

Cay Investment; and Lexxcom LLC,[4] a Florida limited liability company with a 20% total ownership interest; and (b) Class B (non-voting) members; 1900 Congress LLC,[5] a Florida limited liability company with a 5% total ownership interest; Rough Rider Enterprises, LLC, a Texas limited liability company with a 3.25% total ownership interest; Bellefrau Group, LLC, a Florida limited liability company with a 1% total ownership interest; and ConsultEnergy, Inc., a Florida corporation with a .5% total ownership interest.  Class B members contributed preferred equity to Banyan Cay Investment to fund certain equity benchmark requirements (as described in greater detail below) toward the end of 2020 and beginning of 2021, and benefit from priority distributions over the Class A members.

20.     Effective February 28, 2023, I was retained by the Debtors to serve as proposed Chief Restructuring Officer for each of the Debtor entities in connection with the preparation for and the oversight of these Chapter 11 Cases.

## II.     Prepetition Capital Structure.

21.     The Debtors' capital structure is relatively straightforward and consists of secured debt, unsecured debt, and equity.

### A.  Secured Debt.

22.     The Debtors' secured debt consists primarily of a first-lien, secured loan on substantially all of the Debtors' assets (other than Banyan Cay Mezzanine Borrower, LLC and Banyan Cay Maintenance, LLC) presently owned by U.S. Real Estate Credit Holdings III-A, LP,

---

[4] It is my understanding that Lexxcom LLC is an affiliate of Jacobs Industries, LLC, the general contractor of the development, through its principal, Donald Perry, which general contractor allegedly released some liens in exchange for the provision of equity to Lexxcom LLC.  I have not had the opportunity to review this transaction in detail, and the Debtors reserve all rights with respect thereto.

[5] In the interest of full disclosure, it is my understanding that the principal of 1900 Congress LLC, is Domenic Gatto, Sr.

an Irish limited partnership (the "Prepetition Lender" or "Calmwater"), in the principal aggregate amount of $95,084,509.61 which amount was fixed by judgment (the "Foreclosure Judgment") in that certain foreclosure action that was commenced by the Prepetition Lender against the Debtors and certain non-debtor affiliates in the Fifteenth Judicial Circuit Court, in and for Palm Beach County, Florida, Case No. 50-2022-CA-006815-XXXX-MB, styled as *U.S. Real Estate Credit Holdings III-A, LP v. Banyan Cay Resort & Golf, LLC, et al.* (the "Foreclosure Action").  The Foreclosure Judgment bears interest at the prevailing statutory legal rate of interest from the date thereof, February 28, 2023.

23.    The Foreclosure Judgment stems from a series of loans made by the Prepetition Lender for the benefit of the Debtors.  Specifically, on June 14, 2018, the Prepetition Lender and Debtor Banyan Cay Dev. LLC entered into an agreement (with subsequent amendments and modifications from time to time) for a $61,000,000 construction loan for, *inter alia*, the construction of the resort portion of the Development.  Additionally, on September 30, 2020, the Prepetition Lender and the Debtors entered into a further agreement for a $19,000,000 loan and recapitalization (which loan was thereafter increased to the principal amount of $33,000,000) to secure continued access to the Prepetition Lender's prior commitments and to further fund the construction of the Development and the Villas portion thereof.  A more detailed description of the prepetition loan documents, the various amendments and modifications thereto, the specific of the various collateral therefor, the conduct of the parties with respect thereto, and the ultimate entry of the Foreclosure Judgment therefor can be found in the Prepetition Lender's complaint (the "Foreclosure Complaint") filed in the Foreclosure Action on July 16, 2022.

24.    In addition to the secured claim of the Prepetition Lender, the assets of Debtor Banyan Cay Mezzanine Borrower, LLC ("Banyan Cay Mezz Borrower"), comprising solely of the

equity interests in Debtors Banyan Cay Resort & Golf LLC; Banyan Cay Dev. LLC; and Banyan Cay Villas, LLC; are subject to a security interest owned by Banyan Cay Resort Fund LLC, the Debtors' EB-5 lender (the "EB-5 Lender"), in the amount of $5,000,000. As explained in greater detail in the sections below, the EB-5 Lender was originally going to fund the vertical construction of the entire development plan, however when it became apparent in 2016 that it would be unable to do so, the Debtors were required to enter the capital markets and secure financing from elsewhere, thus leading to the loan agreements with the Prepetition Lender, Calmwater. Nevertheless, the sum of $5,000,000 from the EB-5 Lender was already in escrow from the prior efforts to raise capital, and such funds were drawn upon in 2020 as part of the recapitalization of the Calmwater loan.

25.    Apart from the Prepetition Lender and the EB-5 Lender, the Debtors' property is subject to various other liens asserted by subcontractors of the Debtors' general contractor, Jacob Industries, LLC. The vast majority of these liens are asserted against property owned by Banyan Cay Resort & Golf LLC, however some are asserted against property owned by Banyan Cay Dev. LLC. In addition to these construction lienholders the only other secured creditors and mortgage holders of the Debtors are (i) Bellefrau Group, LLC, which holds a mortgage on certain parcels of real property presently owned by Debtor Banyan Cay Maintenance, LLC; and (ii) ZJC, LLC, which holds a mortgage on a separate parcel owned by Debtor Banyan Cay Maintenance, LLC.

**B. Unsecured Debt and Equity.**

26.    The Debtors' unsecured debt primarily consists of vendor payables, and the Debtors' equity consists of those membership interests described in the Chapter 11 Petition [Docket No. 1], the Debtors' Corporate Ownership Statement filed contemporaneously herewith, and the Debtors' List of Equity Security Holders filed contemporaneously herewith.

**III.    The Debtors' Assets.**

27.    The Debtors' principal balance sheet assets are the Hotel, the golf course, the Villas property, the development site for 179 condominium units, the twenty-eight single-family lots, and all other real property and personal property related thereto comprising the Development located throughout the various properties owned by the Debtors.  In addition, it is my understanding that the Debtors have cash in the amount of approximately $500,000, presently secured in a lockbox controlled by the Prepetition Lender.

28.    I am also currently reviewing, among other things, the Debtors' books and records as they exist, certain documents, and various other information to ascertain whether the Debtors have any claims or causes of action against third parties.  I anticipate that my review will continue after the filing of these Chapter 11 Cases to ensure that potential assets of the Debtors' estates are preserved and maximized for stakeholders.

**IV.    Key Events Leading to the Chapter 11 Cases.**

    **A.  The Debtors Engaged Calmwater as Prepetition Lender.**

29.    When the Debtors determined that the EB-5 Lender would not be able to function as the source of funding for the vertical construction of the Development, the Debtors (with the assistance of brokers) went into the capital markets to secure funding in 2017.  It was in this process that the Debtors found Calmwater and first began negotiations with their soon-to-be prepetition secured lender.

30.    Calmwater immediately became incredibly involved in the Debtors' projects, becoming part of the entire budgeting process.  Thus, in early 2018, Calmwater, the Debtors, and Noble House Hotels & Resorts ("Noble House," the entity that was to manage the entire hotel construction process) created the budget for the loan and construction process.  While disputes

regarding the budget arose, the parties eventually agreed to a budget, which enabled the loan to close in June 2018.

31.     Under the agreement with Noble House, in exchange for Noble House taking total responsibility for the construction and operations of Debtor Banyan Cay Resort & Golf LLC, Noble House received ten percent (10%) of that entity.

32.     While construction began under Noble House in 2018, it soon became evident that it was not up to the task.  Plagued with misplanning issues ranging from discrepancies with hotel room heights to provisions for a luxury resort pool that did not go deeper than a meager 2.5 feet, the Debtors realized that Noble House was not equipped to  handle the ground-up construction and management necessary for this project.  As the Debtors began to contemplate how to efficiently and expeditiously sever the relationship and salvage the project, Noble House itself sent the Debtors a termination in January of 2019.

33.     The 10% equity interest of Noble House made its exit a difficulty for the Debtors, which now had to not only figure out how best to get construction back on track and save face with their lender, but also how to reacquire the equity interest from Noble House.  The Debtors subsequently implemented a plan to secure the Hyatt flag, hire a different construction manager, and require the 10% equity interest.

**B.  The 2020 Recapitalization with Calmwater.**

34.     In late 2020, the Debtors and Calmwater returned to the negotiation table to salvage their relationship and get the construction project back under control.  Through these negotiations, Calmwater put forward a plan for the provision of further funding that contained various milestones, including the Debtors' securing of further significant equity contributions, an expedited timetable (such as the requirement that the Debtors receive a final TCO by December 15, 2021), and the imposition of a new management company and management agreement

explicitly approved of by Calmwater (which management agreement would ultimately be entered into with Benchmark).  With construction delays mounting, the Debtors agreed to the recapitalization.

35.    After agreeing to the recapitalization of the Calmwater loan and closing on the deal in late September 2020, the Debtors spent the next several months working to meet Calmwater's milestones and to raise the necessary funds to access the recapitalized deal.

36.    Specifically, the Debtors' management and members created a new Class B membership interest in Banyan Cay Investment, which Class B membership benefits from preferred liquidation and distribution rights.  The preferred equity came in the form of an initial $2,000,000 investment from Rough Rider Enterprises LLC on November 16, 2020, which initial investment was increased by an additional $500,000 on September 22, 2020 and a further $750,000 on March 25, 2021; an initial $250,000 investment from ConsultEnergy, Inc. on November 27, 2020, which initial investment was increased by an additional $250,000 on March 18, 2021; an initial $4,500,000 investment from 1900 Congress LLC on January 1, 2021, which initial investment was increased by an additional $500,000 on October 22, 2021; and an initial $1,000,000 investment from Bellefrau Group, LLC in October 2021.  Over the course of 2020 and 2021, the Debtors raised a total of approximately $9.75 million in the form of preferred equity.

37.    In addition to the non-Calmwater funding that the Debtors secured as preferred equity investment, the Debtors also secured $6.8 million in Community Development District ("CDD") funding and gained access to $5 million of the anticipated $60 million from the EB-5 Lender.

**C.  The Eventual Cessation of Construction and the Calmwater Foreclosure.**

38.    Through the beginning of 2021, the project was back in full swing and the Debtors were meeting the milestones implemented by Calmwater in the 2020 recapitalization, including

the institution of Benchmark as an outside management company, and the Debtors were optimistic that both the Calmwater relationship and the Development as a whole could be saved.

39.     Unfortunately, in April 2021, the Debtors' then-manager Domenic Gatto, Jr. came under criminal investigation by various governmental entities in connection with matters wholly unrelated to the Debtors, the Development, or any of the Debtors' properties.  Mr. Gatto went personally to inform Calmwater of this investigation and to make himself available to answer any questions, assuage any concerns, and make any needed concessions.

40.     Through June, July, and August 2021, the Debtors undertook effort to save face with Calmwater, including the replacement of Mr. Gatto by Ms. Pillar, another member of the Gatto family, for the Debtors' management, the onboarding of hotelAVE as an independent asset manager and consultant, the firing of the existing construction manager and the hiring of Fulcrum as replacement construction manager, and the hiring of Benchmark as management company, all at Calmwater's request.

41.     With the many shakeups in the Development, and as the December final TCO deadline drew nearer, Calmwater eventually agreed with the Debtors that the December 2021 final TCO was not possible.  This set the stage for two further modifications to the 2020 loan agreement. The first modifiaction, in September 2021, in addition to increasing the principal amount from $19,000,000 to $24,000,000, extended the TCO deadlines to require a temporary TCO by January 31, 2022 and a final TCO by May 31, 2022.  The second modification, which closed December 31, 2021, further increased the principal amount to $33,000,000 and extended the deadline to receive the temporary TCO to April 30, 2022.

42.     Despite the efforts of the Debtors, a temporary TCO was not able to be issued before the April 30 deadline.  As a result, the final draw from the Calmwater loan occurred on April 26,

2022, Calmwater shortly thereafter sent a notice of default to the Debtors, and eventually filed the Foreclosure Complaint on July 16, 2022.

43.     The Foreclosure Action eventually resulted in the entry of the Foreclosure Judgment in the amount of $95,084,509.61 on February 28, 2023, and the scheduled sale of the Debtors' assets.  Moreover, on March 24, 2023, in the midst of extensive negotiations and on the eve of bankruptcy, Calmwater filed a motion in the Foreclosure Action seeking to modify the Foreclosure Judgment to include an additional approximately $1.8 million comprised of additional note interest, default note interest, post-judgment statutory interest, attorneys' fees covering periods both before and after the entry of the Foreclosure Judgment, appraisal fees, and the so-called "Exit Fee" contained in the Calmwater loan documents.

**D. The EB-5 Lender Dispute, Scheduled UCC Sale, and Banyan Cay Mezz Borrower's Bankruptcy Filing.**

44.     Concomitantly with the breakdown of discussions and the eventual Foreclosure Action against the Debtors by Calmwater, as well as the operational and development difficulties associated therewith, the Debtors soon found themselves saddled with maturity of the EB-5 Lender's loans with no liquidity and even larger financial strains due to the Foreclosure Action.

45.     In connection therewith, the EB-5 Lender sent formal notices of default and began efforts to schedule a strict foreclosure sale of the equity pledged by Banyan Cay Mezz Borrower on account of the EB-5 loan, the equity interests in: (i) Debtor Banyan Cay Resort & Golf, LLC; (ii) Debtor Banyan Cay Villas, LLC; and (iii) Debtor Banyan Cay Dev. LLC.  The EB-5 Lender proceeded to schedule a UCC public auction sale of the pledged equity for February 17, 2023 (the "UCC Sale").

46.     Because the Debtors were already engaged in sale efforts and preparing for these Chapter 11 Cases with the hope of maximizing recovery to all creditors and stakeholders, not just

the select few seeking to extract value through their own individual remedies, the Debtors knew that allowing the UCC Sale to occur would have disastrous effects on the Debtors' marketing and restructuring efforts.  Accordingly, on February 16, 2023, in order to stave off the UCC Sale and vindicate the Debtors' rights, as well as those of all of its creditor constituencies, Debtor Banyan Cay Mezz Borrower filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing Case No. 23-11281 before this Court, with the promise that the rest of its debtor family would soon be following it with a clear path forward that maximizes the value of the Debtors' estates for all parties in interest.  With the filing of the remaining Debtors contemporaneously herewith, together with the Debtors' acquisition of a stalking horse bidder and a proposed sale process that is poised for great success, this promise has been fulfilled.

### E.  The Debtors' Unsuccessful Prior Sale Processes.

47.     In June 2022, shortly before the initiation of the Foreclosure Action, the Debtors engaged Hodges Ward Elliott ("HWE"), a well-known broker in the hospitality arena, to run a competitive and expedited sale process, which could hopefully bring finality to the disputes between the Debtors and their secured creditors.  The sale process was placed on a fast-track in light of the breakdowns with Calmwater and the EB-5 Lender, and it contemplated receiving final bids by July of that year, diligence to be completed in August, and final closing in September.

48.     While the proposed sale process was proceeding on schedule, Calmwater nevertheless filed the Foreclosure Action and in July 2022 filed an emergency motion to appoint a receiver.  While this request for a receiver was not ultimately granted by the court, the Debtors believe that the request, as well as the continued Foreclosure Action itself, hurt the sale process.

49.     On September 16, 2022, the Debtors entered into a purchase and sale agreement with an entity called 2020 Banyan LLC to sell almost all of the real property of the Debtors.  After

several rounds of negotiation, the purchaser thereunder failed to replenish the deposit when it became due on February 16, 2023, allegedly due to the impending UCC Sale that the EB-5 Lender refused to postpone.

50.     With the onslaught of ongoing litigation amongst all the parties, including actions brought by the EB-5 Lender against Calmwater for alleged breaches of an intercreditor agreement, the sale failed to close and it became clear that the only path forward was chapter 11.

**F.   Next Steps, and the Commencement of the Chapter 11 Cases.**

51.     I am firmly of the belief that the Debtors' best chance of maximizing value for its various constituencies is the chapter 11 proceedings, through which the Debtors' plan is to (a) secure postpetition financing that will facilitate the club remaining open with continued employment and a level of service to the members that they have grown accustomed to, and (b) prepare the Development for a competitive and robust bidding process to actualize its value through a plan of reorganization that maximizes value to the Debtors, their estates, their creditors, and all of their stakeholders.

52.     In that regard, on March 16, 2023, I authorized the Debtors to engage Keen-Summit Capital Partners LLC ("Keen-Summit") to market the Development for sale, either in one transaction or a series of transactions.  As a result of that process, Keen-Summit has already received numerous indications of interest and a number of offers to be a "stalking horse" purchaser for some or substantially all of the Debtors' property.  As of the date hereof, I am working diligently with Keen-Summit and the Debtors' proposed restructuring counsel, Pack Law, to finalize the terms and conditions of certain agreements that will be presented to the Court as part of a motion to, among other things, approve bidding and sale procedures.  I further anticipate that these

"stalking horse" transactions will provide for sales proceeds well in excess of all secured debt encumbering the Debtors' assets.

53.    I am also currently reviewing a number of offers for "debtor in possession" ("DIP") financing that will provide the Debtors with sufficient liquidity to run a thorough sale process, allow the Debtors to remain current with necessary post-petition operating expenses, and cover certain administrative costs associated the Chapter 11 Cases.  In this regard, I am in discussions with Calmwater regarding a DIP and believe that financing from Calmwater would be the most efficient means of obtaining liquidity; however, I am also entertaining competitive offers from third party lenders that would require a "priming lien" and believe that there is a sufficient basis under the current facts and circumstances to obtain such a lien pursuant to the applicable provisions of the Bankruptcy Code and orders of this Court.

54.    With such a plan in place, I am confident that the Chapter 11 Cases will provide the best venue to monetize the Debtors' assets and provide the maximum recovery to the Debtors' stakeholders in an efficient and orderly process.

**The Debtor's First Day Pleadings**

55.    The First Day Pleadings seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I have been advised of the relief requested in the First Day Pleadings filed contemporaneously herewith and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value and best serves the Debtors' estate and creditors' interests.  The facts set forth in each First Day Pleading are incorporated herein by reference.  The First Day Pleadings include the following:

    a.   *Debtors in Possession's Application for Employment of McHale, P.A. as Chief Restructuring Officer Effective as of March 29, 2023* (the "<u>McHale Retention Application</u>");

    b.   *Debtors in Possession's Application for Employment of Pack Law as Counsel Effective as of March 29, 2023* (the "<u>Pack Law Retention Application</u>");

    c.   *Debtor in Possession's Application for Employment of Keen-Summit Capital Partners LLC as Marketing Agent and Broker* (the "<u>Keen-Summit Retention Application</u>");

    d.   *Debtors' Emergency* Ex Parte *Motion For Joint Administration of Bankruptcy Estates and Request For Expedited Consideration* (the "<u>Joint Administration Motion</u>");

    e.   *Debtor's* Ex Parte *Motion For Authorization to File Consolidated Chapter 11 Case Management Summary* (the "<u>Consolidated Case Management Motion</u>"); and

    f.   *Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated Creditor Matrix and Consolidated List of the Top Thirty Unsecured Creditors* (the "<u>Consolidated Creditor List Motion</u>").

56.    In addition to these pleadings, I have been advised that the Debtors shall file additional pleadings that shall seek authority to, among other things, honor employee-related wages and benefit obligations, use cash collateral, acquire post-petition financing, approve a stalking horse asset purchase agreement, approve bid and sale procedures, maintain other operations in the ordinary course of business, and attend to various administrative matters related to the Chapter 11 Cases themselves. I believe all relief sought in the First Day Pleadings and these subsequent pleadings to-come are critical to the continued success of the Debtors during the Chapter 11 Cases and ultimately, of important benefit to all stakeholders.

57.    Of these to-be-filed pleadings, some will request authority to pay certain prepetition claims against the Debtors. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the

Debtors shall narrowly tailor their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and its estate.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

58.    The above describes the Debtor's business and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, and the critical need for the Debtors to obtain the relief sought in the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 29, 2023

By:  */s/ Gerard A. McHale*
Name: Gerard A. McHale, Jr. of McHale, P.A.
Title: Proposed Chief Restructuring Officer
1601 Jackson Street, Suite 200
Fort Myers, FL 33901

**Exhibit A**

**Organizational Chart**



* Kim Pillar, Trustee; Domenic Gatto, Jr., Beneficiary