## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | Case No. 23-12386 |
| Debtors. | (Jointly Administered) |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) (A) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (B) DEEMING ITS SECURED LENDER ADEQUATELY PROTECTED PURSUANT TO 11 U.S.C. §§ 361 AND 363, OR (II) IN THE ALTERNATIVE, (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362 AND 364(c) AND 364(d) AND (B) GRANTING SUPER PRIORITY CLAIMS TO THE DIP LENDER PURSUANT TO 11 U.S.C. 364(c), AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

### *(Emergency Hearing Requested)*

### Basis for Expedited Relief

The Debtors seek to continue to operate their business in the ordinary course, to preserve the value of their estates, to preserve jobs, and to facilitate their orderly reorganization. Without the immediate authorization to use Cash Collateral (as defined herein) and, in the alternative to the extent such authorization is not granted, DIP Financing, the Debtors will not be able to meet payroll, run the risk of having utilities shut off, irreversible browning on golf course (one of the Debtors' jewels), and will have members showing up to pre-arranged Easter brunch with no food, and other obligations necessary for its day-to-day operations. The Debtors respectfully requests that the Court conduct a hearing on this Motion within three (3) business days of the filing hereof, consistent with Local Rule 9013-1(F), as the Debtors believes that a hearing on this Motion is needed as soon as practicable in order for them to continue to operate. Pursuant to Local Rule 9075-1(B), which requires an affirmative statement that a *bona fide* effort was made in order to resolve the issues raised in the Motion, the Debtors confirm that they engaged in a good faith effort to resolve the matter raised herein in advance of filing of this Motion, to the extent possible under the circumstances.

---

[1] The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

The above-captioned debtors and debtors in possession (the "Debtors") by  and  through their undersigned  proposed  counsel,  submit this  motion (the "Motion")  for  entry of  an interim order substantially in the form submitted   herewith  (the "DIP Order" or "Order"), , pursuant to section 105(a), 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"), (i) authorizing the Debtors' use of cash collateral pursuant to section 363 of the Bankruptcy Code; (ii) deeming its secured lender adequately protected for such use of cash collateral pursuant to section 361 and 365 of the Bankruptcy Code; (iii) in the alternative, authorizing the Debtors to obtain secured post-petition financing lender party to the DIP Credit Term Sheet (defined herein) (the "DIP Lender"), consisting of a term loan facility in the aggregate principal amount of up to $375,000 at this time (the "DIP Financing" or the "DIP Facility") for the purpose of funding the Debtors' general operating and working capital needs in the administration of the Debtors' Chapter 11 cases, to the extent the Debtors' secured lender is not deemed adequately protected, in accordance with (a) that certain *Debtor-in-Possession Financing Term Sheet*, dated April 3, 2023 (the "DIP Credit Term Sheet"), substantially in the form attached to the DIP Order as **Exhibit 2** between the Debtors and the DIP Lender and (b) the budget (the "Budget"), (iv) authorizing and approving the Debtors' entry into the DIP Credit Term Sheet and any other documents, certificates or instruments ancillary thereto, and performance of such other acts as may be necessary or appropriate in connection therewith, (v) granting to the DIP Lender valid, fully protected, and enforceable security interest and liens (collectively, the "DIP Liens") in and upon the DIP Collateral (as set forth in the DIP Credit Term Sheet) pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code; (vi) vacating and modifying the automatic stay to the extent necessary to effectuate the terms of the DIP Credit Term Sheet and the DIP Orders; and (viii) determining and authorizing Jerry McHale of McHale, P.A. to act as Chief Executive Officer

2

and Chief Restructuring Officer (CEO/CRO) and further empowering and directing the CEO/CRO to execute and deliver all instruments, including, and without limitation, a promissory note and mortgage and such other instruments as required to complete the DIP Facility with full power and authority to bind each of the individual Debtors to the terms of the DIP Facility and encumber the Collateral (as that term is defined in the DIP Credit Term Sheet.

In further support of this Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.     Over the past several weeks, since before the Debtors' chapter 11 cases were even initiated, the Debtors have worked expeditiously to secure access to their cash collateral and the necessary funding to preserve their estates in contemplation of a sale process for their assets.  In so doing, the Debtors have engaged various parties, including but not limited to the Debtors' Prepetition Secured Lender, the Debtors' Stalking Horse Bidder, and other third-party lenders to secure the funds needed to realizing value for all parties in interest.

2.     The Debtors are optimistic that, with the benefit of a few more days of negotiation and final documentation, the Debtors will be prepared to present to this Court terms for debtor in possession financing that will facilitate the Debtors' operation and administration throughout the remainder of the Debtors' cases.

3.     However, a few more days is a few days more than the Debtors can afford to wait to ensure the success of these cases, and it is not yet clear whether Calmwater will agree to the budget the Debtors believe is necessary to avoid irreparable harm to the estate.  With payroll and workman's compensation expenses, utility bills and deposits, various business-critical postpetition deliveries, grass dying on the golf course, and a high-profile Easter event at the Debtors' golf club all imminent, the Debtors seek by this motion authorization to use their Cash Collateral (as defined herein) on a strict budget solely for the purposes of maintaining operations

for the next several days.  As set forth below, the Debtors (through the Stalking Horse Agreement, prepetition agreements, and the preliminary sale process) estimate that auctions for the sale of their Assets will begin with a baseline of no less than *at least* the aggregate amount of $114,100,000.00.  In light of such baseline, with the Debtors anticipating paying Calmwater in this case, Calmwater enjoys an "equity cushion" of no less than at least fifteen percent (15%) and the Debtors seek to use cash (absent adequate protection payments) that constitutes less than zero point 3 percent (0.3%) of the Debtors' total assets. Further, the assets that serve as security for the Calmwater indebtedness is stable in value, if not appreciating.

4.     If the Debtors are unable to secure the necessary funding and the necessary approvals in place to implement it,[2] not only the business, but the chapter 11 cases in totality will be irreparably harmed, particularly in light of the requirement in the Debtors' Stalking Horse Agreement that all club operations will continue to operate in their current manner without interruption or modification.  Accordingly, to the extent the Debtors' secured lender cannot be deemed adequately secured for the use of Cash Collateral as set forth herein, the Debtors seek DIP Financing on the terms of the DIP Credit Term Sheet.

**<u>Jurisdiction, Venue and Statutory Predicates</u>**

5.     The United States Bankruptcy Court for the Southern District of Florida (the "<u>Bankruptcy Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that

---

[2] The Debtors will be imminently filing motions to expedite the necessary retentions to ensure access to funding can be effectuated by actual persons, even if it is otherwise granted by the Court.

the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution

6.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules, 2002, 4001, and 9014 and Local Bankruptcy Rule 4001-2 (and the Bankruptcy Court's *Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (the "Guidelines") incorporated therein), 9013-1, and 9075-1.

### Disclosures Under the Bankruptcy Rules, Local Rules, and Guidelines

8.     The following disclosures are provided in conformance with the requirements of Bankruptcy Rule 4001(b), Local Rules 4001-2, 9013-1(F) and (G), and the Guidelines:

   a.   **Cash Collateral:  As used herein, "Cash Collateral" shall mean any collateral constituting "Cash Collateral", as such term is defined in section 363 of the Bankruptcy Code.**

   b.   **Party with an Interest in Cash Collateral:  U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership (the "Prepetition Secured Lender" or "Calmwater"), is the sole entity with a lien interest in Cash Collateral.  In accordance with the Prepetition Loan Documents (as defined herein) and the Foreclosure Judgment (as defined herein), the Prepetition Secured Lender asserts a secured claim against the Debtors in the facially asserted amount of approximately $95 million, plus certain interest and fees, the precise amount of which will likely be contested.  For the avoidance of doubt, nothing herein or in the Cash Collateral Orders shall constitute a provision or finding of fact that binds the Debtors' estates or any party in interest with respect to the validity, perfection, or amount of the Prepetition Secured Lender's prepetition lien, claim, or debt, or the waiver of claims against the Prepetition Secured Lender, in accordance with Section II(B)(2) of the Guidelines.**

   c.   **Other Prepetition Secured Parties and Lienholders:  In addition to the Prepetition Secured Lender, Bellefrau Group, LLC ("Bellefrau") holds a mortgage on certain parcels of real property presently owned by Debtor Banyan Cay Maintenance, LLC, and ZJC, LLC ("ZJC") holds a mortgage on a separate parcel owned by Debtor Banyan Cay Maintenance, LLC. Moreover, several of the Debtors' properties are encumbered by construction, materialmen's, and similar liens held by various worker**

parties (collectively, the "<u>Construction Lienholders</u>").  Each of Bellefrau, ZJC, the Construction Lienholders, and the Prepetition Secured Lender shall be referred to as a "<u>Prepetition Secured Party</u>," and collectively as the "<u>Prepetition Secured Parties</u>."   The collateral of each such Prepetition Secured Party shall be referred to herein as that Prepetition Secured Party's "<u>Prepetition Collateral</u>," and collectively as the "<u>Prepetition Collateral</u>." The only Prepetition Secured Party with an interest in Cash Collateral is the Prepetition Secured Lender.  For the avoidance of doubt, the Prepetition Collateral of Belllefrau and ZJC is excluded from the DIP Collateral (as set forth in the DIP Credit Term Sheet).

d.  <u>Proposed Use of Cash Collateral</u>:   The Debtors propose to use Cash Collateral for emergency capital purposes, including but not limited to, operating the Debtors' business, including to pay wages, purchase supplies, and pay outside vendors, and such use shall be limited to the payment of such amounts and for such items set forth in the emergency budget attached hereto as <u>Exhibit 1</u> to the proposed Order (the "<u>Budget</u>") and shall be subject to availability testing in accordance with the proposed Order.

e.  <u>Cash Collateral Termination Date</u>:  The Debtors will continue to use their Cash Collateral (including both cash on hand and cash generated from the operation of its business) until the earliest occurrence of: (a) the date that is fourteen (14) days following the entry of the Order; or (b) the date set forth at the Hearing, if the Order is modified by pronouncement in open court at the same.

f.  <u>Adequate Protection</u>: The Prepetition Secured Parties, as adequate protection for the use of Cash Collateral and the Priming Liens (as set forth in the DIP Credit Term Sheet) shall be granted, as adequate protection, replacement liens on the Prepetition Collateral and DIP Collateral of the Debtors (the "<u>Adequate Protection Liens</u>") to the extent there is any diminution in the value of such Prepetition Secured Party's interests in the Prepetition Collateral or Cash Collateral during the pendency of these Cases. The Adequate Protection Liens shall be junior only to: (i) the DIP Facility Liens (as set forth in the DIP Credit Term Sheet), and (ii) the Carve-Out (as defined in the Order, which Carve-Out shall be limited to United States Trustee Fees, to the extent applicable), and senior to any other liens.  The Adequate Protection Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or any Prepetition Secured Party of security agreements, pledge agreements, financing statements or other agreements. The Adequate Protection Liens shall cover assets, interests and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents if not for Bankruptcy Code § 552(a), and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors that constitute DIP Collateral.

6

g. **DIP Facility**: The Debtors seek an order of the Bankruptcy Court, to the extent the Debtors cannot deem the Prepetition Secured Lender adequately protected against the use of Cash Collateral, approving the Debtors' provision of the DIP Facility as post-petition financing. The DIP Facility is a term loan facility in the aggregate principal amount of up to $375,000.00 at this time. The maturity date of the DIP Facility is 60 days after the execution of the loan. It shall be secured by valid, binding, continuing, enforceable, and fully protected security interest and first-priority, "priming" liens in all the DIP Collateral, junior in priority only to the "Carve-out" (to be ordered in the DIP Order).

h. **DIP Lender**: The DIP Lender shall be 364 Capital, LLC, a Delaware limited liability company, and/or its Lender Assigns (as set forth in the DIP Credit Term Sheet).

i. **Interest Rate**: The DIP Facility shall bear interest on the unpaid principal amount thereof plus all obligations owing, including without limitation, all interest accruing thereon, together with any other fees and costs (collectively, the "Post-Petition Obligations") from the date of entry of the Order to and including the Maturity Date at the rate of fifteen percent (12%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed. After the Maturity Date, the Post-Petition Obligations shall bear interest at a rate equal to the interest rate set forth above plus three percent (3%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "Default Interest Rate").

j. **Grant of Liens**: To induce the Lender to provide the DIP Facility, the Debtors shall grant to the DIP Lender, as security for the full and prompt payment when due of the Post-Petition Obligations, a continuing first priority lien on and security interest in all of the DIP Collateral.

k. **Use of DIP Facility**: The proceeds of the DIP Financing shall be available solely to provide funding in an amount necessary to fund the Debtors' emergency business operations.

## Background

I. **General Background.**

9. On the March 29, 2023 (the "Petition Date"), each of the Debtors other than Banyan Cay Mezzanine Borrower, LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases") before the Bankruptcy Court. Banyan Cay Mezzanine Borrower, LLC filed its voluntary

petition for relief on February 16, 2023.

10.     The Debtors are operating their business and managing their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of this Motion, no request has been made for the appointment of a trustee or examiner and no statutory committee has been appointed in the Chapter 11 Cases.

11.     The Debtors collectively own, develop, and operate Banyan Cay Resort & Golf Club, as well as businesses and developments related thereto, in West Palm Beach, Florida.  A more detailed description of the Debtors' history and the facts surrounding the commencement of the Chapter 11 Cases is set forth in the First Day Declaration, which is incorporated herein by reference.

12.     On April 2, 2023, the Debtors submitted that certain *Debtors' Motion For Entry Of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Property of the Debtors' Estates, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into the Stalking Horse Agreement, (E) Approving Bid Protections, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Such Property Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Granting Related Relief* [Docket No. 31] (the "Bid Procedures and Sale Motion"), which Bid Procedures and Sale Motion contemplates a robust sale process for the Debtors' assets, as well as authorization to enter into that certain *Asset Purchase Agreement* (the "Stalking Horse Agreement"), attached thereto as Exhibit A, which contemplates the sale of certain Assets (as defined therein) for a Purchase Price (as defined therein) of $102,100,000.00.

## II.    The Debtors' Secured Capital Structure.

13.     The Debtors' material debt consists of a first-lien, secured loan presently owned by the Prepetition Secured Lender, in the principal aggregate amount of $95,084,509.61 which

amount was fixed by judgment (the "Foreclosure Judgment") in that certain foreclosure action that was commenced by the Prepetition Lender against the Debtors and certain non-debtor affiliates in the Fifteenth Judicial Circuit Court, in and for Palm Beach County, Florida, Case No. 50-2022-CA-006815-XXXX-MB, styled as *U.S. Real Estate Credit Holdings III-A, LP v. Banyan Cay Resort & Golf, LLC, et al.* (the "Foreclosure Action"). The Foreclosure Judgment bears interest at the prevailing statutory legal rate of interest from the date thereof, February 28, 2023.

14. The Foreclosure Judgment stems from a series of loans made by the Prepetition Lender for the benefit of the Debtors. Specifically, on June 14, 2018, the Prepetition Lender and Debtor Banyan Cay Dev. LLC entered into an agreement (with subsequent amendments and modifications from time to time) for a $61,000,000 construction loan for, *inter alia*, the construction of the resort portion of the Development. Additionally, on September 30, 2020, the Prepetition Lender and the Debtors entered into a further agreement for a $19,000,000 loan and recapitalization (which loan was thereafter increased to the principal amount of $33,000,000) to secure continued access to the Prepetition Lender's prior funding commitments and to fund additional construction at the Development. A more detailed description of the prepetition loan documents, the various amendments and modifications thereto, the specific details of the various collateral therefor, the conduct of the parties with respect thereto, and the ultimate entry of the Foreclosure Judgment therefor can be found in the Prepetition Lender's complaint (the "Foreclosure Complaint") filed in the Foreclosure Action on July 16, 2022.

15. In addition to the secured claim of the Prepetition Lender, the assets of Debtor Banyan Cay Mezzanine Borrower, LLC, comprising solely of the equity interests in Debtors Banyan Cay Resort & Golf LLC; Banyan Cay Dev. LLC; and Banyan Cay Villas, LLC; are

subject to a security interest owned by Banyan Cay Resort Fund LLC, the Debtors' EB-5 lender (the "EB-5 Lender"), in the amount of $5,000,000. Additionally, each of Bellefrau and ZJC hold mortgages against separate parcels owned by Debtor Banyan Cay Maintenance, LLC. The Prepetition Secured Lender is the only party with an interest in Cash Collateral.

16.     The Debtors reserve the right to contest the validity, priority, and extent of the liens and claims of the Prepetition Secured Lender and the EB-5 Lender, in accordance with the Order.

### Request for a Hearing to Consider Granting the
### Order and Authorizing the Debtors' Use of Cash Collateral

17.     Pursuant to Bankruptcy Rule 4001(b)(2), a final hearing on a motion to use Cash Collateral may not be commenced earlier than fourteen (14) days after service of such motion. Pursuant to the same, upon request, the Court may conduct a preliminary, expedited hearing on such motion and authorize the use of cash collateral to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

18.     It is essential to the continued operation of the Debtors' business that it be authorized by this Court to use Cash Collateral and, to the extent necessary, obtain the DIP Facility as set forth in the Order pending the final hearing on the Motion. Unless this Motion is approved on an emergency, interim basis, the Debtors will not be able to pay their employees and satisfy their ongoing, emergency operational obligations, which would have a devastating effect on the Debtors' operations and the sale to the Stalking Horse Bidder (or such other successful bidder, in accordance with the terms of the Bid Procedures and Sale Motion). Thus, funds are urgently needed to meet all of the Debtors' working capital and other liquidity needs. In the absence of immediate relief, the Debtors' attempts to continue business in the ordinary course will be immediately and irreparably jeopardized. Simply put, the value of the

Development will be destroyed.

19.     The interim relief requested herein is essential to enable the Debtors to fulfill their existing obligations, as specifically detailed in the Budget.  These sums will be required to pay employees, and other operating expenses that are, at the very minimum, necessary for the Debtors to continue operating for the benefit of all of their creditor constituencies, ***including, most importantly, the Prepetition Secured Lender.***  Accordingly, the Debtors respectfully request approval of the Motion, pending a final hearing on the Motion, on an emergency basis, on the terms and subject to the conditions set forth in the Order and Budget, or on such other terms that the Bankruptcy Court may deem appropriate.

<u>**Basis for Relief**</u>

**A.  The Debtors Should be Authorized to Use Cash Collateral.**

20.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) governs a debtor's use of cash collateral.  It provides, in relevant part:

> The [debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless —
>
> (A)     each entity that has an interest in such cash collateral consents; or
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

21.     Further, section 363(e) of the Bankruptcy Code provides for "adequate protection" of interests in property when a debtor uses cash collateral.  As discussed above, although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *Desert Fire Prot. v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434 B.R. 716, 749 (S.D.

Fla. 2010) ("The adequacy of protection must be determined on a case by case basis.") *citing* 3 Collier on Bankruptcy P 361.03[1];  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Big Dog II, LLC*, 602 B.R. 64, 64 (Bankr. N.D. Fla 2019) ("What constitutes adequate protection is a question of fact to be determined on a case-by-case basis."); *SouthPoint Glob. Invs., LLC v. Warren (In re Westport Holdings Tampa, Ltd. P'ship)*, 607 B.R. 715, 729 (M.D. Fla. 2019) ("A determination of whether there is adequate protection is made on a case by case basis.").

22.     Indeed, "[i]n many cases, the existence of an equity cushion in existing collateral is sufficient in and of itself to provide adequate protection of a secured creditor's interest in property." *In re M.D. Moody & Sons, Inc.*, 2010 Bankr. LEXIS 5220, at *22 (Bankr. M.D. Fla. Mar. 5, 2010); *see also Acquisition Corp. of Am. v. Fed. Sav. & Loan Ins. Corp.*, 96 B.R. 380, 382 n.8 (S.D. Fla. 1988) (holding, in the stay relief context governed by the same section of the Bankruptcy Code, "[i]t has been held that an equity cushion in and of itself is legally sufficient to satisfy the adequate protection requirement"); *NLG, LLC v. Selective Advisors Grp., LLC*, 2019 U.S. Dist. LEXIS 49437, at *7 n.3 (S.D. Fla. Mar. 22, 2019) ("The United States Bankruptcy Code provides for the concept of adequate protection for creditors in a bankruptcy proceeding which has been defined as "equity cushion" — the difference between the outstanding debt and value of the collateral.").

23.     The degree of the "cushion" is of particular relevance in this analysis.  Equity cushions of 15% or more have often been found, as a matter of fact, to be sufficient for adequate protection purposes, and courts have deemed even lesser cushions as adequate protection.  *In re M.D. Moody* 2010 Bankr. LEXIS 5220, at *23; *see also In re Hawaiian Pacific Industries,* 17

B.R. 670 (Bankr. D. Ha. 1982) (15% is adequate); *In re Pitts,* 2 B.R. 476 (Bankr. C.D. Ca. 1979) (15% is adequate); *In re Rodgers Development Corp.,* 2 B.R. 679 (Bankr. E.D. Va. 1980) (17% is adequate); *In re Las Torres Dev., LLC*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) (20% is adequate); *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (20% is adequate); *In re Helionetics,* 70 B.R. 433 (Bankr. C.D. Ca. 1987) (20.4% is adequate); *In re Dunes Casino Hotel,* 69 B.R. 784 (Bankr. D. N.J. 1986) (30% is adequate); *In re Ritz Theatres*, 68 B.R. 256, 260 (Bankr. M.D. Fla. 1987) (38% is adequate); *In re Dunes Casino Hotel*, 69 B.R. 784, 795-96 (Bankr. D.N.J. 1986) (45% is adequate); *In re Nashua Trust Co*., 73 B.R. 423, 433 (Bankr. D. N.J. 1987) (50% is adequate).

24.     In the instant case, the Debtors respectfully submit that the Prepetition Secured Lender should be deemed adequately protected for the use of the Debtors' Cash Collateral, solely on the terms set forth herein and in the Budget.  In the plainest terms possible, the *only* way to combat the diminution in value of the Prepetition Secured Lender's Prepetition Collateral is to provide the Debtors with access to cash to facilitate their cash needs.

25.     The Debtors, on April 2, 2023, filed the Bid Procedures and Sale Motion, seeking authorization to enter into the Stalking Horse Agreement for the sale of certain Assets (as defined therein) for $102,100,000.00.  In addition to the Stalking Horse Agreement, the Debtors separately have a prepetition contract for the sale of certain single-family estate lots for approximately an additional $9,800,000.00.  Furthermore, the Debtors have been in robust discussions with interested parties regarding four other lots owned by the Debtors and anticipate that proposed asset purchase agreements for the sale of such lots for the aggregate amount of no less than $2,200,000.00 will be filed with this Court imminently.  When taken together with the foregoing, the Debtors respectfully submit that the *baseline* value of the Debtors' assets is in

excess of $114,000,000.00.

26.     In light of this baseline asset value, the Debtors submit that they enjoy a "cushion" apart from the Prepetition Secured Lender's claims in the Prepetition Collateral of approximately 15.8%.  As set forth in the authorities above, equity cushions in excess of 15% have been deemed enough to adequately protect a prepetition secured party, absent the provision of any other protection.  Nevertheless, the facts of these Chapter 11 Cases make tis particularly so.  Indeed, if the Debtors do not secure access to cash on the emergency terms set forth in the budget, the 15.8% equity cushion currently existing in favor of the Prepetition Secured Lender will diminish.  Moreover, the proposed Budget itself serves as adequate protection, in light of its extremely narrowly-tailored nature.

27.     Accordingly, the Debtors respectfully submit that the use of Cash Collateral is both necessary and appropriate in the instant cases.  While the Debtors submit that the Prepetition Secured Lender should be deemed adequately protected for such use of Cash Collateral, to the extent authorization for the use of cash collateral on the terms set forth above cannot be achieved, the Debtors shall seek the DIP Facility to provide the needed cash.

**B. In the Alternative, the Debtors Should be Authorized to Obtain Postpetition Financing on the Terms Set Forth in the DIP Credit Term Sheet.**

    **a. Standards Governing Authorization of Post-Petition Debtor in Possession Financing.**

28.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, as described in greater detail below.  Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the

court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *Grp. of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry*., 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co*., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc*., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

29.     In evaluating the proposed terms of postpetition financing and determining whether it is within the debtor's sound business judgment, courts generally perform a qualitative analysis to review the underlying economics of the transaction, considering factors such as whether:

> (a) unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> (b) the credit transactions are necessary to preserve assets of the estate;
>
> (c) the terms of the credit agreement are fair, reasonable, and adequate;
>
> (d) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and
>
> (e) the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc*., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc*., 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

30.     Furthermore, courts also review various noneconomic terms in order to ensure

that the efficiency of the chapter 11 process is preserved.  As the bankruptcy court in *In re ION Media Networks, Inc.* put it:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

*In re ION Media Networks, Inc*., No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

**b. Entry into the DIP Credit Term Sheet is an Exercise of the Debtors' Sound Business Judgment and the Terms of the DIP Credit Term Sheet Should be Approved in Light of the Economic and Noneconomic Circumstances.**

31. In light of the above, the DIP Facility in the instant case should be approved.  The Debtors have engaged in good faith efforts to procure postpetition financing on the best possible terms for the Debtors their estates, and their creditor constituencies.  As explained above, the provision and use of funds is vital to the Debtors' successful reorganization and sale process and without adequate financing the Debtors' reorganization efforts will be irreparably imperiled.  The terms of the DIP Facility were negotiated in good faith and are based on terms that will maximize the Debtors' chance of effectively and expeditiously resolving the Chapter 11 Cases.

32. Indeed, the Debtors engaged various parties in an effort to procure the DIP Facility on the best possible terms available to them.  To further this goal, the Debtors entered robust negotiations with the Stalking Horse Bidder, the Prepetition Secured Lender, and various outside financial institutions wholly unrelated to the Chapter 11 Cases.

33. These negotiations are ongoing and the Debtors are optimistic that they will soon

submit to this Court a robust proposal for debtor in possession financing that will carry the Debtors through the remainder of these Chapter 11 Cases with full and final terms and documentation.  However, as these negotiations enter their final stages, the Debtors nevertheless require funding *now*.

34.    As set forth above, both the economic and noneconomic terms should be considered when approving debtor in possession funding.  The economic terms of the DIP Credit Term Sheet are patently reasonable and well in line with the market for such loans.  Thus, the economic terms justify the entry of the DIP Order approving the DIP Facility.  However, as the above authorities make clear, "a business decision to obtain credit from a particular lender is almost never based purely on economic terms."  Indeed, the timing and certainty of closing with the DIP Lender, together with the inherently beneficial cooperation with the Debtors' selected stalking horse, renders the DIP Credit Term Sheet the best possible path forward for the Debtors.  If, as the *ION Media* court put it, a debtor may pass up on a "notionally better transaction" in favor of one that provides security and certainty, these Debtors can certainly enter into the DIP Facility on the terms set forth above to ensure such notionally better transaction is given the chance to close at all.

35.    Because the economic terms are reasonable, the noneconomic factors weigh in favor of expeditious and fair financing, and the Debtors have at all times engaged itself in a manner that is consistent with its sound business judgment, the DIP Facility should be approved.

**c.    Standards Governing the Grant Liens and Superpriority Claims.**

36.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lender valid, binding,

enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Order), which includes substantially all of the Debtors' assets.

37.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, (i.e., by allowing a lender only an administrative claim); (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.  *See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also Norris Square Civic Assoc. v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

38.      To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority

administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and/or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

39.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

40.     Furthermore, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

41.     To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the petition date, section 364(d)(1)(B) of the

Bankruptcy Code requires that the Debtors provide adequate protection to such creditor where a debtor-in-possession financing facility primes the liens of such secured creditor. While section 361 of the Bankruptcy Code provides a non-exclusive list of possible forms of adequate protection—including periodic cash payments, additional liens, replacement liens and other forms of relief—the Court must determine what constitutes adequate protection on a case-by-case basis. *See In re Columbia Gas Sys., Inc.,* 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O 'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin,* 761 F.2d 472 (8th Cir. 1985). The focus of the adequate-protection requirement is to protect a secured creditor from the diminution in the value of its interest in the collateral during the period of use. *See Resolution Trust Corp. v. Swede land Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.),* 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

### d. The Debtors Should be Authorized to Grant Liens and Superpriority Claims.

42.     The Debtors have worked expeditiously to secure debtor in possession financing on the emergency basis set forth herein, and have made a good faith effort to receive the most advantageous terms possible. As is often the case, however, the Debtors are unable to obtain unsecured credit or credit on a junior basis, nor do the Debtors have sufficient unencumbered assets to encourage such credit. Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

43.     In the instant cases, and as set forth in the Order, the Debtors propose to provide the Prepetition Secured Lender with a variety of mechanisms for adequate protection against the post-petition diminution in value of both the Cash Collateral (and the Prepetition Collateral) resulting from the Debtors' use of the remaining Cash Collateral and the imposition of the automatic stay as well as the imposition of the DIP Lender's "priming lien", including: (a) valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral to the extent of such diminution; (b) superpriority administrative claims under section 507(b) of the Bankruptcy Code to the extent of such diminution; and (c) the terms of the Budget, which protect against any impropriety on the part of the Debtors and guarantees great visibility to the Prepetition Secured Lender (collectively, the "<u>Prepetition Secured Lender Adequate Protection</u>").

44.     Given the facts and circumstances of the instant case, the priming liens and superpriority claims to the DIP Lender are necessary and do not in any way harm the Prepetition Lender or any other party in interest.  As a preliminary matter, the Stalking Horse Agreement and other transactions proposed for the sale of the Debtors' assets, ensures that absent any adequate protection at all, the Prepetition Secured Lender is oversecured.  Indeed, after full and complete payment of the DIP facility obligations contemplated in the DIP Credit Term Sheet, the Prepetition Secured Lender stands to receive a 100% recovery in the Chapter 11 Cases on account of the Foreclosure Judgement,[3] even if no other parties bid on the assets of the Debtors (which, for the avoidance of doubt, the Debtors are optimistic they shall receive further and

---

[3] Subject in all respects to the Debtors' right to contest the extent and validity of the Prepetition Secured Lender's claims against the Debtors and assert the Debtors' claims against the Prepetition Secured Lender, which rights are expressly reserved herein.

higher bids as they continue their robust sale process).

45.     Notwithstanding the oversecured status of the Prepetition Secured Lender, however, the Debtors have nevertheless ensured that it shall not be prejudiced by the granting of priming liens through the provision of the robust and insulating Prepetition Secured Lender Adequate Protection.  Moreover, the terms of the Budget, together with the expertise, community reputation, and scrupulous fiduciary-duty-bound nature of the Debtors' proposed chief restructuring officer guarantees that every dollar spent in the Chapter 11 Cases on this emergency basis will serve not to diminish the value of property of the estates, but instead preserve and maximize it.

46.     In light of the adequate protection mechanisms set forth herein, the Debtors respectfully submit that the Prepetition Secured Lender is adequately protected against a diminution in the value of its prepetition collateral.  Indeed, the provisions of the DIP Facility, to the extent the Debtors cannot use Cash Collateral absent the provision of adequate protection payments to the Prepetition Secured Lender, provide the Debtors with the greatest possible chance of closing on its proposed sale process, which successful sale will inure to the benefit of all of the Debtors' constituencies, including the Prepetition Secured Lender.  Because the DIP Facility liens discussed herein are vital to the success of the Chapter 11 Cases and the Prepetition Secured Lender is adequately protected, the Debtors respectfully request that the DIP Facility be approved and that it be empowered to grant the liens contemplated therein.

### C.     The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e) of the Bankruptcy Code.

47.     The terms and conditions of the DIP Facility, including the terms of the DIP Credit Term Sheet, are fair and reasonable and were negotiated in good faith at arms' length. Accordingly, the obligations incurred in connection with the DIP Loan should be accorded the

benefits of section 364(e) of the Bankruptcy Code.

48.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

49.     Because "good faith" is not defined in the Bankruptcy Code, courts often look to case law under section 363(m).  7 Collier on Bankruptcy, 16th ed. ¶ 364.08, p. 37 ("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction.").  To analogize to the sale context, "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM) 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992) (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

50.     As explained in detail herein, the DIP Credit Term Sheet is the result of: (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain necessary postpetition financing, and (b) extended arm's-length, good faith negotiations between the Debtors and the DIP Lender.

51.     The Debtors submit that the terms and conditions of the DIP Credit Term Sheet are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

### D.     The Relief Requested Herein Should be Granted on an Interim Basis to Avoid Immediate and Irreparable Harm to the Debtors.

52.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Bankruptcy Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

53.     The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business.  The Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Lender's Cash Collateral.  The Debtors will therefore be unable to operate their business or otherwise fund these Chapter 11 Cases without access to the Cash Collateral and the DIP Facility, and they will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer the Chapter 11 Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

54.     The Debtors request that the Bankruptcy Court hold and conduct a hearing to consider entry of the Order authorizing the Debtors, from and after entry of the Order until the Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

### Notice

55.     The Debtors will provide notice of this motion to: (a) the Office of the United States Trustee for the Southern District of Florida; (b) the Debtors' creditors, and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

56.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank.]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court (a) enter the Order granting the relief requested herein, and (b) grant such other and further relief as the Court deems appropriate.

Dated:   April 3, 2023

         Respectfully submitted,

         **PACK LAW**
         *Proposed Counsel to the Debtors and*
         *Debtors-in-Possession*
         51 Northeast 24th Street, Suite 108
         Miami, Florida 33137
         Telephone: (305) 916-4500

         By:  */s/ Joseph A. Pack*
         Joseph A. Pack
         Email:  joe@packlaw.com
         Florida Bar No. 117882

         Jessey J. Krehl
         Email:  jessey@packlaw.com
         Florida Bar No. 1025848

**Exhibit A-1 to Motion**

**Proposed Order**

**(Cash Collateral Only)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12386 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER**
**(I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363,**
**(II) DEEMING THE SECURED LENDER ADEQUATELY PROTECTED PURSUANT**
**TO 11 U.S.C. §§ 361 AND 363, AND (III) SCHEDULING A FINAL HEARING**

Upon the motion, (the "Motion")[2] of the above-captioned debtors and debtors in possession

(the "Debtors") for entry of an Order (this "Order") (i) authorizing use of Cash Collateral pursuant

---

[1] The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

to 11 U.S.C. § 363, (ii) granting adequate protection pursuant to 11 U.S.C. §§ 361 and 363, and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001, all as more specifically set forth in the Motion; and upon the *Declaration of Gerard A. McHale, Jr. in Support of the Chapter 11 Petition* (the "<u>First Day Declaration</u>") filed on the Petition Date; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "<u>Hearing</u>"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:[3]**

1.      The Motion is GRANTED, pending final hearing, as set forth herein.

2.      The statutory predicates for the relief sought in the Motion are sections 105, 361, and 364 of the Bankruptcy Code, Rule 4001 of the Bankruptcy Rules and Rule 4001–2 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "<u>Local Rules</u>").

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

3.      Notice of the Motion for the Hearing on the Debtors' proposed use of cash collateral has been served in accordance with section 102(1) of the Bankruptcy Code and Bankruptcy Rule 4001(b), which notices are appropriate and sufficient for all purposes under the Bankruptcy Code and applicable Bankruptcy Rules with respect to the relief requested.

4.      The Court finds that the Debtors do not have sufficient unencumbered cash or other assets to continue to operate their business during the Chapter 11 Cases or to effectuate a reorganization without the use of the Cash Collateral of the Prepetition Secured Lender.  The Debtors will be immediately and irreparably harmed if they are not immediately granted the authority to use Cash Collateral in order to permit, among other things, the orderly continuation of their business, the ability to fund payroll and payroll taxes, satisfaction of working capital needs, and other necessary, emergency expenses.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors and a successful reorganization of the Debtors.

5.      The Debtors have requested the immediate entry of this order pursuant to Bankruptcy Rule 4001(b) and (c), and Local Rule 4001-2.  Absent the entry of this Order, the Debtors and their estates will be immediately and irreparably harmed.

6.      The Debtors are hereby authorized to use Cash Collateral pursuant to and in accordance with the terms of this Order until the earliest occurrence of: (a) the date that is fourteen (14) days following the entry of this Order; or (b) the date set forth at the Final Hearing, if the Order is modified by pronouncement in open court at the same.

7.      Until the Final Hearing, the Prepetition Secured Lender shall be deemed adequately protected for the Debtors' use of Cash Collateral, by virtue of its equity cushion and the other

mechanism provided thereto, as set forth more fully in the Motion.

8.    As set forth herein, the Debtors are authorized to use their Cash Collateral (including both cash on hand and cash generated from the operation of their business), and the Prepetition Secured Lender shall grant access to such Cash Collateral to the Debtors, to the extent necessary to effectuate such authorization.

9.    The entry of this Order is without prejudice to the rights of any party in interest, including any Official Committee of Unsecured Creditors (the "Committee"), appointed in this Chapter 11 Cases, to challenge the prepetition liens of the Prepetition Secured Lender or any other party to the extent such a right exists.

10.    Nothing in this Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

11.    Nothing herein or in the Motion shall be construed as to limit, or in any way affect, the Debtors' ability to dispute or contest the amount of or basis for any claims against the Debtors.

12.    All applicable financial institutions are authorized and directed to receive, process, honor, and pay, at the Debtors' direction, to the extent of funds on deposit or otherwise available therefor, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors in respect of any obligations contemplated within this Order.

13.    The contents of the Motion are deemed to satisfy the requirements set forth in Bankruptcy Rules 6003 and 6004.

14.    Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (a) the terms of this Order shall be immediately effective and enforceable upon its entry, (b) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (c) the Debtors may, in their discretion and without further delay,

take any action and perform any act authorized under this Order.

15.    The Court retains jurisdiction with respect to all matters arising from or related to

the interpretation, implementation or enforcement of this Order.

###

**Submitted by:**
Joseph Pack, Esq.
*Proposed Counsel  for the Debtors and Debtors-in-Possession*
Pack Law, P.A.
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Tel: 305-916-4500
Email: joe@packlaw.com

Attorney Joseph A. Pack, Esq. is directed to serve a copy of this order on interested parties who
do not receive service by CM/ECF pursuant to applicable rules.

**<u>Exhibit A-2 to Motion</u>**

**Proposed Order**

**(DIP Facility and Cash Collateral)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) |
| | ) Case No. 23-12386 |
| Debtors. | ) |
| | ) (Jointly Administered) |

**ORDER (I) AUTHORIZING USE OF CASH COLLATERAL**
**PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION**
**PURSUANT TO 11 U.S.C. §§ 361 AND 363, (III) AUTHORIZING THE DEBTORS**
**TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a),**
**362 AND 364(c) AND (d), GRANTING SUPER PRIORITY CLAIMS TO THE DIP**
**LENDER PURSUANT TO 11 U.S.C. 364(c) AND FIRST PRIORITY LIENS**
**PURSUANT TO 11 U.S.C. 364(d), (V) MODIFYING THE AUTOMATIC STAY**

---

[1] The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

Upon the motion, (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors") for entry of an Order (this "Order")  (i) authorizing use of Cash Collateral pursuant to 11 U.S.C. § 363, (ii) granting adequate protection pursuant to 11 U.S.C. §§ 361 and 363, (iii) authorizing the debtor to obtain postpetition financing pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), granting super priority claims to the dip lenders pursuant to 11 U.S.C. 364(c), (v) modifying the automatic stay, and (vi) scheduling a final hearing pursuant to bankruptcy rule 4001, all as more specifically set forth in the Motion; and upon the *Declaration of Gerard A. McHale, Jr. in Support of the Chapter 11 Petition* (the "First Day Declaration") filed on the Petition Date; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and having determined that the interests of the holders of prepetition security interests in the Collateral, as defined herein are adequately protected; and having determined that the proposed Debtor-in-Possession lender, 364 Capital, LLC, is extending the financing in good faith; and upon all of the

---

[2]  All captioned items not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein and all objections are overruled.

2.      The statutory predicates for the relief sought in the Motion are Bankruptcy Code §§ 105, 361, 362, 363, 364, Rule 4001 of the Bankruptcy Rules and Rule 4001–2 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules").

3.      Notice of the Motion for the Preliminary Hearing on the Debtors' proposed financing and use of cash collateral has been served in accordance with section 102(1) of the Bankruptcy Code and Bankruptcy Rule 4001(b), which notices are appropriate and sufficient for all purposes under the Bankruptcy Code and applicable Bankruptcy Rules with respect to the relief requested.

4.      The Court finds that the Debtors do not have sufficient unencumbered cash or other assets to continue to operate its business during the Chapter 11 Cases or to effectuate a reorganization absent interim approval of the proposed DIP Facility and use of the Cash Collateral of the Prepetition Secured Lender.  The Debtors will be immediately and irreparably harmed if they are not immediately granted the authority to use Cash Collateral and to obtain postpetition financing from the DIP Lender in accordance with the terms of the DIP Credit Term Sheet in order to permit, among other things, the orderly continuation of their business, the ability to fund payroll and payroll taxes, satisfaction of working capital needs, as well as the ability to pay other necessary, emergency expenses.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new

indebtedness for borrowed money, and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors and a successful sale process and reorganization of the Debtors.

5.  Despite reasonable efforts, the Debtors assert, and the Court finds, that they has been unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Credit Term Sheet and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Lender, subject to the Carve-out (defined below), the DIP Liens and the DIP Superpriority Claim under the terms and conditions set forth in this Order and in the DIP Credit Term Sheet.

6.  The terms of the DIP Facility proposed by the DIP Lender are fair and reasonable, and the best available under the present circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The postpetition financing under the DIP Facility has been entered into in good faith by and among the Debtors and the DIP Lender; and the postpetition financing to be provided by the DIP Lender has been extended in good faith as such term is used in section 364(e) of the Bankruptcy Code.

7.  Based on the record before the Court, the terms of the use of Cash Collateral and the adequate protection granted in this Order have been proposed in good faith, as that term is used in section 364(e) of the Bankruptcy Code and are in the best interest of the Debtors, their estates, and creditors, and are consistent with the Debtors' fiduciary duties.

8.  The DIP Lender is willing to provide the DIP Facility subject to the conditions set

4

forth herein and in the DIP Credit Term Sheet,[3] including, without limitation, the provisions of this Order which grant the Super Priority Claims (defined below), Adequate Protection Superpriority Claims (defined below), Adequate Protection Liens (defined below), and other protections granted pursuant to this Order and provide that such protections will not be affected by any subsequent reversal or modification of this Order or any other order which is applicable to the DIP Facility, to the extent provided in section 364(e) of the Bankruptcy Code.

9.      The Debtors have requested the immediate entry of this order pursuant to Bankruptcy Rule 4001(b) and (c), and Local Rule 4001-2.  Absent the entry of this Order, the Debtors and their estates will be immediately and irreparably harmed.

10.      The terms and conditions of the DIP Credit Term Sheet are hereby approved and ratified and the Debtors are authorized and directed to comply with and perform all the terms and conditions contained therein on an interim basis. The failure to reference or discuss any particular provision of the DIP Credit Term Sheet in this Order shall not affect the validity or the enforceability of any such provision.  In the event of a conflict between this Order and the DIP Credit Term Sheet, the terms of this Order shall govern. The terms of the DIP Credit Term Sheet are incorporated herein by reference and made a part of this Order.

11.      The Debtors are hereby authorized to obtain postpetition financing from the DIP Lender in accordance with the terms of this Order, the DIP Facility, and the Budget up to the principal amount of $375,000.00 at this time pursuant to section 364(c) of the Bankruptcy Code.

12.      In accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code and subject to the Adequate Protection Superpriority Claims (defined below), all DIP Obligations

---

[3] Notwithstanding anything to the contrary in the Motion or the DIP Credit Term Sheet, if there is any inconsistency among the Motion, the DIP Credit Term Sheet, or this Order, the terms of this Order will govern.

under the DIP Facility shall constitute claims (the "DIP Superpriority Claims") with priority in payment over any and all administrative expense of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases.

13.      As security for the Debtors' DIP Obligations arising under or in connection with the DIP Credit Term Sheet, the DIP Lender is hereby granted a continuing first priority lien on and security interest in all of the DIP Collateral, subject in all respects to the Carve-out:

     a.  pursuant to Bankruptcy Code Sections 364(c)(1), 503, and 507, all claims for repayment of the Post-Petition Obligations shall constitute allowed superpriority administrative expense claims ("DIP Facility Superpriority Claims"), which DIP Facility Superpriority Claims shall have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 and/or 1114 of the Bankruptcy Code and all administrative claims granted pursuant to an order of the Bankruptcy Court, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Chapter 11 Cases or any successor case, and which DIP Superpriority Claims of the DIP Lender shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, to the extent provided for herein;

     b.  pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on and security interest in all unencumbered assets of the Debtors;

     c.  pursuant to Bankruptcy Code Section 364(d), a first priority priming lien on and security interest in (the "Priming Liens") all assets of the Borrowers encumbered by a first priority lien under the Prepetition Credit Documents (now or hereafter acquired and all proceeds thereof) that were subject to a lien as of the Petition Date. The first priority Priming Liens shall attach to all assets and property interests described in the DIP Credit Terms Sheet, including, without limitation, the real property further described in Exbibit "B-1" thereof, appended to and incorporated into this Order.

14.      In the event the adequate protection provided to the Prepetition Secured Lender

does not preserve the value of the Prepetition Collateral as of the Petition Date, then the Prepetition Secured Lender shall have a Superpriority claim pursuant to section 507(b) of the Bankruptcy Code, having priority over all claims allowed under section 507(a) of the Bankruptcy Code, but junior to the Superpriority claim of the DIP Lender, to the extent of the failure to preserve such value.

15.     The DIP Liens granted to the DIP Lender pursuant to this Order and the DIP Facility are deemed valid and perfected upon the entry of this Order without the necessity of the DIP Lender taking possession or control of any collateral, or filing financing statements, mortgages, or other documents.  Upon the request of the DIP Lender, the Debtors shall execute and deliver to the DIP Lender any and all UCC financing statements, mortgages, notes, assignments, or other instruments or documents considered by the DIP Lender necessary in order to perfect the DIP Liens; and the DIP Lender is hereby granted relief from the automatic stay embodied in section 362(a) of the Bankruptcy Code to receive, file, and record the foregoing. The Chief Executive Officer and Chief Restructuring Officer, Gerard "Jerry" McHale of McHale, P.A., is authorized, empowered, and directed to execute on behalf of the Debtors and Debtors-in-Possession all such instruments to facilitate and complete the DIP Facility.

16.     The Debtors are hereby authorized to use Cash Collateral pursuant to and in accordance with the terms of this Order and the Budget.  Until the Final Hearing with respect to the continued use of Cash Collateral, as adequate protection for the Debtors' use of Cash Collateral, the Prepetition Secured Lender is granted the Prepetition Secured Lender Adequate Protection set forth in the Motion.

17.     The Adequate Protection Liens, and all other security interests and priorities granted the Prepetition Secured Parties, are deemed valid and perfected upon entry of this Order

without the necessity of any Prepetition Secured Party taking possession of any collateral, filing financing statements, mortgages or other documents, junior only to the DIP Liens and priorities granted herein to the DIP Lender.  Upon the request of any Prepetition Secured Party, the Debtors shall execute and deliver to such Prepetition Secured Party, any and all UCC financing statements, mortgages, notes, assignments, or the other instruments or documents considered by such Prepetition Secured Party as necessary in order to perfect the Adequate Protection Lien; and each Prepetition Secured Party is hereby granted relief from the automatic stay embodied in section 362(a) of the Bankruptcy Code to receive, file, and record the foregoing.

18.     Furthermore, the Debtors shall provide the Office of the U.S. Trustee, counsel to any official committee of unsecured creditors (if appointed), and counsel to the Prepetition Secured Lender all reports that are submitted to the DIP Lender, at or about the same time that such reports are provided to the DIP Lender, with a courtesy copy emailed to Chambers.

19.     No cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b), 726 (to the extent permitted by law), 1113, 1114 or otherwise of the Bankruptcy Code, shall be senior to, equal to or *pari passu* with, the Superpriority Claims granted hereunder.

20.     Notwithstanding anything to the contrary contained anywhere in this Order and/or the DIP Credit Term Sheet, the DIP Collateral and all collateral which is made subject to the security interest and liens granted to the DIP Lender and Prepetition Secured Parties pursuant to the terms of this Order shall be subject to a carve-out (the "Carve-out") for the sum of allowed statutory expenses payable pursuant to 28 U.S.C. § 1930(a)(6).

21.     Pursuant to section 364(e) of the of the Bankruptcy Code, if any or all of the provisions of this Order or hereinafter modified, vacated or stayed, such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, security interest, or liens

granted by the Debtors to the DIP Lender and the Prepetition Secured Parties, prior to the effective date of any such stay, modification, or vacation, or the validity and enforceability or priority of any Lien or security interest authorized, granted or created pursuant to this Order.

22.    The entry of this Order is without prejudice to the rights of any party in interest, including the Official Committee of Unsecured Creditors (the "Committee"), if any, appointed in the Chapter 11 Cases, to challenge the prepetition liens of any Prepetition Secured Party or any other pre-petition creditor to the extent such a right exists.

23.    Nothing in this Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

24.    Nothing herein or in the Motion shall be construed as to limit, or in any way affect, the Debtors' ability to dispute or contest the amount of or basis for any pre-petition claims against the Debtors.

25.    All applicable financial institutions are authorized and directed to receive, process, honor, and pay, at the Debtors' direction, to the extent of funds on deposit or otherwise available therefor, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors in respect of any obligations contemplated within this Order.

26.    The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of any payments made hereunder to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' Chapter 11 Cases.

27.    Nothing contained in this Order or in the Motion, and no payments made pursuant to this Order are intended to be or shall be construed as (a) an admission as to the validity, priority, or perfection of any pre-petition claim or lien against the Debtors or their property, (b)

a waiver of the Debtors' or any appropriate party in interest's rights to avoid or dispute any pre-petition claim or lien against the Debtors or their property, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

28.     The contents of the Motion are deemed to satisfy the requirements set forth in Bankruptcy Rules 6003 and 6004.

29.     Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

30.     The Court retains jurisdiction with respect to all matters arising from or related to the interpretation, implementation or enforcement of this Order.


###

**Submitted by:**
Joseph Pack, Esq.
*Proposed Counsel  for the Debtors and Debtors-in-Possession*
Pack Law, P.A.
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Tel: 305-916-4500
Email: joe@packlaw.com

Attorney Joseph A. Pack, Esq. is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF pursuant to applicable rules.

**Exhibit 1 to Proposed Orders**

**The Budget**

| Expense Schedule | Amounts Due On or Before Hearing | |
|---|---|---|
| | 4/12/2023 | Further Detail |
| Payroll | 58,500 | Payroll Due on 4/10 |
| Workman's Comp | 1,970 | Part of Payroll |
| FPL (Electricity) | 26,000 | Prepetitition Amount Due ($80,000 Deposit Requested) |
| City of West Palm Beach  (Water) | 6,578 | Deposit Not Yet Requested |
| Comcast (Cable and Internet) | 7,500 | Phone and Email |
| Florida Public Utilities (Gas) | 3,850 | April Gas Bill (COD) |
| DLL (Equipment Leases) | 18,600 | Golf Course Maintenance Equipment Lease Payment (April) |
| VESTIGE SCHOOL PROTECTION LLC | 38,000 | Security for Month of April |
| Insurance Renewal | 56,000 | [Renewal Due on or Before April 14] |
| The Staffing (Labors) | 47,500 | Prepetition Amount of $39,000 Included |
| SSI (Diesel and Gas GCM) COD | 5,700 | Fuel To Be Delivered for Equipment (April) |
| Cheney (Food) | 5,000 | Food |
| GFS (Food) | 7,500 | Food |
| Pepsi | 1,500 | Food |
| Port Royal LLC - COD | 900 | Food (Fish) |
| Fintech (Alcohol) Member  Guest | 2,500 | Software Fees for State (Alcohol Tracking) |
| County Ice | 300 | Food/Ice |
| Member Easter Brunch | 3,500 | Easter Sunday Event Rentals |
| Member Guest Casino Party Nights | 3,200 | 4/12 and 4/13 Member Golf Event |
| 1099 (Bi-Weekly and Special Event (Member Guest) | 5,600 | Labor for 4/12, 4/13, 4/14 Member Golf Event |
| Member Golf Event Costs | 3,500 | Member Guest Awards and Event Rentals 4/12, 4/13, 4/14 |
| Sunniland (Fertilizer) | 15,000 | |
| Site One (Chemicals) | 4,000 | |
| Wedgworth's Inc. (Fertilizer) | 6,000 | |
| Legacy Turf  (Liquid Fertilizer) | 7,500 | Immediate Necessary Golf Course Maintenance to Prevent Browning (Should Be Quarterly, Has Not Been Done Since October 2022) |
| Plant Health Solution (Chemicals) | 5,000 | |
| Golf Agronomics Supply  (Testing, Sand) | 2,500 | |
| Hector (Irrigation & Parts) | 3,500 | |
| Atlantic Dry Jet (aerification, seasonal maintenance) | 7,990 | |
| SUBTOTAL | 355,188 | |

**Exhibit 2 to Order**

**DIP Credit Term Sheet**

**364 CAPITAL, LLC**
**500 NORTH AKARD STREET**
**SUITE 1500**
**DALLAS, TX 75201**

April 3, 2023

**DEBTOR:**

Banyan Cay Resort & Golf, LLC, et al.
c/o Jerry McHale
1601 Jackson Street
Suite 200
Fort Myers, FL 33901

**DEBTOR'S COUNSEL:**

Pack Law
c/o Joseph Pack, Esq.
51 Northeast 24th Street, Suite 108
Miami, FL 33137

In re:   <u>$375,000 Interim Emergency Debtor-In-Possession Loan</u>

Gentlemen:

In reference to the above-captioned matter, and on behalf of Lender [as described herein], the undersigned is pleased to provide to Debtors [as described herein], this non-assignable commitment ("**Commitment**") for an interim emergency, super-priority debtor-in-possession term loan pursuant to the terms and conditions described herein ("**Loan**").

| | |
|---|---|
| **LENDER:** | **364 Capital, LLC**, a Delaware limited liability company, and/or its Lender Assigns [as herein defined] ("**Lender**"). |
| **BORROWERS/**<br>**DEBTORS:** | The debtors described in the immediately following (i) - (vi) shall collectively be referred to herein as, "**Debtors**"). |
| | (i) **Banyan Cay Resort & Golf, LLC,** a Delaware limited liability company, debtor and debtor-in-possession under Case No. 23-12386, |
| | (ii) **Banyan Cay Dev., LLC,** a Delaware limited liability company, debtor and debtor-in-possession under Case No. 23-12387, |

1

(iii) **Banyan Cay Villas, LLC,** a Delaware limited liability company, debtor and debtor-in-possession under Case No. 23-12388,
(iv) **Banyan Cay Maintenance, LLC,** a Florida limited liability company, debtor and debtor-in-possession under Case No. 23-12389,
(v) **Banyan Cay Investment, LLC,** a Florida limited liability company**,** debtor and debtor-in-possession under Case No. 23-12390, and
(vi) **Banyan Cay Mezzanine Borrower, LLC,** a Delaware limited liability company**,** debtor and debtor-in-possession under Case No. 23-11281

Each of the underlying cases comprising Debtors are administratively consolidated under Case No. 23-12386 (collectively, the "**Bankruptcy Case**") in The United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "**Bankruptcy Court**").

**AMOUNT OF LOAN/ADVANCES:**    Upon entry of a final order of the Bankruptcy Court, the form of which shall be approved by Lender in its sole and absolute discretion, satisfying the requirements of this Commitment and granting Lender the liens and other rights described herein, and which final order has not been appealed, modified, stayed, vacated, amended, or reversed ("**Final Order**"), the Lender will make the Loan to Debtors in the maximum aggregate principal amount of **THREE-HUNDRED AND SEVENTY-FIVE THOUSAND DOLLARS ($375,000)** ("**Maximum Loan Amount**"), which sum shall be loaned as follows:

A.    Closing shall be predicated upon Debtor's satisfaction of the terms and conditions pursuant to this Commitment and the Final Order, which satisfaction shall be in the Lender's sole and absolute discretion, the Maximum Loan Amount will be disbursed as mutually agreed to by Lender and Debtors.

B.    At the expense of Debtors, and without further order of the Bankruptcy Court, Lender may make advance(s) for Lender's costs and expenses incurred (i) the Closing [as herein defined] of the Loan and any advance(s) made thereafter, (ii) the Bankruptcy Case (and in each of Debtors underlying cases including, but not limited to, reasonable fees and costs of the Lender's counsel), (iii) the monitoring, administration, and/or servicing of the Loan, (iv) the protection of the Collateral [as herein defined] securing the Loan, and (v) the protection of Lender's super-priority lien rights, and any and all other lien rights described under this Commitment, the Final Order, and the Loan Documents (i-v shall collectively be referred to herein as, "**Lender Expense**") through to the

2

payoff of the Loan in form, scope, and amounts that the Lender deems necessary, in its sole and absolute discretion.

Pursuant to the terms of this Commitment and the Final Order, Lender Expense(s) advanced by the Lender shall automatically become part of the principal amount of the Loan as of the date(s) that each such advance was made, subject to all the terms under this Commitment and the Final Order.

**TERM:**  The maturity date of the Loan shall be the date which is SIXTY (60) days after Closing ("**Maturity Date**").

**BUDGET/USE OF PROCEEDS:**  Loan proceeds shall be used by Debtors in accordance with the Budget [as herein defined] and in substantially the same form as that which is attached hereto as Exhibit A, unless otherwise agreed to by Lender, in its sole and absolute discretion, and incorporated into the Final Order entered by the Bankruptcy Court ("**Budget**").

**INTEREST:**  The interest rate under the Loan shall be TWELVE PERCENT (12.00%) ("**Contract Rate**").

In the event of default, the interest rate under the Loan shall increase to FIFTEEN PERCENT (15.00%) ("**Default Rate**"), beginning as of the date of default.

A.      Interest shall accrue daily based on a 30-day month and a 360-day year, computed on the outstanding principal balance plus accrued unpaid interest of the Loan, multiplied by the Contract Rate and/or Default Rate, as the case may be ("**Accrued Interest**"), unless such computation results in the effective interest rate of the Loan exceeding the maximum rate of interest allowable under applicable state or federal law. It is hereby understood and agreed upon by and between Debtors and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law.  Should the effective interest rate exceed the maximum rate allowable by applicable state or federal law, Debtors and Lender hereby agree to reduce the effective interest rate to the maximum rate allowable by state or federal law.  Any and all interest amounts collected by the Lender in excess of the maximum rate allowable under state and federal law shall be applied to reduce the principal balance of the Loan.

B.      Without limiting the generality of the foregoing, any payments that are not made as they become due shall be deemed to be in default and

3

shall be assessed at the Default Rate. Should the Default Rate's effective interest rate exceed the maximum rate allowable by applicable state or federal law, Debtors and Lender intend to and hereby agree to reduce the Default Rate's effective interest rate to the maximum rate allowable by state or federal law.  Any and all interest amounts collected by the Lender in excess of the maximum rate allowable under state and federal law shall be applied to reduce the principal balance of the Loan.

C.      Debtors have the absolute obligation to pay Accrued Interest and other amounts due in connection with the Loan, as such interest and/or other amounts become due and payable.

**COLLATERAL/**
**OTHER RIGHTS**:      The shall be collateralized by all of the assets of Debtors now existing, or hereafter acquired including, without limitation, the Real Property [as herein defined], the Personal Property [as defined herein], and all other property interests of Debtors (collectively, the "**Collateral**").

A.      "**Real Property**" shall mean all of the real property assets of Debtors including, without limitation:

(i)      150 Key Boutique Hotel (Parcel III on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(ii)     Club House w/ Food & Beverage Outlet(s) (Parcel IV on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(iii)    18-Hole Jack Nicklaus Signature Golf Course (Parcels I and II on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(iv)    Resort Pool, Waterside Bar, and Related Amenities (Parcel III on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(v)     Golf Club Event Law (Parcel IV on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(vi)    Practice & Future Golf Development Areas (Parcels I and II on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(vii)   Structured Parking (Parcel III on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(viii)  179 Unit Condo Pad (Parcel VI on Exhibit B-1; Banyan Cay Dev. LLC);

(ix)    22 Resort Villas (Parcel VII on Exhibit B-1; Banyan Cay Villas, LLC);

(x)     31 Estate Lots (Parcel V on Exhibit B-1; Banyan Cay Dev. LLC);

(xi)    Tennis Court & Facilities (Parcel III on Exhibit B-1; Banyan Cay Resort & Golf, LLC);

(xii)   the real property interests attached hereto as Exhibit B-1; and

(xiii)  any and all other real property interests of Debtors, other than the Real Property Carveout.

4

C.      "**Real Property Carveout**" shall mean those certain real property assets of Debtors which Lender is not seeking as collateral security under the Loan, described below and under Exhibit B-2:

(i)      Maintenance Lot (Banyan Cay Maintenance, LLC); and
(ii)     Bellefrau Mortgage Lots (Banyan Cay Maintenance, LLC)

B.      "**Personal Property**" shall mean any and all of the tangible and intangible personal property assets of Debtors including, without limitation, licenses, permits, entitlements, developer agreements, easements, contracts of sale, executory contracts or any other contracts of any nature, utility deposits, community development district rights, letters of credit, merchandise, FF&E, business records, deposit accounts, intellectual property, intellectual property rights, trademarks and copyrights, building materials, plans and specifications in the form of computer aided design and shop or field drawings made in furtherance thereof, schematic design sets, design development sets, construction document sets, structural plans and specifications, MEP (mechanical, electrical and plumbing) sets, interior design sets, landscaping and hardscaping sets, and any project manual in connection therewith, and as further described and attached hereto as Exhibit B.

C.      Lender's priming liens and security interests in the Collateral shall be senior to any and all other prepetition or postpetition liens or interests including, without limitation, judgment liens, mechanics' liens, liens imposed by applicable covenants, declarations and restrictions, mortgages, deeds of trust, and security interests pursuant to 11 U.S.C. §§ 364(d) and 364(c)(2).  Lender's liens and security interests in the Collateral shall also be senior to all other interests of any party including, without limitation, tax liens (except ad valorem taxes for 2022 and subsequent years). Lender's liens and security interests may be subject to deed restrictions, equitable servitudes or other rights in such Collateral as may be acceptable to Lender, its counsel, and the Title Company [as herein defined], in their sole and absolute discretion.

D.      Lender shall also receive a superpriority administrative expense in the Bankruptcy Case pursuant to 11 U.S.C. §§ 364(c)(1), 503(b) and 507(b), with priority over all other administrative expense claims in the Bankruptcy Case except fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee ("**Carveout**"), with the proviso that the Lender's first lien position with respect to the Carveout shall not be subject to surcharge, either pursuant to 11 U.S.C. § 506(c) or otherwise. The Lender shall not be required, without its consent and at its sole and absolute discretion, to accept property other than cash in satisfaction of

5

(a) its liens and security interests which encumber the Collateral as security for payment of the Loan and (b) the super-priority administrative expense claim, notwithstanding 11 U.S.C. § 1129 (a)(7) or (b)(2)(A).  Debtors hereby agree not to support or seek to modify, subordinate, reduce, impair, alter, surcharge, extinguish or otherwise change either the priming lien or superpriority administrative expense claims of the Lender pursuant to any provisions of Title 11 or other applicable law, except that Lender acknowledges and agrees that should a proposed plan of reorganization ("**Plan**") be confirmed and become effective, the Lender's administrative claim will be paid pursuant to that Plan, provided that the Plan is agreeable to the Lender, does not otherwise impair its Liens, and the payments conform to the Budget.  None of the Lender's rights as set forth herein may be modified except with the express written consent of the Lender.

E.      Lender's mortgage liens and security interests in the Collateral shall not be primed, surcharged, altered, impaired, marshaled or otherwise adversely affected in any way, whether requested by Debtors, a creditor of Debtors, or any other party.  No claim or expense, except those that are the subject to the Carveout, shall have priority over, or be *pari pasu* with, Lender's rights in the Collateral.   Except for the Carve-Out, no administrative expense, and no claim allowed and payable under 11 U.S.C. §§ 330, 331, 503(b) 506(c), 507 or 726, shall have priority over, or be *pari pasu* with, Lender with respect to any asset of Debtors which constitutes either the Collateral pursuant to 11 U.S.C. §364(d) or with respect to the claims of Lender pursuant to 11 U.S.C. §364(c)(1).

F.      The Final Order authorizing the Loan, and Lender's first priority liens and super-priority administrative expense claims, shall incorporate the terms and requirements of this Commitment and shall also contain findings by the Bankruptcy Court that the extension of credit and making of the Loan by Lender to Debtors is being made in good faith and, therefore, Lender shall be entitled to the full protections of 11 U.S.C. §364(e), effective immediately without any stay of the effect of such Final Order so as to permit, in Lender's sole and absolute discretion, immediate funding within the provisions and protections of 11 U.S.C. §364(e).

G.      In the event of a conflict between the Final Order authorizing the Loan and granting the interests and rights in favor of Lender, and any order issued by the Bankruptcy Court including, without limitation, any order confirming any Plan, whether liquidating or reorganizing, the terms of the Final Order authorizing the Loan shall control.

**COVENANTS**:

In addition to all standard covenants required by the Lender in debtor-in-possession and post-petition loans made under like circumstances, including all standard commercially appropriate terms in the Lender's absolute discretion, the Lender will require that:

A.      Debtors shall: (a) own the Collateral, (b) disburse funds in substantial compliance with the Budget, (c) comply with all provisions of this Commitment and the Final Order and attendant Mortgage and Promissory Note, (d) notify Lender in writing of any material adverse change in the Collateral, the financial condition, viability or performance of Debtors estate(s), or of economic conditions which may materially adversely affect the value or performance of Debtors property and/or Lender's Collateral, and (e) comply with all statutory deadlines for filing a Plan [as herein defined] and the solicitation of acceptances of the Plan [as herein defined].

B.      So long as any portion of the Loan remains outstanding, Debtors shall not seek or permit (absent Lender's consent), and shall actively object to the request for entry of (i) an order dismissing or converting the Bankruptcy Case, or (ii) any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security interest in any Collateral in favor of any party other than Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to super-priority administrative status equal to or superior to that granted to Lender.

**DEFAULT/**
**REMEDIES:**

A.      This Commitment, the Final Order, and the Loan Documents shall contain events of default and remedies customarily required by Lender in its absolute discretion in transactions such as the Loan.

B.      In addition to other rights and remedies available under the Loan Documents or applicable law, upon occurrence of an event of default:

i) Should Lender seek to exercise its rights and remedies contained in this Commitment, the Final Order, and/or the Loan Documents with respect to any default, shall provide written notice ("**Written Notice**") to Debtors' counsel of record, the United States Trustee, all entities scheduled by Debtors as secured creditors of Debtors, counsel (if any) for the official committee of unsecured creditors, and shall file an affidavit with the Bankruptcy Court specifying the default. The Written Notice may be any written document providing notice of default, including but not limited to the affidavit filed with the Bankruptcy Court.

ii)  Any party entitled to the Written Notice shall have five (5) business days from the receipt of the Written Notice in which to cure the default or file a controverting affidavit with respect to the default.

iii)  If the default is not cured within the prescribed five (5) business day period, Lender may file an emergency motion for relief from the automatic stay, and Lender shall request that the Bankruptcy Court set an expedited hearing on 48 hours' notice to determine whether Lender shall be granted relief from the automatic stay to foreclose on its liens or take any other action available to Lender under the Loan Documents and applicable law. At the hearing, Debtors may only contest the Lender's declaration of the default and may not assert any other or additional defenses.

C.       The entire principal balance of the Loan, plus all accrued and unpaid interest (including interest at the Default Rate, from the date of the actual default notwithstanding the date the Written Notice is provided to Debtors), fees and costs, through the date of payment shall, in addition to default by Debtors under the Loan Documents as described above, automatically become due and payable upon  (i) the failure to cure any default as is set forth above, (ii) the confirmation of any plan of reorganization in the Bankruptcy Case unless the plan proposes to treat Lender's claims in the same manner as provided for in this Commitment, the Final Order, and the Loan Documents, or such other treatment as the Lender, in its sole and absolute discretion, may agree in writing at request of Debtors, (iii) conversion of the Bankruptcy Case to a case under Chapter 7 if, at or prior to the Closing [as herein defined] of the Loan, the Bankruptcy Case is a Chapter 11 case, (iv) appointment of a Chapter 11 trustee or examiner with expanded powers unless the Lender consents to such an appointment, (v) dismissal of the Bankruptcy Case, (vi) entry of an order granting relief from stay to any party with regard to any interest in the Collateral, (vii) entry of an order approving the transfer of any of the Collateral, or the actual transfer of any of the Collateral either voluntarily or by operation of law, to a party other than Lender, (viii) any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security interest in any Collateral in favor of any party other than Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to priority status equal to or superior to that granted to Lender, (ix) the institution of any foreclosure action with respect to any interest in the Collateral.

CONDITIONS:            The Closing [as herein defined] and funding of the Loan shall be expressly subject to, without limitation, Debtors' completion of the conditions described in this section, this Commitment, the Final Order, and the Loan Documents (the "**Conditions**"), subject to the Lender's satisfaction, in its sole and absolute discretion:

A.      Debtors shall have a motion, in form and substance acceptable to Lender, in its sole and absolute discretion, requesting, without limitation, approval of (i) the Loan as described herein (ii) the Commitment, and (iii) authority to grant the Lender the lien priorities described herein (the immediately proceeding (i) - (iii) shall collectively be referred to herein as, "**Motion**"). A copy of this Commitment shall be attached to the Motion as filed and served on all parties in interest required to be so served.  The Motion shall have been served on all creditors of Debtors, all parties with whom Debtors has executory contract(s) with respect to any of the Collateral, all taxing authorities having or asserting authority over Debtors, all entities that have filed a notice to owner or asserted potential lien rights with reference to the Collateral or any component thereof.

B.      The Bankruptcy Court shall have entered a Final Order authorizing the Loan under the terms set forth in this Commitment, finding that Debtors own the Collateral and the documentation for the same, which Final Order authorizing the Loan shall have a copy of this Commitment attached thereto and incorporated in its entirety by reference, and shall be in form and substance acceptable to Lender in its sole discretion, and which Final Order authorizing the Loan shall not have been appealed**,** modified, stayed, vacated, or reversed as further described above.

C.      Debtors shall have (i) obtained such orders of the Bankruptcy Court approving the Loan and attendant requirements of this Commitment, in form and content consistent, in Lender's sole and absolute discretion, with the terms of this Commitment, (ii) Debtors shall have executed definitive loan agreement(s), notes, deeds of trust or mortgages, security agreements, and other documentation and customary certificates, consistent with the terms set forth herein and otherwise in form satisfactory to Lender and its counsel; unless any such conditions are waived in Lender's sole and absolute discretion, (iii) The Order(s) authorizing the Loan shall not have been appealed, stayed, modified or amended, and shall be in form and substance acceptable to Lender, and shall be made effective immediately without any stay of the effect of such Order(s) authorizing the Loan, in Lender's sole discretion, immediate funding within the provisions and protections of 11 U.S.C. §364 and (iv) in all other respects the status of the Bankruptcy Case is satisfactory to Lender and its counsel in their respective absolute discretion.

In addition, Debtors shall have provided Lender evidence satisfactory to Lender that all agreements and documents relating to the Loan have been executed by Debtors, and the party executing such documents has the authority to bind Debtors.  In the event that any portion of the Loan proceeds are intended to be used to provide labor, services or materials to the Collateral, the Loan Documents shall provide for such additional protections to the Lender as the Lender may, in its sole and absolute discretion, require pertaining to, inter alia, disbursements of the Loan proceeds and conditions precedent to such disbursements. Additionally, Debtors shall provide such other legal opinions as may be required to ensure the Loan complies will all applicable state and federal legal requirements. This Commitment, the Final Order, and all of the foregoing loan agreements, notes, deeds of trust or mortgages, escrow agreements, security agreements, other documentation and customary certificates shall be collectively referred to herein as, the "**Loan Documents**".  Each of the Loan Documents shall be in form and substance satisfactory to the Lender and Lender's counsel, in their sole and absolute discretion.

D.      Debtors shall have complied with all of the terms of the Loan Documents and there shall exist no event of default or set of circumstances which given the expiration of time or the giving of notice would give rise to an event of default under the Loan Documents.


E.      All parties claiming prepetition or post-petition liens or other interests in the Collateral, including, without limitation, all creditors of Debtors, all parties with whom Debtors have executory contract(s) with respect to the Collateral or the Project and all entities who have filed a Notice to Owner with reference to the Collateral (all such entities being collectively referred to as the "**Parties in Interest**") shall have received notice of the Motion and the hearing thereon, and (a) Parties in Interest shall have consented to, or shall not have objected to, the Loan, or (b) any objections of Parties in Interest shall have been specifically overruled in their entirety in the Order of the Bankruptcy Court authorizing the Loan.

F.      This Commitment is subject to and conditioned upon the accuracy of all information, representations, exhibits and other materials submitted with or in support of the Loan request and there must be no adverse change in the condition, business or prospects of the Collateral or Debtors prior to the disbursements of funds or during the term of the Loan.

G.      Debtors shall demonstrate the capability based upon its business plan, in the sole and absolute discretion of the Lender, of repaying the Loan on the Maturity Date.

H.      Lender, at its discretion, may waive any one or more of the above-described conditions, but no such waiver shall be effective against Lender unless in writing and signed by an authorized representative of Lender.

**FEES & COSTS:**      A.      With each disbursement of the Loan, Debtors shall pay (a) Lender Expenses (b) all recording costs (including mortgage, stamp or intangible taxes) for filing the recordable loan documents, and (c) as applicable, the cost of the Lender's Mortgagee Title Insurance Policy ("**Title Policy**"), and the cost of the survey of the real property, all of such costs under (a)-(c) being collectively referred to as the "**Closing Costs**" with a schedule provided to Debtors concomitantly therewith.

B.      In addition, Debtors shall pay to Lender the reasonable fees and expenses (including reasonable travel expenses) of Lender's counsel, arising subsequent to Closing [as herein defined] in connection with this transaction and the representation of Lender in the Bankruptcy Case, which such reasonable fees and expenses shall be deemed a part of the Loan secured by the Collateral.  The reasonable legal fees of Lender's counsel shall be calculated on a time-spent basis, based upon the standard hourly rates of Lender's counsel generally charged to clients of that firm for similar matters and shall be paid from proceeds of the Loan. Post-closing attorneys' fees incurred by Lender's counsel during the course of Debtors' Bankruptcy Case, including, without limitation, those fees incurred to monitor the instant bankruptcy proceedings, shall be submitted to the Bankruptcy Court on a periodic basis for approval.

C.      Debtors agrees that the Loan shall be without cost to Lender. Debtors assumes liability for and will pay all costs and expenses required to satisfy the conditions hereof and the making of the Loan as provided hereunder (including the costs of the Title Policy and the survey, as applicable).  Such costs and expenses shall be paid as provided hereunder, or upon demand if the Loan does not close or if this Commitment is terminated.

11

| | |
|---|---|
| **ACCEPTANCE OF COMMITMENT:** | **Lender's Commitment is subject the receipt of the Application Fee [as herein defined] at the earlier of (i) April 5, 2023, or (ii) the first Bankruptcy Court hearing with respect to the approval of the Loan. Time is of the essence.** |

As a condition precedent to Lender's obligations hereunder, Debtors shall cause to be paid to Lender, an Application Fee in the total amount of TEN THOUSAND DOLLARS ($10,000.00) ("**Application Fee**"). The Application Fee shall be made from a third party ("**Remitter**") and from funds other than those of Debtors. The Application Fee shall be fully earned upon receipt.

Lender shall have no obligation with respect to the Loan unless this Commitment is fully executed and conditions described have been completed to the Lender's satisfaction, in its sole and absolute discretion.

The Application Fee shall be paid in accordance with the following wire instructions:

| | |
|---|---|
| **Bank:** | Texas Capital Bank |
| **Bank Address:** | 2000 McKinney Ave #190, Dallas, TX 75201 |
| **ABA Routing Number:** | [REDACTED] |
| **Account Name:** | 364 Capital, LLC |
| **Acct Number:** | [REDACTED] |
| **364 Capital Address:** | 500 N. Akard Street, Suite 1500 |
| | Dallas, TX 75201 |
| **Memo:** | Application Fee |

**CLOSING/FUNDING**: The closing of the Loan shall be the date and time that Bankruptcy Court enters the Final Order approving the Loan ("**Closing**"). Notwithstanding the foregoing to the contrary, funding of the Loan shall take place at Closing, or as soon as practical, after satisfaction of the Conditions contained herein and the Final Order, in Lender's sole and absolute discretion.

**ASSIGNMENT:** At its sole and absolute discretion, Lender may assign [including, without limitation, collaterally assign], delegate, and/or participate (together, the "**Assignment**") any or all of its obligations and rights in this Commitment, the Final Order, the Loan Documents, and/or any other documents evidencing and securing the Loan to one or more assignees, delegates, participants, and/or any other third parties, other than any party or affiliates in the Bankruptcy Case and known by Lender as of the date of the Commitment ("**Lender Assigns**"), at Closing or anytime thereafter. All of the rights and protections granted to Lender pursuant to this

Commitment, the Final Order, the Loan Documents, and/or any other documents evidencing and securing the Loan shall retroactively inure to the benefit of any and all Lender Assigns as of the Closing. Debtors hereby agree to execute any and all agreements and/or other documents reasonably requested by Lender or Lender Assigns to cause an Assignment.

Lender's rights and protections granted pursuant to this Commitment, the Final Order, the Loan Documents, and/or any other documents evidencing and/or securing the Loan shall forever survive any Assignment.

**USURY:**   This Commitment is subject to the express condition that at no time shall Debtors be obligated, or required, to pay interest at a rate which could subject Lender or Lender Assigns to either civil or criminal liability as a result of being in excess of the maximum rate which Debtors are permitted by law to contract or agree to pay. If the terms of this Commitment, the Final Order, and/or the Loan Documents subject or obligate Debtors to pay interest at a rate in excess of such maximum rate, than the rate of interest in this Commitment, the Final Order and/or Loan Documents shall be deemed to be immediately reduced to such maximum rate of interest payable, and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of principal balance or, if the Loan has not closed, shall be void. Additionally, if Lender deems it a hardship to close the Loan under usury statutes, all fees paid to Lender shall be refunded and this Commitment shall be null and void.

It is also hereby understood and agreed upon by and between Debtors and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the effective interest rate does exceed the maximum rate allowable by applicable state or federal law, Debtors and Lender intend to and hereby agree to reduce the effective interest rate to the maximum rate allowable by applicable state or federal law.

It is further understood and agreed upon by and between Debtors and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest at an effective rate which exceeds the maximum rate allowable under applicable state and federal law. If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, Debtors and Lender intend, and hereby agree, to reduce the effective interest rate to the maximum rate allowable by applicable state or federal law.

13

**SURVIVAL OF**
**COMMITMENT:**      This Commitment shall be incorporated and attached, in its entirety, to the Final Order entered by the Bankruptcy Court. The Final Order and all of the terms and conditions contained therein shall control and shall remain binding upon Debtors and Lender in the event of any inconsistencies and/or discrepancies between this Commitment, the Final Order, or the Loan Documents.

Lender's rights and protections granted pursuant to this Commitment, the Final Order, the Loan Documents, and/or any other documents evidencing and/or securing the Loan shall survive and remain binding upon Debtors.

**EXECUTION AND**
**RELIANCE ON**
**COUNSEL:**      This Commitment may be executed in counterparts which, taken together, shall constitute one original.  This Commitment is for the benefit of Debtors only and may not be assigned, except upon the prior written consent of Lender, which consent may be withheld for any reason or for no reason.  No party other than Debtors, or an assignee acceptable to Lender may rely upon the terms and conditions of this Commitment.  This Commitment is executed by an individual strictly in his capacity as a representative of the Lender.  By acceptance of this Commitment, Debtors agrees that no representative, member, partner, shareholder, employee or agent of the Lender shall be personally liable for the payment of any claim or performance of any obligations hereunder.  This Commitment will be governed by and construed in accordance with the laws of the State of Florida and of the United States, without regard to the principles of conflicts of laws thereof.  Debtors had the benefit of advice of counsel in connection with the execution of this Commitment and the Loan contemplated hereby.  This document has been negotiated at arm's length and in good faith between the Lender and Debtors.

**NON-WAIVER:**      No failure or delay on the part of Lender to exercise any rights under the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right under the Loan Documents preclude any further exercise thereof, or the exercise of any other right.  Each and every right or remedy granted under the Loan Documents or under any document delivered thereunder or in connection therewith or allowed to Lender in law or equity shall be deemed cumulative and may be exercised from time to time.

14

**OTHER:**    The Final Order authorizing the Loan shall expressly provide that the Bankruptcy Court shall retain the fullest jurisdiction over this Loan, Debtors, and the Bankruptcy Case until such time that the Loan is irrevocably repaid to the Lender, in full, in cash. Debtors shall not seek, and the Bankruptcy Court shall not enter, an order that modifies, alters, or impairs the liens and/or claims of the Lender or the terms of the Loan and this Commitment pursuant to the Final Order, unless expressly waived by the Lender via submission to the Bankruptcy Court.  The Final Order shall also contain such waivers as Lender shall require entitling the Lender to immediately foreclose and otherwise enforce rights against Debtors, and to the Collateral, should Debtors voluntarily or involuntarily be the subject of a subsequent case or proceeding under title 11 of the United States Code to which the Lender is a party, or otherwise default under the Loan and any terms of this Commitment, the Final Order,  Loan Documents and/or any other documents evidencing and/or securing the Loan made by Lender.

As referenced in this Commitment, funding of the Loan is dependent upon, among other things, satisfactory negotiation of loan documentation between Debtors and Lender. **This Commitment is not a document that guarantees funding by Lender to Debtors in the amounts set forth, or upon the terms described, herein, as only the satisfaction of all of the conditions set forth herein, in the Lender's sole and absolute discretion, will obligate the Lender to fund the Loan.**  Any material deterioration in the Collateral or the financial condition of Debtors between the execution of this Commitment and the Closing of the Loan will relieve the Lender of any obligation on the part of the Lender to fund the Loan.

If you find this Commitment to your satisfaction, please have Debtors authorized signatory execute a copy of this Commitment, in the space provided for herein below, and cause the same to be returned to the undersigned via email.

[SIGNATURE PAGE TO FOLLOW]

15

We appreciate this opportunity to respond to your financing requirements.  Should you have any questions with respect to the matters discussed herein, please contact the undersigned.

Very truly yours,

**364 CAPITAL, LLC,**
a Delaware limited liability company

By:    _____
Robert P. Grammen, Manager

**DEBTORS:**

**Banyan Cay Investment, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Dev. LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Mezzanine Borrower, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Villas, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Resort & Golf, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Maintenance, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

# EXHIBIT A
## BUDGET

| Expense Schedule | Amounts Due On or Before Hearing | |
|---|---|---|
| | 4/12/2023 | Further Detail |
| Payroll | 58,500 | Payroll Due on 4/10 |
| Workman's Comp | 1,970 | Part of Payroll |
| FPL (Electricity) | 26,000 | Prepetition Amount Due ($80,000 Deposit Requested) |
| City of West Palm Beach  (Water) | 6,578 | Deposit Not Yet Requested |
| Comcast (Cable and Internet) | 7,500 | Phone and Email |
| Florida Public Utilities (Gas) | 3,850 | April Gas Bill (COD) |
| DLL (Equipment Leases) | 18,600 | Golf Course Maintenance Equipment Lease Payment (April) |
| VESTIGE SCHOOL PROTECTION LLC | 38,000 | Security for Month of April |
| Insurance Renewal | 56,000 | [Renewal Due on or Before April 14] |
| The Staffing (Labors) | 47,500 | Prepetition Amount of $39,000 Included |
| SSI (Diesel and Gas GCM) COD | 5,700 | Fuel To Be Delivered for Equipment (April) |
| Cheney (Food) | 5,000 | Food |
| GFS (Food) | 7,500 | Food |
| Pepsi | 1,500 | Food |
| Port Royal LLC - COD | 900 | Food (Fish) |
| Fintech (Alcohol) Member  Guest | 2,500 | Software Fees for State (Alcohol Tracking) |
| County Ice | 300 | Food/Ice |
| Member Easter Brunch | 3,500 | Easter Sunday Event Rentals |
| Member Guest Casino Party Nights | 3,200 | 4/12 and 4/13 Member Golf Event |
| 1099 (Bi-Weekly and Special Event (Member Guest) | 5,600 | Labor for 4/12, 4/13, 4/14 Member Golf Event |
| Member Golf Event Costs | 3,500 | Member Guest Awards and Event Rentals 4/12, 4/13, 4/14 |
| Sunniland (Fertilizer) | 15,000 | Immediate Necessary Golf Course Maintenance to Prevent Browning (Should Be Quarterly, Has Not Been Done Since October 2022) |
| Site One (Chemicals) | 4,000 | |
| Wedgworth's Inc. (Fertilizer) | 6,000 | |
| Legacy Turf  (Liquid Fertilizer) | 7,500 | |
| Plant Health Solution (Chemicals) | 5,000 | |
| Golf Agronomics Supply  (Testing, Sand) | 2,500 | |
| Hector (Irrigation & Parts) | 3,500 | |
| Atlantic Dry Jet (aerification, seasonal maintenance) | 7,990 | |
| SUBTOTAL | 355,188 | |

# EXHIBIT B
## COLLATERAL

Collateral:  The Collateral for the Loan shall include the following:

(a)  The real property more particularly described on Exhibit B-1 attached hereto, together with all of the owner's right, title, interest, and privileges in  all (i) streets, ways, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to the Property or the improvements thereon; (ii) strips or gores of real property between the Property and abutting or adjacent properties; and (iii) all water and water rights pertaining to the Property;

(b)  Any and all improvements of any kind or nature situated, placed, or constructed on the Property;

(c)  All fixtures, materials, supplies, equipment, systems, and apparatus, now or hereafter attached to, installed in, or used in connection with (temporarily or permanently) any of the Property or its improvements, including motors, engines, boilers, furnaces, pipes, cleaning, call and sprinkler systems, fire extinguishing apparatus and equipment, water tanks, swimming pools, heating, ventilating, refrigeration, plumbing, laundry, lighting, generating, cleaning, waste disposal, transportation (of people or things, including but not limited to, stairways, elevators, escalators, and conveyors), incinerating, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and lighting, traffic control, waste disposal, raw and potable water, gas, electrical, storm and sanitary sewer, telephone and cable television facilities, and all other utilities whether or not situated in easements;

(d)  Any and all leases, master leases, subleases, licenses, concessions, and other agreements (whether written or oral, or now or hereafter in effect) which grant to third parties a possessory interest in and to, or the right to use or occupy, all or any part of the Property, including all security and other deposits;

(e)  All, machinery, goods, general intangibles, money, insurance proceeds, accounts, trademarks, trade names, copyrights, chattel paper, instruments, investment property, letter of credit rights, inventory, deposit accounts or other funds or evidences of cash, credit or indebtedness deposited by or on behalf of owner with any governmental agencies, boards, corporations, providers of utility services, public or private, including reimbursable tap fees, utility deposits, commitment fees and development costs, any awards, remunerations, reimbursements, settlements, or compensation heretofore made or hereafter to be made by any governmental authority pertaining to any of the Collateral, and all other personal property of any kind or character which is now or hereafter situated in, on, or about the Property or used in or necessary to the complete and proper planning, development, construction, financing, use, occupancy, or operation thereof;

(f)  Any and all contracts, subcontracts, and agreements, written or oral, in any way relating to the construction of the improvements on the Property or the supplying of material (specially fabricated or otherwise), labor, supplies, or other services therefor, contracts, licenses, permits, and rights relating to living unit equivalents or other entitlements for water, wastewater,

and other utility services whether executed, granted, or issued by a private person or entity or a governmental or quasi-governmental agency, which are directly or indirectly related to, or connected with, the development, ownership, maintenance or operation of the Property, whether such contracts, licenses, and permits are now or at any time thereafter existing;

(g)    Any and all other rights of the owner (i) to develop and/or operate the Property as a commercial and/or residential project, as the case may be; (ii) in any financing arrangements relating to the financing of or the purchase of all or any portion of the Property by future purchasers; and (iii) in all other contracts which in any way relate to the use, enjoyment, occupancy, operation, maintenance, repair, management or ownership of the Property.

# EXHIBIT B-1
## LEGAL DESCRIPTION

**PARCEL I (FRONT NINE):**

A PORTION OF TRACT  "B", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGE 72, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH CORNER OF TRACT  "B" OF SAID PLAT THENCE SOUTH 57°00'00 "' EAST ALONG THE NORTH LINE OF TRACT  "B ", 392.64 FEET; THENCE SOUTH ALONG A RADIAL LINE SOUTH 33°00'30" WEST, 60.00 FEET TO THE POINT OF BEGINNING (SAID POINT ALSO BEING THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 842.04 FEET, A CENTRAL ANGLE OF 00°10'47" AN ARC LENGTH OF 2.64 FEET; THENCE SOUTH 26°42'09" EAST, 78.89 FEET; THENCE NORTH 71 °50'50" EAST, 87.95 FEET; THENCE NORTH 88°26'53" EAST, 87.00 FEET; THENCE SOUTH 58°34'14" EAST, 41.83 FEET; THENCE SOUTH 54°04'40" EAST, 75.76 FEET; THENCE NORTH 56°50'56" EAST, 70.00 FEET; THENCE SOUTH 07°00'44 "' WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 06°57'47" WEST); THENCE EAST ALONG SAID CURVE HAVING A RADIUS OF 797.04 FEET AND CENTRAL ANGLE OF 22°19'31" AN ARC LENGTH OF 310.57 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE HAVING A RADIUS OF 305.00 FEET, A CENTRAL ANGLE OF 42°16'16" AN ARC LENGTH OF 225.02 FEET TO THE END OF SAID CURVE; THENCE SOUTH 62°48'15" EAST, 98.36 FEET TO A POINT OF CURVATURE OF A NON CONCENTRIC CURVE CONCAVE TO THE SOUTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 44°48'38" EAST); THENCE SOUTHEASTERLY ALONG SAID CURVE, HAVING A RADIUS OF 320.00 FEET, A CENTRAL ANGLE OF 30°38'13" AN ARC LENGTH OF 171.11 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 83°34'35" AN ARC DISTANCE OF 36.47 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 180.00 FEET, A CENTRAL ANGLE OF 102°03'14" AN ARC LENGTH OF 320.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 79°22'42" AN ARC LENGTH OF 34.64 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 1085.00 FEET, A CENTRAL ANGLE OF 54°59'52" AN ARC LENGTH OF 1041.48 FEET; THENCE SOUTH 08°39'28" EAST, 468.07 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 19°42'49" AN ARC LENGTH OF 263.21 FEET; THENCE NORTH 78°56'09" WEST (RADIAL TO SAID CURVE), 10.00 FEET; THENCE SOUTH 22°52'49" WEST, 149.38 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH WEST, HAVING A RADIUS OF 739.00 FEET, A CENTRAL ANGLE OF 14°00'20" AN ARC LENGTH

20

OF 180.64 FEET TO THE END OF SAID CURVE; THENCE NORTH 53°33'16" WEST, 4.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT IS SOUTH 53°32'46" EAST) THENCE ALONG SAID CURVE HAVING A RADIUS OF 735.02 FEET, A CENTRAL ANGLE OF 13°38'11" AN ARC LENGTH OF 174.93 FEET TO THE END OF SAID CURVE; THENCE SOUTH 43°38'15" WEST, 145.11 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 29°02'42" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 01 °29'52" AN ARC LENGTH OF 20.00 FEET TO THE END OF SAID CURVE; THENCE SOUTH 77°37'28 "' WEST, 100.68 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 20°03'10" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 745.00 FEET, A CENTRAL ANGLE OF 25°31 '37" AN ARC LENGTH OF 331.92 FEET TO THE END OF SAID CURVE; THENCE SOUTH 05°27'57" WEST, 5.00 FEET; THENCE NORTH 84°32'08" WEST, 295.96 FEET; THENCE SOUTH 05°28'27" WEST, 15.00 FEET; THENCE NORTH 84°32'03" WEST, 87.64 FEET TO A BEGINNING OF A CURVE CONCAVE TO THE WEST ( A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 85°35'11" EAST); THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 990.00 FEET, A CENTRAL ANGLE OF 14°23'04" AN ARC LENGTH OF 248.55 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 88°18'23" AN ARC LENGTH OF 38.53 FEET TO A POINT OF TANGENCY; THENCE NORTH 69°03'00" EAST, 397.44 FEET; THENCE SOUTH 20°30'00" EAST, 25.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (THE PREVIOUS BEARING BEING RADIAL); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 739.25 FEET, A CENTRAL ANGLE OF 14°05'38" AN ARC LENGTH OF 181.84 FEET; THENCE NORTH 56°42'50" EAST ALONG A NON TANGENT LINE, 51.93 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°35'47" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 742.25 FEET, A CENTRAL ANGLE OF 22°15'00" AN ARC LENGTH OF 288.24 FEET TO A POINT OF TANGENCY; THENCE NORTH 29°08'43" EAST, 152.03 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 218.00 FEET, A CENTRAL ANGLE OF 126°00'00" AN ARC LENGTH OF 479.41 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 131.28 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 69.88 FEET TO A POINT OF TANGENCY; THENCE SOUTH 52°39'13" WEST, 44.02 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 206.00 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 109.66 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 345.00 FEET, A CENTRAL ANGLE OF 15°47'37" AN ARC LENGTH OF 95.10 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS BEARS SOUTH 66°42'44" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 345.99 FEET, A CENTRAL ANGLE OF 12°53'21" AN ARC LENGTH OF 77.83 FEET; THENCE SOUTH 53°49'23" EAST (RADIAL TO SAID CURVE), 28.26 FEET TO THE

BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 375.25 FEET, A CENTRAL ANGLE OF 33°15'11 AN ARC LENGTH OF 217.79 FEET TO A POINT OF TANGENCY; THENCE SOUTH 69°30'00" WEST, 393.96 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 98°40'54" AN ARC LENGTH OF 43.06 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 290.00 FEET, A CENTRAL ANGLE OF 31°52'53" AN ARC LENGTH OF 161.37 FEET TO A POINT OF TANGENCY; THENCE NORTH 20°00'00" EAST, 175.73 FEET; THENCE SOUTH 70°00'00" EAST, 15.00 FEET; THENCE NORTH 20°00'00" EAST, 224.67 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 595.00 FEET, A CENTRAL ANGLE OF 11°21'37" AN ARC LENGTH OF 117.97 FEET TO THE END OF SAID CURVE; THENCE NORTH 81°27'13" WEST 15.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 580.00 FEET, A CENTRAL ANGLE OF 07°25'24 "' AN ARC LENGTH OF 75.15 FEET TO THE END OF SAID CURVE; THENCE NORTH 87°56'12 "' EAST, 45.00 FEET; THENCE NORTH 17°15'54 "' EAST, 161.68 FEET; THENCE NORTH 11°56' 22" EAST, 408.45 FEET; TO THE SOUTHEAST CORNER OF TRACT   "D" OF BANYAN CAY RESORT, PLAT BOOK 125, PAGE 116, THENCE CONTINUE ALONG THE NEXT FIVE COURSES OF TRACT "D "; THENCE NORTH 11°56' 22" EAST, 59.86 FEET;  THENCE NORTH 48°03'38" WEST, 64.70 FEET; THENCE NORTH 01°11'51" EAST, 109.65 FEET; THENCE NORTH 76°19'06" WEST, 19.24 FEET; THENCE NORTH 27°09'45" EAST, 843.47 FEET BACK TO THE POINT OF BEGINNING.

## PARCEL II (BACK NINE):

A PORTION OF TRACT  "C ", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 29, PAGE 72 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF LOT 1 OF SAID PLAT (ALSO THE NORTH RIGHT OF WAY LINE OF CONGRESS AVENUE); THENCE NORTH 57°00'00" WEST ALONG THE SAID NORTH RIGHT OF WAY LINE, 170.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 57°00'00" WEST, 10.92 FEET; THENCE NORTH 33°00'00" EAST, 175.00 FEET; THENCE NORTH 57°00'00" WEST, 600.00 FEET; THENCE SOUTH 35°28'31" WEST, 87.42 FEET; THENCE NORTH 20°08'04" WEST, 100.09' FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°36'10 "WEST) THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 1515.99 FEET, A CENTRAL ANGLE OF 06°59'55 ", AN ARC LENGTH OF 185.18 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 50.00 FEET, A CENTRAL ANGLE OF 89°53'08 ", AN ARC LENGTH OF 78.44 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 190.00 FEET, A CENTRAL ANGLE OF 111°36'33 ", AN ARC LENGTH OF 370.11 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 48.51 FEET, A CENTRAL ANGLE OF 36°29'47 ", AN ARC LENGTH OF 30.90 FEET TO A POINT OF COMPOUND CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 1335.99 FEET, A

CENTRAL ANGLE OF 30°39'23 ", AN ARC LENGTH OF 714.83 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°11'51" EAST, 264.88 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE WEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 58°31 '04" EAST); THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CURVE HAVING A RADIUS OF 175.00 FEET, A CENTRAL ANGLE OF 126°43'54 ", AN ARC LENGTH OF 387.08 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST; THENCE WESTERLY AND NORTHERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 95°43'47 ", AN ARC LENGTH OF 41.77 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°01'51" EAST, 401.00 FEET; THENCE SOUTH 88°48'00" EAST, 160.03 FEET TO A POINT OF CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 100 FEET, A CENTRAL ANGLE OF 56°30'18 ", AN ARC LENGTH OF 98.62 FEET TO A POINT OF TANGENCY; THENCE SOUTH 32°18'00" EAST, 312.76 FEET; THENCE SOUTH 09°16'39" EAST, 105.00 FEET; THENCE SOUTH 77°36'02" EAST, 18.00 FEET; THENCE SOUTH 53°06'11" EAST, 104.04 FEET; THENCE SOUTH 50°56'54" EAST, 50.01 FEET; THENCE SOUTH 44°05'31" EAST, 50.25 FEET; THENCE SOUTH 35°45'59" EAST, 32.95 FEET; THENCE SOUTH 23°16'19" EAST, 20.16 FEET; THENCE SOUTH 16°01'43" EAST, 21.47 FEET TO A POINT OF A CURVE CONCAVE TO THE EAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 73°40'02" WEST); THENCE SOUTH ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 22°14'06 ", AN ARC LENGTH OF 86.54 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 65.00 FEET, A CENTRAL ANGLE OF 08°48'53 ", AN ARC LENGTH OF 10.00 FEET; TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEAST ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 71°29'56 ", AN ARC LENGTH OF 278.28 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 96.38 FEET, A CENTRAL ANGLE OF 32°13'15 ", AN ARC LENGTH OF 54.20 FEET TO A POINT OF TANGENCY; THENCE SOUTH 54°03'06" EAST, 26.71 FEET; THENCE NORTH 35°56'54" EAST, 112.00 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 39°53'17" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 185.00 FEET, A CENTRAL ANGLE OF 28°39'01 ", AN ARC LENGTH OF 92.51 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 68°18'26" WEST) THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 58°41'38 ", AN ARC LENGTH OF 25.61 FEET TOA POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 09°26'02" WEST); THENCE ALONG SAID CURVE EASTERLY HAVING A RADIUS OF 300.00 FEET, A CENTRAL ANGLE OF 06°04'40 ", AN ARC LENGTH OF 31.82 FEET; THENCE SOUTH 17°31'14 "' EAST, 10.00 FEET; THENCE NORTH 75°33'55" EAST, 64.11 FEET; THENCE NORTH 67°40'25 "' EAST, 137.00 FEET; THENCE NORTH 85°10'25" EAST, 281.37 FEET; THENCE NORTH 11°09'00" EAST, 12.00 FEET; THENCE NORTH 78°51'00 "WEST 273.94 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 55°58'33" EAST; THENCE NORTH ALONG SAID CURVE HAVING A

23

RADIUS OF 330.00 FEET, A CENTRAL ANGLE OF 00°34'11" AN ARC LENGTH OF 3.28 FEET; THENCE SOUTH 80°00'00" EAST, 276.63 FEET; THENCE SOUTH 00°42'42" EAST 332.57 FEET; THENCE SOUTH 70°00'00" EAST, 143.00 FEET; THENCE SOUTH 20°00'00" WEST, 325.91 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 625.00 FEET, A CENTRAL ANGLE OF 40°29'58" AN ARC LENGTH OF 441. 78 FEET TO A POINT OF TANGENCY; THENCE SOUTH 20°00'00" EAST, 320.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 655.00 FEET, A CENTRAL ANGLE OF 50°04'01" AN ARC LENGTH OF 572.36 FEET; THENCE NORTH 60°26'00" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 60°26'00" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 640.00 FEET, A CENTRAL ANGLE OF 04°48'42" AN ARC LENGTH OF 53.75 FEET TO THE END OF SAID CURVE; THENCE NORTH 55°37'20" WEST, 40.40 FEET; THENCE SOUTH 08°24'57" WEST, 11.34 FEET; THENCE SOUTH 38°35'47" WEST, 39.50 FEET; THENCE SOUTH 64°40'58" WEST, 45.94 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH, HAVING A RADIUS OF 80.00 FEET, A CENTRAL ANGLE OF 62°22'25" AN ARC LENGTH OF 87.09 FEET TO A POINT OF TANGENCY; THENCE NORTH 52°56'25" WEST, 94.23 FEET; THENCE NORTH 66°43'06" WEST, 14.52 FEET; THENCE NORTH 81°30'16" WEST, 24.17 FEET; THENCE NORTH 87°22'10 "' WEST, 24.19 FEET; THENCE SOUTH 52°57'50" WEST, 79.92 FEET; THENCE SOUTH 70°31'03" WEST, 63.47 FEET; THENCE NORTH 69°15'28" WEST, 36.37 FEET; THENCE NORTH 45°05'26" WEST, 34.89 FEET; THENCE NORTH 24°02'28" WEST, 16.14 FEET; THENCE SOUTH 33°00'00" WEST, 56.00 FEET BACK TO THE POINT OF BEGINNING.

## PARCEL III:

TRACTS C1, C2, D, HC AND H2, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

## PARCEL IV:

LOT 3, PLAT 1, THE PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, LESS THE SOUTHERLY 3.0 FEET THEREOF.

**PARCEL V:** TRACT L2 OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 125, PAGE 114 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

## PARCEL VI:

TRACT MF, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

**PARCEL VII:**

TRACT L3, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

**PARCEL VIII:** INTENTIONALLY OMITTED.

**PARCEL IX:** INTENTIONALLY OMITTED.

TOGETHER WITH THE FOLLOWING ADDITIONALLY INSURED PARCELS WHICH BENEFIT THE PARCELS ABOVE:

THOSE CERTAIN  "OUT OF BOUNDS" EASEMENT RIGHTS AND BENEFITS GRANTED IN THAT CERTAIN EASEMENT AGREEMENT RECORDED IN OFFICIAL RECORDS BOOK 22745, PAGE 868, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN 15 FOOT EASEMENT RIGHTS AND BENEFITS FOR INGRESS AND EGRESS GRANTED IN THAT CERTAIN SPECIAL WARRANTY DEED RECORDED IN OFFICIAL RECORD BOOK 2787, PAGE 1231, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, SUBJECT TO THE MAINTENANCE OBLIGATION SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS ESTABLISHED BY THAT CERTAIN AMENDED AND RESTATED MASTER DECLARATION OF COVENANTS AND RESTRICTIONS RECORDED IN OFFICIAL RECORD BOOK 22293, PAGE 83, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN RIGHTS AND BENEFITS GRANTED BY THAT CERTAIN GOLF COURSE ACCESS EASEMENT RECORDED IN OFFICIAL RECORDS BOOK 25002, PAGE 290, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA. SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFICIAL RIGHTS TO USE COMMON AREAS ESTABLISHED BY THAT CERTAIN DECLARATION OF MASTER COVENANTS OF BANYAN CAY RESORT RECORDED IN OFFICIAL RECORD BOOK 29679, PAGE 227, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS TO USE A GOLF CART PATH ACROSS LOT 18, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, GRANTED BY THAT CERTAIN CART PATH EASEMENT RECORDED IN OFFICIAL RECORD BOOK 29932, PAGE 112, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

# EXHIBIT B-2
## REAL PROPERTY CARVE-OUT LEGAL DESCRIPTION

**Maintenance Lot:**

TRACT M, BANYAN CAY RESORT COMMUNITY PLAT 1, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 124, PAGE 182, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

**Bellefrau Mortgage Lots:**

LOT 18, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA,

and

LOT 19, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.