# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12368 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF
(I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH
THE SALE OF PROPERTY OF THE DEBTORS' ESTATES, (B) SCHEDULING AN
AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER
OF NOTICE THEREOF, (D) AUTHORIZING THE DEBTORS TO ENTER INTO
THE STALKING HORSE AGREEMENT, (E) APPROVING BID PROTECTIONS,
AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING
THE SALE OF SUCH PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS, AND (B) GRANTING RELATED RELIEF**

*(Emergency Hearing Requested)*

## Basis for Expedited Relief

The Debtors by this motion seek the approval of certain bid and sale procedures with respect to certain parcels of real property, substantially identical to those certain bid and sale procedures outlined in that certain motion of the Debtors [Docket No. 31], seeking approval of the same with respect to certain other property of the Debtors. So these motions may be heard contemporaneously, thus setting the stage for a streamlined sale process, the Debtors respectfully request that the Court conduct a hearing on this Motion at the hearing scheduled for April 17, 2023 at 1:30 p.m. (Eastern Time). The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B), which requires an affirmative statement that a *bona fide* effort was made in order to resolve the issues raised in the Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this Court (this "Motion"), pursuant to §§ 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), for the entry of (i) an order, substantially in the form attached hereto as **Exhibit B** (the "Bid Procedures Order"), (a) approving procedures in connection with the sale of certain Assets (as defined herein) of the Debtors, substantially in the form attached to the Bid Procedures Order as Exhibit 1 (the "Bid Procedures"), (b) scheduling the related auction and hearing to consider approval of the Sale (as defined below), (c) approving the form and manner of notice thereof, (d) authorizing the Debtors to enter into the Stalking Horse Agreement (as defined below), (e) approving certain bid protections for the Stalking Horse Bidder (as defined below), and (f) granting related relief; and (ii) an order, substantially in the form attached hereto as **Exhibit C** (the "Sale Order"), (a) approving the Sale of the Assets free and clear of liens, claims, encumbrances, and other interests, and (b) granting related relief.  In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 105, 363, 365, 503, and 507 and Bankruptcy Rules 2002, 6004, 6006, 9007, 9014.

## BACKGROUND

**A.    The Debtors' Chapter 11 Cases**

4.    On March 29, 2023(the "Petition Date"), each of the Debtors other than Banyan Cay Mezzanine Borrower, LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases") before the Bankruptcy Court.  Banyan Cay Mezzanine Borrower, LLC filed its voluntary petition for relief on February 16, 2023.

5.    The Debtors are operating their business and managing their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of this Motion, no request has been made for the appointment of a trustee or examiner and no statutory committee has been appointed in the Chapter 11 Cases.

6.    No committee has been appointed in the Debtor's Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

7.    On March 16, 2023, the Debtors retained Keen-Summit Capital Partners ("Keen-Summit") to act as their marketing agent and broker.

8.    On April 2, 2023, the Debtors filed that certain motion [Docket No. 31] (the "Bid Procedures and Sale Motion"), seeking, *inter alia*, approval of certain bid procedures, substantially identical to those identified in this Motion, with respect to the sale of other property of the Debtors.

## RELIEF REQUESTED

9.    By this Motion, the Debtors seek entry of the Bid Procedures Order in substantially the form attached hereto as **Exhibit B**:

(a)    authorizing and approving the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1** in connection with the sale (the "Sale") of certain property of the Debtors, as more specifically identified in the Stalking Horse Agreement (the "Assets");

(b)     scheduling an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the Sale of the Assets;

(c)     approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as **Exhibit 2** (the "Sale Notice");

(d)     approving the form and manner of notice of the Successful Bidder and Backup Bidder with respect to the Auction, a copy of which is attached to the Bid Procedures Order as **Exhibit 3** (the "Post-Auction Notice");

(e)     authorizing the Debtors to enter into that certain Asset Purchase Agreement with Florida Foreclosure Investments LLC, dated April 10, 2023 (including all schedules and exhibits attached thereto, as it may be amended from time to time in accordance with its terms, the "Stalking Horse Bidder"), a copy of which is attached hereto as **Exhibit A** (the "Stalking Horse Agreement"), pursuant to which the Stalking Horse Bidder seeks to purchase the Assets from the Debtors pursuant to the consideration as set forth therein;

(f)     approving certain bid protections as set forth in the Stalking Horse Agreement, consisting of:

(i)     a break-up fee of $66,000.00 (the "Break-Up Fee"); and

(ii)    an expense reimbursement of $20,000.00 (the "Expense Reimbursement"); and

(iii)   an initial overbid of $133,000.00 (the "Initial Overbid" and, together with the Break-Up Fee and Expense Reimbursement, the "Bid Protections"); and

(g)     granting related relief.

10.     Second, the Debtors may seek entry of the Sale Order at the conclusion of the Sale Hearing in substantially the form attached hereto as **Exhibit C**:

(a)     if an Auction is conducted, authorizing and approving the sale of the Assets (as defined in the Stalking Horse Agreement) to the Qualified Bidder (as defined in the Bid Procedures) that the Debtors determine has made the highest and best Qualified Bid (as defined in the Bid Procedures) for the Assets (the "Successful Bidder") (or, if the Successful Bidder fails to consummate the Sale, to the Qualified Bidder with the next-highest or second-best Qualified Bid at the Auction for the Assets (the "Backup Bidder"), free and clear of all liens, claims, encumbrances, and other interests other than Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement);

     (b)     if an Auction is not conducted, authorizing and approving the Sale of the Assets to the Stalking Horse Bidder free and clear of liens, claims, encumbrances, and other interests other than Permitted Liens and Assumed Liabilities; and

     (c)     granting any related relief.

11.     The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing, subject to the terms of the Stalking Horse Agreement.

## STALKING HORSE AGREEMENT

12.     The key terms of the proposed transaction can be found in the Stalking Horse Agreement attached hereto as **Exhibit A**. The material terms of the Stalking Horse Agreement and other key provisions governing the Sale, as set forth and required in Local Rule 6004-1, are as follows:

- The identity of the Stalking Horse Bidder is Florida Foreclosure Investments LLC.

- The legal description of the real property to be sold pursuant to the Stalking Horse Agreement or the Auction, as applicable, is identified in Exhibit A of the Stalking Horse Agreement.

- The Assets to be purchased consist of real property owned by Debtor Banyan Cay Dev. LLC, comprising of a single-family estate lot (Lot 21) lying in Tract "L1" as recorded in Plat Book 127, Page 18 of the Public Records of Palm Beach County, Florida, and three other single-family estate lots (Lots 8, 10, and 17) lying in Tract "L2" as recorded in Plat Book 125, Page 114 of the Public Records of Palm Beach County, Florida.

- The Stalking Horse Bidder shall deposit the sum of $220,000.00 into an escrow as a good faith deposit.

- The Assets shall be sold free and clear of all liens, claims, and interests, except for the any Assumed Liabilities.

- The known potential lienholders and interest holders, the nature and extent of such liens or interests, and whether such liens or interests are disputed are as follows:

    i.   U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership, holds a foreclosure judgment on substantially all of the Assets (subject to dispute).

    ii.  Property taxes on the Assets are owed to the Palm Beach County Tax Collector.  The property taxes are not disputed.

- The Purchase Price (as such term is defined in the Stalking Horse Agreement) shall be $2,200,000.00, as set forth in the Stalking Horse Agreement.

- Unless otherwise agreed to by the Seller and Successful Bidder in writing, the closings of transactions contemplated by the Stalking Horse Agreement (the "Closing") shall occur on or within ten (10) days after the date of entry of the Sale Order (the "Closing Date").

- Pursuant to the terms of the Stalking Horse Agreement, the Bid Procedures shall provide for, *inter alia*: (i) a break-up fee of $66,000 to be paid to Purchaser in the event of and upon the closing of a sale of the Assets to any other bidder, which break-up fee shall be treated as an administrative expense under section 503(b)(1) of the Bankruptcy Code and secured by a Lien on the Deposit of the Successful Bidder or the closing proceeds in the event such transaction with the Successful Bidder closes; (ii) an expense reimbursement of up to $20,000 limited to actual legal fees and actual costs incurred in connection with this Agreement, which expense reimbursement shall accorded the same treatment set forth in subsection (i) hereof; (iii) "credit" bidding protections for such bidding protections in the case in which the Stalking Horse Bidder participates in an auction; and (iv) a requirement that any competing bid must be at least $133,000.00 greater than the Purchase Price under the Stalking Horse Agreement.

- The Debtors do not have a policy of prohibiting the transfer of personally identifiable information, no consumer privacy ombudsman is required under section 332 of the Bankruptcy Code in connection herewith, and the Sale contemplated in the Stalking Horse Agreement and Bid Procedures would not pose any threat to any personally identifiable information or consumer privacy concerns.

## **THE PROPOSED SALE**

13.    The Debtors believe that a prompt sale of the Assets represents the best option available to maximize value for all stakeholders in the Chapter 11 Cases.

14.     By this Motion, the Debtors respectfully request that the Court approve the following general timeline, with the assumption that the Bankruptcy Court will enter an order granting this Motion on shortened notice.  These dates are identical to those dates set forth in the Debtors' prior Bid Procedures and Sale Motion, and are subject to change in the event the Bankruptcy Court does not enter an order at that hearing:

(a)     ***Bid Deadline***: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures) must be received by no later than **June 8, 2023 at 5:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "Bid Deadline").

(b)     ***Sale Objection Deadline***: Objections to the Sale will be filed and served no later than **June 16, 2023 at 5:00 p.m. (prevailing Eastern Time)**.

(c)     ***Auction***: The Auction, if necessary, will be held on **June 13, 2023 at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.

(d)     ***Sale Hearing***: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **June 20, 2023**.

15.     The Debtors believe this timeline maximizes the prospect of receiving the highest and best offer without unduly prejudicing their estates and is consistent with the timeline provided for the other parcels that compose the Debtors' larger development.  The Debtors believe that the proposed timeline is sufficient to complete a fair, robust and open sale process that will maximize the value received for the Assets, particularly in light of the fact that such Assets have been marketed in excess of three-months on the open market.  To further ensure that the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, and in accordance with the Stalking Horse Agreement, the Debtors and their professionals will continue to actively market the Assets in an attempt to solicit the highest or best bids available.  The Debtors

believe the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

## THE BID PROCEDURES ORDER

### A.     The Bid Procedures

16.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order.  The Bid Procedures were developed to permit an expedited sale process, to promote participation and active bidding, and to ensure that the Debtors receive the highest or best offer for the Assets.  As such, the Debtors believe the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of their estates and all parties in interest.

17.     The Bid Procedures substantially conform to the Bid Procedures identified in the Debtors' prior Bid Procedures and Sale Motion.  In the event of a conflict between the prior-submitted Bid Procedures and those attached hereto (other than conflicts arising from the identities of the Stalking Horse Bidders identified therein, the Assets proposed to be sold thereunder, or any rights arising from the Stalking Horse Agreements described therein), the Debtors respectfully request that the more up-to-date Bid Procedures attached hereto be approved as the controlling Bid Procedures.

18.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, and the criteria for selecting a successful bidder.

19.     Importantly, the Bid Procedures recognize the Debtors' fiduciary obligations to maximize the value of its assets and, as such, do not impair the Debtors' ability to consider all

qualified bid proposals.  Additionally, as noted above, the Bid Procedures preserve the Debtors'
rights to modify the Bid Procedures as necessary or appropriate to maximize value of the Debtors'
estates.

20.     The Debtors believe the proposed Bid Procedures are in the best interest of the
Debtors, their estates, their creditors, and all parties in interest.

**B.      The Auction and Sale**

21.     If a Qualified Bid is received prior to the Bid Deadline (other than the Stalking
Horse Agreement), the Debtors will conduct an Auction to determine the highest and best
Qualified Bid.  This determination shall take into account any factors the Debtors reasonably deem
relevant to the value of the Qualified Bid to the Debtors' estates, including, without limitation, the
Bid Assessment Criteria.  If no Qualified Bid (other than the Stalking Horse Agreement) is
received by the Bid Deadline, the Debtors will deem the Stalking Horse Agreement to be the
Successful Bid without conducting the Auction.  The Debtors seek authority from the Court to
schedule the Auction on a date as further described in the Bid Procedures.

**C.      Form and Manner of Sale Notice and Post-Auction Notice**

22.     On or within two (2) business days after entry of the Bid Procedures Order, the
Debtors will cause the Sale Notice to be served on (a) the Office of the United States Trustee,
(b) all parties who have filed and served requests for notice pursuant to Bankruptcy Rule 2002,
(c) all parties who have communicated, through Keen-Summit, an interest in potentially submitting
a Qualified Bid and/or participating in the Auction, and (d) all known and potential lienholders
with liens on the Assets (collectively, the "Notice Parties").

23.     As soon as reasonably practicable after the entry of the Bid Procedures Order, the
Debtors shall publish the Sale Notice in The Wall Street Journal, and the Debtors respectfully

request that such publication notice be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

24.     Subsequent to the conclusion of the Auction, the Debtors shall serve the Post-Auction Notice on the Notice Parties.

## BASIS FOR RELIEF

**A.     The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved**

### 1.     The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate

25.     The Debtors seek authority to sell the Assets through an Auction and related sale process, subject to the Debtors' right to seek an alternative course of action to maximize the value of their estates.  The Debtors and their advisors have conducted and will conduct an extensive marketing process.  The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of its creditors and other stakeholders.

26.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

27.     The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, and (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests other than Assumed

Liabilities (as such terms are defined in the Stalking Horse Agreement)[2], if any, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds.

28.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice and Post-Auction Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.   The Debtors further submit the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates.   Accordingly, the Debtors respectfully request the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

### 2.      The Bid Procedures Are Appropriate and Will Maximize Value

29.     Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").   Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.   *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated

---

[2] Schedule 1 to Exhibit B of the Stalking Horse Agreement provides that no liabilities shall be assumed pursuant to the Stalking Horse Agreement.

business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

30.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. Of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

31.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

32.     The Debtors believe the proposed Bid Procedures will establish the parameters under which the value of the Sale may be tested at the Auction.  The Bid Procedures will increase the likelihood the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

33.     The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or best offers available for the Assets. The proposed Bid Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

34.     Specifically, the proposed Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

35.     At the same time, the proposed Bid Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or best offer for the completion of the Sale.  Additionally, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures the Debtors obtain fair market value by making a minimum purchase price for the Assets available to the Debtors that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured the consideration obtained will be fair and reasonable and at or above the market.

36.     Thus, the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

### 3.    The Minimum Overbid Increment Is Appropriate

37.    One important component of the proposed Bid Procedures is the "Overbid" provision.  Once the Debtors determine the Baseline Bid, which shall equal or exceed the value of the Stalking Horse Agreement, as determined by the Debtors, plus the Initial Overbid, and hold the Auction, bidding on the Assets must be in initial Minimum Overbid Increments of at least **$25,000.00**, which increment may be reduced as appropriate.

38.    The Debtors believe such Minimum Overbid Increment is reasonable under the circumstances and in light of the value of the Assets, and will enable the Debtors to maximize the value received for the Assets while limiting any potential chilling effect in the marketing process.

### 4.    Entering into the Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should Be Approved

39.    Pursuant to the Motion, the Debtors are seeking the approval of this Court of the Stalking Horse Bidder and to offer the Bid Protections.  The Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid.  The ability of the Debtors to offer the Stalking Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors in that, by providing these incentives, the Debtors will have an opportunity to induce a potential Bidder to submit or increase its bid prior to the Auction.

40.    Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotation omitted); *see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear

that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

41.    As a result, courts routinely approve bid protections similar to the Bid Protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  The Debtors believe the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as these protections will only be employed where a stalking horse bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

42.    The Stalking Horse Bidder has expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, and its bid will be subject not only to Court approval, but also to overbidding by third parties.  The Bid Protections granted to the Stalking Horse Bidder were negotiated in good faith and at arm's length, with significant give-and-take with respect to those Bid Protections. The Debtors agreed to the Bid Protections in the Stalking Horse Agreement because they ensure the Debtors will have the benefit of the option to accept the transaction with the Stalking Horse offered through the Stalking Horse Agreement, without sacrificing the potential for interested parties to submit overbids at the Auction.

**B.    Approval of the Proposed Sale Is Appropriate and in the Best Interest of the Estate**

  **1.    The Sale of the Assets Should Be Authorized Pursuant to Bankruptcy Code Section 363 as a Sound Exercise of the Debtor's Business Judgment**

43.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to

§ 363 if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

44.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith. *See Del. & Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

45.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

46.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. Of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of

the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d

858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995)

("The business judgment rule 'is a presumption that in making the business decision the directors

of a corporation acted on an informed basis, in good faith, and in the honest belief that the action

was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No.

11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business

justification exists, then a strong presumption follows that the agreement at issue was negotiated

in good faith and is in the best interests of the estate.") (citations omitted). Thus, if a debtor's

actions satisfy the business judgment rule, then the transaction in question should be approved

under Bankruptcy Code § 363(b)(1). Indeed, when applying the business judgment standard,

courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon

Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under

this test, the debtor's business judgment . . . must be accorded deference unless shown that the

bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

47.    The Debtors have a sound business justification for selling the Assets. The value

of the Assets will be tested through the Auction conducted pursuant to and according to the Bid

Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of

the Auction and accepted by the Debtors in the exercise of their reasonable business judgment,

will constitute the highest and best offer for the Assets and at this time the Debtors believe will

provide a recovery for its estate greater than any known or practically available alternative. *See,

e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del.

2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the

auction procedure has developed over the years as an effective means for producing an arm's-

length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid.

48.     Thus, absent a change in circumstances that causes the Debtors to abandon the sale process, the Debtors submit the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to explore selling the Assets through an Auction process and subsequently to enter into the asset purchase agreement with the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse Bidder) will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request the Court make a finding the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**2.      Adequate and Reasonable Notice of the Sale Will Be Provided**

49.     As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing, (ii) inform parties in interest of the deadlines for objecting to the Sale, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice and Post-Auction Notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

**3.      The Sale and Purchase Price Will Reflect a Fair-Value Transaction**

50.      It is well settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value

is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).  The Debtors will continue to market the Assets and solicit offers consistent with the Bid Procedures and Stalking Horse Agreement.  In this way, the number of Bidders that are eligible to participate in the competitive Auction process will be maximized.  On the other hand, if the Debtors enters into the Stalking Horse Agreement and no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

  **4.**  **The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Bankruptcy Code Section 363(f)**

  51.  The Debtors further submit it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Interests") other than Permitted Exceptions and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement), if any, pursuant to § 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent applicable.

  52.  Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

  53.  Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.

*See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citicorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating section 363(f) of the Bankruptcy Code is written in the disjunctive; holding the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) has been satisfied).

54.     The Debtors submit that the Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of section 363(f).  Consistent with section 363(f)(2), subject to the terms of the Stalking Horse Agreement, each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets.  Furthermore, any party holding a valid lien against the Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors from the sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force, and effect such creditor had prior to such sale, subject to any order by this Court, and claims and defenses the Debtors and their estates may possess with respect thereto.  Accordingly, section 363(f) authorizes the sale and transfer of the Assets free and clear of any such Interests including.

**5.      The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code Section 363(n)**

55.      The Debtors request that the Court find the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

56.      Section 363(m) provides, in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

57.      Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith."  Although the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

58.      The Debtors submit the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, would be a "good faith purchaser" within the meaning of Bankruptcy

Code section 363(m), and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m).[3]  The Debtors will submit evidence at the Sale Hearing to support these conclusions.

**D.    Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

59.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

60.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its

---

[3] The Debtors believe a finding of good faith within the meaning of section 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bid Procedures.  Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures.  In addition, the Debtors will not choose as the Successful Bidder or the Backup Bidder any entity whose good faith under section 363(m) can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) has been satisfied.

intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

61.     To maximize the value received from the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## CONSENT TO JURISDICTION

62.     The Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

63.     Notice of this Motion will be given to: (a) the Office of the United States Trustee, (b) all parties who have filed and served requests for notice pursuant to Bankruptcy Rule 2002, (c) all parties who have communicated, through Keen-Summit, an interest in potentially submitting a Qualified Bid and/or participating in the Auction, and (d) all other parties entitled to notice hereof.

64.     In addition, copies of the Sale Notice, the Bid Procedures, the Bid Procedures Order, and the Post-Auction Notice will be served on the applicable parties no later than three (3) business days after entry of the Bid Procedures Order by this Court.  In light of the nature of the relief requested herein, the Debtors submit no other or further notice is required.

## NO PRIOR REQUEST

65.     No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request this Court: (i) enter the Bid Procedures Order, the form of which is attached as **Exhibit B** hereto, (ii) enter the Sale Order, the form of which is attached as **Exhibit C** hereto, and (iii) grant such other and further relief as is just and proper.

Dated:   April 12, 2023

Respectfully submitted,

**PACK LAW**
*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Telephone: (305) 916-4500

By:   *Jessey J. Krehl*
      Joseph A. Pack
      Email:  joe@packlaw.com
      Florida Bar No. 117882

      Jessey J. Krehl
      Email:  jessey@packlaw.com
      Florida Bar No. 1025848

**<u>Exhibit A to Motion</u>**

**Stalking Horse Agreement**

ASSET PURCHASE AGREEMENT

BETWEEN

BANYAN CAY DEV. LLC

as Seller

AND

FLORIDA FORECLOSURE
INVESTMENTS LLC

as Buyer

*Banyan Cay Resort & Golf, LLC, et al.*
Case No. 23-12386-EPK
(Jointly Administered)

*Banyan Cay Dev. LLC*
Case No. 23-12387-EPK

Dated as of: April 8, 2023

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this *"Agreement"*), dated as of the 8th day of April, 2023, between Banyan Cay Dev. LLC (*"Seller"* or *"Debtor"*) and Florida Foreclosure Investments LLC (the *"Buyer"*) (Seller and Buyer are sometimes collectively referred to herein as the *"Parties"*) recites and provides:

## RECITALS

**WHEREAS**, on March 29, 2023, Banyan Cay Dev. LLC, and various of its debtor affiliates, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (such title of the United States Code, the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the Southern District of Florida (the *"Bankruptcy Court"*) commencing Case No. 23-12387-EPK (the *"Bankruptcy Case"* or *"Chapter 11 Case"*);

**WHEREAS**, Seller desires to sell, transfer, convey and assign to Buyer, and Buyer desires to purchase and acquire from the Seller, certain of Seller's Assets (as defined herein) free and clear of all Liens (as defined herein), other than Assumed Liabilities (as herein defined), all as more specifically set forth herein; and

**WHEREAS**, the Parties contemplate that such assets will be sold, transferred, conveyed and assigned to Buyer and/or its affiliated designee pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with an order to be entered by the Bankruptcy Court and in accordance with this Agreement.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

1.      Bankruptcy Court Approval. The Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval after notice and a hearing, subject to higher and better offers, and the provisions, requirements and limitations of the Sale Order (defined below).

2.      Sale and Purchase of Property. Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the following assets (collectively, the *"Assets"*):

2.1      The real property identified on Exhibit A hereof, together with all improvements, structures or facilities currently or hereafter located thereon, all fixtures, systems, and items of personal property attached or appurtenant thereto and all interests, easements, rights of way, licenses, rights, privileges, covenants, restrictive covenants, hereditaments and other appurtenances relating to the foregoing (the *"Real Property"*).

4.      Excluded Assets. The term *"Excluded Assets"* means the following assets of Seller, all of which are and shall be excluded from the purchase and sale transaction provided for

1

in this Agreement:

4.1    the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments, such as certificates of deposit, treasury bills and other marketable securities;

4.2    all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

4.3    any and all right, title and interest in any current or prior insurance policy(ies) in connection with the ownership or operation of the Real Property by the Seller and any and all amounts claimed and/or collected pursuant to such insurance policy(ies);

4.4    all rights of Seller under this Agreement;

4.5    all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, and pending litigation;

4.6    all rights, claims, defenses and other matters that relate to any construction contracts affecting the Real Property, except that Buyer shall have all such rights, claims and defenses if such contracts are Assumed Contracts; notwithstanding anything herein to the contrary, any construction defect or related claims which arose prior to Closing shall be Excluded Assets;

4.7    all rights, claims, causes of action, defenses and other matters that relate or belong to the Seller, including without limitation, any claims, or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code;

4.8    any prepaid expenses, advance payments, security deposits, rents and other items related to the Assets that are applicable to the period prior to Closing, or that relate to executory contracts, other than with respect to any Assumed Contracts; and

4.9    any asset not specifically included in the definition of "Assets".

5.    Deposit.
5.1    Upon execution of this Agreement by the last of Buyer and Seller, Buyer shall have deposited the total sum of 10% of the Purchase Price, $220,000.00, with counsel to Seller, Pack Law (the **"Deposit Agent"**), in the form of a wire transfer or certified check payable to Deposit Agent, in escrow, as Buyer's initial deposit under this Agreement (the **"Deposit"**), which Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or returned to Buyer if this Agreement is not approved by the Bankruptcy Court, or paid to Seller in the event of Buyer's unexcused failure to perform its obligations at Closing.

5.2    If all of the contingencies set forth in Section 11 are satisfied or waived in

2

writing by Buyer, and Seller then fails, after the entry of the Sale Order, to close on the sale of the Property to Buyer as required by this Agreement, Buyer shall be entitled to a refund of the Deposit, as its sole and exclusive remedy and as liquidated damages for Seller's failure to close.

6.     Purchase Price.
    6.1     The purchase price for the Assets shall be **$2,200,000.00** (the **"*Purchase Price*"**). At the Closing, Buyer shall: (i) pay to Seller the Purchase Price, by wire transfer of immediately available funds to such account(s) as Seller shall designate; and (ii) execute an assumption agreement pursuant to which Buyer assumes the Assumed Liabilities (as defined in Section 7).

7.     Assumption of Liabilities.
    7.1     The term **"*Assumed Liabilities*"** refers to all of Debtor's obligations listed on Schedule 1 to Exhibit B, as well as any liabilities that this Agreement expressly provides that Buyer shall assume. Buyer shall file a notice with the Bankruptcy Court, at least two (2) business days prior to the final hearing to approve the sale of the Assets, setting forth a final schedule of Assumed Liabilities. Other than the Assumed Liabilities, Buyer is neither assuming nor agreeing to pay or discharge any of the liabilities or obligations of Seller, and nothing in this Agreement or otherwise shall be construed to the contrary. Other than as specifically set forth herein, all liabilities and obligations of Seller, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, are and shall remain the responsibility of Seller.

8.     Bankruptcy Court Approval, Break-Up Fee, and Overbid Protections.
    8.1     Bankruptcy Court Approval. Seller will file its Motion pursuant to 11 U.S.C. §§105 and 363 and Fed. R. Bankr. P. 2002, 6004 and 9014 and Local Rules 2002-1(C)(2) and 6004-1 for the entry of an Order (1) approving competitive bidding and sale procedures for the sale of the Assets, (2) scheduling dates to conduct auction and hearing to consider final approval of sale, (3) approving the form and manner of notices, (4) approving the sale of the Assets free and clear of all liens, claims, encumbrances and interests, and (5) granting related relief (the "*Sale Motion*"). Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the bidding and sale procedures proposed in the Sale Motion (the "*Bid Procedures*") and if Buyer is the successful bidder at the auction contemplated in the Bid Procedures, then to use commercially reasonable efforts to obtain Bankruptcy Court approval sale of the Assets to Buyer pursuant to this Agreement (the "*Sale Order*"). The Sale Order shall be in a form reasonably acceptable to Buyer and Seller and shall contain the following provisions:

    (a)     a finding that notice of the Sale Motion and the proposed sale of the Assets was proper and sufficient under the Bankruptcy Code and Bankruptcy Rules, and that all parties in interest entitled to notice of the Sale Motion received such notice;

    (b)     the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

    (c)     all defaults under the Assumed Contracts have been cured or waived by the counterparties to the Assumed Contracts or Buyer has provided adequate assurances of future performance in respect of the Assumed Contracts;

    (d)     the sale of the Assets to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens, attaching to the sale proceeds;

(e) Buyer is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Buyer, Buyer is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or *de facto* merger of Buyer and Seller;

(f) Buyer has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(g) the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(h) Buyer is not assuming or acquiring any of the Excluded Assets;

(i) all Persons are enjoined from in any way pursuing Buyer or the Assets by suit or otherwise to recover on any Liens which they may have against Debtor or the Assets as of the Closing Date; and

(j) the Sale Order shall contain a waiver of the 14 day stay pursuant to, and shall be effective immediately notwithstanding the provisions of, Bankruptcy Rules 6004(h) and 6006(d).

8.2. <u>Break-Up Fee</u>. In the event Buyer is not in default hereunder, has not terminated this Agreement pursuant to the terms hereof, and is ready, willing, and able to close on the purchase of the Assets, and should Seller accept a higher or better offer to sell the Assets to another Buyer ("*Alternative Buyer*"), which sale is approved by the Bankruptcy Court in the Bankruptcy Case, and such transaction closes, then Seller agrees that Buyer shall be entitled to receive 3% of the Purchase Price as a break-up fee to reimburse Buyer for the value of its time, costs, and expenses incurred in connection with this transaction, including Buyer's agreement to serve and participate as the "stalking horse" bidder under the Sale Procedures Order (the "*Break-Up Fee*"), together with an additional $20,000 expense reimbursement for Buyer's reasonable, documents, out-of-pocket expenses (the "*Expense Reimbursement*"). The Break-Up Fee and Expense Reimbursement shall be entitled to status as administrative expenses under Bankruptcy Code section 503(b)(1), shall be secured by a Lien on the deposit of the Alternative Buyer or the closing proceeds in the event the transaction with the Alternative Buyer closes, and shall be paid solely and exclusively from such forfeited deposit or closing proceeds. Any sums becoming payable to Buyer pursuant to this Section 8.2 shall be paid to Buyer promptly after the closing with any such Alternative Buyer approved in the Bankruptcy Case or, if applicable, promptly after the deposit on such transaction is forfeited.

8.3. <u>Overbid Protections</u>. In the event of an Auction (as defined herein) in connection with the Sale of the Assets, the initial overbid or baseline bid, as the case may be (the "*Initial Overbid*"), above the Purchase Price for the purposes of such Auction shall be no less than the Purchase Price plus: (i) the amount of the Break-up Fee, (ii) the amount of the Expense Reimbursement, and (iii) the sum of $75,000.00. The overbid increment after the Initial Overbid at the Auction (the "*Overbid Increment*") shall be no less than $25,000.00.

9.    <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer:

9.1    the Sale Order shall have been entered by the Bankruptcy Court, and the Sale Order shall contain findings set forth in Section 8 above; and

9.2    the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement.

9.3    If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under Section 17 and any other provision of this Agreement that expressly provides for such survival.

10.    <u>Conditions to Obligations of Seller</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

10.1    the Sale Order shall have been entered by the Bankruptcy Court;

10.2    the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default in any material respect under the provisions of this Agreement;

10.3    Buyer shall have paid to Seller the Purchase Price and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing; and

10.4    the Bankruptcy Court shall have made a finding of good faith, pursuant to section 363(m) of the Bankruptcy Code.

11.    <u>Closing</u>.

11.1    <u>Conveyance of Property</u>. Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer on the Closing Date the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to Buyer free and clear of all Liens in accordance with sections 363(b) and (f) of the Bankruptcy Code, with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES:

11.2    Quitclaim Deed (the "***Deed***") conveying the Real Property to Buyer which shall be free and clear of any and all Liens in accordance with section 363(f) of the Bankruptcy Code, except those approved by Buyer.

11.3    Bill of Sale (the "***Bill of Sale***") transferring the Tangible Personal Property to Buyer (if any); and

11.4     Separate Assignment and Assumption Agreements for all of the Assumed Contracts (if any).

Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "***Closing***") shall take place within ten business days after the entry of the Sale Order (the "***Closing Date***"). Notwithstanding anything herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved.

11.5     Closing shall be conducted through an escrow arrangement by the title insurance agent through which Buyer is purchasing title insurance for the Real Property (the "***Closing Agent***"), provided such Closing Agent is reasonably satisfactory to Seller. Closing shall take place at the offices of the Closing Agent, virtually through other instructions, or such other place as the parties may designate in writing.  Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement.

11.6     At the Closing, Seller shall deliver to Buyer:

(a)     the transfer instruments provided for in this Section 11; and
(b)     such other documents as Buyer may reasonably request to consummate the transaction provided for in this Agreement.

11.7     At the Closing, Buyer shall deliver to Seller:

(a)     the Purchase Price as provided in Section 6;
(b)     the transfer instruments provided for in this Section 11; and
(c)     such other documents as Seller may reasonably request to consummate the transaction provided for in this Agreement.

11.8     Buyer shall pay, on the Closing Date, the cost of recording the deed and the cost of the issuance of the title insurance policy premium for any owner's title insurance policy (and any loan policy) obtained by Buyer or its lender (if applicable), the cost of all title updates, title examination, and lien searches, and the cost of any inspections and/or surveys, any settlement fees charged by the Person conducting the Closing, state documentary stamps which are required to be affixed to the instrument of conveyance, the cost of recording any corrective documents, the cost of recording of the deed and all other costs and charges of Closing. Each Party shall pay its own attorneys' and other professionals' fees.

12.     Prorations.

12.1     Real property taxes and assessments for the tax year in which the Closing occurs, and all utility bills shall be apportioned between Buyer and Seller as of the Closing Date. If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation and a further proration shall be made between the parties when the final documentation or billing becomes available, provided that if the final documentation or billing is not available within 30 days after the Closing, then no further proration shall be made.  The provisions of this Section 12 shall survive the Closing.

12.2     The parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any

cash, checks with appropriate endorsements or other property that they may receive on or after the Closing Date which properly belong to the other Party, including any insurance proceeds, and shall account to the other for all such receipts.

13.   <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer that, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, Seller has the power to convey the Assets to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.

14.   <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

14.1   At the time of closing, Buyer will be a limited liability company, duly organized and validly existing under the laws of the State of Florida.

14.2   The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer. This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

14.3   Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, nor any rules, regulations, permits, licenses and orders promulgated thereunder.

14.4   BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT THE ASSETS ARE SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER IN "AS IS" CONDITION ON A "WHERE IS" BASIS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT.

15.   <u>Default and Remedies</u>.
15.1   If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

15.2   If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order, or any other order of the Bankruptcy Court applicable to the sale of the Assets hereunder, then Buyer may, as its exclusive remedy, receive a return of its Deposit and terminate this Agreement by notice to Seller.

16.  Risk of Loss. Risk of loss to the Assets or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon Seller until the Closing. If, between the date hereof and the Closing, any portion of the Assets shall be damaged or destroyed by fire or other casualty or be subject to any claim of condemnation, Seller shall notify Buyer in writing of said damage, destruction, casualty or loss and the extent thereof or of such condemnation claim as the case may be. If the cost to repair any such damage exceeds $1,000,000 or in the event of any such claim for condemnation, Buyer shall have the option, exercisable by notice to Seller given within ten days after Seller's notice to Buyer of said damage, destruction, casualty, loss or condemnation, to either: (a) terminate this Agreement, whereupon Deposit Agent shall forthwith refund the Deposit to Buyer and upon such refund this Agreement shall terminate and neither party shall have any further liability to the other hereunder (except for any rights and obligations arising under this Agreement which by their terms survive such termination); or (b) elect to proceed with this Agreement and pay the full Purchase Price, in which case Seller shall assign to Buyer any insurance or condemnation proceeds to which Seller or its successors may be entitled as a result of such damage, destruction, condemnation, loss or casualty without Seller replacing or repairing any such damage. If Buyer fails to give such written notice, Buyer shall be conclusively deemed to have chosen option (b).  If the cost to repair any such damage is equal to or less than $1,000,000, Buyer shall proceed to Closing, in which event Seller agrees to pay to Buyer at the Closing all insurance or condemnation proceeds which Seller has received as a result of the same, if any, and assign to Buyer all insurance proceeds payable as a result of the same without Seller replacing or repairing such damage, and Seller will have no further obligations to Buyer in respect of such loss or damage.

17.  Claims of Brokers. Other than as set forth herein Seller shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer. The provisions of this Section shall survive the Closing and any termination of this Agreement.  For the avoidance of doubt, the Buyer represents that it has not engaged a broker in connection with the Real Property or this Agreement, and therefore no commissions are due on behalf of the Buyer.  Keen-Summit Capital Partners, LLC shall be paid a commission at Closing, the amount of which shall be set forth in the Sale Order and the order approving the retention of the same in the Bankruptcy Case.

18.  Parties' Access to Records after Closing. Except as provided in Section 19, the Parties agree to preserve until the earlier of the first anniversary of the Closing Date or the date the Debtor's bankruptcy estate is closed, all records in their possession relating to any of the Assets. Buyer shall permit the Seller or his representatives to gather and prepare such information as the Seller may reasonably require for preparing its tax returns for periods prior to the Closing Date. If either Seller or Buyer needs access to records in the possession of the other Party relating to any of the Assets for purposes of preparing income tax returns or for complying with any audit request, subpoena or other investigative demand by any governmental authority or for any civil litigation or for any other legitimate purpose not injurious to the other Party, such Party shall allow representatives of the other Party access to such records, including reasonable use of office space and facilities, during regular business hours at such Party's place of business for the sole purpose of obtaining information for use as provided for in this Section and shall permit such other Party to make extracts and copies thereof as may be necessary or convenient.

19.  Disposal of Records. Either Party may at any time and from time to time after the Closing Date and prior to the earlier of the second anniversary of the Closing Date or the date the Debtor's bankruptcy case is closed, dispose of the records in its possession relating to the Real Property after giving 60 days' prior written notice of such disposal to the other Party; provided, however, that if such records are pertinent to any dispute, claim, litigation, governmental

investigation or the determination of any federal, state or local tax liability of the other Party, then such other Party shall have the right, by giving written notice to the Party desiring to dispose of records within such 60 day period, to require the Party desiring to dispose of records to retain such records until such time as the other Party may specify or provide such records to the other Party.

20.    Further Assurances. Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

21.    Deposit Agent Provisions.

21.1    If conflicting demands relating to this Agreement are made upon the Deposit Agent, the parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following: (i) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (ii) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the parties under this Agreement, the Deposit Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

21.2    In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct. Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

21.3    Buyer and Seller reserve the right, at any time and from time to time, by mutual agreement, to substitute a new escrow agent in place of Deposit Agent. In addition, Deposit Agent reserves the right to resign from its role as escrow agent by giving the Seller and the Buyer written notice of such resignation. If Seller and Buyer have jointly designated a successor escrow agent in writing, then Deposit Agent shall deliver any funds held by Deposit Agent under this Agreement to such successor escrow agent. However, if no such successor escrow agent is designated by Seller and Buyer in writing within ten days after any notice of resignation from Deposit Agent, then Deposit Agent may deliver any such funds to the Bankruptcy Court and interplead Buyer and Seller in connection therewith.

21.4    Seller acknowledges that Deposit Agent also serves as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity. In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to

this Agreement the Funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

22.    <u>Certain Definitions; Rules of Construction</u>.

22.1    The following terms have the following meanings in this Agreement:

(a)    "*Auction*" shall have the meaning set forth in the Bid Procedures.

(b)    "*Legal Costs*" means court costs and attorneys' fees and costs, including the costs of paralegals, whether or not any mediation, arbitration or legal proceeding is filed, or if any mediation, arbitration or legal proceeding is filed, then all such costs incurred at any point in such mediation, arbitration or legal proceeding, including trial and all levels of appeal.

(c)    "*Lien*" means "any interest in" the Assets as used in Section 363(f) of the Bankruptcy Code and includes any lien (including any tax lien or judgment lien), pledge, security interest, mortgage or lis pendens, contracts, options or other rights to acquire any condominium units or any other interest in the Assets, but does not include any easements or restrictions of record.

(d)    "*Party*" or "*Parties*" mean Seller and/or Buyer, as the context may require.

(e)    "*Person*" means any individual or any corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or other legal entity or a government or governmental entity.

22.2    As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and Schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

22.3    Each Party and its counsel have reviewed and revised this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

23.    <u>Miscellaneous</u>.

23.1    This Agreement and the Schedules to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

23.2    This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements,

understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

        23.3      All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by a recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

If to Buyer, addressed to:

        Florida Foreclosure Investments LLC
        Attention: Sam Fisch
        4616 S Dixie Hwy
        West Palm Beach, FL 33405
        Email: sfisch@reswpb.com

With a copy to:

        Law Offices of Cary P. Sabol
        Attention: Cary P. Sabol
        P.O. Box 15981
        West Palm Beach, FL 33416
        Email: csabol@sabollaw.com

If to Seller, addressed to:

        Banyan Cay Dev. LLC (as Seller)
        Attention: Gerard McHale, McHale, P.A.
        1601 Jackson Street, # 200
        Fort Myers, Florida 33901
        Email: jerrym@thereceiver.com

With a copy to:

        Pack Law
        Attention:  Joseph Pack, Jessey Krehl
        51 Northeast 24th Street, Suite 108
        Miami, Florida 33137
        Telephone: (305) 916-4500
        Email:  joe@packlaw.com; jessey@packlaw.com

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

        23.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall be accorded the same enforcement rights as an original. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement.

        23.5    Time is of the essence with respect to each Party's obligations hereunder.

23.6     This Agreement shall not be recorded by Buyer and, if recorded by Buyer, Seller may immediately terminate all of its obligations under this Agreement, and Buyer shall pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section 23.6 shall survive the Closing.

23.7     If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Miami, Florida are open for business, but in no case will the extension be for more than three days. For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are closed or are authorized to be closed, including all legal holidays.

23.8     Notwithstanding any other provision of this Agreement, any representation, warranty or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

23.9     Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

23.10     The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

23.11     No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

23.12     The rights and obligations of Buyer hereunder may be assigned to one or more affiliated entities without the consent of Seller, and to any unaffiliated third party with the prior written consent of Seller. No assignment under this provision shall relieve Buyer of liability to Seller for amounts accruing under this Agreement. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties hereto. The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, or shall any such third party have any rights hereunder.

23.13     This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of

process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

23.14    BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

[*Signature Page Follows*]

WITNESS the following signatures as of the date in the preamble.

BUYER:

_Sam Fisch_

By: Sam Fisch
    Manager,
    Florida Foreclosure Investments LLC

Date: 04/10/23

SELLER:

By: Gerard McHale, McHale, P.A.
    Chief Restructuring Officer,
    Banyan Cay Dev. LLC

Date: 4/10/23

## EXHIBIT A

## LEGAL DESCRIPTIONS

Legal Description of Lot 21:

LOT 21 OF BANYAN CAY RESORT REPLAT OF TRACT "L1", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 127, PAGE 18, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

Legal Description of Future Lot 8:

A PARCEL OF LAND LYING IN TRACT "L2", BANYAN CAY RESORT, AS RECORDED IN PLAT BOOK 125, PAGE 114, PUBLIC RECORDS, PALM BEACH COUNTY, FLORIDA; SAID PARCEL OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**COMMENCE** AT THE SOUTHEAST CORNER OF SAID TRACT "L2"; THENCE, NORTH 78°15'04" WEST, ALONG THE BOUNDARY OF SAID TRACT, A DISTANCE OF 55.97 FEET; THENCE, NORTH 57°00'00" WEST, CONTINUING ALONG SAID TRACT BOUNDARY, A DISTANCE OF 77.84 FEET TO THE **POINT OF BEGINNING**;

THENCE, CONTINUE NORTH 57°00'00" WEST, CONTINUING ALONG SAID TRACT BOUNDARY, A DISTANCE OF 65.00 FEET; THENCE, SOUTH 33°00'00" WEST, DEPARTING SAID TRACT BOUNDARY, A DISTANCE OF 150.00 FEET; THENCE, SOUTH 57°00'00" EAST, A DISTANCE OF 65.00 FEET; THENCE, NORTH 33°00'00" EAST, A DISTANCE OF 150.00 FEET TO THE **POINT OF BEGINNING**.

CONTAINING: 9,750 SQUARE FEET OR 0.22 ACRE, MORE OR LESS.

SUBJECT TO EASEMENTS, RESERVATIONS, RESTRICTIONS AND RIGHTS-OF-WAY OF RECORD.

Legal Description of Future Lot 10:

A PARCEL OF LAND LYING IN TRACT "L2", BANYAN CAY RESORT, AS RECORDED IN PLAT BOOK 125, PAGE 114, PUBLIC RECORDS, PALM BEACH COUNTY, FLORIDA; SAID PARCEL OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**BEGIN** AT THE SOUTHEAST CORNER OF SAID TRACT "L2"; THENCE, SOUTH 33°00'00" WEST, ALONG THE BOUNDARY OF SAID TRACT, A DISTANCE OF 170.29 FEET; THENCE, NORTH 88°30'57" WEST, CONTINUING ALONG SAID TRACT BOUNDARY, A DISTANCE OF 45.65 FEET TO A POINT ON A CURVE CONCAVE WEST, HAVING A RADIUS OF 50.00 FEET AND WHOSE RADIUS POINT BEARS NORTH 88°30'57" WEST; THENCE, NORTHERLY, DEPARTING SAID TRACT BOUNDARY, AND ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 39°09'53", A DISTANCE OF 34.18 FEET TO THE END OF SAID CURVE; THENCE, NORTH 33°00'00" EAST, A DISTANCE OF 152.82 FEET TO SAID TRACT BOUNDARY; THENCE, SOUTH 57°00'00" EAST, ALONG SAID TRACT BOUNDARY, A DISTANCE

OF 12.84 FEET; THENCE, SOUTH 78°15'04" EAST, CONTINUING ALONG SAID TRACT BOUNDARY, A DISTANCE OF 55.97 FEET TO THE **POINT OF BEGINNING**.

CONTAINING: 11,027 SQUARE FEET OR 0.25 ACRE, MORE OR LESS.

SUBJECT TO EASEMENTS, RESERVATIONS, RESTRICTIONS AND RIGHTS-OF-WAY OF RECORD.

Legal Description of Future Lot 17:

A PARCEL OF LAND LYING IN TRACT "L2", BANYAN CAY RESORT, AS RECORDED IN PLAT BOOK 125, PAGE 114, PUBLIC RECORDS, PALM BEACH COUNTY, FLORIDA; SAID PARCEL OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**COMMENCE** AT THE SOUTHEAST CORNER OF SAID TRACT "L2"; THENCE, SOUTH 33°00'00" WEST, ALONG THE BOUNDARY OF SAID TRACT, A DISTANCE OF 170.29 FEET; THENCE, NORTH 88°30'57" WEST, CONTINUING ALONG SAID TRACT BOUNDARY FOR THIS AND THE NEXT EIGHT COURSES, A DISTANCE OF 45.65 FEET TO A POINT ON A CURVE CONCAVE NORTH, HAVING A RADIUS OF 50.00 FEET AND WHOSE RADIUS POINT BEARS NORTH 88°30'57" WEST; THENCE, WESTERLY, ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 194°28'34", A DISTANCE OF 169.71 FEET TO THE END OF SAID CURVE; THENCE, SOUTH 33°00'00" WEST, A DISTANCE OF 125.35 FEET; THENCE, NORTH 57°00'00" WEST, A DISTANCE OF 325.00 FEET; THENCE, SOUTH 33°00'00" WEST, A DISTANCE OF 5.91 FEET; THENCE, NORTH 57°00'00" WEST, A DISTANCE OF 65.00 FEET TO THE **POINT OF BEGINNING**;

THENCE, SOUTH 33°00'00" WEST, A DISTANCE OF 21.99 FEET; THENCE, NORTH 57°00'00" WEST, A DISTANCE OF 46.77 FEET; THENCE, SOUTH 73°48'42" WEST, A DISTANCE OF 9.43 FEET; THENCE, NORTH 07°01'33" WEST, DEPARTING SAID TRACT BOUNDARY, A DISTANCE OF 18.76 FEET; THENCE, NORTH 33°00'00" EAST, A DISTANCE OF 139.93 FEET TO A POINT ON A CURVE CONCAVE SOUTH, HAVING A RADIUS OF 413.00 FEET AND WHOSE RADIUS POINT BEARS SOUTH 10°45'19" WEST; THENCE, EASTERLY, ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 09°27'59", A DISTANCE OF 68.24 FEET TO THE END OF SAID CURVE; THENCE, SOUTH 33°00'00" WEST, A DISTANCE OF 145.68 FEET TO **THE POINT OF BEGINNING**.

CONTAINING: 10,317 SQUARE FEET OR 0.24 ACRE, MORE OR LESS.

SUBJECT TO EASEMENTS, RESERVATIONS, RESTRICTIONS AND RIGHTS-OF-WAY OF RECORD.

**<u>EXHIBIT B</u>**

**PERSONAL PROPERTY**

<u>None</u>

## SCHEDULE 1 TO EXHIBIT B

### ASSUMED LIABILITIES

None

**<u>Exhibit B to Motion</u>**

**Proposed Bid Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12368 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN PROPERTY OF THE DEBTORS' ESTATES, (II) SCHEDULING AN AUCTION AND A SALE HEARING, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE AGREEMENT, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors") for entry of an order (this "Order") (i) authorizing and approving the Bid Procedures attached hereto as **Exhibit 1** (the "Bid Procedures") in connection with the sale

---

[1] The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

[2] Capitalized terms used as defined terms herein but not otherwise defined shall have the meanings ascribed to them in the Motion or the Bid Procedures, as applicable. In the event there is a conflict between this Order and the Motion, this Order shall control and govern.

(the "Sale") of certain assets of the Debtors identified in the Stalking Horse Agreement (the "Assets"), (ii) scheduling an auction and hearing to consider the Sale of the Assets, (iii) approving the form and manner of notice thereof, (iv) authorizing the Debtors to enter into the Stalking Horse Agreement (as defined below), (v) approving the Bid Protections (as defined below) in connection therewith, and (vi) granting related relief, all as more fully set forth in the Motion; this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); this Court having determined the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor:

**THE COURT FINDS THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

C.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors have confirmed its consent to the entry of a final order by this Court in connection with the Motion, to the extent it is later determined this Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

D.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      The bases for the relief requested in the Motion are sections 105, 363, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006, 9007, and 9014.

F.      Good and sufficient notice of the Motion, including the relief sought therein, and the Hearing was sufficient under the circumstances, and such notice complied with all applicable requirements under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice need be provided.  A reasonable opportunity to object or be heard regarding the relief provided in this Order has been afforded to all parties in interest.

G.      The Debtors have articulated good and sufficient reasons for this Court to (i) approve the Bid Procedures, (ii) schedule the bid deadlines and the Auction and the Sale Hearing, (iii) approve the form and manner of notice of the Auction and Sale Hearing, (iv) authorize the Debtors to enter into a Stalking Horse Agreement, and (v) extend to the Stalking Horse Bidder the Bid Protections, in the exercise of its reasonable business judgment.  The entry of this Order is in the best interests of the Debtors, their estate, creditors, and other parties in interest.

H.      The Bid Procedures attached hereto as **Exhibit 1** are reasonable, appropriate and represent the best method for maximizing value for the benefit of the Debtors, their estates, and their creditors.  The Bid Procedures were negotiated at arm's length, in good faith, and without collusion.  The Bid Procedures balance the Debtors' interests in emerging expeditiously from the chapter 11 cases while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors, their estates, their creditors, and other parties in interest.

I.      The Debtors have demonstrated compelling and sound business justifications for authorization to (i) enter into that certain Asset Purchase Agreement, a copy of which is attached

3

as **Exhibit A** to the Motion (the "Stalking Horse Agreement") by and among the Debtors and the

Stalking Horse Bidder, and (ii) offer the Stalking Horse Bidder the following: (a) a break-up fee

equal to 3% of the Purchase Price (the "Break-Up Fee") on the terms set forth in the Stalking Horse

Agreement, (b) an expense reimbursement in the amount of $20,000 (the "Expense

Reimbursement"), and (c) an initial overbid of to **$133,000.00** (the "Initial Overbid" and, together

with the Break-Up Fee and the Expense Reimbursement, the "Bid Protections").  With respect to

the Bid Protections, the Court makes the following findings:

  a.  the Bid Protections are the product of extensive negotiations between the Debtors and the Stalking Horse Bidder conducted in good faith and at arm's length, and the Stalking Horse Agreement (including the Bid Protections) are the culmination of a process undertaken by the Debtors and their professionals to negotiate a transaction with a bidder who was prepared to pay the highest price or best purchase price to date for the Assets to maximize the value of the Debtors' estates;

  b.  the Break-Up Fee and Expense Reimbursement are an actual and necessary cost and expenses of preserving the value of the respective Debtors' estate;

  c.  the Bid Protections are fair, reasonable, and appropriate in light of, among other things, the size and nature of the proposal Sale under the Stalking Horse Agreement, the substantial efforts that have been and will be expended by the Stalking Horse Bidder, and notwithstanding that the proposed sale is subject to higher and better offers, the substantial benefits the Stalking Horse Bidder has provided to the Debtors, their estates, their creditors, and all parties in interest, including, among other things, by increasing the likelihood that the best possible price for the Assets will be received;

  d.  the Bid Protections were material inducements for, and express conditions of, the Stalking Horse Bidder's willingness to enter into the Stalking Horse Agreement and were necessary to ensure that the Stalking Horse Bidder would continue to pursue the proposed acquisition on terms acceptable to the Debtors in their sound business judgment, subject to competitive bidding;

  e.  the offer of the Bid Protections is intended to promote more competitive bidding by inducing the Stalking Horse Bid, which (i) will serve as a minimum floor bid on which all other bidders can rely with respect to the Assets, (ii) may prove to be the highest or otherwise best available offer for

the Assets, and (iii) increases the likelihood that the final purchase price will reflect the true value of the Assets; and

f.    the Stalking Horse Bidder is unwilling to commit to purchase the Assets under the terms of the Stalking Horse Agreement without approval of the Bid Protections.

J.    The Debtors' performance of certain pre-closing obligations contained in the Stalking Horse Agreement is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of the Debtors' sound business judgment.

K.    The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtors, as those terms are defined in § 101 of the Bankruptcy Code, and no common identity of incorporators, directors, managers, controlling shareholders, or other insider of the Debtors exist between the Stalking Horse Bidder and the Debtor.

L.    The notice, substantially in the form attached hereto as **Exhibit 2**, provided by the Debtors regarding the Sale of the Assets by Auction and Sale Hearing (the "Sale Notice"), is reasonably calculated to provide interested parties with timely and proper notice of the proposed Sale, including, without limitation: (i) the date, time, and place of the Auction (if one is held), (ii) the Bid Procedures and certain dates and deadlines related thereto, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) reasonably specific identification of the assets for sale, (v) instructions for promptly obtaining a copy of the Stalking Horse Agreement, and (vi) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds.

M.    Neither the filing of the Motion, entry of this Order, the solicitation of bids or the conducting of the Auction in accordance with the Bid Procedures nor any other actions taken by

the Debtors in accordance therewith shall constitute a sale of the Assets, which sale will only take place, if at all, following the Sale Hearing.

**IT IS HEREBY ORDERED THAT:**

1.     The Motion is GRANTED as set forth herein.

2.     All objections, statements, and reservations of rights with respect to the relief requested in the Motion with respect to the Bid Procedures that have not been withdrawn, waived, or settled, as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled and denied on the merits with prejudice.

**A.     The Bid Procedures**

3.     The Bid Procedures, attached hereto as **Exhibit 1**, are hereby approved in their entirety and fully incorporated into this Order.  The Bid Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed Sale and any party desiring to submit a higher or better offer for the Assets must comply with the terms of the Bid Procedures and this Order.  The Bid Procedures shall also govern the terms on which the Debtors will proceed with the Auction and/or Sale pursuant to the Stalking Horse Agreement.

4.     The Stalking Horse Bidder shall be deemed a Qualified Bidder pursuant to the Bid Procedures for all purposes.

5.     The following dates and deadlines regarding competitive bidding are hereby established (subject to modification in accordance with the Bid Procedures):

---

- (All times are prevailing Eastern Time)

- **[__] at 5:00 p.m.:** Deadline to submit Bid to be considered for the Auction

- **[__] at 10:00 a.m.:** Proposed date of Auction

- **[__] at 5:00 p.m.:** Debtors to file notice of Successful Bidder

- **[__] at 5:00 p.m.:** Deadline to file and serve objections to relief requested at Sale Hearing (except for any objection that arises at the Auction)

- **[__] at [_____] a.m./p.m.:** Proposed date of Sale Hearing

---

**B.        Entry into Stalking Horse Agreement**

6.        The Stalking Horse Agreement is hereby approved.  The Debtors are authorized to enter into the Stalking Horse Agreement with the Stalking Horse Bidder and to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms and conditions set forth in the Stalking Horse Agreement.

7.        The Debtors are authorized to perform all of its respective pre-closing obligations under the Stalking Horse Agreement; *provided* that for the avoidance of doubt, approval and consummation of the transactions contemplated by the Stalking Horse Agreement shall be subject to the terms and conditions herein and the entry of an order approving the Sale of the Assets and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse Agreement.

**C.        Approval of the Bid Protections**

8.        The Bid Protections are hereby approved.  The Debtors are authorized to pay the Stalking Horse Bidder the Break-Up Fee and Expense Reimbursement if and to the extent they become due and payable under the Stalking Horse Agreement and the terms of the Bid Procedures Order.  The Break-Up Fee and Expense Reimbursement shall be entitled to status as administrative expenses under Bankruptcy Code section 503(b)(1), shall be secured by a lien on the deposit of

the Successful Bidder (or the closing proceeds in the event the transaction with the Alternative Buyer closes), and shall be paid solely and exclusively from such forfeited deposit or closing proceeds.

**D.      The Auction**

9.       As further described in the Bid Procedures, if a Qualified Bid, other than the Stalking Horse Agreement, is received by the Bid Deadline, the Debtors will conduct the Auction at **[__] [__].m. (prevailing Eastern Time) on _____, 2023,** or such later time on such day or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids, if a Qualified Bid is timely received.  The Debtors are authorized, subject to the terms of this Order and the Bid Procedures, to take actions reasonably necessary to conduct and implement the Auction.  The Debtors and their professionals shall have the right to adjourn or cancel the Auction at or prior to the Auction, without the need for further approval by the Bankruptcy Court.

10.     If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Agreement): (i) the Debtors may cancel the Auction, (ii) the Stalking Horse Agreement may be deemed by the Debtors to be the Successful Bid for the Assets, and (iii) the Debtors shall be authorized to seek approval of the Stalking Horse Agreement as the Successful Bid at the Sale Hearing.

11.     Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) will be entitled to make any Bids at the Auction.

12.     The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed or videotaped.

13.     Each Qualified Bidder (including, for the avoidance of doubt, the Stalking Horse Bidder) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands,

and accepts the Bid Procedures, and (c) has consented to the core jurisdiction of this Court and to the entry of a final order by this Court on any matter related to this Order, the Sale, or the Auction if it is determined that this Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

14.    The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit other than as contemplated in the Stalking Horse Agreement.

15.    In the event of a competing Qualified Bid, all Qualified Bidders will be entitled, but not obligated, to submit Overbids.

16.    The Debtors may: (i) determine which Qualified Bid or combination of Qualified Bids (including the Stalking Horse Agreement) is the highest or best offer; (ii) reject at any time before the entry of the Sale Order any Bid (other than the Stalking Horse Agreement) that, in the discretion of the Debtor, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bid Procedures, or (c) contrary to the best interest of the Debtor, its estate, its creditors, interest holders, or other parties in interest; and (iii) at or before the conclusion of the Auction may impose such other terms and conditions upon Qualified Bidders (other than the Stalking Horse Bidder) as the Debtors determine to be in the best interest of the Debtors' estates.

17.    No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fee, topping or termination fee, or other similar fee or payment, and, by submitting a Bid, such person or entity is deemed to have waived its right to request or file with this Court any request for expense reimbursement or any other fee of any nature in connection with the Auction and the Sale, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

### E.    Notice of the Sale Process

18.    The Sale Notice, in substantially the form as annexed to this Order as **Exhibit 2**, is hereby approved.

19.    Within three (3) business days after the entry of this Order, the Debtors (or their agent) shall serve the Sale Notice on the Notice Parties (as defined in the Motion).

20.    As soon as reasonably practicable after the entry of the Bid Procedures Order, the Debtors shall publish the Sale Notice in The Wall Street Journal, and such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

21.    The Post-Auction Notice, in substantially the form annexed to this Order as **Exhibit 3**, is hereby approved.

22.    Subsequent to the conclusion of the Auction, the Debtors (or their agent) shall serve the Post-Auction Notice on the Notice Parties (as defined in the Motion).

### F.    The Sale Hearing

23.    The Sale Hearing will be conducted on _____ **at [____] a.m./p.m. (prevailing Eastern Time)**.  The Debtors will seek entry of an order of the Court at the Sale Hearing approving and authorizing the sale of the Assets to the Successful Bidder.  Upon entry of this Order, the Debtors are authorized to perform any obligation intended to be performed prior to the Sale Hearing or entry of the Sale Order with respect thereto.  The Sale Hearing may be adjourned from time to time without further notice other than such announcement being made in open court or a notice of adjournment filed on the Court's docket.

### G.    Objections to the Sale

24.    Objections, if any, to the relief requested in the Motion relating to the Sale (each, a "Sale Objection") must: (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local

10

Rules, (iii) be filed with the Court, and (iv) be served so it is actually received no later than **5:00 p.m. (prevailing Eastern Time) on [__].**

25.     A party's failure to timely file a Sale Objection in accordance with this Order shall forever bar the assertion, at the applicable Sale Hearing or otherwise, of any objection to the relief requested in the Motion, or to the consummation of the Sale and the performance of the related transactions, including the transfer of the Assets to the applicable Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to be a "consent" for purposes of section 363(f) of the Bankruptcy Code.

**H.     Other Relief Granted**

26.     Nothing in this Order, the Stalking Horse Agreement, or the Motion shall be deemed to or constitute the assumption or assignment of an executory contract or unexpired lease.

27.     The requirements of Bankruptcy Rules 6004(h) and 6006(d) are waived.

28.     The Debtors are hereby authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

29.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

30.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

31.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

###

**Submitted by:**
Joseph Pack, Esq.
Counsel for the Debtors and Debtors-in-Possession
Pack Law, P.A.
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Tel: 305-916-4500
Email: joe@packlaw.com

**<u>Exhibit 1 to Bid Procedures Order</u>**

**Bid Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12386 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## BID PROCEDURES

      In the exercise of their good faith reasonable business judgment, the above-captioned debtors and debtors in possession (the "Debtors") have executed Asset Purchase Agreement (the "Stalking Horse Agreement") with Florida Foreclosure Investment, LLC (the "Stalking Horse Bidder"), pursuant to which (i) the Stalking Horse Bidder proposes to purchase, acquire, and take assignment and delivery of the Assets (as defined in the Stalking Horse Agreement), and (ii) the Debtors propose to, upon the termination of the Stalking Horse Agreement, pay the Stalking Horse Bidder an aggregate stalking-horse bidder fee in an amount equal to $66,000 to be paid to the Stalking Horse Bidder in the event of and upon the closing of a sale of the Assets to any other bidder, which break-up fee shall be entitled to status as administrative expenses under Bankruptcy Code section 503(b)(1), shall be secured by a lien on the deposit of the Successful Bidder (or the closing proceeds in the event the transaction with the Alternative Buyer closes) (the "Break-Up Fee"), and an expense reimbursement of up to $20,000 limited to actual legal fees and actual costs incurred in connection with the Staling Horse Agreement, which expense reimbursement shall be entitled to the same treatment set forth above for the Break-Up Fee (the "Expense Reimbursement"), in accordance with the terms and conditions of the Stalking Horse Agreement.

      On [_____], 2023, the Bankruptcy Court entered an order [Docket No. [__]] (the "Bid Procedures Order") approving, *inter alia*, these bid procedures (the "Bid Procedures").

      These Bid Procedures set forth the process by which the Debtors are authorized to conduct the auction (the "Auction") for the sale (the "Sale") of the Assets. Subject to the entry of the Sale Order, the Sale may be implemented pursuant to the terms and conditions of the Stalking Horse Agreement, as the same may be amended pursuant to the terms thereof, subject to the receipt of higher or otherwise better Bids (as defined below) in accordance with these Bid Procedures. Pursuant to the Bid Procedures, the Debtors will determine the highest or otherwise best price for the sale of the Assets.

---

[1] The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

### A.  Important Dates

- (All times are prevailing Eastern Time)

- _____ **at 5:00 p.m.:** Deadline to submit Bid to be considered for the Auction

- _____ **at 10:00 a.m.:** Proposed date of Auction

- _____ **at 5:00 p.m.:** Debtors to file notice of Successful Bidder

- _____ **at 4:00 p.m.:** Deadline to file and serve objections to relief requested at Sale Hearing (except for any objection that arises at the Auction)

- _____ **at _____ a.m./p.m.:** Proposed date of Sale Hearing

### B.  Marketing Process

**1.       Auction Qualification Process**

To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "Bid"), and each party submitting such Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the following conditions:

(i)  Stalking Horse Bidder. The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall be deemed to be a Qualified Bid (the "Stalking Horse Bid"), without the need to comply with any of the requirements set forth in this section.

(ii) Form and Contents. All Bids shall be in the form of an offer letter from a person or persons that the Debtor, in its reasonable discretion taking into account its fiduciary duties, deems financially able to consummate the purchase of the Assets, which letter states and includes:

(A) Marked Agreement. Each Bid must state the Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed and attached complete asset purchase agreement prepared and executed by the Bidder (an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to price and the time of closing (the "Proposed Agreement");

(B) Purchase Price. Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, such as certain liabilities to be assumed by the Bidder as part of the Transaction, for example (the "Purchase Price");

(C) Overbid. Each Bid or combination of Bids (a) must propose a purchase price equal to or greater than the sum of (i) the value of the Stalking Horse Agreement, as determined by the Debtors; and (ii) an initial overbid of at least **$133,000.00** (the "Initial Overbid"), and (b) must obligate the Bidder(s) to pay, to the extent provided in the Agreement, all amounts which the Stalking Horse Bidder under the Agreement has agreed to pay, including (if any) assumed liabilities (as set forth in the Stalking Horse Agreement);

(D) Contingencies; No Financing or Diligence Outs. A Bid shall not be conditioned on a Bidder obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions;

(E) Evidence of Financial Ability to Close. A Bid shall be accompanied by reasonable evidence (in the form of current bank statements, funds availability letters from an acceptable financial institution, or other evidence of available funding) of the Bidder's financial ability to promptly consummate its Bid;

(F) Identity. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s) and counsel the Debtors' advisors should contact regarding such Bid;

(G) Authorization. Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid;

(H) Substantial Contribution Waiver. Each Bid must contain an express waiver, effective upon submission of the Qualified Bid, of any substantial contribution claims by the Bidder;

(I) Expenses; Disclaimer to Fees. Each Bid must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee,

substantial contribution, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

(J) <u>Consummation</u>. Each Bid must include a statement that the Bidder is prepared to consummate the transaction, upon entry of an order of this Court approving the Sale to the Successful Bidder (the "<u>Sale Order</u>");

(K) <u>Irrevocability</u>. Each Bid must include a statement that such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the sale of the Assets;

(L) <u>Actual Value</u>. The Bid must state the proposed actual value of such Bidder's bid to the Debtors' estates.

(iii) <u>As Is, Where Is</u>. The sale of the Assets shall be on an "as is, where is" and "with all defects" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder.

(iv) <u>Good Faith Deposit</u>. Each Bid must be accompanied by a cash deposit in an amount equal to 10% of the aggregate value of the cash consideration of the Bid to be held in an escrow account to be identified and established by the Debtors (the "<u>Deposit</u>").

(v) <u>Binding Effect</u>. By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures and to refrain from submitting a Qualified Bid or seeking to reopen the Auction after conclusion of the Auction.

(vi) <u>Time Frame for Closing</u>. A Bid by a Bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, but in no event later than thirty (30) Business Days following the date upon which the Sale Order becomes a Final Order.

A Bid received before the Bid Deadline will be considered a "<u>Qualified Bid</u>" and each Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>" if the Debtors determines that such Bid meets the requirements above for a Bid as set forth in these Bid Procedures.

**Bid Deadline.** The Debtors must receive a Bid in writing, on or before _____ **at 5:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "**Bid Deadline**"). Bids must be sent to the following by the Bid Deadline to be considered: the counsel to the Debtors, Pack Law, at 51 NE 24th Street, #108, Miami, Florida 33137, joe@packlaw.com and jessey@packlaw.com; the marketing agent and broker of the Debtors, Keen-Summit Capital Partners, LLC, at 1 Huntington Quadrangle, Suite 2C04, Melville, New York 11747, mbordwin@keen-summit.com.

Within two (2) business days after the Bid Deadline, the Debtors will notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties, as well as the Stalking Horse Bidder with a copy of each Qualified Bid.

Between the date that the Debtors notify a Bidder that it is a Qualified Bidder and the Auction date, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase its Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth in the Bidding Procedures.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures. The Stalking Horse shall be deemed a Qualified Bidder at all times, and the Stalking Horse Agreement shall be a Qualified Bid.

Prior to the Auction, the Debtors and their advisors will evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' reasonable business judgment, the highest or otherwise best bid (the "Baseline Bid" and the Bidder making such Baseline Bid, the "Baseline Bidder"), and shall notify the Stalking Horse Bidder and all Qualifying Bidders with Qualifying Bids of the Baseline Bid no later than the opening of the Auction.

### C.  Auction

If more than one Qualified Bid is received by the Bid Deadline (including the Stalking Horse Agreement), the Debtors will conduct the Auction to determine the highest and best Qualified Bid or combination of Qualified Bids.  This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, *inter alia,* the following: (a) the amount and nature of the consideration; (b) the ability of the Qualified Bidder to close the proposed Transaction and the conditions related thereto, and the timing thereof; (c) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (d) any purchase price adjustments; (e) the impact of the transaction on any actual or potential litigation; (f) the net after-tax consideration to be received by the Debtors' estates; (g) the tax consequences of such Qualified Bid; and (h) the consent of the parties in interest and/or the cost and expense to the Debtors of resolving sale issues before Closing (collectively, the "Bid Assessment Criteria").

If no Qualified Bids other than the Stalking Horse Bid are received prior to the Bid Deadline, then the Auction will not occur, the Stalking Horse Agreement shall be deemed the Successful Bid, and, subject to the termination rights under the Stalking Horse Agreement, the Debtors will pursue entry of an order by the Bankruptcy Court authorizing the Sale to the Stalking Horse Bidder as soon as practicable.

### Procedures for Auction

The Auction, if necessary, will take place on _____ **at [__]:00 [_].m. (prevailing Eastern Time)** or such later time on such day or other place as the Debtors shall notify all Bidders who have submitted Qualified Bids.

1.      **The Debtors Shall Conduct the Auction**

The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed or videotaped.  Prior to the commencement of the Auction, the Debtors shall determine which of the Qualified Bids, at such time, is the highest and best bid for purposes of constituting the opening bid of the Auction, and shall promptly notify the Stalking Horse Purchaser and all Qualified Bidders with Qualified Bids of the Baseline Bid.

The Debtors and their professionals shall have the right to adjourn or cancel the Auction at or prior to the Auction, without the need for further approval by the Bankruptcy Court.

All Bids made after the start of the Auction shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all Bidders who have submitted Qualified Bids. The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Starting Bid and all Overbids.

2.      **Terms of Overbids**

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Starting Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(1)      **Minimum Overbid Increment**

Any Overbid after the Baseline Bid shall be made in increments of at least bidding on the Assets must be in initial minimum overbid increments of at least **$25,000.00**, which increment may be reduced as appropriate (the "Minimum Overbid Increment"). Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; *provided*, *however* that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment.

(2)      **Stalking Horse Credit Bid Rights**

As part of any Overbid made by the Stalking Horse Bidder, the Stalking Horse Bidder shall be entitled to credit bid, to the fullest extent possible under section 364(k) of the Bankruptcy Code, the Break-Up Fee and Expense Reimbursement.

(3)      **Remaining Terms Are the Same as for Qualified Bids**

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; *provided, however*, the Bid Deadline shall not apply, and no additional Good Faith Deposit shall be required beyond the Deposit previously submitted by a Qualified Bidder.  Any Overbid must include, in addition to the amount and form of consideration of the Overbid, a description of all changes (if any) requested by the Qualified Bidder to the Stalking Horse Agreement or a previously submitted Modified Purchase Agreement, in connection therewith (including any changes to the designated assigned contracts and leases and assumed liabilities). Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid.

**(4)      No Collusion; Good-Faith *Bona Fide* Offer**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction (i) it has not engaged in any collusion with respect to the Sale or bidding (including it has no agreement with any other Bidder or Qualified Bidder to control the price) and (ii) its Qualified Bid is the good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

**(5)      Backup Bidder**

Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party(ies) with the second highest or second best Qualified at the Auction, as determined by the Debtors, in the exercise of their business judgment, shall be required to serve as backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep its initial Bid(s) (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until two (2) business days after the closing of the sale of the Assets (the "Outside Backup Date").

**3.      Closing the Auction**

The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids that the Debtors determine, in their reasonable business judgment, is the highest and best Qualified Bid(s) at the Auction (the "Successful Bid" and the Bidder(s) submitting such Successful Bid, the "Successful Bidder").  In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria.  The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, in the Debtors' discretion, to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed Transaction Documents memorializing the terms of the Successful Bid.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

**D.  Sale Hearing**

The Bankruptcy Court has scheduled a hearing (the "Sale Hearing") on _____**, at __:__ _.m. (prevailing Eastern Time)**, at which hearing the Debtors may, in their discretion, seek approval of the Sale with the Successful Bidder.  Objections to the sale of the Assets to the Successful Bidder or Backup Bidder must be filed, comply with the Bankruptcy Rules and Local Rules, and be served so they are actually received by no later than **5:00 p.m. (prevailing Eastern Time) on** _____ (except for any objection that arises at the Auction).

### E.  Reservation of Rights

The Debtors reserve their rights to modify these Bid Procedures in its reasonable business judgment in any manner that will best promote the goals of the bidding process.  Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Agreement.

**Exhibit 2 to Bid Procedures Order**

**Sale Notice**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12368 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF BID PROCEDURES, AUCTION, HEARING AND DEADLINES RELATING TO THE SALE OF CERTAIN PROPERTY OF THE DEBTORS' ESTATES

**PLEASE TAKE NOTICE** that on April 2, 2023 and ____, respectively, the above-captioned debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Bankruptcy Cases"), filed  certain Motions [Docket Nos. 31 and [__]] (the "Bid Procedures and Sale Motions") seeking, *inter alia,* approval of certain bid procedures, setting the date for an auction of certain property of the Debtors' estates, and setting the date for a hearing to approve of such sale.[2] The Debtors seek to complete a sale (the "Sale") of nearly all of their real property, as well as other assets related thereto (the "Assets") to a prevailing bidder or bidders (the "Successful Bidder") at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code section 363 (the "Auction").

**PLEASE TAKE FURTHER NOTICE** that, on [_____], 2023 the Bankruptcy Court entered orders [Docket Nos. ____] (the "Bid Procedures Orders") approving the Bid Procedures set forth in the Bid Procedures and Sale Motions (the "Bid Procedures"), which set the key dates and times related to the sale of the Assets.  **All interested bidders should carefully read the Bid Procedures**.  To the extent there are any inconsistencies between the Bid Procedures and the summary description of its terms and conditions contained in this notice, the terms of the Bid Procedures shall control.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures, the Debtors must receive a Qualified Bid from interested bidders in writing, on or before **[__] at 5:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "Bid Deadline").  To be considered, Qualified Bids must be sent to the following at or before the Bid Deadline: the counsel to the Debtors, Pack Law, at 51 NE 24th Street, #108, Miami, Florida 33137, joe@packlaw.com and jessey@packlaw.com; and the marketing agent and broker of the Debtors, Keen-Summit Capital Partners, LLC, at 1 Huntington Quadrangle, Suite 2C04, Melville, New York 11747, mbordwin@keen-summit.com.

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

[2]  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bid Procedures and Sale Motions.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, if the Debtors receive one or more Qualified Bids (other than the Stalking Horse Agreement) by the Bid Deadline, the Auction will be conducted on **[__] at [__]:00 [__].m. (prevailing Eastern Time)**, or at such other place, date and time as may be designated by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Assets to the Successful Bidder (the "Sale Hearing") before the Honorable Erik P. Kimball, U.S. Bankruptcy Court for the Southern District of Florida, on **[__] at [_____] a.m./p.m. (prevailing Eastern Time)**, or at such time thereafter as counsel may be heard or at such other time as the Bankruptcy Court may determine. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or on the agenda for such Sale Hearing. Objections to the sale of the Assets to the Successful Bidder must be filed and served so they are received no later than **5:00 p.m. (prevailing Eastern Time) on [__].**

**PLEASE TAKE FURTHER NOTICE** that the Debtors are seeking to waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) in order for the Sale to close immediately upon entry of the Sale Order by this Court.

**PLEASE TAKE FURTHER NOTICE** that this notice is subject to the full terms and conditions of the Bid Procedures and Sale Motion, the Bid Procedures Order, and the Bid Procedures, which shall control in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Copies of the Bid Procedures and Sale Motions, the Bid Procedures, and the Bid Procedures Orders may be obtained for free by contacting the Debtors' undersigned counsel.

Dated:    [__], 2023

Respectfully submitted,

**PACK LAW**
*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Telephone: (305) 916-4500

By:   */s/ [DRAFT]*
        Joseph A. Pack
        Email:  joe@packlaw.com
        Florida Bar No. 117882

        Jessey J. Krehl
        Email:  jessey@packlaw.com
        Florida Bar No. 1025848

**<u>Exhibit 3 to Bid Procedures Order</u>**

**Post-Auction Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12368 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF SUCCESSFUL BIDDER AND BACKUP BIDDER WITH
RESPECT TO THE SALE OF PROPERTY OF THE DEBTORS' ESTATES**

  **PLEASE TAKE NOTICE** that on April 2, 2023 and ___, respectively, the above-captioned debtors and debtors in possession (the "Debtors") in the above-captioned case (the "Bankruptcy Case"), filed certain Motions [Docket Nos. 31 and [__]] (the "Bid Procedures and Sale Motions") seeking, *inter alia*, approval of certain bid procedures, setting the date for an auction of certain property of the Debtors' estates, and setting the date for a hearing to approve of such sale.[2]  Pursuant to the Bid Procedures and Sale Motion, the Debtors sought to complete a sale (the "Sale") of certain property of the Debtors' estates (the "Assets") to a prevailing bidder or bidders (the "Successful Bidder") at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code section 363 (the "Auction").

  **PLEASE TAKE FURTHER NOTICE** that, on [__], 2023 the Bankruptcy Court entered orders [Docket Nos. _____] (the "Bid Procedures Orders") approving the Bid Procedures set forth in the Bid Procedures and Sale Motion (the "Bid Procedures"), which set the key dates and times related to the sale of the Assets.

  **PLEASE TAKE FURTHER NOTICE** that on [__] at [__] (EST), pursuant to the Bid Procedures Orders and the Bid Procedures, the Debtors conducted the Auction with respect to the Assets.

  **PLEASE TAKE FURTHER NOTICE** that at the conclusion of the Auction, the Debtors, in consultation with their professionals, selected [__] as the Successful Bidder(s) with a bid of [__], and [__] as the Backup Bidder(s) with a bid of [__].

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

[2]  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bid Procedures and Sale Motions.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider the approval of the Sale of the Assets to the Successful Bidder <u>free and clear of all liens, claims, interests, and encumbrances,</u> in accordance with section 363(f) of the Bankruptcy Code, will be held before the Honorable Erik P. Kimball, United States Bankruptcy Judge for the Southern District of Florida, on [__] at [__].

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in the above-captioned case.

**PLEASE TAKE FURTHER NOTICE** that, at the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of a breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized to close with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the terms and conditions of the Motion, the Bid Procedures Orders, and the Bid Procedures, and the Debtors encourage parties in interest to review such documents in their entirety. Parties with questions regarding this Notice should contact the Debtors' counsel at the contact information provided herein.

Dated:   [__], 2023

Respectfully submitted,

**PACK LAW**
*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Telephone: (305) 916-4500

By:   */s/ [DRAFT]*
    Joseph A. Pack
    Email:  joe@packlaw.com
    Florida Bar No. 117882

    Jessey J. Krehl
    Email:  jessey@packlaw.com
    Florida Bar No. 1025848

**<u>Exhibit C to Motion</u>**

**Proposed Sale Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12368 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |

**ORDER (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN
PROPERTY OF THE DEBTORS, FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS AND (II) GRANTING RELATED RELIEF**

**THIS MATTER** came on before the Court for final hearing on [__] at _____

a.m./p.m. (the "Sale Hearing") upon the Motion of the above-captioned debtors and debtors in

possession (the "Debtors"), pursuant to 11 U.S.C. §§105, 363, Fed. R. Bankr. P. 2002, 6004 and

9014 and Local Rules 2002-1(C)(2) and 6004-1 for the entry of an order approving, *inter alia*, the

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay
Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance,
LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

sale of certain property of the Debtors' estates.  The Sale Hearing was conducted pursuant to the Court's Order approving such hearing and approving the bid procedures for the Sale (the "Bid Procedures Order") [Docket No. [__]].

Pursuant to the Bid Procedures Order, the Debtors conducted an auction (the "Auction") of the Assets[2] on [__] (the "Auction Date").  The Auction was conducted at [__].

The highest and best bids submitted in connection with the Auction for the Assets was submitted by _____ (collectively, the "Successful Bidder").    Pursuant to the Bid Procedures Order, the Debtors, through their CRO, Gerard McHale of McHale, P.A., have determined the Successful Bidder's bid was the highest and best offer to purchase the Assets.

The Court, having read and considered the Motion, the Bid Procedures Order, having obtained proffers on the record at the Sale Hearing from the Debtors' CRO and [__] of Keen-Summit, which proffers were subject to the right of cross-examination and which were accepted by the Court, having considered the statements of counsel for the Debtors on the record at the Sale Hearing, having noted no objections to the Bid Procedures Order or the Auction, and having considered all other matters of record in the instant case, after due deliberation, has determined that the relief requested in the Motion is in the best interests of the Debtors' estates and their creditors, and that good and sufficient cause has been shown in support of such relief, and it appearing that due and appropriate notice of the Motion, the Bid Procedures Order, the Bid Procedures, the Auction and the Sale Hearing having been given, and it appearing that no other notice of the relief granted by this Order need be given, and the Court having conducted the Sale Hearing, at which time all parties in interest were offered an opportunity to be heard with respect to the Motion and the Sale, and the Debtors' CRO and Keen-Summit having conducted a marketing

---

[2] All capitalized terms used herein shall have the same meaning ascribed to them in the Motion, unless otherwise defined.

process in compliance with the Bid Procedures Order and determined that the Successful Bidder has submitted the highest and best bids for the Assets, and all parties in interest having been heard, or having had the opportunity to be heard, regarding entry of this Order and the approval and confirmation of the Successful Bidder's bid and the Sale to the Successful Bidder, this Court, based upon the arguments, testimony and evidence presented to it, makes the following findings of fact and conclusions of law:[3]

A.      This Court has jurisdiction to hear and determine the Motion and to grant the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.      This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D.      The statutory predicates for the relief requested in the Motion are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

E.      As evidenced by the certificates of service filed with the Court, and based upon the representations of counsel at the Sale Hearing, (i) proper, timely and adequate notice of the Motion,

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

the Bid Procedures Order, the Sale Hearing, the Sale, the Auction, and the Bid Deadline has been provided in accordance with Bankruptcy Rules 2002, 6004, 9007 and 9014, (ii) such notice was good, sufficient and appropriate under the circumstances, and (iii) no other or further notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, the Auction or the Bid Deadline is necessary or shall be required.

F.      In compliance with the Bid Procedures Order, actual written notice of the Motion and the Sale Hearing and a reasonable opportunity to object or be heard with respect to the Motion and the Sale has been afforded to all interested persons and entities, including, without limitation: (i) the Office of the United States Trustee for the Southern District of Florida; (ii) counsel to the Successful Bidder; (iii) all entities known to have asserted any lien, interest, or encumbrance upon the Assets; (iv) appropriate state regulatory agencies; and (v) all other parties who filed requests for notice under Bankruptcy Rule 2002 in this case.

G.      Notice, as specified in the preceding paragraphs and as evidenced by the certificates of service filed with the Court, has been provided in the form and manner specified in the Motion and required by the Bid Procedures Order, and the Court finds that notice is adequate and sufficient in all respects to bind all creditors and parties in interest in this proceeding.

H.      The process for the sale of the Assets was conducted in accordance with the Bid Procedures Order and in a non-collusive, fair and good faith manner.

I.      Prior to the Auction, the Debtors solicited offers to purchase the Assets from a wide variety of parties.  In so doing, the Debtors' CRO and Keen-Summit afforded potential bidders with confidential due diligence access to provide any such bidders an opportunity to submit Qualified Bids.

L.     The Bid Procedures were designed to obtain the highest value for Assets for the Debtors and their estates.  The Successful Bidder's bid represents the highest and best offer for the Assets.  The Debtors' determination that the Successful Bidder's bid constitute the highest and best offer for the Assets, was a reasonable, valid and sound exercise of the Debtors' business judgment.

M.     The Successful Bidder is purchasing the Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is, therefore, entitled to the protection of that provision.  The Successful Bidder has proceeded in good faith in all respects in connection with these chapter 11 cases in that, *inter alia*, (i) the Successful Bidder recognized that the Debtors were free to deal with any other party interested in acquiring the Assets; (ii) the Assets were all subject to the competitive bidding procedures set forth in the Bid Procedures Order; (iii) all payments to be made by the Successful Bidder in connection with the Sale and chapter 11 cases, if any, have been disclosed; and (iv) the Successful Bidder has not violated section 363(n) of the Bankruptcy Code by any action or inaction.

N.     The Asset Purchase Agreement (the "APA") attached hereto as **Exhibit A** was negotiated, proposed and entered into by the Debtors and the Successful Bidder without collusion, in good faith and from arms-length bargaining positions.  Neither the Debtors nor the Successful Bidder has engaged in any conduct that would cause or permit the Sale or any part of the transactions contemplated by the APA to be avoidable under section 363(n) of the Bankruptcy Code.

O.     As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing,

the Debtors afforded interested potential purchasers a full and fair opportunity to qualify as Qualified Bidders under the Bid Procedures and to submit an offer for the Assets.

P.      The consideration provided by the Successful Bidder, as the successful bidder for the Assets pursuant to the APA: (i) is fair and reasonable; (ii) is the highest and best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Florida's Uniform Fraudulent Transfer Act and all other applicable laws.

Q.      The Debtors have demonstrated a sufficient basis and compelling circumstances to support the sale of the Assets under section 363 of the Bankruptcy Code pursuant thereto. Furthermore, such actions are appropriate exercises of the Debtors' sound business judgment inasmuch as they are in the best interests of the Debtors, their estates, and their creditors.

R.      The marketing and bidding processes implemented by the Debtors' CRO and Keen-Summit, as set forth in the Motion, were fair, proper, and reasonably calculated to result in the best value received for the Assets.

S.      The Successful Bidder would not have entered into the APA and would not consummate the Sale, thus adversely affecting the Debtors, their estates, and creditors, if the Assets were not sold to it free and clear of all liens, claims, security interests and encumbrances (collectively, "Claims and Encumbrances"), or if the Successful Bidder would, or in the future could, be held liable for any such liens, claims, security interests and/or encumbrances against the Debtors or the Assets, other than those liens, claims, security interests and encumbrances which the Successful Bidder has agreed to.

T.      The provisions of section 363(f) of the Bankruptcy Code have been satisfied.

BASED ON THE FOREGOING, IT IS ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AS FOLLOWS:

1.      The relief requested in the Motion is granted and approved in all respects. The Debtors' entry into the APA and the consummation of the Sale is hereby approved in all respects. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits.

2.       The Debtors and the Successful Bidder are authorized and directed to take any and all actions necessary or appropriate to: (i) consummate the Sale in accordance with the Motion, the APA and this Order, and (ii) perform, consummate, implement and close fully the Sale, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA.  After the date of entry of this Order, the Debtors and the Successful Bidder may enter into any amendment, supplement, or modification to the APA that is not material or adverse to the Debtors' estates without the need of further notice and hearing or Court order.

3.      The holders of Claims and Encumbrances and other non-Debtor parties who did not object are deemed to have consented to this Order, the Bid Procedures Order, the Sale and the APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against the Successful Bidder, its affiliates, any agent of the foregoing or the Assets to recover any claim which such person or entity has solely against Debtors or any of their affiliates, including the Claims and Encumbrances.

4.      Upon closing of the Sale of the Assets to the Successful Bidder (the "Closing"), the Assets transferred, sold and delivered to the Successful Bidder shall be free and clear of all Claims and Encumbrances of any person or entity.  The transfer of the Assets to the Successful Bidder

7

constitutes a legal, valid, and effective transfer and conveyance of the Assets and shall vest the Successful Bidder with all of the Debtors' right, title, and interest in and to the Assets described in and required by the APA and this Order.

5.       The Successful Bidder reserves the right to object to any Claim or Encumbrance that it has agreed to pay, if any, including, without limitation, the claims of the Palm Beach County Tax Collector and the claims of any state or federal agency related to any amounts owed in connection with the Debtors' licenses, permits, registrations, and governmental authorizations or approvals.  To the extent necessary, the Debtors agree to cooperate with the Successful Bidder in bringing an objection to any Claim or Encumbrance.  The Successful Bidder agrees to provide additional funding to the Debtors' estates solely for the reasonable fees incurred by Debtors' counsel in bringing an objection to a Claim or Encumbrance at the direction of the Successful Bidder.

6.       Upon the Closing of the Assets by the Successful Bidder, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Assets to the Successful Bidder, pursuant to the terms of the APA.

7.       As set forth in the APA, the Assets include, but are not limited to, the real property described therein.

8.       Effective on the date of entry of this Order, all entities, including, but not limited to, the Debtors and their creditors, employees, former employees, members, equity owners, as well as administrative agencies, tax and regulatory authorities, governmental agencies, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any Claim and Encumbrances against the Debtors or the Assets, shall be permanently and forever barred, restrained and enjoined from commencing or continuing in

any manner any action or other proceeding of any kind against the Assets or the Successful Bidder (or its members, representatives, or affiliates) as alleged successor or purchaser, with respect to: (i) any Claims and Encumbrances on, in respect of or against the Debtors, the Assets; and (ii) recovering on any claim which such person or entity had or may have against the Debtors.

9.     Each and every term, provision and exhibit of the APA, together with the terms and provisions of this Order, shall be binding in all respects upon all entities, including, but not limited to the Debtors, the Successful Bidder, creditors, and members, equity holders, administrative agencies, governmental agencies, secretaries of state, federal, state and local officials and their respective successors or assigns, including but not limited to, persons asserting any Claim and Encumbrance against or interest in the Debtors' estates or the Assets, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

10.     Upon the Closing, all entities holding a Claim and Encumbrance of any kind and nature, including but not limited to mechanic's lien claims against the Assets hereby are barred from asserting such Claim and Encumbrance against the Successful Bidder and/or the Assets.

11.     This Order: (i) is and shall be effective as a determination that, upon Closing, all Claims and Encumbrances, including but not limited to mechanic's lien claims, existing as to the Assets conveyed to the Successful Bidder have been and hereby are adjudged to be unconditionally released, discharged and terminated: and (ii) shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental agencies or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required

9

to report or insure any title or state of title in or to any of the Assets conveyed to the Successful Bidder. All Claims and Encumbrances of record as of the date of this Order shall be removed and stricken as against the Assets in accordance with the foregoing.

12.     If any person or entity which has filed financing statements, mortgages, notices of lis pendens, construction liens, judgments, or other documents or agreements evidencing any Claim and Encumbrance encumbering the Assets shall not have delivered to the Debtors prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all Claims and Encumbrances which the person or entity has or may assert with respect to the Assets, then to the extent this Order does not do so without the need of further action of any party, the Debtors and/or the Successful Bidder are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets. Upon Closing of the Sale, the Debtors' creditors are authorized and directed to execute such documents and take all such actions as may be necessary to release their respective Claims and Encumbrances against the Assets.

13.     Upon Closing, the Successful Bidder shall not be deemed to be: (a) a successor-in-interest to the Debtors; (b) a party to a *de facto* merger of the Successful Bidder and the Debtors; or (c) a mere continuation of the Debtors. Without limiting the generality of the foregoing, and except as specifically provided in the APA, the Successful Bidder shall not be liable for any claims against the Debtors or any of their predecessors, other than as expressly provided for in such APA or this Order. Further, except as expressly provided in the APA or in this Order, the Successful Bidder is not assuming nor shall it in any way be liable or responsible, as successor or otherwise, for any claims, liabilities, debts, obligations, or Claims or Encumbrances of the Debtors or their

estates of any kind or character in any way whatsoever relating to or arising from the Assets or the Debtors' operation or use of the Assets prior to the Closing, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, under the laws of the United States, any state, territory, or possession of the United States, the District of Columbia, or any other country or foreign jurisdiction.

14.     The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered: (i) confirming or consummating any plan of liquidation of Debtors; (ii) converting Debtors' bankruptcy case from chapter 11 to chapter 7; (iii) dismissing Debtors' bankruptcy case; or (iv) appointing a chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Order and the APA shall continue in this or any superseding case and shall be binding upon the Debtors, the Successful Bidder, and their respective successors and permitted assigns.

15.     Each and every federal, state and local governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and a copy of this Order may be filed in any place where federal, state, or local law permits filing or recording.

16.     The consideration provided by the Successful Bidder for the Assets under the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Florida Uniform Fraudulent Transfer Act, and all other applicable laws.

17.     Nothing contained in any order of any type or kind entered in these chapter 11 cases or any related proceeding subsequent to entry of this Order, nor in any chapter 11 plan confirmed in these chapter 11 cases, shall conflict with or derogate from the provisions of the APA or the

11

terms of this Order, which shall be expressly preserved under the terms of such plan.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of an order confirming any plan of liquidation of the Debtors or any other party, the conversion of Debtors' bankruptcy cases from chapter 11 to a case under chapter 7 of the Bankruptcy Code or the dismissal of Debtors' bankruptcy cases.

18.    The APA is authorized and approved in its entirety.  The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the APA (and any amendments thereto executed subsequent to the date of this Order) and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

19.    To the extent anything contained in this Order conflicts with a provision in the APA, this Order shall govern and control.

20.    The Successful Bidder is purchasing Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full rights, benefits, privileges and protections of that provision.  The consideration provided by the Successful Bidder for the Assets is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

21.    This Court retains jurisdiction, even after conversion of Debtors' chapter 11 cases to cases under chapter 7 (should such conversion occur), to: (i) interpret, implement and enforce the terms and provisions of this Order (including any injunctive relief provided in this Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (ii) protect the Successful Bidder and the Assets from and against any of the Claims and Encumbrances; (iii) resolve any disputes arising

under or related to the APA or the Sale; (iv) adjudicate all issues concerning Claims and Encumbrances and any other interest(s) in and to Assets; and (v) adjudicate any and all issues and/or disputes relating to Debtors' right, title or interest in the Assets, the Motion and/or the APA.

22.    From and after the date hereof, the Debtors and the Successful Bidder shall act in accordance with the terms of the APA and execute and deliver all documents in connection therewith.

23.    This Order and the APA with the Successful Bidder shall be binding in all respects upon all creditors and equity holders (whether known or unknown) of the Debtors, all successors and assigns of the Successful Bidder, the Debtors and their affiliates, the Assets, and any subsequent trustees appointed in the Debtors' chapter 11 cases or chapter 7 cases or upon: (i) a conversion of the Debtors' chapter 11 cases to cases under chapter 7; or (ii) dismissal of the Debtors' bankruptcy cases.

24.    [The Successful Bidder is not assuming any contracts or leases and for the avoidance of doubt shall further not be responsible for any obligations to pay any contractors or materialmen under any contracts for any labor, materials or otherwise with respect to any contracts related to any construction relating to Assets and Successful Bidders only purchasing the rights to any warranties related to the Assets and/or the completed construction.][4]

25.    The provisions of this Order are non-severable and mutually dependent.

26.    This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.

27.    The automatic stay pursuant to section 362(a) of Bankruptcy Code is hereby modified, lifted, and annulled with respect to the Debtors and the Successful Bidder, to the extent

---

[4]  [This paragraph shall be revised to the extent the APA contains Assumed Contracts.]

necessary, without further order of this Court, to (a) allow the Successful Bidder to deliver any notice provided for in the APA, and (b) allow the Successful Bidder to take any and all actions permitted under the APA or this Sale Order.

28.    This Court shall retain jurisdiction to interpret, implement and enforce the terms and provisions of this Sale Order, the APA, all amendments thereto, and any waivers and consents thereunder, and each other document or agreement executed in connection therewith.

###

**Submitted by:**
Joseph Pack, Esq.
Counsel for the Debtors and Debtors-in-Possession
Pack Law, P.A.
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Tel: 305-916-4500
Email: joe@packlaw.com

**Exhibit 1 to Sale Order**

**APA Between Debtors and Successful Bidder**