**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) | |
|  | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12386 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' EMERGENCY MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING USE OF CASH**
**COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING**
**ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 363,**
**(III) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING**
**PURSUANT TO 11 U.S.C. §§ 105(a), 362, 364(c), AND 364(d), (IV) GRANTING SUPER**
**PRIORITY CLAIMS TO THE DIP LENDER PURSUANT TO 11 U.S.C. 364(c), AND**
**(V) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

*(Emergency Hearing Requested)*
**Basis for Expedited Relief**

The Debtors seek to continue to operate their business in the ordinary course, to preserve the value of their estates, to preserve jobs, and to facilitate their orderly reorganization. Without the continued authorization to use Cash Collateral and the provision of DIP Financing (each as defined herein), the Debtors will not be able to meet payroll, run the risk of having utilities shut off, and will generally be unable to satisfy the obligations necessary to maintain day-to-day operations. The Debtors respectfully request that the Court conduct a hearing on this Motion at the hearing scheduled for April 21, 2023 at 1:30 p.m. (EST), as the Debtors believe that a hearing on this Motion is needed as soon as practicable in order for them to continue to operate. Pursuant to Local Rule 9075-1(B), which requires an affirmative statement that a *bona fide* effort was made in order to resolve the issues raised in the Motion, the Debtors confirm that they engaged in a good faith effort to resolve the matter raised herein in advance of filing of this Motion, to the extent possible under the circumstances.

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

The above-captioned debtors and debtors in possession (the "Debtors") by and through their undersigned proposed counsel, submit this motion (the "Motion") for entry of an interim order substantially in the form submitted herewith (the "DIP Order" or "Order")[2], pursuant to section 105(a), 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"), (i) authorizing the Debtors' use of cash collateral pursuant to section 363 of the Bankruptcy Code and prior orders of this Court; (ii) approving certain adequate protection in connection therewith; (iii) authorizing the Debtors to obtain secured post-petition financing from the lender party to the DIP Credit Term Sheet (defined herein) (the "DIP Lender"), consisting of a term loan facility in the aggregate principal amount of up to $3,800,000.00 (the "DIP Financing" or the "DIP Facility") for the purpose of funding the Debtors' general operating and working capital needs in the administration of the Debtors' Chapter 11 cases, in accordance with (a) that certain *Debtor in Possession Senior Secured Financing Term Sheet*, dated April 17, 2023 (the "DIP Credit Term Sheet"), substantially in the form attached to the DIP Order as **Exhibit 2** between the Debtors and the DIP Lender and (b) the budget (the "Budget"), substantially in the form attached to the DIP Credit Term Sheet and to the DIP Order as **Exhibit 1**, (iv) authorizing and approving the Debtors' entry into the DIP Credit Term Sheet and any other documents, certificates or instruments ancillary thereto, and performance of such other acts as may be necessary or appropriate in connection therewith, (v) granting to the DIP Lender valid, fully protected, and enforceable security interest and liens (collectively, the "DIP Liens") in and upon the DIP Collateral (as set forth in the DIP Credit Term Sheet) pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code; (vi) vacating and modifying the automatic stay to the extent

---

[2] The form of the DIP Order is still being drafted and will be filed separately.

necessary to effectuate the terms of the DIP Credit Term Sheet and the DIP Orders; and (viii) approving certain other compromises of controversies between the Debtors and the DIP Lender, as set forth more fully in the DIP Credit Term Sheet.

In further support of this Motion, the Debtors respectfully state as follows:

## **Preliminary Statement**

The Debtors' liquidity position reached the point that, without immediate funding, it would likely require that the Debtors cease operations. Notwithstanding that, the Debtors' crown jewel, a stunning, and equally challenging, Jack Nicklaus golf course and adjacent hotel (along with the surrounding undeveloped real estate parcels) remain a West Palm Beach diamond.

The Debtors' ability to pay necessary expenses to maintain the property and golf club operations while pursuing a sale and robust auction process to achieve that sale is critical. As discussed in the First Day Declaration of Gerard McHale [Docket No. 2], the Debtors, through the efforts of their Chief Restructuring Officer, their principals, their marketing agent and real estate broker, and other professionals, reached out to numerous parties to obtain financing, but could not secure such financing on a non-priming basis.

During this time, the Debtors were furiously working to achieve a global deal between the Debtors, their Prepetition Secured Lender, and the principals of the same. While those efforts were underway, negotiations never resolved at the proverbial tonic C note, and the Debtors had to pivot quickly. Notwithstanding attractive offers from many interested parties, including, but not limited to, FUSE Funding and 364 Capital, the Debtors determined, in their business judgment, that a deal as between the Debtors and the Prepetition Secured Lender that (a) settled the amount of the pre-petition secured obligations and (b) provided the necessary capital infusion to seamlessly continue

operations without disruption, was the best path forward for all stakeholders and in the best interest of the estates.

Given the Debtors' circumstances—most importantly, that the sale process cannot and should not be interrupted with avoidable litigation so as to maximize value for all parties in interest—the Debtors believe the proposed terms of the DIP Financing are fair, reasonable, adequate and necessary to preserve and maximize the value of the Debtors' business and assets, pending the sale process for substantially all of the Debtors' assets, and thus in the best interest of the Debtors, their estates, their creditors and all stakeholders.

## Jurisdiction, Venue and Statutory Predicates

1.      The United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules, 2002, 4001, and 9014 and Local Bankruptcy Rule 4001-2 (and the Bankruptcy Court's *Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (the "Guidelines") incorporated therein), 9013-1, and 9075-1.

**<u>Disclosures Under the Bankruptcy Rules, Local Rules, and Guidelines</u>**

4.    The following disclosures are provided in conformance with the requirements of

Bankruptcy Rule 4001(b), Local Rules 4001-2, 9013-1(F) and (G), and the Guidelines:

**a.   <u>Cash Collateral</u>:  As used herein, "Cash Collateral" shall mean any collateral constituting "Cash Collateral", as such term is defined in section 363 of the Bankruptcy Code.**

**<u>Party with an Interest in Cash Collateral</u>:  U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership (the "<u>Prepetition Secured Lender</u>" or the "<u>DIP Lender</u>"), is the sole entity with a lien interest in Cash Collateral.  In accordance with the Prepetition Loan Documents (as defined herein), the Foreclosure Judgment (as defined herein), and the DIP Credit Term Sheet, the Prepetition Secured Lender has agreed the Debtors are indebted to it in an amount equal to $96.5 million, plus certain interest and fees, all as set forth with more particularity herein and in the DIP Credit Term Sheet (such total amount, the "<u>Prepetition Obligations</u>").**

**b.   <u>Other Prepetition Secured Parties and Lienholders</u>:  In addition to the Prepetition Secured Lender, Bellefrau Group, LLC ("<u>Bellefrau</u>") holds a mortgage on certain parcels of real property presently owned by Debtor Banyan Cay Maintenance, LLC, and ZJC, LLC ("<u>ZJC</u>") holds a mortgage on a separate parcel owned by Debtor Banyan Cay Maintenance, LLC.  Moreover, several of the Debtors' properties are encumbered by construction, materialmen's, and similar liens held by various worker parties (collectively, the "<u>Construction Lienholders</u>").  Each of Bellefrau, ZJC, the Construction Lienholders, and the Prepetition Secured Lender shall be referred to as a "<u>Prepetition Secured Party</u>," and collectively as the "<u>Prepetition Secured Parties</u>."  The collateral of each such Prepetition Secured Party shall be referred to herein as that Prepetition Secured Party's "<u>Prepetition Collateral</u>," and collectively as the "<u>Prepetition Collateral</u>."  The only Prepetition Secured Party with an interest in Cash Collateral is the Prepetition Secured Lender.  For the avoidance of doubt, the Prepetition Collateral of Belllefrau and ZJC shall only be DIP Collateral on a perfected, junior basis pursuant to section 364(c)(3) of the Bankruptcy Code, as set forth in the DIP Credit Term Sheet.**

**c.   <u>Proposed Use of Cash Collateral</u>:  The Debtors propose to use Cash Collateral for emergency capital purposes, including but not limited to, operating the Debtors' business, including to pay wages, purchase supplies, and pay outside vendors, and such use shall be limited to the payment of such amounts and for such items set forth in the budget attached hereto as <u>Exhibit 1</u> to the proposed Order (the "<u>Budget</u>") and shall be subject to availability testing in accordance with the proposed Order and other orders of this Court.**

d. <u>Cash Collateral Termination Date</u>:  The Debtors will continue to use their Cash Collateral (including both cash on hand and cash generated from the operation of its business) until the earliest occurrence of: (a) the Final Hearing; or (b) the date set forth at the Hearing if the Order is modified by pronouncement in open court at the same.

e. <u>Adequate Protection and DIP Liens</u>: The DIP Lender, as a Prepetition Secured Party, as adequate protection for the use of Cash Collateral shall be granted, replacement liens on the Prepetition Collateral and DIP Collateral of the Debtors (the "<u>Adequate Protection Liens</u>") to the extent there is any diminution in the value of such Prepetition Secured Party's interests in the Prepetition Collateral or Cash Collateral during the pendency of these Cases. The Adequate Protection Liens shall be junior only to the Carve-Out (as defined in the Order), and senior to any other liens.  The Adequate Protection Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or the DIP Lender of security agreements, pledge agreements, financing statements or other agreements.  The Adequate Protection Liens shall cover assets, interests and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors that constitute DIP Collateral.  Moreover, to induce the Lender to provide the DIP Facility, the Debtors shall grant to the DIP Lender, as security for the full and prompt payment when due of the Post-Petition Obligations, a continuing first priority lien on and security interest in all of the DIP Collateral, which DIP Collateral shall be .

f. <u>DIP Facility</u>: The Debtors seek an order of the Bankruptcy Court, approving the Debtors' provision of the DIP Facility as post-petition financing.  The DIP Facility is a term loan facility in the aggregate principal amount of up to $3,800,000.00.  The maturity date of the DIP Facility is the earliest of (a) the effective date of the plan for the Chapter 11 Cases, dismissal or conversion of the Chapter 11 Cases or the appointment of a  trustee or examiner with expanded powers for Debtors; (b) 21 days from the entry of Interim DIP Order approving the DIP Facility if the Court has not entered the Final DIP Order; or (c) the occurrence an Event of Default (as set forth herein and in the DIP Credit Term Sheet. It shall be secured by valid, binding, continuing, enforceable, and fully protected security interest and first-priority liens in all the DIP Collateral, junior in priority only to the "Carve-out" (to be ordered in the DIP Order).

g. <u>DIP Lender</u>: The DIP Lender shall be U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership, and/or its lender assigns (as set forth in the DIP Credit Term Sheet).

h. <u>Interest Rate</u>: The DIP Facility shall bear interest on the unpaid principal

amount thereof plus all obligations owing, including without limitation, all interest accruing thereon, together with any other fees and costs (collectively, the "<u>Post-Petition Obligations</u>") from the date of entry of the Order to and including the Maturity Date at the rate of 12.5% per annum, calculated on the basis of a 360-day year for the actual number of days elapsed.  After the Maturity Date or upon the occurrence of an Event of Default, the Post-Petition Obligations shall bear interest at a rate of 15% per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "<u>Default Interest Rate</u>").

i.  <u>Use of DIP Facility</u>: The proceeds of the DIP Financing shall be available to fund the Debtors' business operations, to the extent set forth in the Budget.

j.  <u>Events of Default</u>: Customary and appropriate Events of Default for financings of this type and this transaction in particular, including the following:

    i.  breach of the Budget amounts in excess of permitted variances per category;

    ii.  customary bankruptcy events of default, including conversion or dismissal of case, or appointment of trustee and failure to meet the agreed upon milestones;

    iii.  reversal or modification or challenge of any of the DIP Orders by the Debtors without the consent of DIP Lender;

    iv.  other breaches of covenants, subject to customary grace periods and cure periods if applicable;

    v.  the occurrence of a breach under or termination of any contract for the purchase and sale of any of the Debtors' property without the consent of DIP Lender;

    vi.  Debtors' failure to strictly adhere to the milestones set forth on the attached Schedule 1 to the DIP Credit Term Sheet (the "<u>Sale Milestones</u>"); and

    vii.  such other defaults which shall be included in the DIP Loan Documents and the DIP Orders.

## Background

**I.      General Background.**

5.      On the March 29, 2023 (the "Petition Date"), each of the Debtors other than Banyan Cay Mezzanine Borrower, LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases") before the Bankruptcy Court.  Banyan Cay Mezzanine Borrower, LLC filed its voluntary petition for relief on February 16, 2023.

6.      The Debtors are operating their business and managing their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of this Motion, no request has been made for the appointment of a trustee or examiner and no statutory committee has been appointed in the Chapter 11 Cases.

7.      The Debtors collectively own, develop, and operate Banyan Cay Resort & Golf Club, as well as businesses and developments related thereto, in West Palm Beach, Florida.  A more detailed description of the Debtors' history and the facts surrounding the commencement of the Chapter 11 Cases is set forth in the First Day Declaration, which is incorporated herein by reference.

8.      On April 6, 2023 this Court entered that certain *Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, and (III) Scheduling a Further Hearing* [Docket No. 66] (the "Cash Collateral Order"), granting, in part, that certain motion [Docket No. 36] (the "Cash Collateral Motion"), filed on April 3, 2023.  Prepetition Lender has consented to the continued use of Cash Collateral for necessary and approved expenses through the Interim Hearing on this Motion.

## II.    The Debtors' Secured Capital Structure.

### The Hotel Loan:

9.     On June 14, 2018, Prepetition Lender made a construction loan to the Hotel Borrowers ("Hotel Borrowers" being defined as Debtors' Banyan Cay Resort & Golf, LLC and Banyan Cay Dev. LLC ) in the original principal amount of up to $61,000,000 (the "Hotel Loan"). The Hotel Borrowers intended to use the Hotel Loan to build the resort portion of their master-planned Banyan Cay Resort & Golf Club in West Palm Beach, including a 150-room luxury hotel, golf course, and private club.  The Hotel Loan was advanced in accordance with an Amended and Restated Loan Agreement among Hotel Borrowers and Prepetition Lender dated as of September 30, 2020, as amended pursuant to that certain First Amendment to Amended and Restated Loan Agreement and other Loan Documents dated as of October 15, 2020; that certain Second Amendment to Amended and Restated Loan Agreement and other Loan Documents dated September 2, 2021; and that certain Third Amendment to Amended and Restated Loan Agreement and other Loan Documents dated December 31, 2021 (collectively, the "Hotel Loan Agreement").

### The Villas Loan:

10.     On September 30, 2020, in conjunction with the First Amendment to the Hotel Loan, Prepetition Lender extended to the Debtors a loan in the original principal amount of up to Nineteen Million and No/100 Dollars ($19,000,000.00) (as the same has been increased to the new principal amount of up to $24,000,000.00, as described below, the "Villas Loan").  The Villas Loan was intended to be used for constructing 22 residential golf villas under a condominium regime.  The Villas Loan was advanced in accordance with a loan agreement among Debtors and Prepetition Lender dated as of September 30, 2020, as amended pursuant to that certain First Amendment to Loan Agreement and other Loan Documents dated September

2, 2022 which, among other things, evidenced a future advance in the amount of $5,000,000.00, increasing the Maximum Principal amount from $19,000,000.00 to $24,000,000.00; as further amended pursuant to that certain Amended and Restated Loan Agreement dated December 31, 2021 (the "Villas Loan Agreement" collectively with the Hotel Loan Agreement, the "Loan Agreements").

11.    In connection with the Loan Agreements, the Debtors entered into various security and collateral documents pursuant to and in connection with the Prepetition Lender, pursuant to which the Prepetition Lender was granted the benefit of valid, binding, perfected, enforceable, first-priority liens and security interests in the Pre-Petition Collateral (the "Pre-Petition Secured Liens").  The Pre-Petition Secured Liens provide the Prepetition Lender with valid, binding, properly perfected, enforceable, first-priority liens, and security interests in all property described in the Loan Agreements, including, without limitation, certain Cash Collateral and the "Collateral" (as defined in the Loan Agreements and the Final Foreclosure Judgment) (collectively, the "Pre-Petition Collateral").

**The State Court Complaint:**

12.    The Prepetition Secured Lender asserted defaults by the Debtors under the Loan Agreements and the maturity of the obligations under the Loan Agreements, and on July 16, 2022, the Prepetition Lender filed the State Court Case, in Palm Beach County Circuit Court. assigned Case Number 50-2022-CA-006815-XXXX-MB (the "State Court Case").  On February 28, 2023, the State Court entered the Final Foreclosure Judgment in favor of Prepetition Lender (the "Final Foreclosure Judgement").  The amount set forth in the Final Foreclosure Judgment was $95,084,509.61, plus accruing interest, fees, costs  and expenses.  As of the Petition Date, Prepetition Lender asserts it is owed $97,006,657.00, plus accruing interest, attorneys fees and

costs. (the "U.S. Real Estate Secured Claims").

13. Notwithstanding the amount of the U.S. Real Estate Secured Claims as set forth in paragraph 12 above, the Debtors and the Prepetition Lender agreed as part of the DIP Credit Term Sheet, the DIP Facility and the financing contemplated therein, that pursuant to the Loan Agreements and the Final Foreclosure Judgment, the Debtors are indebted to Lender in the amount of: (a) $96,500,000 million (the "Agreed Pre-Petition Principal Amount"), plus (b) simple interest on the Agreed Pre-Petition Principal Amount of 6.25% per annum, which shall accrue from the Petition Date and which shall be paid monthly to the Prepetition Lender in accordance with the DIP Facility Documents, plus (c) costs and attorneys' fees and costs incurred from and after March 24, 2023 (the aggregate of the foregoing (a), (b) and (c), the "Pre-Petition Obligations").

14. In addition to the U.S. .Real Estate Secured Claims the assets of Debtor Banyan Cay Mezzanine Borrower, LLC, comprising solely of the equity interests in Debtors Banyan Cay Resort & Golf LLC; Banyan Cay Dev. LLC; and Banyan Cay Villas, LLC; are subject to a security interest owned by Banyan Cay Resort Fund LLC, the Debtors' EB-5 lender (the "EB-5 Lender"), in the amount of $5,000,000. Additionally, each of Bellefrau and ZJC hold mortgages against separate parcels owned by Debtor Banyan Cay Maintenance, LLC. The DIP Lender is the only party with an interest in Cash Collateral.

## Basis for Relief

### A. The Debtors Should be Authorized to Use Cash Collateral.

15. Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) governs a debtor's use of cash collateral. It provides, in relevant part:

> The [debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless —

> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

16.    Further, section 363(e) of the Bankruptcy Code provides for "adequate protection" of interests in property when a debtor uses cash collateral.  As discussed above, although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *Desert Fire Prot. v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434 B.R. 716, 749 (S.D. Fla. 2010) ("The adequacy of protection must be determined on a case by case basis.") *citing* 3 Collier on Bankruptcy P 361.03[1];  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Big Dog II, LLC*, 602 B.R. 64, 64 (Bankr. N.D. Fla 2019) ("What constitutes adequate protection is a question of fact to be determined on a case-by-case basis."); *SouthPoint Glob. Invs., LLC v. Warren (In re Westport Holdings Tampa, Ltd. P'ship)*, 607 B.R. 715, 729 (M.D. Fla. 2019) ("A determination of whether there is adequate protection is made on a case by case basis.").

17.    The DIP Lender, as the sole party with an interest in Cash Collateral, has consented to the use of Cash Collateral as set forth herein and in the Cash Collateral Order (and subsequent orders of this Court).  Moreover, as set forth in the Budget, the Debtors and the DIP Lender have agreed that the Debtors shall pay approximately $520,000.00 monthly to the DIP Lender as adequate protection against the future diminution of their cash collateral.

18.    Accordingly, the Debtors respectfully submit that the use of Cash Collateral is both necessary and appropriate in the instant cases.  With the consent of the DIP Lender, the sole party

with an interest in Cash Collateral, the adequate protection payments, and the Adequate Protection Liens, the Debtors respectfully submit that the Debtors' consensual use of Cash Collateral satisfies the applicable provisions of the Bankruptcy Code.

**B.  The Debtors Should be Authorized to Obtain Postpetition Financing on the Terms Set Forth in the DIP Credit Term Sheet.**

**a.  Standards Governing Authorization of Post-Petition Debtor in Possession Financing.**

19.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *Grp. of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

20.    In evaluating the proposed terms of postpetition financing and determining whether it is within the debtor's sound business judgment, courts generally perform a qualitative analysis to review the underlying economics of the transaction, considering factors such as whether:

(a) unencumbered credit or alternative financing without superpriority status is available to the debtor;

13

(b) the credit transactions are necessary to preserve assets of the estate;

(c) the terms of the credit agreement are fair, reasonable, and adequate;

(d) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

(e) the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

21.     Furthermore, courts also review various noneconomic terms in order to ensure that the efficiency of the chapter 11 process is preserved.  As the bankruptcy court in *In re ION Media Networks, Inc.* put it:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

*In re ION Media Networks, Inc.*, No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

> **b.  Entry into the DIP Credit Term Sheet is an Exercise of the Debtors' Sound Business Judgment and the Terms of the DIP Credit Term Sheet Should be Approved in Light of the Economic and Noneconomic Circumstances.**

22.     In light of the above, the DIP Financing and the DIP Facility in the instant case

should be approved.  The Debtors have engaged in good faith efforts to procure postpetition financing on the best possible terms for the Debtors their estates, and their creditor constituencies. As explained above, the provision and use of funds is vital to the Debtors' successful sale process and without adequate financing the Debtors' sale  efforts will be irreparably imperiled.  The terms of the DIP Facility were negotiated in good faith and are based on terms that will maximize the Debtors' chance of effectively and expeditiously resolving the Chapter 11 Cases.

23.     Indeed, the Debtors engaged various parties in an effort to procure the DIP Facility on the best possible terms available to them.  To further this goal, the Debtors entered robust negotiations with the Debtors' Stalking Horse Bidder, various outside financial institutions wholly unrelated to the Chapter 11 Cases, and the DIP Lender.

24.     As set forth above, both the economic and noneconomic terms should be considered when approving debtor in possession funding.  The economic terms of the DIP Credit Term Sheet are patently reasonable and well in line with the market for such loans.  Thus, the economic terms justify the entry of the DIP Order approving the DIP Facility.  However, as the above authorities make clear, "a business decision to obtain credit from a particular lender is almost never based purely on economic terms."  Indeed, the timing and certainty of closing with the DIP Lender, together with the benefits of compromising the controversies between the Debtors and the DIP Lender, renders the non-economic terms of the DIP Facility particularly attractive to the Debtors.

25.     Because the economic terms are reasonable, the noneconomic factors weigh in favor of expeditious and fair financing, and the Debtors have at all times engaged themselves in a manner that is consistent with its sound business judgment, the DIP Facility should be approved.

   **c.  Standards  Governing  the  Grant  Liens  and  Superpriority  Claims.**

26.     The Debtors propose to obtain financing under the DIP Facility by providing

security interests and liens as set forth in the DIP Documents (which are currently being drafted) pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lender valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Order), which includes substantially all of the Debtors' assets.

27.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, (i.e., by allowing a lender only an administrative claim); (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also Norris Square Civic Assoc. v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

28.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit

from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and/or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

29.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

30.     Furthermore, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

31.     To the extent a secured creditor's interests in collateral constitute valid and

perfected security interests and liens as of the petition date, section 364(d)(1)(B) of the Bankruptcy Code requires that the Debtors provide adequate protection to such creditor where a debtor-in-possession financing facility primes the liens of such secured creditor.  While section 361 of the Bankruptcy Code provides a non-exclusive list of possible forms of adequate protection— including periodic cash payments, additional liens, replacement liens and other forms of relief— the Court must determine what constitutes adequate protection on a case-by-case basis. *See In re Columbia Gas Sys., Inc.,* 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O 'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin,* 761 F.2d 472 (8th Cir. 1985).  The focus of the adequate-protection requirement is to protect a secured creditor from the diminution in the value of its interest in the collateral during the period of use. *See Resolution Trust Corp. v. Swede land Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.),* 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

### d.  The Debtors Should be Authorized to Grant Liens and Superpriority Claims.

32.    The Debtors have worked expeditiously to secure debtor in possession financing, as set forth herein and in previous motions before this Court, and have made a good faith effort to receive the most advantageous terms possible.  As is often the case, however, the Debtors are unable to obtain unsecured credit or credit on a solely junior basis, nor do the Debtors have sufficient unencumbered assets to encourage such credit.  Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

33.     In the instant cases, and as set forth in the Order, the Debtors propose to provide the DIP Lender, as Prepetition Secured Lender, with a variety of mechanisms for adequate protection against the post-petition diminution in value of both the Cash Collateral (and the Prepetition Collateral) resulting from the Debtors' use of the Cash Collateral and the imposition of the automatic stay as well as the imposition of the DIP Lender's "priming lien", including: (a) valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral to the extent of such diminution; (b) superpriority administrative claims under section 507(b) of the Bankruptcy Code to the extent of such diminution; and (c) the terms of the Budget, which protect against any impropriety on the part of the Debtors and guarantees great visibility to the Prepetition Secured Lender (collectively, the "Adequate Protection").

34.     Given the facts and circumstances of the instant case (in particular the fact that the section 364(d) priming liens shall only apply to the DIP Lender's existing Prepetition Collateral), the priming liens and superpriority claims to the DIP Lender are necessary and do not in any way harm any party in interest.  Indeed, as the only Prepetition Secured Party to be primed, the DIP Lender's consent to receive its own Adequate Protection and DIP Liens justifies the imposition of such liens.

35.     In light of the adequate protection mechanisms set forth herein and the consent of the DIP Lender as Prepetition Secured Lender, the Debtors respectfully submit that the DIP Lender is adequately protected against a diminution in the value of its prepetition collateral, to the extent there is any.  Accordingly, the Debtors respectfully request that the DIP Facility be approved and that it be empowered to grant the liens contemplated therein.

   **C.     The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e) of the Bankruptcy Code.**

36.     The terms and conditions of the DIP Facility, including the terms of the DIP Credit

Term Sheet, are fair and reasonable and were negotiated in good faith at arms' length. Accordingly, the obligations incurred in connection with the DIP Loan should be accorded the benefits of section 364(e) of the Bankruptcy Code.

37.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

38.    Because "good faith" is not defined in the Bankruptcy Code, courts often look to case law under section 363(m).  7 Collier on Bankruptcy, 16th ed. ¶ 364.08, p. 37 ("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction.").  To analogize to the sale context, "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM) 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992) (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

39.    As explained in detail herein, the DIP Credit Term Sheet is the result of: (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain necessary postpetition financing, and (b) extended arm's-length, good

faith negotiations between the Debtors and the DIP Lender.

40.     The Debtors submit that the terms and conditions of the DIP Credit Term Sheet are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**D.     The DIP Credit Term Sheet, to the Extent it Compromises Controversies Between the Debtors and the DIP Lender, Should be Approved.**

41.     Rule 9019(a) of the Bankruptcy Rules, which governs the approval of compromises and settlements, provides, relevant in part, that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Bankruptcy Rule 9019(a).  "It has long been the law that approval of a settlement in a bankruptcy proceeding is within the sound discretion of the court, and will not be disturbed or modified on appeal unless approval is an abuse of discretion."  *In re Litten*, 2007 WL 2020159, at *1 (Bankr. S.D. Fla. July 5, 2007) (citing *In re Arrow Air, Inc.*, 85 B.R. 886, 890-891 (Bankr. S.D. Fla. 1988)).

42.     There is a general policy encouraging settlements and favoring compromises in chapter 11 cases.  *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993) (recognizing that the law favors compromise of disputes); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996); *Florida Trailer and Equip. Co. v. Deal*, 284 F.2d 567,571 (5th Cir. 1960).  In fact, some courts in this district have held that a proposed settlement should be approved unless it yields less than the lowest amount that a litigation could reasonably produce.  *In re Holywell Corp.*, 93 B.R. 291, 294 (Bankr. S.D. Fla. 1988).

43.     The United States Supreme Court requires that all court-approved settlements must

be determined to be "fair and equitable" before they can be approved by such court.  *See Protective Comm. For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  In determining whether to approve a compromise, a bankruptcy court is not obligated to actually rule on the merits of the various claims or conduct a "mini trial" on the merits of any underlying cause of action.  *In re Van Diepen, P.A.*,236 F. Appx. 498, 503 (11th Cir. 2007); *U.S. v Alaska National Bank of the North (In the Matter of Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982).  Rather, courts consider the *fairness* of a proposed settlement agreement. *Chira v. Saal et al. (In re Chira)*, 567 F.3d 1307, 1312-1313 (11th Cir. 2009).

44.     In ruling on a proposed compromise, a court should not substitute its own judgment for that of the trustee or debtor in possession.  *See McMasters v. Morgan (In reMorgan)*, 2011 WL 3821102, at *1 (11th Cir. Aug. 29, 2011) (affirming bankruptcy court order approving "settlement because it was the Trustee's best business judgment that the settlement be approved"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("under normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification."); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("The reviewing court need not conduct its own investigation concerning the reasonableness of the settlement and may credit and consider the opinion of the Trustee and counsel that the settlement is fair and equitable.").  Nor is it a court's task to determine whether the settlement was the best that the trustee could have obtained.  *See Cosoff v Rodman (In re W.T. Grant)*, 699 F.2d 599, 608, 613 (2d Cir.), *cert. denied* 464 U.S. 822 (1983).  Rather, courts should "canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness."  *Id.* at 608; *see also In re Bell & Beckwith*, 87 B.R.472, 474 (N.D. Ohio 1987).

45.     As set forth above in the sections *infra*, the Debtors believe that the DIP Credit

Term Sheet represents a fair and prudent deal that falls well within the realm of reasonableness given due consideration in the Debtors' reasonable business judgment. Indeed, the liquidation of the Agreed Pre-Petition Principal Amount to a sum-certain is an accretive feature of the DIP Credit Term Sheet, and represents one of the noneconomic terms (from a DIP financing perspective) that makes the DIP Facility a particularly attractive option for the Debtors. Indeed, the degree of certainty and clarity provided by the DIP Credit Term Sheet represents a significant benefit to the Debtors' estates, and the Debtors accordingly submit that the terms thereof should approved pursuant to Bankruptcy Rule 9019 in addition to the sections of the Bankruptcy Code articulated above.

### E. The Relief Requested Herein Should be Granted on an Interim Basis to Avoid Immediate and Irreparable Harm to the Debtors.

46.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Bankruptcy Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

47.     The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business and the sale process. The Debtors believe that substantially all of their available cash constitutes the DIP Lender's Cash Collateral. The Debtors will therefore be unable to operate their business or otherwise fund these Chapter 11 Cases without access to the Cash Collateral and the DIP Facility, and they will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. In short, the Debtors' ability to administer the Chapter 11 Cases through the use of Cash Collateral is vital to preserve and

maximize the value of the Debtors' estates.

48.     The Debtors request that the Bankruptcy Court hold and conduct a hearing to consider entry of the Order authorizing the Debtors, from and after entry of the Order until the Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

## **Notice**

49.     The Debtors will provide notice of this motion to: (a) the Office of the United States Trustee for the Southern District of Florida; (b) the Debtors' creditors, and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

50.     No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank.*]

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court (a) enter the Order granting the relief requested herein, and (b) grant such other and further relief as the Court deems appropriate.

Dated:   April 18, 2023

Respectfully submitted,

**PACK LAW**
*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Telephone: (305) 916-4500

By:   */s/ Jessey J. Krehl*
Joseph A. Pack
Email:  joe@packlaw.com
Florida Bar No. 117882

Jessey J. Krehl
Email:  jessey@packlaw.com
Florida Bar No. 1025848

**<u>Exhibit A to Motion</u>**

**Proposed Order**

**[TO COME]**

**Exhibit 1 to Proposed Order**

**The Budget**



**MCHALE, P.A.**
BANKRUPTCIES · RECEIVERSHIPS
LITIGATION SUPPORT · FORENSIC ACCOUNTING
WWW.MCHALEPA.COM

Banyan Cay Properties
13 Week Rough Expense Budget
Ending 30 June 2023

| Item | Total $ | 4/3/2023 Week 1 | 4/10/2023 Week 2 | 4/17/2023 Week 3 | 4/24/2023 Week 4 | April Total | 5/1/2023 Week 5 | 5/8/2023 Week 6 | 5/15/2023 Week 7 | 5/22/2023 Week 8 | 5/29/2023 Week 9 | May Total | 6/5/2023 Week 10 | 6/12/2023 Week 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operational Expenses** | | | | | | | | | | | | | | |
| **Admin Expenses** | | | | | | | | | | | | | | |
| Sprint (Cell Phone and iPad) | $ 6,400 | $ 1,600 | | | | $ 1,600 | 1,600 | | | | | $ 1,600 | 1,600 | |
| Software Maintenance | 11,200 | | 2,800 | | | 2,800 | 2,800 | | | | | 2,800 | 2,800 | |
| Phone System, Domains, Emails (Paid by Credit Card) | 18,000 | | 3,000 | | | 3,000 | | 5,000 | | | | 5,000 | | 5,000 |
| **Total Admin Expenses** | **35,600** | - | **7,400** | - | - | **7,400** | 4,400 | 5,000 | - | - | - | **9,400** | 4,400 | 5,000 |
| | | | | | | | | | | | | | | |
| **Repairs & Maint** | | | | | | | | | | | | | | |
| Building Repairs and Maintenance (Temp AC Repairs Ch | 3,000 | | | | 3,000 | 3,000 | | | | | | - | | |
| General Deferred Maintenance | 50,000 | | | | 50,000 | 50,000 | | | | | | - | | |
| Lock Replacement and Repairs | 10,000 | | | | 10,000 | 10,000 | | | | | | - | | |
| **Total Repairs & Maint** | **63,000** | - | - | - | 63,000 | **63,000** | - | - | - | - | - | **-** | - | - |
| | | | | | | | | | | | | | | |
| **Insurance** | | | | | | | | | | | | | | |
| First Funding (Club Operations) | 65,000 | | | | 20,000 | 20,000 | | 45,000 | | | | 45,000 | | |
| Property Insurance - Golf | 138,000 | 138,000 | | | | 138,000 | | | | | | - | | |
| Workman's Comp | 8,000 | | | 2,000 | | 2,000 | | 2,000 | | | | 2,000 | | 2,000 |
| Anticipated Additional Premiums | - | | | | | - | | | | | | - | | |
| **Total Insurance** | **211,000** | 138,000 | - | 2,000 | 20,000 | **160,000** | - | 47,000 | - | - | - | **47,000** | - | 2,000 |
| | | | | | | | | | | | | | | |
| **Payroll & Contract Labor** | **398,000** | - | 68,000 | - | 55,000 | **123,000** | - | 55,000 | - | 55,000 | - | **110,000** | 55,000 | - |
| | | | | | | | | | | | | | | |
| **Golf Couse expenses** | | | | | | | | | | | | | | |
| DLL (Equipment Leases) | 74,400 | | 18,600 | | | 18,600 | 18,600 | | | | | 18,600 | 18,600 | |
| Cart Rental | 20,000 | | | | 5,000 | 5,000 | 5,000 | | | | | 5,000 | 5,000 | |
| Sunniland (Fertilizer) | 22,500 | | | | 15,000 | 15,000 | - | | | | | - | 7,500 | |
| Site One (Chemicals) | 24,000 | | | | 8,000 | 8,000 | 8,000 | | | | | 8,000 | 8,000 | |
| Wedgworth's Inc. (Fertilizer) | 18,000 | | | | 6,000 | 6,000 | 6,000 | | | | | 6,000 | 6,000 | |
| Legacy Turf (Liquid Fertilizer) | 13,500 | | 7,500 | | | 7,500 | 3,000 | | | | | 3,000 | 3,000 | |
| Plant Health Solution (Chemicals) | 8,000 | | | | 2,500 | 2,500 | 500 | 2,500 | | | | 3,000 | | 2,500 |
| Golf Agronomics Supply (Testing, Sand) | 8,000 | | 2,500 | | | 2,500 | 500 | 2,500 | | | | 3,000 | | 2,500 |
| Hector (Irrigation & Parts) | 15,000 | | | | 8,000 | 8,000 | 700 | 700 | 700 | 700 | 700 | 3,500 | 875 | 875 |
| Sullivan Electric (Pump Station Repair) | 10,000 | | | | | - | | 10,000 | | | | 10,000 | | |
| Atlantic Dry Jet (Aerification, Seasonal Maintenance) | 16,000 | | | | | - | 8,000 | | | | | 8,000 | | |
| Lake Maintenance | 2,790 | | | | 1,000 | 1,000 | | 895 | | | | 895 | 895 | |
| Clubs Shipped North for Members | 1,300 | | | | 400 | 400 | 100 | 100 | 100 | 100 | 100 | 500 | 500 | 100 |
| The Staffing (Laborers) | 131,400 | | 39,000 | 8,000 | 8,000 | 55,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 40,000 | 5,100 | 5,100 |
| SSI (Diesel and Gas GCM) | 14,650 | 2,800 | | | | 2,800 | 3,450 | | | | | 3,450 | 1,250 | 1,250 |
| **Total Golf Course Expenses** | **379,540** | 2,800 | 67,600 | 8,000 | 53,900 | **132,300** | 71,850 | 14,695 | 8,800 | 8,800 | 8,800 | **112,945** | 56,320 | 12,325 |
| | | | | | | | | | | | | | | |
| **Utilities Expenses** | | | | | | | | | | | | | | |
| FPL (Electricity) | 144,000 | | 33,000 | | | 33,000 | 37,000 | | | | | 37,000 | 37,000 | |
| FPL (Electricity) Required deposit | 80,000 | | | | 80,000 | 80,000 | | | | | | - | | |
| City of West Palm Beach (Water) | 27,703 | | 6,578 | | | 6,578 | | 8,125 | | | | 8,125 | | 6,500 |
| Comcast (Cable and Internet) | 8,800 | | 1300 | | | 1,300 | | 2,500 | | | | 2,500 | | 2,500 |
| Florida Public Utilities (Gas) | 15,400 | | | 3,850 | | 3,850 | | 3,850 | | | | 3,850 | | 3,850 |
| **Total Utilities** | **275,903** | - | 40,878 | 3,850 | 80,000 | **124,728** | 37,000 | 14,475 | - | - | - | **51,475** | 37,000 | 12,850 |

**McHale, P.A.**
BANKRUPTCIES · RECEIVERSHIPS
LITIGATION SUPPORT · FORENSIC ACCOUNTING
WWW.MCHALEPA.COM

Banyan Cay Properties
13 Week Rough Expense Budget
Ending 30 June 2023

| Item | Total $ | 4/3/2023 Week 1 | 4/10/2023 Week 2 | 4/17/2023 Week 3 | 4/24/2023 Week 4 | April Total | 5/1/2023 Week 5 | 5/8/2023 Week 6 | 5/15/2023 Week 7 | 5/22/2023 Week 8 | 5/29/2023 Week 9 | May Total | 6/5/2023 Week 10 | 6/12/2023 Week 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Other Expenses** | | | | | | | | | | | | | | |
| City Violations Fines (Property Cleanup Related) | - | | | | | | | | | | | - | - | - |
| Removal of Debris and Lake Cleanup | 90,000 | | | | 30,000 | 30,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 40,000 | 5,000 | 5,000 |
| Security | 152,000 | | 38,000 | | | 38,000 | 38,000 | | | | | 38,000 | 38,000 | |
| storage | 112,000 | | 28,000 | | | 28,000 | | 28000 | | | | 28,000 | | 28,000 |
| Taxes - Sales (Included in Revenue) | - | | | | | - | | | | | | - | | |
| Taxes Property | - | | | | | - | | | | | | - | | |
| **Total Other Expenses** | 354,000 | - | 66,000 | - | 30,000 | 96,000 | 46,000 | 36,000 | 8,000 | 8,000 | 8,000 | 106,000 | 43,000 | 33,000 |
| | | | | | | | | | | | | | | |
| **Hardscape Repairs** | | | | | | | | | | | | | | |
| Landscape Congress Ave and Development | 50,000 | | | | | - | | | 25,000 | 13,000 | | 38,000 | | 12,000 |
| Swimming Pools - Drain, Acid Wash & Concrete Restora | 15,000 | | | | | - | | | 15,000 | | | 15,000 | | |
| Lake Maintenance (dev) | 10,000 | | | | | - | | | 6,000 | 2,000 | | 8,000 | | 2,000 |
| Repair Fountain Roundabout | 10,000 | | | | | - | | | 5,500 | 4,500 | | 10,000 | | |
| Repair Fountain in Lakes | 5,000 | | | | | - | | | 2,000 | 3,000 | | 5,000 | | |
| Date Palms Refurbishing (Along Spine Road) | 10,000 | | | | | - | | | 5,000 | 2,500 | | 7,500 | | 2,500 |
| **Total Hardscape Repairs** | 100,000 | - | - | - | - | - | - | - | 58,500 | 25,000 | - | 83,500 | - | 16,500 |
| | | | | | | | | | | | | | | |
| **Bankruptcy Related** | | | | | | | | | | | | | | |
| Adequate Protection Payment | 1,560,000 | | | | | - | 520,000 | | | | 520,000 | 1,040,000 | | |
| *DIP Loan 12.5%* | 73,470 | | | | | - | 3,240 | | 21,250 | | | 24,490 | 3,240 | 21,250 |
| Professional Fee Carve Outs | - | | | | | - | | | | | | - | | |
| CRO | 140,000 | | | | 50,000 | 50,000 | | | | | 45,000 | 45,000 | | |
| Attorney | 280,000 | | | | 100,000 | 100,000 | | | | | 90,000 | 90,000 | | |
| US Trustee Fees | - | | | | | - | | | | | | - | | |
| Keen-Summit (Real Estate Broker - Marketing) | 60,000 | | | | 30,000 | 30,000 | | 10,000 | | | | 10,000 | | 20,000 |
| **Total Bankruptcy Related** | 2,113,470 | - | - | - | 180,000 | 180,000 | 523,240 | 10,000 | 21,250 | - | 655,000 | 1,209,490 | 3,240 | 41,250 |
| | | | | | | | | | | | | | | |
| **Total Expenses** | 3,930,513 | 140,800 | 249,878 | 13,850 | 481,900 | 886,428 | 682,490 | 182,170 | 96,550 | 96,800 | 671,800 | 1,729,810 | 198,960 | 122,925 |
| | | | | | | | | | | | | | | |
| **Anticipated Revenue** | | | | | | - | | | | | | - | | |
| Golf and F&B | 268,497 | 77,000 | 20,597 | 2,800 | 2,800 | 103,197 | 52,800 | 51,800 | (19,200) | 800 | 40,800 | 127,000 | 40,800 | (1,700) |
| **Total Revenue Offsets** | 268,497 | 77,000 | 20,597 | 2,800 | 2,800 | 103,197 | 52,800 | 51,800 | (19,200) | 800 | 40,800 | 127,000 | 40,800 | (1,700) |
| | | | | | | | | | | | | | | |
| **Net Financing Required** | $ 3,662,016 | $ 63,800 | $ 229,281 | $ 11,050 | $ 479,100 | $ 783,231 | $ 629,690 | $ 130,370 | $ 115,750 | $ 96,000 | $ 631,000 | $ 1,602,810 | $ 158,160 | $ 124,625 |
| | | | | | | | | | | | | | | |
| **Net Funding Requested** | 2,028,546 | | | | | | | | | | | | | |
| *Beginning Cash Balance* | | | 264,000 | 34,719 | 23,669 | | (455,431) | (1,085,121) | (1,215,491) | (1,331,241) | (1,427,241) | | (2,058,241) | (2,216,401) |
| *Ending Cash Balance* | - | (0) | 34,719 | 23,669 | (455,431) | - | (1,085,121) | (1,215,491) | (1,331,241) | (1,427,241) | (2,058,241) | - | (2,216,401) | (2,341,026) |

|  |  |
|---|---|
| Net Financing Required | 3,662,016 |
| Less: Opening Cash | (264,000) |
| Less: Week 1 Paid | (63,800.00) |
| Equals Ending Cash Week 13 | $ 3,334,216 |



Banyan Cay Properties
13 Week Rough Expense Budget
Ending 30 June 2023

| 6/19/2023 | 6/26/2023 | June Total | 7/3/2023 | 7/10/2023 | July Total |
|---|---|---|---|---|---|
| Week 12 | Week 13 | | Week 14 | Week 15 | |
| | | $    1,600 | $    1,600 | | $    1,600 |
| | | 2,800 | 2,800 | | 2,800 |
| | | 5,000 | | 5,000 | 5,000 |
| - | - | 9,400 | 4,400 | 5,000 | 9,400 |
| | | - | | | - |
| | | - | | | - |
| | | - | | | - |
| | | - | | | - |
| - | - | - | - | - | - |
| | | - | | | - |
| | | - | | | - |
| | | - | | | - |
| | | 2,000 | | 2,000 | 2,000 |
| | | - | | | - |
| - | - | 2,000 | - | 2,000 | 2,000 |
| | | | | | - |
| 55,000 | - | 110,000 | 55,000 | - | 55,000 |
| | | | | | - |
| | | | | | - |
| | | 18,600 | 18,600 | | 18,600 |
| | | 5,000 | 5,000 | | 5,000 |
| | | 7,500 | | | - |
| | | 8,000 | | | - |
| | | 6,000 | | | - |
| | | 3,000 | | | - |
| | | 2,500 | | | - |
| | | 2,500 | | | - |
| 875 | 875 | 3,500 | | | - |
| | | - | | | - |
| | | - | 8,000 | | 8,000 |
| | | 895 | | | - |
| 100 | 100 | 400 | | | - |
| 5,100 | 5,100 | 20,400 | 8,000 | 8,000 | 16,000 |
| 1,250 | 1,250 | 5,000 | 3,400 | | 3,400 |
| 7,325 | 7,325 | 83,295 | 43,000 | 8,000 | 51,000 |
| | | - | | | - |
| | | 37,000 | 37,000 | | 37,000 |
| | | - | | | - |
| | | 6,500 | | 6,500 | 6,500 |
| | | 2,500 | | 2,500 | 2,500 |
| | | 3,850 | | 3,850 | 3,850 |
| - | - | 49,850 | 37,000 | 12,850 | 49,850 |



Banyan Cay Properties
13 Week Rough Expense Budget
Ending 30 June 2023

| | 6/19/2023 | 6/26/2023 | June Total | 7/3/2023 | 7/10/2023 | July Total |
|---|---|---|---|---|---|---|
| | Week 12 | Week 13 | | Week 14 | Week 15 | |
| | | | - | | | - |
| | | | - | | | - |
| | - | - | - | - | - | - |
| | 5,000 | 5,000 | 20,000 | | | - |
| | | | 38,000 | 38,000 | | 38,000 |
| | | | 28,000 | | 28,000 | 28,000 |
| | | | - | | | - |
| | 5,000 | 5,000 | 86,000 | 38,000 | 28,000 | 66,000 |
| | | | | | | - |
| | | | 12,000 | | | - |
| | | | - | | | - |
| | | | 2,000 | | | - |
| | | | - | | | - |
| | | | - | | | - |
| | | | 2,500 | | | - |
| | - | - | 16,500 | - | - | - |
| | | | | | | - |
| | | | | | | - |
| | | 520,000 | 520,000 | | | - |
| | | | 24,490 | 3,240 | 21,250 | 24,490 |
| | | | - | | | - |
| | | 45,000 | 45,000 | | | - |
| | | 90,000 | 90,000 | | | - |
| | | | - | | | - |
| | | | 20,000 | | | - |
| | - | 655,000 | 699,490 | 3,240 | 21,250 | 24,490 |
| | | | | | | - |
| | 67,325 | 667,325 | 1,056,535 | 180,640 | 77,100 | 257,740 |
| | | | - | | | - |
| | | | - | | | - |
| | 800 | 800 | 40,700 | (1,200) | (1,200) | (2,400) |
| | 800 | 800 | 40,700 | (1,200) | (1,200) | (2,400) |
| | | | - | | | - |
| | $ 66,525 | $ 666,525 | $ 1,015,835 | $ 181,840 | $ 78,300 | $ 260,140 |
| | | | | | | |
| | (2,341,026) | (2,407,551) | | (3,074,076) | (3,255,916) | |
| | (2,407,551) | (3,074,076) | - | (3,255,916) | (3,334,216) | - |

**Exhibit 2 to Proposed Order**

**DIP Credit Term Sheet**

**EXECUTION COPY**

**In re: Banyan Cay Resort & Golf, LLC, et al.**
**(Jointly Administered Cases (Case No. 23-12386) (EPK))**

Debtor in Possession Senior Secured Financing Term Sheet

This Debtor in Possession Senior Secured Financing Term Sheet (the "**DIP Term Sheet**") sets out the principal terms of a DIP Loan intended to provide Banyan Resort & Golf, LLC; Banyan Cay Investments, LLC; Banyan Cay Mezzanine Borrower, LLC; Banyan Cay Dev. LLC; Banyan Cay Villas, LLC; and Banyan Cay Maintenance LLC (each a "**Debtor**" and collectively, the "**Debtors**") the liquidity they need to propose, advance, close and consummate a sale of substantially all their assets pursuant to section 363 of the Bankruptcy Code (the "**Sale**"). The financing proposed in this Term Sheet is subject to the entry of one or more orders by the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "**Bankruptcy Court**") presiding over the Debtors' cases (the "**Chapter 11 Cases**"), approving the proposed financing and the execution and delivery by Debtors of the definitive agreements, instruments and documents related to the DIP Facility in forms acceptable to the DIP Lender and the Debtors (together, the "**Parties**," and such documents, the "**DIP Facility Documents**").

This Term Sheet is not inclusive of all of the conditions, covenants, representations and warranties and other provisions to be set forth in the DIP Facility Documents.

| | |
|---|---|
| **Borrowers** | Each Debtor, jointly and severally. |
| **DIP Lender** | U.S. Real Estate Credit Holdings III-A, LP, or its affiliate(s) (as relevant, the "**Pre-Petition Secured Lender**") |
| **DIP Facility** | The DIP Facility will be made pursuant to and governed by the DIP Facility Documents, subject to the DIP Orders (as defined herein). The Debtors shall exclusively use the proceeds from the DIP Facility to fund business operating and administrative expenses of the Chapter 11 Cases attendant to the Sale, and solely in accordance with the 13-week budget attached hereto as Schedule 1 and incorporated herein by reference (the "**Budget**"). |
| **Post-Petition Term Loan Credit Facility** | A maximum commitment of up to US $3,800,000.00 (the "**Total Loan Amount**"). Upon entry of the Interim DIP Order, a maximum of amount up to US $[1,200,000.00] will be available under the DIP Facility (the "**Initial Maximum Amount**"). Upon entry of the Final DIP Order, an additional maximum amount of up to US $2,400,000.00 would be available under the DIP Facility, which will be funded from time to time in accordance with the DIP Facility Documents, the Budget and the orders approving same. |
| **Closing Date** | Upon entry of the Interim DIP Order and Cash Collateral Order (for up to the Initial Maximum Amount). |
| **Maturity** | The maturity of the DIP Facility (the "**Maturity Date**") shall be the earliest to occur of: (a) the effective date of the plan for the Chapter 11 Cases, dismissal or conversion of the Chapter 11 Cases or the appointment of a trustee or examiner with expanded powers for Debtors; (b) 21 days from the entry of Interim DIP Order approving the DIP Facility if the Court has not entered the Final DIP Order; or (c) the occurrence an event of default ("**Event of Default**"), as to be set forth in the DIP Facility Documents. |

1

| | |
|---|---|
| **Repayment** | On the Maturity Date, amounts due under the DIP Facility shall be paid in full, in cash, together with accrued interest on amounts advanced, costs and attorneys' fees of the DIP Lender (collectively, the "**DIP Obligations**"). Until such time as DIP Lender and Pre-Petition Lender have each received Indefeasible Payment of the DIP Obligations and the Pre-Petition Obligations (including post-petition interest, costs and attorneys' fees) respectively, Pre-Petition Lender and DIP Lender retain all their respective rights and remedies under the Pre-Petition Loan Documents (as defined below), the DIP Facility Loan Documents, at law and in equity. |
| | "**Indefeasible Payment**" means the payment in full, in cash, of all Pre-Petition Obligations and DIP Obligations owing to the Pre-Petition Secured Lender and DIP Lender that is not subject to any pending or threatened demand, claim demand or cause of action, seeking avoidance, recharacterization, equitable subordination, marshaling or any other form of recovery (in whole or in part) including, without limitation, on account of or in connection with the claims asserted in the New York Action and/or the Florida Action (as each term is defined below). |
| | For the avoidance of doubt, the Indefeasible Payment to the Pre-Petition Secured Lender shall not terminate, modify or limit the indemnitors' obligations under the Hazardous Substances Indemnity Agreement  dated June 14, 2018, which shall survive and remain fully enforceable by its terms. |
| **Carve-Out** | The DIP Lender's liens and administrative claims shall be subject to the prior payment of the Carve-Out Expenses. "**Carve-Out Expenses**" would mean: |
| | (a) allowed, accrued, but unpaid professional fees of Debtors consistent with and not in excess of the amounts included in the Budget which have been incurred prior to the occurrence and declaration of an Event of Default (which, for the avoidance of doubt, such budgeted Carve-Out Expenses shall not serve as a cap and limit the reasonable and documented fees and expenses requested by the respective professionals in the Chapter 11 Cases). For the avoidance of doubt, DIP Lender and Pre-Petition Secured Lender shall have no obligation to fund professional fees and expenses in excess of the amounts set forth in the Budget; |
| | (b) allowed, accrued but unpaid professional fees and expenses incurred by Debtors consistent with the Budget which are incurred after the declaration of an Event of Default (that is not cured or waived) in an aggregate amount not to exceed US $25,000; and |
| | (C) fees payable to the U.S. trustee pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court; |
| | *provided, however*, that the Carve-Out Expenses shall not include: (i) any other claims that are or may be senior to or *pari passu* with any of the Carve-Out Expenses; (ii) any fees or expenses of a Chapter 7 trustee; (iii) any fees or disbursements arising after the conversion of the Chapter 11 Cases to a Chapter 7 cases; (iv) any fees or disbursements related to the investigation of, preparation for, or commencement or prosecution of any litigation, proceeding or adverse action against, or challenge to the rights, validity and/or the first-priority status of liens and secured claims of the DIP Lender; or (v) any fees or disbursements related to any challenge or objection to the debt or collateral position of the DIP |

2

| | |
|---|---|
| | Lender or hindering or delaying the DIP Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing. |
| **Interest Rate and Fees** | Interest Rate: 12.5% per annum |
| | Default Rate: 15%. |
| | Loan Commitment Fee: None. |
| | Exit Fee: None. |
| | Draw Fee: $2,500 per draw during the period covered by the Interim Order, with the final Draw Fee to be agreed upon prior to the entry of the Final Order. |
| | Other: Fees and costs of legal counsel and professional advisors of DIP Lender in connection with the DIP Facility and the Chapter 11 Cases. |
| **Security** | As security for the DIP Obligations the Debtors shall grant to the DIP Lender the following liens and security interests (the "**DIP Liens**"): |
| | (a) Pursuant to section 364(d)(1), a first-priority, priming, perfected security interest in all of the DIP Lender's Pre-Petition Collateral (as defined below); |
| | (b) Pursuant to section 364(c)(2), a first-priority, perfected security interest on all property of the Debtors that is not subject to a valid and perfected lien by any third party; |
| | (c) Pursuant to section 364(c)(3), a perfected junior lien on all property of the Debtors that is subject to a valid and perfected lien; and |
| | (d) all proceeds and product of the foregoing, whether now existing  or hereafter arising (collectively, the "**Post-Petition Collateral**"). |
| | The liens granted to DIP Lender shall be valid and fully enforceable without any requirement for the execution, delivery, recording or filing of any security agreement, mortgage, deed of trust, financing statement or similar document, instrument or agreement covering such Post-Petition Collateral; *provided, however*, that the liens and security interests granted to the DIP Lender under the Interim Order and the Final Order shall not extend to causes of action under Chapter 5 of the Bankruptcy Code or the proceeds thereof. |
| | The DIP Lender shall also receive a super-priority administrative expense under Section 364(c)(1) of the Code (the "**DIP Superpriority Claim**") for the amount of DIP Obligations, subject only to amounts carved out and as otherwise set forth in the Budget. |
| | For so long as any of the DIP Obligations remain outstanding, Debtors shall not grant or permit any other security interest in the Post-Petition Collateral to any other person or entity that is senior or *pari passu* to either (i) the DIP Liens or (ii) the liens held by the Prepetition Secured Lender, other than, with respect to (i) and (ii), permitted liens agreed to by the DIP Lender in its sole discretion (the "**Permitted Liens**"). |
| **Adequate Protection & Interest Payments** | As adequate protection of its interest in the Pre-Petition Collateral (as defined below), the Debtors shall: (a) grant DIP Lender Replacement Liens (junior to the DIP Liens) on all property that constitutes the Pre-Petition Collateral; and (b) pay monthly adequate protection of interest on the amount of the Agreed Pre-Petition Principal Amount (as defined below) at 6.25% per annum (which DIP Lender may pay directly from the proceeds of advances under the DIP Facility).  Further, to |

|  |  |
|---|---|
|  | the extent DIP Lender suffers a diminution in the value of its interest in the Pre-Petition Collateral (as defined below), DIP Lender shall have a superpriority administrative expense claim, junior only to the DIP Superpriority Claim. |
| **Conditions Precedent to Closing on the Interim Amount** | (a) Execution and delivery of the DIP Loan Documents and other customary loan documents in form and substance satisfactory to the DIP Lender; |
|  | (b) The filing by the Debtors on or before April 14, 2023, of a motion seeking entry of the Interim DIP Order and the Final DIP Order, each in a form acceptable to the DIP Lender. |
|  | (c) The Court's approval of the DIP Loan on an interim basis no later than, April 17, 2023 (the "**Interim DIP Order**") and, on a final basis no later than April 28, 2023 (the "**Final DIP Order**" and, together with the Interim Order, the "**DIP Orders**"); |
|  | (d) Each disbursement under the DIP Loan would be consistent with the most recently delivered and approved version of the Budget, subject to any variances solely as permitted by the DIP Loan Documents; |
|  | (e) The DIP Orders shall be acceptable to the DIP Lender in its sole discretion and shall include provisions relating to the DIP Loan that are customary for facilities of this type and other provisions acceptable to the DIP Lender, including the Debtors' acknowledgment that: |
|  |     (i)  The Debtors and the Pre-Petition Secured Lender stipulate and agree that pursuant to the Pre-Petition Loan Documents[1] and that certain *Final Judgment of Foreclosure on Counts III and XIII of Verified Complaint*, entered on February 16, 2023 and any amendments or modifications thereto (Case No. 50-2022-CA-006815-XXXX-MB (Div. AK), the Debtors are indebted to Pre-Petition Secured Lender in the amount of: (a) $96.5 million (the "**Agreed Pre-Petition Principal Amount**"), plus (b) simple interest on the Agreed Pre-Petition Principal Amount of 6.25% per annum, which shall accrue from the Petition Date and which shall be paid monthly to the Pre-Petition Lender in accordance with the DIP Facility Documents, plus (c) costs and attorneys' fees and costs incurred from and |

---

[1] The term "Pre-Petition Loan Documents" shall mean (i) that certain Amended and Restated Loan Agreement among Banyan Cay Resort & Golf, LLC and Banyan Cay Dev. LLC and the Pre-Petition Secured Lender, dated as of September 30, 2020, as amended pursuant to that certain First Amendment to Amended and Restated Loan Agreement and other Loan Documents dated as of October 15, 2020; that certain Second Amendment to Amended and Restated Loan Documents dated September 2, 2021; and that certain Third Amendment to Amended and Restated Loan Agreement and other Loan Documents dated December 31, 2021, (ii) that certain loan agreement among Banyan Cay Resort & Golf, LLC, Banyan Cay Dev. LLC, and Banyan Cay Villas, LLC and U.S. Real Estate Credit Holdings III-A, LP, dated as of September 30, 2020, as amended pursuant to that certain First Amendment to Loan Agreement and other Loan Documents dated September 2, 2022, and as further amended pursuant to that certain Amended and Restated Loan Agreement dated December 31, 2021, and (iii) any and all guaranties, indemnitees and other agreements executed by Kim Pillar, Domenic J. Gatto, Jr. and Domenic F. Gatto, Sr. in favor of, or for the benefit of, the Pre-Petition Secured Lender.

|  | after March 24, 2023 (the aggregate of the foregoing (a), (b) and (c), the "**Pre-Petition Obligations**"); |
|  | (ii) The Pre-Petition Obligations are not subject to any setoff, defense, claim or counterclaim of the Debtors, save and except the reservation of rights relating to fees and expenses; and |
|  | (iii) The Pre-Petition Obligations are secured by valid, properly perfected and duly enforceable first-priority liens on substantially all of the assets of the Debtors (except as set forth, and as more particularly described in the DIP Orders, the "**Pre-Petition Collateral**"). |
|  | (f) The Debtors reserve their right to object to Pre-Petition Secured Lender's entitlement to the recovery of attorneys' fees in connection with the defense of the claims asserted by Banyan Cay Resort Fund, LLC against Pre-Petition Secured Lender in the United States District Court for the Southern District of New York assigned Case No. 1:23-cv-01345-JPO (the "**New York Action**") and defending the counterclaim asserted by Jacobs Industries against the Pre-Petition Secured Lender in Case No. 50-2022-CA-006815-XXXX-MB (the "**Florida Action**"). |
|  | (g) No material adverse change would have occurred with respect to the operations, properties, or financial condition of the Debtors, taken as a whole, since the commencement of the Chapter 11 Cases; |
|  | (h) Execution and delivery of releases by the Debtors in respect of any and all claims against DIP Lender, and its affiliates, officers, directors, employees, agents and advisors, in form and substance satisfactory to the DIP Lender. |
| **Covenants and Representations and Warranties** | The final documentation shall contain representations and warranties of the Borrowers reasonably acceptable to DIP Lender. |
|  | Customary affirmative and negative covenants for facilities of this type and this transaction in particular, including: |
|  | (a) reasonable access to information relating to the Debtors; |
|  | (b) compliance with the Budget by the Debtors, through the CRO, including, during the period covered by the Interim Order, a variance of 5% for each line item contained in the Budget, with the total variance for all line items not to exceed 10% in the aggregate for this interim period. Prior to entry of the Final Order, the Parties shall agree on the variance covenant that shall govern the Debtors' compliance with the Budget from and after the entry of the Final Order;; |
|  | (c) Debtors' timely adherence to the Sale Milestones (as defined herein) subject to Bankruptcy Court availability; |
|  | (d) Operating covenants regarding revenues in accordance with the Budget; |
|  | (e) Compliance with all orders of the Court including the interim and final orders authorizing the retention Gerard A. McHale, P.A. to provide the services of Gerard A. McHale as Chief Restructuring Officer for the Debtors; and |

5

EXECUTION COPY

| | |
|---|---|
| | (f) Such other provisions as are ordinarily contained in DIP Orders and DIP Loan Documents in transactions of this type. |
| **Reporting Requirements** | So long as Debtors' obligations under the DIP Loan remain unpaid or the DIP Lender shall have any commitment under the DIP Loan, the Debtors shall, unless the DIP Lender shall otherwise consent in advance in writing, provide the DIP Lender with: (a) a weekly flash report (to be delivered by no later than Tuesday of each week) reflecting the Debtors' income and expenses for the prior week; (b) an updated 13-week budget comparing the actual performance to the budget; and (c) all reports filed with the United States Trustee in the Chapter 11 Cases. |
| **Credit Bid** | Pursuant to section 363(k) of the Code, the DIP Lender and Pre-Petition Secured Lender shall be permitted, but not compelled, to credit bid up to the full amount of (x) Pre-Petition Obligations, plus (y) the allowed claim on account of the DIP Facility in connection with any sale of the Debtors' assets. |
| **Events of Default** | Customary and appropriate Events of Default for financings of this type and this transaction in particular, including the following: (a) breach of the Budget amounts in excess of permitted variances per category; (b) customary bankruptcy events of default, including conversion or dismissal of case, or appointment of trustee and failure to meet the agreed upon milestones; (c) reversal or modification or challenge of any of the DIP Orders by the Debtors without the consent of DIP Lender; (d) other breaches of covenants, subject to customary grace periods and cure periods if applicable; (e) the occurrence of a breach under or termination of any contract for the purchase and sale of any of the Debtors' property without the consent of DIP Lender; (f) Debtors' failure to strictly adhere to the milestones set forth on the attached Schedule 1 (the "**Sale Milestones**"); and (g) such other defaults which shall be included in the DIP Loan Documents and the DIP Orders. |
| **Notice** | If to Debtors:<br><br>Gerard A. McHale<br>Chief Restructuring Officer<br>MCHALE, P.A.<br>1601 Jackson Street, Suite 200<br>Fort Myers, FL 33901<br>Phone: 239-337-0808<br>Facsimile: 239-337-1178<br>jerrym@thereceiver.net<br><br>With a copy to:<br><br>Joseph Pack, Esq. | If to DIP Lender:<br><br>U.S. Real Estate Credit Holdings III-A, LP<br>c/o Calmwater Capital<br>507 S. Douglas St., 2nd Floor<br>El Segundo, CA 90245<br>simond@calmwatercapital.com<br><br>With a copy to:<br><br>Jordi Guso, Esq.<br>Berger Singerman LLP<br>1450 Brickell Avenue<br>Suite 1900 |

12069209-10

| | | |
|---|---|---|
| | Pack Law<br>51 NE 24th Street<br>Suite 108<br>Miami, FL 33137<br>Phone: 305-916-4500<br>joe@packlaw.com | Miami, FL 33131<br>Phone: 305-714-4375<br>jguso@bergersingerman.com<br><br>and<br><br>Brian G. Rich, Esq.<br>Berger Singerman, LLP<br>313 N. Monroe Street, Suite 301<br>Tallahassee, Florida 32301<br>Phone (850)521-6725<br>brich@bergersingerman.com |
| **Remedies** | The final documentation shall contain remedies typical and appropriate for this type of matter. | |
| **Commitment and Administration Fees** | None – other than a $2,500 per draw request fee. | |
| **Expenses** | The Borrowers shall reimburse the DIP Lender for all reasonable costs and expenses, including legal and advisory fees in connection with the negotiation, documentation, execution, and delivery of the DIP Loan and the Borrowers' Chapter 11 Cases. The DIP Lender is authorized to advance from the DIP Loan an amount equal to such fees. | |
| **Non-Binding Effect** | This Term Sheet constitutes only a statement of the intentions of the Parties and does not contain all matters upon which agreement must be reached for the DIP Facility to be provided, which would only be accomplished by (a) DIP Lender's agreement, which may be provided or withheld in its sole discretion, to provide the DIP Facility to Debtors, (b) the entry of the Interim DIP Order and the Final DIP Order by the Court, and (c) the execution of the DIP Facility Documents by the Parties and other required parties. | |

Accepted and agreed to this ⁄⁄⁄⁄day of April 2023.

**BORROWERS:**

BANYAN RESORT & GOLF, LLC; BANYAN CAY INVESTMENTS, LLC; BANYAN CAY MEZZANINE BORROWER, LLC; BANYAN CAY DEV. LLC; BANYAN CAY VILLAS, LLC; and BANYAN CAY MAINTENANCE LLC

By: _____

Print Name: _Gerard A. McHale, Jr._

Title: _Chief Restructuring Officer_

12069209-10

**EXECUTION COPY**

**LENDER:**

U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP

By: _____

Print Name: _Dean Chang_____

Title: _Authorized Signatory_____

8

**Schedule 1**

**Budget**

9

## Schedule 2

### Sale Milestones

The DIP Lender shall be entitled to performance of the following milestones by the dates set forth below (or such later date as may be agreed in writing by the DIP Lender, in its sole discretion) (the "Sale Milestones"), and for the avoidance of doubt, the failure of Debtors to comply with any of the Sale Milestones shall constitute an immediate Event of Default under the DIP Facility Documents:

1.    On or before *April 17, 2023*, Debtors shall have filed one or more motions seeking approval of sale and bidding procedures and scheduling an auction(s) (the "Bidding Procedures Motion"), proposing a sale of substantially all of Debtors' assets, in a form acceptable to the DIP Lender.

2.    On or before *April 21, 2023*, action to assume or appropriately ratify the contract between Banyan Cay Development, LLC, as seller, and Banyan Cay Estates, LLC, as purchaser, for the purchase sale of twenty-four (24) lots within the development owned and operated by the Debtors;

3.    If Debtors have timely filed a Bidding Procedures Motion, then:

    a.    On or before *April 21, 2023*, the Bankruptcy Court shall have entered an order granting the Bidding Procedures Motion, in form reasonably acceptable to the DIP Lender (the "**Bidding Procedures Order**").

    b.    On or before *June 8, 2023*, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

    c.    On or before *June 13, 2023*, Debtors shall have commenced the Auction (as defined in the Bidding Procedures Order), if necessary.

    d.    On or before *June 14, 2023*, or as soon as possible thereafter subject to Bankruptcy Court availability, a hearing shall have occurred in the Bankruptcy Court to consider approval of the sale contemplated by the Bidding Procedures Order.

    e.    On or before *June 15, 2023,* or as soon as possible thereafter subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered the Sale Order (as defined in the Bidding Procedures Order).

    On or before *July 14, 2023*, the sale transaction approved in the Sale Order shall be consummated and closed.

12069209-10