

**ORDERED in the Southern District of Florida on May 1, 2023.**

Erik P. Kimball, Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12386 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN PROPERTY OF THE DEBTORS' ESTATES, (II) SCHEDULING AN AUCTION AND A SALE HEARING, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE AGREEMENT, AND (V) GRANTING RELATED RELIEF**

Upon the motions, [Docket No. 31] (the "Motion")[2] and [Docket No. 99] (the "Amended Bid Procedures Motion"), of the above-captioned debtors and debtors in possession (the "Debtors") for entry of an order (this "Order") (i) authorizing and approving the Bid

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

[2]  Capitalized terms used as defined terms herein but not otherwise defined shall have the meanings ascribed to them in the Motion or the Bid Procedures, as applicable. In the event there is a conflict between this Order and the Motion, this Order shall control and govern.

Procedures attached hereto as **Exhibit B-1** (the "<u>Bid Procedures</u>") in connection with the sale (the "<u>Sale</u>") of certain assets of the Debtors identified in the Stalking Horse Agreement (the "<u>Assets</u>"), (ii) scheduling an auction and hearing to consider the Sale of the Assets, (iii) approving the form and manner of notice thereof, (iv) authorizing the Debtors to enter into the Stalking Horse Agreement (as defined below), (v) approving the Bid Protections (as defined below) in connection therewith, and (vi) granting related relief, all as more fully set forth in the Motion; this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); this Court having determined the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor:

**THE COURT FINDS THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

C.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors have confirmed its consent to the entry of a final order by this Court in connection with the Motion, to the extent it is later determined this Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

D.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      The bases for the relief requested in the Motion are sections 105, 363, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006, 9007, and 9014.

F.      Good and sufficient notice of the Motion, including the relief sought therein, and the Hearing was sufficient under the circumstances, and such notice complied with all applicable requirements under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice need be provided.  A reasonable opportunity to object or be heard regarding the relief provided in this Order has been afforded to all parties in interest.

G.      The Debtors have articulated good and sufficient reasons for this Court, pursuant to the terms hereof, to (i) approve the Bid Procedures, (ii) schedule the bid deadlines and the Auction and the Sale Hearing, (iii) approve the form and manner of notice of the Auction and Sale Hearing, (iv) authorize the Debtors to enter into a Stalking Horse Agreement, and (v) extend to the Stalking Horse Bidder the Bid Protections, in the exercise of its reasonable business judgment. The entry of this Order is in the best interests of the Debtors, their estate, creditors, and other parties in interest.

H.      The Bid Procedures attached hereto as **<u>Exhibit B-1</u>** are reasonable, appropriate and represent the best method for maximizing value for the benefit of the Debtors, their estates, and their creditors.  The Bid Procedures were negotiated at arm's length, in good faith, and without collusion.  The Bid Procedures balance the Debtors' interests in emerging expeditiously from the chapter 11 cases while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors, their estates, their creditors, and other parties in interest.

I.        The Debtors have demonstrated compelling and sound business justifications for authorization to (i) enter into that certain Amended and Restated Asset Purchase Agreement, a copy of which is attached hereto as **Exhibit A** (the "Stalking Horse Agreement") by and among the Debtors and the Stalking Horse Bidder, and (ii) offer the Stalking Horse Bidder the following: (a) a break-up fee equal to $2,250,000.00 (the "Break-Up Fee") on the terms set forth in the Stalking Horse Agreement, (b) an expense reimbursement in the amount of up to $400,000 (the "Expense Reimbursement"), and (c) an initial overbid of to **$3,250,000.00** (the "Initial Overbid" and, together with the Break-Up Fee and the Expense Reimbursement, the "Bid Protections"). With respect to the Bid Protections, the Court makes the following findings:

a.        the Bid Protections are the product of extensive negotiations between the Debtors and the Stalking Horse Bidder conducted in good faith and at arm's length, and the Stalking Horse Agreement (including the Bid Protections) are the culmination of a process undertaken by the Debtors and their professionals to negotiate a transaction with a bidder who was prepared to pay the highest price or best purchase price to date for the Assets to maximize the value of the Debtors' estates;

b.        the Break-Up Fee and Expense Reimbursement are an actual and necessary cost and expenses of preserving the value of the respective Debtors' estate;

c.        the Bid Protections are fair, reasonable, and appropriate in light of, among other things, the size and nature of the proposal Sale under the Stalking Horse Agreement, the substantial efforts that have been and will be expended by the Stalking Horse Bidder, and notwithstanding that the proposed sale is subject to higher and better offers, the substantial benefits the Stalking Horse Bidder has provided to the Debtors, their estates, their creditors, and all parties in interest, including, among other things, by increasing the likelihood that the best possible price for the Assets will be received;

d.        the Bid Protections were material inducements for, and express conditions of, the Stalking Horse Bidder's willingness to enter into the Stalking Horse Agreement and were necessary to ensure that the Stalking Horse Bidder would continue to pursue the proposed acquisition on terms acceptable to the Debtors in their sound business judgment, subject to competitive bidding;

      e.     the offer of the Bid Protections is intended to promote more competitive bidding by inducing the Stalking Horse Bid, which (i) will serve as a minimum floor bid on which all other bidders can rely with respect to the Assets, (ii) may prove to be the highest or otherwise best available offer for the Assets, and (iii) increases the likelihood that the final purchase price will reflect the true value of the Assets; and

      f.     the Stalking Horse Bidder is unwilling to commit to purchase the Assets under the terms of the Stalking Horse Agreement without approval of the Bid Protections.

J.     The Debtors' performance of certain pre-closing obligations contained in the Stalking Horse Agreement is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of the Debtors' sound business judgment.

K.     The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtors, as those terms are defined in § 101 of the Bankruptcy Code, and no common identity of incorporators, directors, managers, controlling shareholders, or other insider of the Debtors exist between the Stalking Horse Bidder and the Debtor.

L.     The notice, substantially in the form attached hereto as **Exhibit B-2**, provided by the Debtors regarding the Sale of the Assets by Auction and Sale Hearing (the "Sale Notice"), is reasonably calculated to provide interested parties with timely and proper notice of the proposed Sale, including, without limitation: (i) the date, time, and place of the Auction (if one is held), (ii) the Bid Procedures and certain dates and deadlines related thereto, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) reasonably specific identification of the assets for sale, (v) instructions for promptly obtaining a copy of the Stalking Horse Agreement, and (vi) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds.

M.      Neither the filing of the Motion, entry of this Order, the solicitation of bids or the conducting of the Auction in accordance with the Bid Procedures nor any other actions taken by the Debtors in accordance therewith shall constitute a sale of the Assets, which sale will only take place, if at all, following the Sale Hearing.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      All objections, statements, and reservations of rights with respect to the relief requested in the Motion with respect to the Bid Procedures that have not been withdrawn, waived, settled or resolved as set forth herein, as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled and denied on the merits with prejudice.  All rights of Bellefrau Group, LLC, ZJC, LLC, and the Prepetition Secured Lender to object to the Sale of the Assets in connection with the Sale Hearing, including all rights under section 363(f) of the Bankruptcy Code, are fully preserved and reserved. [3]

A.      **The Bid Procedures**

3.      The Bid Procedures, attached hereto as **<u>Exhibit B-1</u>**, are hereby approved in their entirety and fully incorporated into this Order.  The Bid Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed Sale and any party desiring to submit a higher or better offer for the Assets must comply with the terms of the Bid Procedures and this Order.  The Bid Procedures shall also govern the terms on which the Debtors will proceed with the Auction and/or Sale pursuant to the Stalking Horse Agreement.

---

[3]      Bellefrau Group, LLC, ZJC, LLC, and the Prepetition Secured Lender shall be and remain consultation parties regarding Qualified Bids unless the Prepetition Secured Lender, Bellefrau Group, LLC, or ZJC, LLC elects to participate in the Auction, upon which such party shall no longer be a consultation party.

4.      The Stalking Horse Bidder shall be deemed a Qualified Bidder pursuant to the Bid Procedures for all purposes.

5.      The following dates and deadlines regarding competitive bidding are hereby established (subject to modification in accordance with the Bid Procedures):

| |
|---|
| • (All times are prevailing Eastern Time) |
| • **June 8, 2023 at 5:00 p.m.:** Deadline to submit Bid to be considered for the Auction |
| • **June 13, 2023 at 10:00 a.m.:** Date of Auction |
| • **June 13, 2023 at 5:00 p.m.:** Debtors to file notice of Successful Bidder |
| • **June 8, 2023 at 5:00 p.m.:** Deadline to file and serve objections to relief requested at Sale Hearing (except for any objection that arises at the Auction) |
| • **June 15, 2023 at 1:30 p.m.:** Date of Sale Hearing |

**B.      Entry into Stalking Horse Agreement**

6.      The Stalking Horse Agreement is hereby approved.  The Debtors are authorized to enter into the Stalking Horse Agreement with the Stalking Horse Bidder and to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms and conditions set forth in the Stalking Horse Agreement as modified by this Order.

7.      The Debtors are authorized to perform all of its respective pre-closing obligations under the Stalking Horse Agreement; *provided* that for the avoidance of doubt, approval and consummation of the transactions contemplated by the Stalking Horse Agreement shall be subject to the terms and conditions herein and the entry of an order approving the Sale of the Assets and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse Agreement.

8.      Notwithstanding any allocation of the Purchase Price under the Stalking Horse Agreement or the schedules attached thereto or supplemented hereafter, no less than the greater of

(i) $1,600,000.00 of the Purchase Price, or (ii) the allowed secured claim of Bellefrau Group, LLC ("Bellefrau") shall be allocated to the portion of the Assets that constitutes the collateral of Bellefrau Group, LLC, which portion of the Assets is more specifically described as:

> Lots 18 and 19, Plat 1, President Country Club, as recorded in Plat Book 29, Page 72 through 76, inclusive of the Public Records of Palm Beach County, Florida

(the "Bellefrau Collateral"), without prejudice to the rights of parties in interest to object to such allocation prior to the Sale. For the avoidance of doubt, each Qualified Bid shall provide an allocation that sets forth the portion of the Purchase Price contained in such Qualified Bid allocated to the Bellefrau Collateral.

9.       Notwithstanding any allocation of the Purchase Price under the Stalking Horse Agreement or the schedules attached thereto or supplemented hereafter, no less than the greater of (i) $1,100,000.00 of the Purchase Price, or (ii) the allowed secured claim of ZJC, LLC shall be allocated to the portion of the Assets that constitutes the collateral of ZJC, LLC, which portion of the Assets is more specifically described as:

> Tract M, Banyan Cay Resort Community Plat 1, according to the plat thereof, as recorded in Plat Book 124, Page 182, Public Records of Palm Beach County, Florida

(the "ZJC Collateral"), without prejudice to the rights of parties in interest to object to such allocation prior to the Sale. For the avoidance of doubt, each Qualified Bid shall provide an allocation that sets forth the portion of the Purchase Price contained in such Qualified Bid allocated to the ZJC Collateral.

## C.    Approval of the Bid Protections

10.       The Bid Protections are hereby approved. The Debtors are authorized to pay the Stalking Horse Bidder the Break-Up Fee and Expense Reimbursement if and to the extent they become due and payable under the Stalking Horse Agreement and the terms of the Bid Procedures

Order, provided the Stalking Horse Agreement has not been terminated, other than as a result of a closing to another Qualified Bidder. The Break-Up Fee and Expense Reimbursement shall be paid from the proceeds of any Sale to a Successful Bidder other than the Stalking Horse Bidder at the closing of such Sale, as a cost of closing, *provided however*, that such Break-Up Fee and Expense Reimbursement shall not constitute a lien under any circumstances on the collateral of U.S. Real Estate Credit Holdings III-A, LP (the "Prepetition Secured Lender"), the Bellefrau Collateral or the ZJC Collateral and *provided further* that in the event the Bellefrau Collateral or the ZJC Collateral is sold separately from the other Assets under the Stalking Horse Agreement, including through a credit bid, then there shall be no Break-Up Fee or Expense Reimbursement due or paid in connection therewith. So long as the Stalking Horse Agreement has not been terminated, other than as a result of a closing to another Qualified Bidder, any Overbid submitted at the Auction by the Prepetition Secured Lender shall have a cash component sufficient to pay for the Break-Up Fee and the Expense Reimbursement, subject to the Prepetition Secured Lender's rights under Section 363(f) of the Bankruptcy Code to not consent to the sale. If Prepetition Secured Lender exercises its rights under Section 363(f) and does not consent to the Sale, then the Break-Up Fee and Expense Reimbursement shall not be payable from the proceeds of the Prepetition Lender's collateral, the Bellefrau Collateral, or the ZJC Collateral in any respect.

**D.    The Auction**

11.    As further described in the Bid Procedures, if a Qualified Bid, other than the Stalking Horse Agreement, is received by the Bid Deadline, the Debtors will conduct the Auction at 1900 Banyan Club Road, West Palm Beach, Florida 33401 at **10:00 a.m. (prevailing Eastern Time) on June 13**, **2023,** or such later time on such day or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids, if a Qualified Bid is timely received. To participate at the Auction, each Qualified Bidder must have at least one person physically present

at the Auction, though other parties may appear virtually with the consent of the Debtors.  The Debtors are authorized, subject to the terms of this Order and the Bid Procedures, to take actions reasonably necessary to conduct and implement the Auction.  The Debtors and their professionals shall have the right to adjourn or cancel the Auction at or prior to the Auction, without the need for further approval by the Bankruptcy Court.

12.     If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Agreement): (i) the Debtors may cancel the Auction, (ii) the Stalking Horse Agreement may be deemed by the Debtors to be the Successful Bid for the Assets, and (iii) the Debtors shall be authorized to seek approval of the Stalking Horse Agreement as the Successful Bid at the Sale Hearing.

13.     Except with respect to the credit bid rights of the Prepetition Secured Lender, ZJC, LLC, and Bellefrau, only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) will be entitled to make any Bids at the Auction.

14.     The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed or videotaped.

15.     Each Qualified Bidder (including, for the avoidance of doubt, the Stalking Horse Bidder) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands, and accepts the Bid Procedures, and (c) has consented to the core jurisdiction of this Court and to the entry of a final order by this Court on any matter related to this Order, the Sale, or the Auction if it is determined that this Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

16.     The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit other than as contemplated in the Stalking Horse Agreement.

17.     To the fullest extent permissible under Bankruptcy Code section 363(k), the Prepetition Secured Lender, ZJC, LLC, and Bellefrau may credit bid, as a Qualified Bid or subsequent Bid at the Auction, in their sole and absolute discretion, any portion and up to the entire amount of their secured claim with respect to the portion of the Assets secured thereby (the "Credit Bid").  Each of the Prepetition Secured Lender, ZJC, LLC, Bellefrau, and the Debtors reserve their respective rights with respect to the amount of such secured claims; *provided*, *however*, that this Court retains jurisdiction to hear any matters related to the determination and liquidation of the amount of such secured claims *for the purposes of the Credit Bid only without prejudice as to the ultimate allowable amount of such claims*, and the amount of such secured claims may be mutually agreed to between each of the Prepetition Secured Lender and the Debtors, ZJC, LLC and the Debtors, or Bellefrau and the Debtors prior to the Auction without further order from this Court.

18.     In the event of a competing Qualified Bid, all Qualified Bidders will be entitled, but not obligated, to submit Overbids.

19.     The Debtors may: (i) determine which Qualified Bid or combination of Qualified Bids (including the Stalking Horse Agreement) is the highest or best offer; (ii) reject at any time before the entry of the Sale Order any Bid (other than the Stalking Horse Agreement) that, in the discretion of the Debtor, is (a)  inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bid Procedures, or (c) contrary to the best interest of the Debtor, its estate, its creditors, interest holders, or other parties in interest; and (iii) at or before the conclusion of the Auction may impose such

11

other terms and conditions upon Qualified Bidders (other than the Stalking Horse Bidder) as the Debtors determine to be in the best interest of the Debtors' estates.

20.    No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fee, topping or termination fee, or other similar fee or payment, and, by submitting a Bid, such person or entity is deemed to have waived its right to request or file with this Court any request for expense reimbursement or any other fee of any nature in connection with the Auction and the Sale, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

**E.    Notice of the Sale Process**

21.    The Sale Notice, in substantially the form as annexed to this Order as **Exhibit B-2**, is hereby approved.

22.    Within three (3) business days after the entry of this Order, the Debtors (or their agent) shall serve the Sale Notice on the creditors of the Debtors and the Notice Parties (as defined in the Motion).  For avoidance of doubt, the following shall be a Notice Party and all required notices shall be sent by U.S. Mail and email to: (i) Bellefrau Group, LLC, c/o Paul J. Battista, Esq., Venable LLP, 100 S.E. Second Street, 44th Floor, Miami, FL 33131, pjbattista@venable.com; and (ii) ZJC, LLC, c/o James S Telepman, Esq., Cohen Norris Wolmer Ray Telepman Berkowitz & Cohen, 712 U.S. Highway One, Suite 400, North Palm Beach, Florida 33408, jst@cohennorris.com.

23.    As soon as reasonably practicable after the entry of the Bid Procedures Order, the Debtors shall publish the Sale Notice in The Wall Street Journal, and such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

24.    The Post-Auction Notice, in substantially the form annexed to this Order as **Exhibit B-3**, is hereby approved.

25.     Subsequent to the conclusion of the Auction, the Debtors shall serve the Post-Auction Notice via this Court's Case Management/Electronic Case Files ("CM/ECF") system.

**F.      The Sale Hearing**

26.     The Sale Hearing will be conducted on **June 15, 2023 at 1:30 p.m. (prevailing Eastern Time)** at the United States Bankruptcy Court, 1515 North Flagler Drive, Room 801, Courtroom B, West Palm Beach, FL 33401.  Although the Court will conduct the Sale Hearing in person, any interested party may choose to attend the hearing remotely using the services of Zoom Video Communications, Inc. ("Zoom"), which permits remote participation by video or by telephone. To participate in the hearing remotely via Zoom (whether by video or by telephone), you must register in advance no later than 3:00 p.m., one business day before the date of the hearing. To resister, click or manually enter the following registration link in a browser:

https://www.zoomgov.com/meeting/register/vJIsduGsrTouGn7Udkhqe_ZF90qPJ3uM95E

All participants (whether attending in person or remotely) must observe the formalities of the courtroom, exercise civility, and otherwise conduct themselves in a manner consistent with the dignity of the Court.  This includes appropriate courtroom attire for those participants appearing in person or by video.

27.     The Debtors will seek entry of an order of the Court at the Sale Hearing approving and authorizing the sale of the Assets to the Successful Bidder.  Upon entry of this Order, the Debtors are authorized to perform any obligation intended to be performed prior to the Sale Hearing or entry of the Sale Order with respect thereto.  The Sale Hearing may be adjourned from time to time without further notice other than such announcement being made in open court or a notice of adjournment filed on the Court's docket.

**G.      Objections to the Sale**

28.      Objections, if any, to the relief requested in the Motion relating to the Sale (each, a "Sale Objection"), other than those arising at the Auction, must: (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Rules, (iii) be filed with the Court, and (iv) be served so it is actually received no later than **5:00 p.m. (prevailing Eastern Time) on June 8, 2023**.  Sale Objections, if any, arising at the Auction, must: (i) explain the basis for such objection, how it arose at the Auction, and why it could not have been raised prior to June 8, 2023, (ii) be in writing, (iii) comply with the Bankruptcy Rules and the Local Rules, (iv) be filed with the Court, and (v) be served so it is actually received no later than **5:00 p.m. (prevailing Eastern Time) on June 14, 2023.**

29.      A party's failure to timely file a Sale Objection in accordance with this Order shall forever bar the assertion, at the applicable Sale Hearing or otherwise, of any objection to the relief requested in the Motion, or to the consummation of the Sale and the performance of the related transactions, including the transfer of the Assets to the applicable Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to be a "consent" for purposes of section 363(f) of the Bankruptcy Code.

**H.      Other Relief Granted**

30.      Nothing in this Order, the Stalking Horse Agreement, or the Motion shall be deemed to or constitute the assumption or assignment of an executory contract or unexpired lease.

31.      The requirements of Bankruptcy Rules 6004(h) and 6006(d) are waived.

32.      The Debtors are hereby authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

33.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

34.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

35.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

###

**Submitted by:**
Jessey Krehl, Esq.
*Counsel for the Debtors and Debtors-in-Possession*
Pack Law, P.A.
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Tel: 305-916-4500
Email: jessey@packlaw.com

**<u>Exhibit A to Bid Procedures Order</u>**

**Amended and Restated Stalking Horse Agreement**

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of April 28, 2023 (the "<u>Agreement</u>"), between BANYAN CAY INVESTMENT, LLC, a Florida limited liability company ("<u>BC Investment</u>"), BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company ("<u>BC Mezz</u>"), BANYAN CAY DEV. LLC, a Delaware limited liability company ("<u>BC Dev</u>"), BANYAN CAY RESORT & GOLF, LLC, a Delaware limited liability company ("<u>BCRG</u>"), BANYAN CAY VILLAS, LLC, a Delaware limited liability company ("<u>BC Villas</u>"), BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company ("<u>BC Maintenance</u>" and together with BC Investment, BC Mezz, BC Dev, BCRG, and BC Villas, collectively, the "<u>Sellers</u>," and each, a "<u>Seller</u>"), each a debtor and debtor in possession in Case No. 23-12390 (EPK), Case No. 23-11281 (EPK), Case No. 23-12386 (EPK), Case No. 23-12387 (EPK), Case No. 23-12388 (EPK), and Case No. 23-12389 (EPK) (each, a "<u>Chapter 11 Case</u>," and together, the "<u>Chapter 11 Cases</u>"), pending in the United States Bankruptcy Court for the Southern District of Florida  (the "<u>Bankruptcy Court</u>") respectively, and  Westside Property Investment Company, Inc., a Colorado corporation, or an affiliate assignee ("<u>Purchaser</u>," and together with Sellers, the "<u>Parties</u>").

**RECITALS**

**WHEREAS**, Sellers own various parcels of real estate and personal property assets, and holds various rights, in each case relating to operating a resort and golf development located in West Palm Beach, Florida;

**WHEREAS**, BC Investment owns a one hundred percent (100%) interest in BC Mezz;

**WHEREAS**, BC Mezz owns a one hundred percent (100%) interest in each of BC Dev, BCRG, and BC Villas;

**WHEREAS**, Purchaser desires to purchase certain assets of the Sellers, and to assume certain liabilities of the Sellers, and the Sellers desire to sell such assets to the Purchaser and to assign such liabilities to the Purchaser and have the Purchaser assume the same as described hereinafter and in the Schedules to this Agreement,[1] all on the terms and conditions set forth in this Agreement, the Bid Procedures Order and the Sale Order, and in accordance with sections 105, 363 and 365 of Title 11 of the United States Code (as in effect for the Chapter 11 Cases filed on the Petition Date, the "<u>Bankruptcy Code</u>") and other applicable provisions of the Bankruptcy Code (the "<u>Acquisition</u>");

**WHEREAS**, the Bankruptcy Court conducted hearings on April 17, 2023 and April 28, 2023, approving (i) the Debtors' entry into this Agreement, together with the amendments and restatements contained herein, (ii) the entry of the Bid Procedures Order (as defined herein); and (iii) the Financial Bid Protections set forth in Section 6.1(b) hereof.

**NOW THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, the Parties hereby agree as follows:

---

[1] Unless specifically defined when initially used in this Agreement, capitalized terms shall have the meaning ascribed to such terms in Article I of this Agreement.

# ARTICLE I
## DEFINITIONS

1.1    <u>Definitions</u>.  As used in this Agreement, the following terms have the following meanings:

"<u>Agreement</u>" shall mean this Asset Purchase Agreement, including the Schedules and Exhibits attached hereto.

"<u>Assets</u>" shall have the meaning set forth in Section 2.1 of this Agreement.

"<u>Administrative Claim</u>" shall mean any Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"<u>Affiliate</u>," when used with reference to another Person, means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"<u>Assignment and Assumption Agreement</u>" shall mean the agreement(s) to assume the Assumed Liabilities identified on **Schedule 7**.

"<u>Assumed Contracts</u>" shall mean those executory contracts, Option Agreements and leases being assumed by and assigned to Purchaser by any Sellers under the terms of this Agreement.  Subject to Section 6.2 of this Agreement, the contracts and leases being assumed and assigned shall be the contracts and leases identified on **Schedule 2** attached hereto and made a part hereof.  For the avoidance of doubt, "Assumed Contracts" shall not include any of those contracts or leases that are not identified on **Schedule 2** and/or any contracts or leases rejected by the Sellers pursuant to section 365 of the Bankruptcy Code.

"<u>Assumed Liabilities</u>" shall mean the liabilities and obligations set forth in Section 2.3 of this Agreement.

"<u>Assumed Permits</u>" means all Permits, Development Orders, plats, site plans, and zoning approvals relating to the Assets that are transferable in accordance with their terms or by operation of law, but excluding all Permits to the extent related to any Excluded Asset (including any contract or lease that is not an Assumed Contract).

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the above Recitals.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the above Recitals.

"<u>Bid Deadline</u>" shall have the meaning set forth in the Bid Procedures Order.

"<u>Bid Procedures Order</u>" shall mean the Order: (A) Approving Bid Procedures For the Sale of Some or All of the Debtors' Assets; (B) Approving Assumption Procedures For Certain Executory Contracts and Unexpired Leases; (C) Approving A Break-Up Fee, Expenses Reimbursement and Overbid Protections; and (D) Approving A Form of Notice Of Sale entered by the Bankruptcy Court, the form of which shall be reasonably acceptable to Purchaser.

"<u>Business Day</u>" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

2

"Casualty Loss" shall mean any loss, damage or destruction of the Assets that occurs during the period between the effective date of this Agreement and the Closing Date (or earlier termination of this Agreement) for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets for production of goods in the ordinary course of the Sellers' business.

"Chapter 11 Cases" shall have the meaning set forth in the above Recitals.

"Claim(s)" shall have the meaning set forth in the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code and shall include, among other things, any and all claims or orders arising under Environmental Laws and any and all claims or rights based on successor, tort and products liability.

"Closing" shall have the meaning set forth in Section 2.6 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 2.6 of this Agreement.

"Confidentiality Agreement" means that certain letter agreement, dated as of March 19, 2023, by and between Sellers and Westside Property Investment Company, Inc., regarding the terms and conditions on which Sellers would make available certain information.

"Consent" shall mean any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Control" shall mean, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Country Club Operations" means all material facilities, vendors, employees, contracts, equipment and systems involved with the operation of the existing golf course and clubhouse within the Premises as of the date of the execution of this Agreement.

"Cure Amounts" shall have the meaning set forth Section 6.2 of this Agreement.

"Cure Notice" shall have the meaning set forth Section 6.2 of this Agreement.

"Current Employees" means all employees of the Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Deposit" shall have the meaning set forth in Section 2.4(a) of this Agreement.

"DIP Borrowers" shall mean Sellers, as borrowers under the DIP Financing Agreement and debtors in possession.

"DIP Collateral" shall have the meaning set forth in the DIP Order.

3

"DIP Financing Agreement" shall mean any Debtor-in-Possession Credit Agreement, among DIP Lender, as lender, and DIP Borrowers, as borrowers and debtors in possession, as the same may have been or be amended, modified, restated, or supplemented and in effect from time to time, as approved by the Bankruptcy Court.

"DIP Financing Obligations" shall mean the "Obligations" as defined under the DIP Financing Agreement.

"DIP Lender" shall mean Purchaser or an affiliate of Purchaser, to the extent the same enters into the DIP Financing Agreement with DIP Borrowers.

"DIP Order" shall mean any interim and final order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, authorizing and approving the DIP Financing Agreement, in form and substance acceptable to the DIP Lender in its sole discretion, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time with the express consent of the DIP Lender, as to which no stay has been entered and which has not been reversed, vacated or overturned, and from which no appeal or motion to reconsider has been timely filed or, if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the DIP Lender waives such requirement in writing.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"End Date" shall mean July 31, 2023.

"Environmental Laws" shall mean all applicable laws, regulations or rules relating to pollution or protection of human health or the environment (including, without limitation, ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources (including without limitation applicable laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, or use of, or release or threatened release into the environment of, any Hazardous Substances.

"ERISA" shall mean the United States Employee Retirement Income Security Act of 1974.

"Escrow Account" shall have the meaning set forth in Section 2.4 of this Agreement.

"Excluded Assets" shall have the meaning set forth in Section 2.2 of this Agreement.

"Final Order" shall mean an order, judgment, or other decree of the Bankruptcy Court that has not been reversed, vacated or stayed and (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order, judgment or decree has been affirmed by the highest court to which such order, judgment or decree was appealed or certiorari has been denied, or

reargument or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Equipment" means tangible personal property (other than Inventory and Intellectual Property), which is used or held for use in the ordinary course of the Sellers' or its Affiliates' businesses.

"Governmental Entity" shall mean and include any agency, board, bureau, executive, court, commission, department, tribunal, instrumentality or administration of the United States or any State, and any local or other governmental body in a State, or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Governmental Permits" shall mean and include all licenses, permits, approvals, consents, certificates, waivers, variances, exemptions, orders and other authorizations or similar right issued, granted, given or otherwise obtained from or by any and all Governmental Entities.

"Hazardous Substance" means any substance or material defined in or governed by any Environmental Law as a dangerous, toxic or hazardous pollutant, contaminant, chemical, waste, material or substance, and also expressly includes ureaformaldehyde, polychlorinated biphenyls, dioxin, radon, asbestos, asbestos containing materials, nuclear fuel or waste, radioactive materials, explosives, carcinogens and petroleum products, including, but not limited to, crude oil or any fraction thereof, natural gas, natural gas liquids, gasoline and synthetic gas, or any other waste, material, substance, pollutant or contaminant which would subject the owner or operator of any assets transferred hereunder to any damages, penalties or liabilities under any applicable Environmental Laws, which, for the avoidance of doubt, includes any material or substance listed, defined, designated or classified as, or included in the definition of, "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants" or "pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law or any other substance regulated pursuant thereto, or the presence or release of, or exposure to which could reasonably be expected to form the basis for liability under any applicable Environmental Law, in each case because of its dangerous or deleterious properties or characteristics.

"Intellectual Property" shall mean all: (i) trademarks, service marks, trade names, trade dress, logos and corporate names and registrations and applications for registration, together with all of the goodwill associated therewith; (ii) Registered copyrights; (iii) computer software (other than general commercial software), data, databases and documentation thereof; (v) domain names and URLs; and (vi) Technology used by Sellers in the ordinary course of their businesses. The Intellectual Property of Sellers includes, but is not limited to, the Intellectual Property identified on **Schedule 3** attached hereto and made a part hereof.

"Inventory" means inventories of raw materials and supplies, manufactured, spare and purchased parts, goods in process and finished goods, in each case, that are used or held for use in the operation of the Sellers' or its Affiliates' businesses, whether or not prepaid and whether in transit to or from Sellers and whether in Sellers' warehouses, distributions facilities, stores, outlets, held by third parties or otherwise.

"Knowledge," or the phrase "to the best of Seller's knowledge" and similar phrases, means with respect to Sellers means none of the Sellers, the shareholders or directors, officers or managers of either of the Sellers has any actual conscious awareness of facts or other information that the

statement made is incorrect, and for this purpose, "implied knowledge" means all information in the books, records and files of Seller and all information that any of such persons should have known in the course of operating and managing the business and affairs of either of the Sellers.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or decree of any Governmental Entity.

"Liability" means any liability, indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured).

"Licenses and Permits" shall mean those Governmental Permits being assigned to Purchaser by Sellers.  The Governmental Permits being assigned shall be the Governmental Permits identified on **Schedule 4** attached hereto and made a part hereof.

"Liens" shall mean any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Authority or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that is materially adverse to the financial condition or results of operations of the Sellers' business (taken as a whole); *provided, however*, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, Equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the business relative to the adverse effect that such changes have on other companies in the industry in which the business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on business relative to the adverse effect that such changes have on other companies in the industry in which the business operates; (iii) any change in GAAP or Law; (iv) compliance with this Agreement or any agreement in

6

connection herewith, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any changes directly attributable to the announcement of this Agreement or any agreement in connection herewith; (vi)  any act of God or other force majeure event (including natural disasters); (vii) in the case of Sellers or the business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; or (viii) seasonal changes in the results of operations.

"Premises" means the real property owned by Sellers including all mineral, air, and water rights, or easements to which Seller has rights, all as applicable, and described on **Schedule 1** attached hereto and made a part hereof.  The Premises shall be transferred and conveyed to Purchaser at Closing pursuant to the terms of a Quitclaim Deed substantially in the form attached hereto as **Exhibit A**.

"Personal Property" means any and all personal property of any kind or nature owned by Sellers and its Affiliates, and includes Intellectual Property, inventory, all furniture, fixtures and equipment of Sellers and its Affiliates, vehicles of Sellers and its Affiliates, books and records of Sellers and its Affiliates, customer lists of Sellers and its Affiliates, corporate records and minutes of Sellers and its Affiliates, and the names of Sellers and its Affiliates and all assumed names.  Personal Property includes, but is not limited to, the Personal Property identified on **Schedule 5** attached hereto and made a part hereof.  The Personal Property (except for any Excluded Assets) shall be transferred and conveyed to Purchaser at Closing pursuant to the terms of Quitclaim Bills of Sales substantially in the form attached hereto as **Exhibit B**.

"Permitted Exceptions" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and procedures; (b)with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property; (c) the title exceptions listed on Schedule B-II of the title commitment issued to Purchaser by Old Republic National Title Insurance Company, effective March 28, 2023; and (d) matters on the Survey provided by Sellers to Purchaser.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" shall mean the day on which the Chapter 11 Cases commenced.

"Plan" shall mean a plan of reorganization proposed to the Bankruptcy Court.

"Priority Claim" shall mean a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Purchase Price" shall have the meaning set forth in Section 2.5 of this Agreement.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Release" shall mean any spilling, emitting, leaking, pumping, pouring, emptying, injecting, escaping, dumping, disposing, discharging, migrating or leaching into, onto or through the environment.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, Representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Motion" shall mean the motion or motions, in form and substance reasonably acceptable to Purchaser, filed and served by Sellers in the Chapter 11 Cases, among other things, to obtain entry of the Sale Order, approve the transactions contemplated by this Agreement, and authorize the assumption and assignment of the Assumed Contracts, Licenses and Permits, and the Intellectual Property to Purchaser in accordance with this Agreement.

"Sale Order" shall mean a Final Order acceptable to Purchaser entered by the Bankruptcy Court approving the sale of the Assets pursuant to this Agreement and under the applicable provisions of the Bankruptcy Code that, among other things, contains usual and customary findings of fact and conclusions of law by the Bankruptcy Court and, except to the extent otherwise agreed to in writing between the Purchaser and Sellers (each acting reasonably), (i) grants the Sale Motion; (ii) approves, authorizes and directs Sellers to enter into this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and consummate the transactions contemplated hereby; (iii) determines that this Agreement was proposed by Purchaser in good faith and represents the highest and best offer for the Assets and should be approved; (iv) determines that Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated; (v) authorizes and directs Sellers to sell the Assets to Purchaser pursuant to this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and all applicable provisions of the Bankruptcy Code, free and clear of all Liens, Claims and rights (including any and all "interests" in the Assets within the meaning of section 363(f) of the Bankruptcy Code) as provided in this Agreement, other than the Assumed Liabilities and the Permitted Exceptions; (vi) authorizes and directs Sellers to execute, deliver, perform under, consummate and implement this Agreement (or any amended version of such agreement agreed upon by the Parties in writing), together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (vii) authorizes the assignment and assumption of the Assumed Contracts and Intellectual Property in accordance with section 365 of the Bankruptcy Code and establishes the Cure Amounts with respect to same that are acceptable to Purchaser in its reasonable discretion; (viii) provides that Purchaser is not the successor to either Seller or the Sellers or their respective bankruptcy estates by reason of any theory of law or equity and that Purchaser has not assumed any liability or obligation of either of the Sellers or their respective bankruptcy estates, except as otherwise expressly provided in this Agreement; (ix) provides that the Assumed Contracts and Intellectual Property are transferred and assigned at Closing to Purchaser and that such Assumed Contracts and Intellectual Property will remain in full force and effect in accordance with their respective terms and notwithstanding any provisions in any such Assumed Contracts and Intellectual Property contracts that prohibit, restrict or condition such assignment or transfer; (x) provides that Purchaser has no obligation to pay any liabilities or obligations of Sellers of any kind, except as expressly provided in this Agreement; (xi) to the extent enforceable under applicable law, enjoins the holder of any Lien or interest in Sellers or any of the Assets from interfering with Purchaser's title or use and enjoyment of the Assets based upon or related to such lien or interest; (xii) provides for the Bankruptcy Court to obtain jurisdiction to enforce or implement the terms and provisions of this Agreement and the Sale Order; and (xiii) provides that, notwithstanding Bankruptcy

Rule 6004(h) and 6006(d), the Sale Order shall be effective and enforceable immediately upon its entry, shall be self-executing and shall authorize Sellers and Purchaser, in the absence of any stay pending appeal, to consummate the transactions contemplated by this Agreement.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other Persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Substantial Contribution" shall mean a Claim under sections 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Cases.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Internal Revenue Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale Equipment, inventory management Equipment, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Transfer Tax" shall have the meaning set forth in Section 5.6(b) of this Agreement.

"Transferred Employee" shall have the meaning set forth in Section 5.7(b) of this Agreement.

9

"Utility Deposit" means any and all utility deposits for electric, water and sewer, gas and similar items, if any, which can be assigned to Purchaser and shall be added to the Purchase Price at Closing if Purchaser is not the DIP Lender, to the extent requested by Purchaser.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1    Purchase and Sale.  Excepting any and all Excluded Assets, upon the terms and subject to the conditions set forth in this Agreement, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the Closing Date, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase and assume from Sellers, all of Sellers' right, title and interest in and to all of the Sellers' properties, assets, and rights in and to the Premises, the Personal Property, the Assumed Contracts and the Licenses and Permits (collectively, the "Assets"), in each case free and clear of any encumbrances, Liens, Claims, rights, remedies or interests, existing as of the Closing except for the Permitted Exceptions and as specifically permitted herein, as approved for sale, transfer and assignment pursuant to the Sale Order.  **The Assets shall not include the Excluded Assets**.

2.2    Excluded Assets.  Notwithstanding anything else to the contrary set forth in this Agreement, the Assets shall not include, and Purchaser shall not buy or have any liability or obligation with respect to, any of the following (collectively, the "Excluded Assets"):

(a)    Sellers' cash, cash equivalents, accounts, accounts receivable, securities, credits, rights of reimbursement, set off rights, and rights of recoupment, including, without limitation, any reimbursement rights or other rights arising out of governmental programs; and/or any amounts due for the sale of tax credits.  For the avoidance of doubt, BC Investment's membership interest in BC Mezz and BC Mezz's membership interests in BC Dev, BCRG, and BC Villas are Excluded Assets;

(b)    Any and all causes of action of any Seller, whether known or unknown on the Closing Date, including without limitation, those arising under chapter 5 of the Bankruptcy Code; *provided however*, that notwithstanding anything to the contrary herein, any and all causes of action that could affect either materially or immaterially the operation of the Assets, the Assumed Liabilities, or the Assumed Contracts after the Closing Date shall be included in the definition of "Assets";

(c)    Except as set forth in section 9.1(b)(v) solely with respect to a Casualty Loss occurring after the entry of the Sale Order, any Seller's rights and interests under any insurance policies;

(d)    Except as identified as an Assumed Contract, any and all: (i) employment, consulting, advisory or service agreements, plans, commitments, arrangements or understandings; (ii) leases or consignment agreements and arrangements; (iii) employee benefit, deferred compensation and/or severance agreements, plans, commitments, arrangements or understandings including, without limitation, all stock option, stock purchase, bonus, incentive and similar agreements, plans, commitments, arrangements or understandings; (iv) collective bargaining agreements, commitments, arrangements or understandings with employees; and (v) agreements, obligations and liabilities with respect to or relating to any "pension plan" or "welfare plan" (as such terms are defined in ERISA);

(e)    Sellers' rights under this Agreement;

(f)    All contracts and leases to which a Seller is a party (and Sellers' related rights), in each case other than the Assumed Contracts assigned to and assumed by Purchaser;

(g)    Sellers' minute books, filed Tax Returns for the five year period prior to the Closing Date (provided that Purchaser shall have the right to copies of such Tax Returns and all documentation related to the preparation of the Tax Returns) books of account, and all books and records that a Seller is prohibited from disclosing or transferring to Purchaser under applicable Law; and

(h)    Any and all additional Excluded Assets identified on **Schedule 6** attached hereto and made a part hereof.

2.3    <u>Assumption and Assignment of Liabilities</u>.  Purchaser shall not assume any liabilities or obligations of any Seller, except for those specifically identified on **Schedule 7** attached hereto and made a part hereof (the "Assumed Liabilities") and the liabilities and obligations assumed in relation to the Assumed Contracts and the Licenses and Permits.

2.4    <u>Deposit</u>.

(a)    Within three (3) Business Days of execution of this Agreement, Purchaser shall deliver to an escrow agent that is mutually agreeable to each of the Purchaser and the Sellers (the "<u>Escrow Agent</u>") the sum of $3,063,000.00 (the "<u>Deposit</u>"), which shall be held by the Escrow Agent in escrow in an interest bearing account to be agreed upon by Purchaser and disbursed pursuant to the Terms of this Agreement, only and not otherwise subject to being part of Seller's estate.  If not funded within three (3) Business Days of execution, the Agreement may be terminated by Sellers.  The Deposit shall be allocated as between Sellers in the same manner as the Purchase Price is allocated.  The Deposit (and any interest accrued thereon) shall be credited (in addition to the credits described in Section 2.5(b)(i) of this Agreement) as a partial payment of the Purchase Price payable at the Closing.

(b)    In the event that: (i) the Parties terminate this Agreement pursuant to Section 9.1(a); (ii) Purchaser terminates this Agreement pursuant to section 5.12 or 9.1(b); or (iii) Sellers terminate this Agreement pursuant to Section 9.1(c)(i) or Section 9.1(c)(ii), then the Deposit (and any interest accrued thereon) shall be returned immediately and in full to Purchaser (plus those amounts described in Sections 6.1(b) and Sections 6.1(h) of this Agreement).

2.5    <u>Purchase Consideration.</u>

(a)    <u>Purchase Price</u>.  In consideration of the sale of the Assets to Purchaser, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Assets (the "<u>Purchase Price</u>") shall consist of:

(i)    Subject to adjustment and prorations as set forth in this Agreement, (i) $102,100,000.00 in cash payable by means of a completed federal funds wire transfer to an account or accounts designated by Sellers in writing not later than three (3) Business Days prior to the Closing Date the ("<u>Cash Purchase Price</u>"), <u>less</u>

(ii)    the Deposit;

(iii)    a credit bid pursuant to section 363(k) of the Bankruptcy Code of all the DIP Financing Obligations held by Purchaser, which may include any DIP Financing Obligations assigned to, and assumed by, the Purchaser by the DIP Lender, if a party other than the Purchaser holds DIP Financing Obligations at any relevant time; and

(iv)     the assumption by Purchaser of any Assumed Liabilities, as set forth on **Schedule 7** hereof.

The Purchase Price shall be allocated as between Sellers as provided for on **Schedule 8** attached hereto and made a part hereof.  Except as otherwise specified herein, the term "Dollars" or "$" as used in this Agreement refers to United States Dollars.

(b)     Adjustment to Purchase Price.

(i)     Assumed Liabilities Adjustment.  The parties have set the Cash Purchase Price at $102,100,000.00 based upon an assumption that the amount of the Assumed Liabilities set forth on **Schedule 7**, shall be $0.00 (the "Assumed Liabilities Target"). In the event the aggregate amount of the Assumed Liabilities exceeds the Assumed Liabilities Target, the Purchase Price shall be adjusted down on a dollar-for-dollar basis by an amount equal to such excess, in accordance with Section 2.5(a)(iv) hereof. In the event the amount of the Assumed Liabilities is less than the Assumed Liabilities Target, the Purchase Price shall be adjusted upward on a dollar-for-dollar basis by an amount equal to such shortfall.  The Parties shall engage in best efforts to reconcile in advance of Closing any adjustment to the Purchase Price pursuant to this Section 2.5(b). Nevertheless, if the need for an adjustment to the Cash Purchase Price is discovered or otherwise determined after Closing, then the party owing a payment hereunder on the basis of such adjustment shall make such payment to the party entitled to receive such payment as soon as practicable following determination of the adjustment.

(ii)     FF&E Package Adjustment.  Purchaser understands that the complete Furniture, Fixtures & Equipment ("FFE") package for the hotel property is currently in storage and is part of the Assets being acquired by Purchaser, but has been unable to verify the completeness and condition of the FFE package (i.e., whether the FFE package is sufficient to outfit all 150 hotel rooms). Purchaser is valuing the FFE at $30,000 per hotel room. To the extent that the FFE package is either not complete or in a condition that cannot be used, the Purchase Price shall be adjusted by the number of incomplete rooms multiplied by $30,000.

2.6    Closing.  The closing (the "Closing") shall occur on or within thirty (30) Business Days following the date upon which the Sale Order approving the sale of the Assets to Purchaser in accordance with this Agreement shall have become a Final Order or such earlier date as may be agreed to by the Parties.  Unless otherwise agreed by the Parties, the Closing shall take place remotely via the exchange of documents and signatures, and shall be effective as of 11:59 p.m. West Palm Beach, Florida, time on the date of Closing (the "Closing Date").

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Sellers each hereby represent and warrant to Purchaser as follows as of the date of this Agreement, conditioned upon and subject to the entry of the Sale Order:

3.1    Organization and Authority.  Sellers are each duly organized and validly existing under the laws of the jurisdiction of their organization and, subject to any required approval of the Bankruptcy Court, and any required approval of applicable Governmental Entities, each has the power and authority to own and lease the Assets, and to enter into the transactions contemplated by this Agreement.

3.2     Good Standing.  Each Seller is duly authorized to do business and is in good standing in each jurisdiction where the ownership or operation of the Assets or the conduct of the business as of the execution of this Agreement requires such qualification.

3.3     As Is/Where Is.  Purchaser shall acquire the Assets on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis, free and clear of any Liens, Claims, rights and interests, including any and all expenses and express and implied warranties of any kind or nature, in each case except as specifically provided in this Agreement and as approved for sale, transfer, and assignment pursuant to the Sale Order.  Except for the representations and warranties contained in this Agreement and as approved for sale, transfer, and assignment pursuant to the Sale Order, Sellers make no express or implied representation or warranty with respect to Sellers, the Assets or the transaction contemplated by this Agreement, and Sellers hereby disclaim any other representations or warranties, whether made by any Seller or any of its Representatives.

3.4     Authority and Binding Agreement.  This Agreement and those agreements executed in connection herewith have been duly authorized, executed and delivered by each of the Sellers and, subject to the approval of the Bankruptcy Court, are the valid and binding obligations of each of the Sellers.

3.5     Consents and Approvals.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be made or obtained by Sellers in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer each of Sellers' interest in any Assets, the title to which is governed by filing in the public records; and (c) the filing of such documents as may be necessary to reflect the release of any Liens that are a matter of public record.

3.6     Title to and Condition of Assets.  Sellers each have good, and upon entry of the Sale Order, marketable title to all of their respective Assets and may transfer each of the Assets free and clear of all liabilities, Liens (including tax liens), rights and interests of any kind whatsoever, all to the extent provided for by the terms of this Agreement and the Sale Order.

3.7     Compliance with Laws.  Sellers are in compliance with all material Laws applicable to the business or the Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect, and no Seller has received any written notice within the past twelve months relating to violations or alleged violations or material defaults under any decree or any Governmental Permit, in each case, with respect to the Sellers' business.

3.8     Title to Assets.  Sellers, as of the Closing, will have good, valid,  and upon entry of the Sale Order, marketable title to, or, in the case of leased assets, have good and valid leasehold interests in, the Assets, free and clear of all Liens and Claims (except for Permitted Exceptions).  At the Closing or such time as title is conveyed under this Agreement from Seller to Purchaser, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Assets, free and clear of all Liens and Claims (except for Permitted Exceptions), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

3.9     Contracts.

(a)     The Sellers have made available to Purchaser or its Representatives true and complete copies of each of the Assumed Contracts in the data room of Keen-Summit, the Sellers' marketing agent and broker, in each case as in effect on the effective date of this Agreement.

(b)     With respect to each such Assumed Contract, to Sellers' Knowledge, such Assumed Contract is in full force and effect and constitutes the valid and legally-binding obligation of a Seller and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

3.10    Intellectual Property.

(a)     The Sellers have provided to Purchaser a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller and used in or related to the Sellers' business, (ii) all material contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all such Registered Intellectual Property free and clear of all Liens and Claims (except for Permitted Exceptions), and, to Sellers' Knowledge, all such Registered Intellectual Property is valid, subsisting and enforceable, and is not subject to any outstanding decree adversely affecting Sellers' use thereof or rights thereto. Immediately after the Closing, Purchaser will own or have the right to, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, use all of the Intellectual Property included in the Assets on the same terms and conditions as in effect for Sellers immediately prior to the Closing, to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

(b)     To Sellers' Knowledge, none of the use of the Intellectual Property included in the Assets, the conduct of the business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person.  To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Assets.

(c)     To Seller's Knowledge, no Litigation is currently pending or threatened against any Seller that challenges the validity, ownership, registrability, enforceability, infringement or use of any material Intellectual Property owned by any Seller.

3.11    Master Declaration.  The Sellers have provided to Purchaser all declarations of covenants, conditions, restrictions (or similarly named instruments) that affects all or any portion of the Premises, and Assignment of Declarant's Rights.

3.12    Employees and Employment Matters. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement), and within the ninety (90) day period ending on the date hereof, and no Seller has implemented any plant closing or layoff of the Current Employees (as determined as of the date of this Agreement) in violation of the United States Worker Adjustment and Retraining Notification Act, or any similar applicable Law (collectively, the "WARN Act"). Within five (5) days after the date hereof, Sellers shall make available to Purchaser a list of all

14

Current Employees with personally identifying information redacted to the extent required by applicable Law.

3.13    Litigation.  Other than those certain matters disclosed in the Sellers' Statements of Financial Affairs [Docket No. 75, Part 3 Annex, in Case No. 23-12386] (the "Disclosed Actions"), there is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Entity pending, or, to the knowledge of Seller, threatened against Seller that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Seller's Knowledge, there are no circumstances or facts, including for the avoidance of doubt the circumstances and facts alleged in the Disclosed Actions, that would prevent Seller from engaging in the transactions contemplated in this Agreement.

3.14    Assumed Permits.  The Sellers have provided to Purchaser, to the best of Sellers' Knowledge, a list of all material Licenses and Permits that Sellers hold as of the date hereof in connection with the operations of the Sellers' business, including the assigned Licenses and Permits, any thereof to be an Excluded Asset, and other governmental and land development approvals required for the operation and development of the Premises and/or Assets.

3.15    Insurance. The Sellers have made available to Purchaser a list, as of the date hereof, of all material insurance policies.

3.16    Country Club Operations.  All Country Club Operations will continue to operate in their current manner through the date of Closing without interruption or modification, to the extent within the control of Sellers, unless specifically requested by Purchaser.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to each of Sellers as follows:

4.1    Organization and Authority.  Purchaser is duly organized and validly existing under the laws of the jurisdiction of its organization and has the power and authority and all necessary approvals of all Governmental Entities to enter into the transactions contemplated by this Agreement.

4.2    Authority and Binding Agreement.  This Agreement has been duly authorized, executed and delivered by Purchaser and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Purchaser.

4.3    Consents and Approvals.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer each of Sellers' interests in any Assets, the title to which is governed by filing in the public records; (c) consents and approvals necessary to transfer the Licenses and Permits being transferred to Purchaser hereunder; (d) any necessary approval, authorization or exemption by any Governmental Entity with jurisdiction over and the right to approve the sale; and (e) consents, approvals, authorizations, declarations, filings or registrations which, if not obtained, individually or in the aggregate, would not have a material adverse effect on the transactions contemplated in this Agreement.

15

4.4     Litigation.  There is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Entity pending, or, to the knowledge of Purchaser, threatened against Purchaser that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Purchaser's Knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement.

4.5     Good Faith Purchaser.  Purchaser is a "good faith" purchaser, as such term as such term is used in the Bankruptcy Code and the court decisions thereunder.  Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Assets and has negotiated and entered into this Agreement in good faith and without collusion or fraud of any kind.

4.6     WHERE-IS/AS-IS.  Except as otherwise expressly stated in this Agreement, Purchaser and any designee agree to accept the Assets in a "**WHERE-IS, AS-IS**" condition as of the Closing Date free and clear of any Liens, Claims, rights and interests, except as specifically permitted in this Agreement and all to the extent provided by the terms of the Sale Order.  Without limitation of the foregoing, Purchaser acknowledges, represents and warrants to Sellers that Purchaser has not been induced to execute this Agreement by any act, statement or representation of Sellers or their agents, employees or other Representatives not expressly set forth in this Agreement.  In addition, Purchaser acknowledges that Purchaser has not executed or authorized the execution of this Agreement in reliance upon any promise, representation or warranty not expressly set forth in this Agreement and that it will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement.

4.7     Adequate Assurances Regarding Executory Contracts.  Purchaser as of the Closing Date will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

4.8     Financing.  At the Closing, Purchaser shall have sufficient and immediately available funds to pay the Purchase Price and all other amounts payable pursuant to this Agreement, the other agreements contemplated herein, and the transactions contemplated herein and thereby.  Upon the consummation of the transactions contemplated herein, Purchaser shall not be insolvent, be left with unreasonably small capital, or have incurred debts beyond its ability to pay such debts as they mature.

4.9     Improvements Escrow.  Purchaser acknowledges and agrees that it shall enter into an agreement between and among itself, Banyan Cay Estates, LLC ("BC Estates"), and the Sellers, as applicable, the terms of which shall contain and substantially conform to the following, subject only to final documentation:

(a)     At the simultaneous Closing of the transactions set forth in this Agreement and those certain transactions set forth in that certain *Agreement for Purchase and Sale of Real Property* (together with the supplements, revisions, and amendments thereto, attached as Exhibit A and Exhibit B to Docket No. 97 in Case No. 23-12386, the "Estate Lots Agreement"), Purchaser shall escrow $2,700,000 in immediately available funds (the "Improvements Escrow Funds") for the sole purpose of the completion of the improvements set forth in Schedule A to the Twentieth Amendment to the Estate Lots Agreement (collectively, the "Improvements"), subject to a mutually acceptable escrow agreement.

(b)     BC Estates may elect to construct the Improvements within 30 days after the Closing.  In the event BC Estates does not so elect, then Purchaser may elect to construct the

Improvements.  The electing party may be referred to herein as the "Constructing Party."

(c)    The Constructing Party may, no more frequently than monthly, submit invoices to the escrow agent and other party for approval and disbursement from escrow agent of Improvements Escrow Funds for the payment of the costs of completion of the Improvements, accompanied by certification of the percentage of completion of the Improvements from the project engineer in accordance with approved plans and customary lien waivers from all contractors and material providers.

(d)    In the event the Constructing Party fails to complete the Improvements in accordance with a mutually acceptable construction schedule, the other party may elect to complete the Improvements and submit invoices for the costs to so complete the Improvements in accordance with the terms set forth above.

(e)    Any costs incurred by the Constructing Party to complete the Improvements in excess of the Improvements Escrow Funds shall be the sole obligation of the Constructing Party.

**ARTICLE V**
**COVENANTS PRIOR TO AND IN FURTHERANCE OF CLOSING**

5.1    <u>Affirmative and Negative Covenants Pending Closing</u>.  Except as expressly set forth below, during the period from the date hereof to the Closing Date (or earlier valid termination of this Agreement), the Parties expressly agree (except as otherwise expressly stated to apply to a different period):

(a)    <u>Certain Efforts; Cooperation</u>.

(i)    Subject to Sections 5.8 and 6.4 of this Agreement, each of the Parties shall use commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement on or prior to the End Date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby), except as otherwise provided in Section 5.2. Without limiting the generality of the foregoing, but subject to Section 5.8 with respect to Topping Bids and Section 6.4 of this Agreement, each of the Parties shall use its commercially reasonable efforts not to take any action, or permit any of its Affiliates or Representatives to take any action, to diminish the ability of any other Party to consummate, or delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result directly or indirectly in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby.

(ii)    On and after the Closing, Sellers and Purchaser shall use their commercially reasonable efforts to take, or cause to be taken by themselves or any of their respective Affiliates and/or Representatives, all appropriate action, to do or cause to be done by Sellers and Purchaser or any of their respective Affiliates all things reasonably necessary, reasonably proper or reasonably advisable under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in Purchaser all of Sellers' right, title and interest to the Assets, free and clear of any encumbrances, Liens, Claims, rights, remedies or interests, existing

17

as of the Closing except for the Permitted Exceptions and as specifically permitted herein and by the Sale Order.

(iii)    This Section 5.1(a) of this Agreement shall survive the closing of the transactions contemplated by this Agreement.

5.2    <u>Notice, Consents and Further Actions</u>.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party consents or sublicenses.  To the extent that any Intellectual Property licenses held by a Seller cannot be assigned to Purchaser hereunder without obtaining the consent of the licensor or grantor thereof (provided such licensor or grantor is not an Affiliate of Sellers), such consent to assignment shall not be deemed a condition of Closing hereunder and the inability of the applicable Seller to obtain such consent to assignment following exercise of its commercially reasonable efforts to obtain the same shall not constitute a breach of this Agreement.

(b)    Sellers and Purchaser shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the transactions contemplated hereby and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

(c)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Purchaser and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the transactions contemplated by this Agreement, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers or Purchaser and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and to consider incorporation of the other Party's reasonable comments.

5.3    <u>Asset Maintenance</u>.  From the date hereof until the Closing (or earlier termination of this Agreement), the Sellers shall maintain the Assets owned or operated by each of the Sellers consistent with Sellers' standard practice, subject only to ordinary wear and tear and in consultation with the Purchaser.

5.4    <u>Notice of Developments</u>.  From the date hereof until the Closing Date, Sellers (with respect to each, as to itself), as the case may be, shall promptly disclose to Purchaser, on the one hand, and Purchaser shall promptly disclose to Sellers, on the other hand, in writing after attaining knowledge (as applicable to each of Sellers and Purchaser) of any material failure of any of Sellers or Purchaser to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; *provided*, *however*, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement.

5.5 Access.

(a) Upon reasonable advance written request by Purchaser, Sellers shall permit Purchaser and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, records and contracts related to the Sellers' business, in each case, for the sole purpose of evaluating the Sellers' business; *provided, however*, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

(b) All information obtained pursuant to this Section 5.5 shall be subject to the terms and conditions of the Confidentiality Agreement.

5.6 Tax Cooperation and Exchange of Information.

(a) Information Access. Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Sellers and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Assets or the Sellers' business as it relates to the Assets.

(b) Allocation of Taxes. Within thirty (30) calendar days after the Closing Date, Purchaser shall in good faith, to the extent necessary, prepare an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate), which allocation shall be binding upon Sellers and Purchaser unless Sellers notify Purchaser in writing within thirty (30) calendar days after their receipt of Purchaser's allocation that Sellers object to one or more items reflected in Purchaser's allocation. In the event of any such objection, Sellers and Purchaser shall negotiate in good faith to resolve such dispute. To the extent necessary, Purchaser and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the allocation established in accordance with this section. Neither Purchaser nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation established in accordance with this section unless required to do so by applicable Law.  In the event that, notwithstanding the provisions of section 1146(a) of the Bankruptcy Code or for any other reason, any sales, use, transfer, documentary and all other non-income taxes, or any fees incurred in connection with the purchase and sale of the Assets (the "Transfer Taxes") are assessed at Closing or at any time thereafter on the transfer of any Assets, then in each instance such taxes or charges incurred as a result of the transactions contemplated hereby shall be paid by Seller.  Purchaser and Sellers shall engage in best efforts to provide each other with any appropriate resale exemption certifications and other similar documentation.

(c) Real Estate Taxes. All Real Estate Taxes for a Tax period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing Date (with respect to any such Tax period, the "Post-Closing Tax Period"). Sellers

shall be liable for the proportionate amount of such Real Estate Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Real Estate Taxes that is attributable to the Post-Closing Tax Period using the maximum allowable discount, if available. If Closing takes place prior to issuance of the real estate tax notice for the year of Closing, then the Real Estate Taxes shall be prorated as described herein based on the Real Estate Tax from the immediately preceding year. There shall not be any re-proration of Real Estate Taxes, after Closing.

5.7     <u>Employee Matters</u>.

(a)     Sellers shall provide to Purchaser within twenty-one (21) days after execution of this Agreement a list of all the Current Employees with all personally identifying information redacted to the extent required by applicable Law, and Purchaser shall provide to Sellers at least ten (10) days before the Closing Date a list of those Current Employees that Purchaser wishes to hire effective as of the Closing Date (such list, the "<u>Retainee List</u>"). Purchaser may amend or supplement the Retainee List from time to time prior to the Closing Date.  Purchaser acknowledges and agrees that Sellers retain the right to terminate or otherwise alter the terms of employment of all employees prior to Closing other than those whose names are listed on the Retainee List.

(b)     For purposes of this Agreement, a Current Employee who is hired by Purchaser on or after the Closing Date shall be referred to as a "Transferred Employee." It is the intention of Purchaser, and Sellers hereby acknowledge and agree with such position, that the Transferred Employees will be new employees of Purchaser, and all such Transferred Employees shall be entitled only to such compensation and employee benefits as are agreed to by such employees and Purchaser or as are otherwise provided by Purchaser, in its sole discretion, except with respect to Assumed Liabilities.

(c)     Except with respect to the Assumed Liabilities, Sellers shall retain the responsibility for all liabilities and obligations relating to compensation earned by a Current Employee on or before the Closing Date, including without limitation all "bonuses" and similar compensation arrangements with Current Employees.

(d)     No provision of this Section 5.7 shall create any rights in any individual who is not a Party hereto, including any employee or former employee (including any beneficiary or dependent thereof) of a Seller except with respect to Assumed Liabilities.  Further, this Section 5.7 shall not in itself create any right to continued employment or service (or resumed employment or service) with Sellers or Purchaser or its Affiliates with respect to any employee, independent contractor or consultant, and except as provided herein, no provision of this Section 5.7 shall create any rights in any Person with respect to any benefits that may be provided, directly or indirectly, under any plan or arrangement established by a Seller or any of its Affiliates or any plan or arrangement that may be established by Purchaser or any of its Affiliates.

5.8     <u>Return of Deposit</u>.  This Agreement is subject to other offers presented to Sellers solely in accordance with the Bid Procedures Order.  In the event that the Bankruptcy Court, in accordance with the Bid Procedures Order, determines that an offer or offers submitted pursuant to the Bid Procedures Order is higher and better than the terms set forth in this Agreement, or is superior to this Agreement and approves such offer or offers ("<u>Topping Bid</u>") in lieu of this Agreement, then Sellers shall return the Deposit (and any interest accrued thereon) to Purchaser in accordance with Section 2.4(b) of this Agreement, and Purchaser may in its sole discretion agree to serve as the back-up bidder.

5.9     Public Announcement.  The Parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or other public statements with respect to this Agreement or the transactions contemplated hereby.  Except as may be required by applicable Law or the Bankruptcy Court, the Parties shall not cause or permit the issuance of any such release or any such public statement without the consent of all of the Parties hereto, which consent shall not be unreasonably withheld or delayed.

5.10    Bulk Transfer Laws. Purchaser acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Assets shall be free and clear of any Liens, Claims, or interests in the Assets, including any Liens, Claims, or interests arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

5.11    Suppliers.  Sellers shall, following the request thereof by Purchaser, seek and use their respective commercially reasonable efforts to arrange meetings and telephone conferences with material suppliers of Sellers as may be reasonably requested by Purchaser and necessary and appropriate for Purchaser to coordinate transition of such suppliers following the Closing. For the avoidance of doubt, Purchaser shall be permitted to contact any customers, suppliers or licensors pertaining to Seller's operation of the Assets in connection with or pertaining to any matter; *provided, however*, that during the period from the date hereof until the Closing, (i) Purchaser shall give prior notice to Sellers, and (ii) Sellers shall be permitted, but shall not be obligated, to attend and participate in any meeting or telephone conference with such customers, suppliers or licensors to the extent reasonably requested.

5.12    Title Insurance.  Seller shall deliver to Purchaser within two (2) business days of this Agreement, a copy of the existing title policy for the Premises together with copies of all title exceptions referenced therein. Purchaser shall, within ten (10) business days and at the expense of Purchaser and Seller in equal shares, have a title commitment ("Title Commitment") prepared by Saul Ewing ("Title Agent") as Agent for Old Republic Title Insurance Company ("Title Underwriter") insuring the Premises in the amount of the Purchase Price allocated to the Premises. If the Title Commitment includes any exceptions other than the Permitted Exceptions, the Purchaser shall have the option to either (i) terminate the Agreement and receive the return of the Deposit including interest earned therein, or (ii) proceed to Closing pursuant to the terms of this Agreement. Purchaser shall notify Seller of any title objections within five (5) business days of receipt of the Title Commitment.  The cost of any policy issued pursuant to the Title Commitment shall be at the expense of Purchaser and Seller in equal shares.

5.13    CDD Disclosure.  Purchaser acknowledges and agrees that the Assets are subject to the Banyan Cay Community Development District ("CDD") formed pursuant to Chapter 190, Florida Statutes to provide a variety of improvements and services for the Assets and that the Assets are subject to the CDD.  Purchaser specifically acknowledges that CDD assessments ("CDD Assessments") have been and/or may be levied and certified for collection against the Assets, including for repayment of special assessment bonds and for annual maintenance assessments due to the CDD, which may vary from year to year.  Within five (5) days of the effective date of this Agreement, or such later date that is mutually agreeable to the Parties, the Sellers shall provide to Purchaser a list of (i) the amount of bonds that have been issued, (ii) the amount of CDD Assessments that have been levied and certified for collection against the Assets, and (iii) the amount in which Sellers have the right to receive a cost or other reimbursement from the CDD ("Seller CDD Reimbursement").  The Assets shall include the

21

Seller CDD Reimbursement.

    5.14    <u>CDD Operations/CDD Closing Obligations</u>.

        (a)    Within three (3) business days from the effective date of this Agreement, Sellers shall provide copies of the following to Purchaser: (i) CDD budgets, (ii) CDD meeting minutes and CDD resolutions, (iii) contracts and other agreements reasonably requested by Purchaser.

        (b)    At Closing, Sellers shall assign their rights to and obligations under the Seller CDD Reimbursement to Purchaser in a manner reasonably acceptable to Purchaser ("<u>CDD Reimbursement Assignment</u>") and obtain and deliver to Purchaser CDD consent to the CDD Reimbursement Assignment in a manner reasonably acceptable to Purchaser, along with and any other consents required under Chapter 190, Florida Statutes, if any ("<u>CDD Consents</u>").

        (c)    In the event Sellers are unable to obtain and deliver the CDD Consents to the CDD Reimbursement as set forth above, then Purchaser shall have the right to terminate this Agreement and shall receive a refund of the Deposit and the Parties shall have no further rights or obligations under the Agreement.

        (d)    On or before Closing, and as a condition precedent thereto, Sellers shall procure and deliver to Purchaser the following pursuant to Chapter 190, Florida Statutes: (i) resignations of the current Board of Supervisors of the CDD, and (ii) proof of appointment of a Board of Supervisors designated by Purchaser.  Additionally, Sellers shall engage in commercially reasonable best efforts to procure a legal opinion letter from CDD counsel that such resignation, designation and appointment of the new Board of Supervisors is in compliance with Chapter 190, Florida Statutes and does not violate or cause a default under Florida law or the obligations of the CDD, including without limitation, any such bonds issued by the CDD, and deliver such legal opinion letter to Purchaser on or before Closing.

    5.15    <u>L2 Lots Acquisition Right</u>.  In the event that BC Estates, as purchaser under the Estate Lots Agreement, fails to acquire the L2 Lots (as defined in the Estate Lots Agreement) for any reason, Sellers shall provide notice to Purchaser of such failure to acquire the L2 Lots after the Closing, and Purchaser shall have the right, by providing written notice thereof to Sellers (the "<u>Election Notice</u>") no later than thirty (30) days after receipt of notice from Sellers of such failed acquisition, to acquire the L2 Lots for the same Purchase Price (as defined in the Estate Lots Agreement) and on the same terms and conditions contained in the Estate Lots Agreement, *mutatis mutandis*.

**ARTICLE VI**
**BID AND AUCTION PROCESS**

    6.1    <u>Bankruptcy Court Actions</u>.

        (a)    <u>Filing of Stalking Horse Motion</u>.  Sellers shall file within three (3) Business Days after the execution date of this Agreement with the Bankruptcy Court and prosecute in good faith, the Sale Motion and all such necessary motions or applications seeking approval of this Agreement, subject to higher and better offers (the "<u>Bid Procedures Motion</u>"), in accordance with the terms of this Agreement and the Bid Procedures Order (the "<u>Bid Procedures</u>"), which Bid Procedures shall be incorporated into the Bid Procedures Order.  Sellers shall use good faith diligent efforts to effectuate the entry of the Sale Order as soon as reasonably practicable under the circumstances.

(b)    <u>Financial Bid Protections</u>.  The Bid Procedures shall provide for, *inter alia*: (i) a break-up fee of $2,250,000 to be paid to Purchaser in the event of and upon the closing of a sale of the Assets to any other bidder, which break-up fee shall be paid from the sale proceeds as a cost of closing; (ii) an expense reimbursement of up to $400,000, limited to actual legal fees and actual costs incurred in connection with this Agreement, to be paid to Purchaser in the event of and upon the closing of a sale of the Assets to any other bidder, which expense reimbursement shall be paid from the sale proceeds as a cost of closing; (iii) "credit" bidding protections for such bidding protections in the case in which Purchaser participates in an auction, in addition to Purchaser's credit bidding rights under Section 2.5 of this Agreement; and (iv) a requirement that any competing bid must be at least $3,250,000 greater than the Purchase Price under this Agreement.

(c)    <u>Compliance</u>.  Each of the Parties shall comply (or obtain an order from a competent court waiving compliance) with all applicable laws, rules and regulations, including, without limitation, requirements under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules of procedure of the Bankruptcy Court.

(d)    <u>Notice</u>.  The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.

(e)    <u>Appeals of Orders</u>.  If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use their reasonable best efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(f)    <u>Administrative and Priority Claims</u>.  Notwithstanding anything expressed or implied herein to the contrary, Sellers shall not consent or agree to the allowance or re-classification of any Claim as an Administrative Claim or a Priority Claim without the prior written consent of Purchaser.

(g)    <u>New Leases and Agreements</u>.  Sellers shall not, without the prior written consent of Purchaser (which shall not be unreasonably withheld), enter into any new leases and/or other agreements, except in the ordinary course of business.

(h)    <u>Substantial Contribution by Purchaser</u>.  Because Purchaser has requested a "work fee," and Sellers could not provide such fee, Sellers acknowledge that the efforts expended by Purchaser have added substantial value to the Sellers, and shall not oppose the Purchaser's filing, and seeking allowance of, a Substantial Contribution Claim if the Purchaser is not selected as the "stalking horse bidder" and is not granted the bid protections described in Section 6.1 of this Agreement pursuant to the Bid Procedures Order.  In no event shall such a Substantial Contribution Claim exceed the amount of allowable expenses for legal fees and hard expenses capped under the Bid Procedures pursuant to Section 6.1(b).

6.2    <u>Contract Assumption and Cure</u>.

(a)    <u>Cure Notice</u>.  On or before the day that is five (5) Business Days after entry of the Bid Procedures Order, Sellers shall serve a cure notice (the "<u>Cure Notice</u>") by first class mail on all

non-debtor counterparties to all potentially Assumed Contracts and provide a copy of the same to Purchaser. The Cure Notice shall inform each recipient that its respective contract or lease may be designated by Purchaser as either assumed or rejected, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the contract or lease, (ii) the name of the contract or lease counterparty, (iii) Sellers' good faith estimates of the Cure Amounts required in connection with such contract or lease (the "Cure Amounts"), (iv) the identity of Purchaser and (v) the deadline by which any such contract or lease counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto.

(b)     Closing Assumed Contract List.  Purchaser shall, prior to the hearing on the Sale Motion, identify the contracts and leases that Purchaser has decided will be Assumed Contracts to be assumed and assigned to Purchaser on the Closing Date by providing a list thereof to Sellers (as updated in accordance with this Agreement, the "Closing Assumed Contract List").  Up to one (1) Business Day prior to the Closing Date, Purchaser may, in its sole discretion, add or remove any contract or lease as an Assumed Contract to be assumed and assigned to Purchaser on the Closing Date by amending the Closing Assumed Contract List, and, in connection with the Closing, the applicable Seller shall move in the Bankruptcy Court to assign any such contract or lease on the Closing Assumed Contract List to Purchaser, and at the Closing shall assume and assign to, and Purchaser shall accept the assignment of and assume such contract or lease. In advance of the Closing Date, Purchaser may, in its sole discretion, designate a contract or lease for exclusion and rejection by delivering written notice to Sellers and, in connection with the Closing, the applicable Seller shall move to reject any such contract or lease as of the Closing Date (which date shall constitute the Rejection Effective Date with respect thereto).

(c)     From and after the Closing Date with respect to any contract or lease that was neither included on the Closing Assumed Contract List nor excluded and rejected as of the Closing Date, and is then in effect, Purchaser may, in its sole discretion, designate such contract or lease as an Assumed Contract by providing written notice to Sellers, specifying the contracts or leases to be assumed by Sellers and assigned to Purchaser by providing written notice to Sellers.  Upon delivery of a notification by Purchaser with respect to any contract or lease under Section 6.2 of this Agreement, the applicable Seller shall move in the Bankruptcy Court within 5 days of receipt of such notice to assign such contract or lease to Purchaser and shall assume and assign to, and Purchaser shall accept the assignment of and assume such contract or lease. The foregoing provisions of this Section 6.2(c) are subject to the right of the Sellers at any time from and after the Closing Date, with respect to any contract or lease that was neither included on the Closing Assumed Contract List nor excluded and rejected as of the Closing Date, as then in effect, to provide the Purchaser written notice of the appliable Seller's intent to exclude and reject a given such contract (a "Post-Closing Rejection Notice"). If the Purchaser does not object to a Post-Closing Rejection Notice in writing delivered to the applicable Seller within ten (10) Business Days of the applicable Seller's delivery of the Post-Closing Rejection Notice to the Purchaser, the Purchaser's rights under this Section 6.2(c) to designate the contract(s) or lease(s) described in such Post-Closing Rejection Notice as Assumed Contracts shall automatically terminate and the applicable Seller may make a motion to reject the subject contract(s) or lease(s) at any time thereafter.  For the avoidance of doubt, any Cure Amount paid or payable by the Purchaser with respect to any contract or lease designated as an Assumed Contract following the Closing Date pursuant to this Section 6.2(c) shall be for the Purchaser's sole account, and notwithstanding any other provision of this Agreement, shall not give rise to any Purchase Price adjustment.

6.3     Compliance with Bid Procedures; Maintenance of Confidentiality.

(a)     The Parties shall comply with the Bid Procedures established or approved by the Bankruptcy Court.

(b)     A Party shall not release any Person from, or waive any provisions of, any confidentiality agreement entered into in accordance with the Bid Procedures, without the other Party's prior written consent.

6.4     Intentionally Omitted.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

7.1     Conditions to Sellers' Obligation to Close.  Each of Sellers' obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Sellers, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)     Representations and Warranties; Covenants.

(i)     All representations and warranties of Purchaser contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which shall have been true and correct as of such date), and Sellers shall have received a certificate, dated as of the Closing Date and signed by an authorized Representative of Purchaser, to that effect.

(ii)     Purchaser shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date, and each of Sellers shall have received a certificate, dated as of the Closing Date and signed by an authorized Representative of Purchaser, to that effect.

(b)     No Injunction.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

(c)     Sale Order.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order.

(d)     Purchaser's Deliveries.  Purchaser shall have paid the Purchase Price and shall have duly executed and delivered to each of the Sellers each of the documents, instruments and agreements required to be delivered pursuant to Section 7.3(b) of this Agreement.

(e)     Governmental Permits.  All Governmental Permits, authorizations and/or exemptions required to be obtained in connection with the consummation of the transactions contemplated by this Agreement shall have been obtained and be in full force and effect.

(f)     No exceptions to title, other than Permitted Exceptions exist as of the date of Closing.

7.2    Conditions to Purchaser's Obligation to Close.  Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)    Representations and Warranties; Covenants.

(i)    All representations and warranties of each of the Sellers contained in this Agreement and any related transaction documents shall have, to the applicable Seller's Knowledge been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties in this Agreement that, by their terms, apply only as of an earlier date, which will be true and correct as of such date and except that Sellers may, if they become aware before Closing that additional disclosures are required in order to make any of Sellers' representations and warranties in this Agreement true and correct, disclose information to Purchaser as is necessary to make those representations and warranties true and correct, and in that case any then-existing breach of Seller's representations and warranties will be cured to the extent of the additional information disclosed, and, if Sellers disclose a Material Adverse Effect (but not otherwise), Purchaser will have the option to either terminate this Agreement or to waive the matter and proceed to Closing without any adjustment to the Purchase Price), and each of the Sellers shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized Representative of each of the Sellers, to that effect.

(ii)    Each of the Sellers shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by each of the Sellers prior to or at the Closing Date, and each of the Sellers shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized Representative of each Seller, to that effect.

(b)    Sellers' Deliveries.  Each of the Sellers shall have duly executed and delivered to Purchaser each of the documents, instruments and agreements required to be delivered by each of the Sellers pursuant to Section 7.3(a) of this Agreement.

(c)    Material Adverse Effect.  From the date of this Agreement until the Closing Date, there shall not have occurred and be continuing a Material Adverse Effect.

(d)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order (with respect to the Assets) in form and substance reasonably satisfactory to Purchaser, and such order shall have become a Final Order.

(e)    No Injunction or Challenge.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.  No law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Entity or any other Person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or decree) which would prevent the consummation at the Closing of, or restrain or invalidate, the transactions contemplated by this Agreement.

(f)    All Consents and Approvals described in Section 3.5 herein have been issued and delivered to Purchaser.

7.3     Deliveries at Closing.

(a)     Deliveries by Sellers.  At the Closing, Sellers (as applicable) shall deliver or cause the delivery of the following to Purchaser:

(i)     a certified copy of the Sale Order;

(ii)     Separate Bills of Sale and Assignment without warranty or other covenants, duly executed by each Seller, in a form reasonably satisfactory to Purchaser and quitclaim deed(s) in relation to the Premises;

(iii)     the Intellectual Property Assumption and Assignment Agreements;

(iv)     the Assignment and Assumption Agreement(s);

(v)     all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Sellers at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably requested by Purchaser to deliver the Assets free and clear of any Liens, Claims, rights or interests, each in form and substance reasonably satisfactory to Purchaser and Sellers;

(vi)     any applicable local, state or federal transfer tax forms;

(vii)     Documents reasonably required by the Title Agent or Title Underwriter;

(viii)     Assignment of all contract warranties still in effect; and

(ix)     Pro Forma Title Policy from title underwriter in form satisfactory to Purchaser.

(b)     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause the delivery of the following to each of the Sellers:

(i)     the Purchase Price (as allocated between the Sellers), in cash by means of a completed federal funds wire transfer to an account or accounts designated by Sellers in writing not later than three (3) Business Days prior to the Closing Date; and

(ii)     all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Purchaser or its designee at or prior to the Closing Date pursuant to this Agreement, each in the form specified by this Agreement, or if the form is not specified by this Agreement, in form and substance reasonably satisfactory to Purchaser and each of the Sellers.

7.4     Possession.  On the Closing Date, possession of the Assets shall be delivered to Purchaser with possession meaning providing access to Purchaser to the Premises and such possession shall not be interfered with by any party or entity that has not asserted or had adjudicated in its favor a right to access.

7.5     Closing Costs.  Buyer shall pay any applicable recording fees and Transfer Taxes in accordance with Section 5.6 hereof unless otherwise provided by the Sale Order.  Other costs associated

with the Closing and transactions contemplated under the Agreement shall be allocated as provided elsewhere in this Agreement.  Sellers shall request that the Bankruptcy Court waive all transfer, stamp and other Transfer Taxes due and owing as result of transfer of Assets from Sellers to Purchaser. Purchaser agrees to be bound by the Bankruptcy Court's ruling on this request.

**ARTICLE VIII**
**RESERVED**

8.1     RESERVED.

**ARTICLE IX**
**TERMINATION**

9.1     <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned, and there shall thereafter be no liability of any Party to the other Party hereunder, as follows:

(a)     <u>Mutual Consent</u>.  Upon the mutual written consent of Sellers and Purchaser.

(b)     <u>By Purchaser</u>.

(i)     By Purchaser, in the event of a material violation or material breach by the Sellers of Sellers' agreements, covenants, representations or warranties contained in this Agreement; <u>provided</u> that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Sellers (as applicable) of written notice of such breach from Purchaser (unless such condition shall become incapable of being satisfied by the Closing Date), and provided further that Purchaser is not then in material breach of the Agreement; or

(ii)     By Purchaser in accordance with Section 7.2(a)(i); or

(iii)     By Purchaser, if the Sale Order is not entered by the Bankruptcy Court on or before June 30, 2023 or the Sale Order shall not have become a Final Order by the 15th day following entry of the Sale Order on the Bankruptcy Court docket; or

(iv)     By Purchaser, if the Closing does not occur on or before the End Date (or on such other extended date upon which the Parties mutually agree in writing); or

(v)     By Purchaser if, prior to the Closing, a Casualty Loss occurs affecting a material portion of the Assets; *provided, however*, that Purchaser may elect to close and accept the Assets with no reduction in the Purchase Price and, in that event, any insurance proceeds (or proceeds of such condemnation proceeding) subsequently recovered by Sellers on account of such loss shall be transferred to Purchaser.

(c)     <u>By Sellers</u>.

(i)     By Sellers, in the event that a higher and better offer, from a Qualified Bidder (as defined in the Bid Procedures Order) other than Purchaser is: (i) accepted by Sellers in accordance with the terms of this Agreement and the Bid Procedures Order; (ii) approved by the Bankruptcy Court; and (iii) results in the closing of such sale, in which event this Agreement shall be deemed, without further action, to have been automatically terminated by Sellers on the date of the approval of such sale by the Bankruptcy Court; or

28

(ii)     By Sellers, provided that all conditions to Closing have been satisfied, if the Closing does not occur on or before the End Date (or on such other extended date upon which the Parties mutually agree in writing) as a result of any circumstances within Purchaser's control; or

(iii)     By Sellers, in the event of a material violation or material breach by Purchaser of its agreements, covenants, representations or warranties contained in this Agreement; provided that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Purchaser of written notice of such breach from Sellers, and provided further that Sellers are not then in material breach of the Agreement.

9.2     Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Party, and all further obligations of the Parties hereunder shall immediately and without further action terminate, except that the obligations set forth in Section 2.4, 5.4, 6.1, and this Section 9.2(a) shall survive in full force and effect, as shall any other provisions of this Agreement which are specifically designated to survive termination; *provided, however*, that if this Agreement is terminated by a Party because of the other Party's failure to comply with its obligations under this Agreement, the terminating Party's right to pursue all legal remedies for breach of contract or otherwise, including, without limitation, specific performance and damages relating thereto. Provided however, Seller's remedy against Purchaser for Purchaser's failure to comply with its obligations under this Agreement shall be limited to the Deposit and no other remedy, and which shall also survive such termination unimpaired.

(b)     Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(c)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Article IX shall relieve Purchaser or Sellers of their respective obligations under the Confidentiality Agreement.

## ARTICLE X
## MISCELLANEOUS

10.1     Entire Agreement.  This Agreement, the Schedules and the Exhibits and the Sale Order, together with the Confidentiality Agreement, contain the entire agreement among the Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings among the Parties.

10.2     Other Governmental Entities.  In the event any Party receives notice from any Governmental Entity that other notices, applications, filings or Governmental Permits are required with respect to this Agreement or the transactions contemplated hereby, Purchaser and Sellers (as applicable) shall make such notices, applications or filings and seek such Governmental Permits, unless they decide, in good faith, that such compliance is not necessary.

10.3     Additional Actions and Documents.  At and after the Closing, and without further consideration, Purchaser and/or Sellers (as applicable) shall promptly execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions, as any Party may

reasonably request in order to convey, assign and transfer to Purchaser all of Sellers' rights, title and interest in and to the Assets, or to clarify, identify or more precisely describe the Assets intended to be conveyed.

10.4    Descriptive Headings; Certain Interpretations.

(a)    Section headings are descriptive and for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(b)    Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "either" are not exclusive and "include" and "including" is not limiting; (iii) a reference to any agreement or other contract includes any schedules and exhibits thereto and permitted supplements and amendments thereof; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; (v) a reference to a Person includes a natural person or entity and its permitted successors and assigns; and (vi) a reference in this Agreement to an Article, Section, Schedule or Exhibit is to the Article, Section, Schedule or Exhibit of this Agreement.

10.5    Successors and Assigns.  This Agreement is made solely and specifically by and for the benefit of the Parties hereto, and their respective successors and assigns.  Purchaser shall be entitled to assign its rights hereunder to an affiliate or an entity related to Purchaser; *provided, however*, that such assignment shall not relieve Purchaser of its obligations hereunder.

10.6    Notices.  All notices, requests, and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered by overnight courier to the Parties at the following addresses:

If to Sellers, addressed to:

Jerry McHale
Banyan Cay Resort & Golf, LLC, *et al.*
1900 Banyan Club Road
West Palm Beach, FL 33401
Email:  jerrym@thereceiver.net

With copies (which shall not constitute notice hereunder) to:

Joseph A. Pack, Esq.
Jessey J. Krehl, Esq.
Pack Law
51 Northeast 24th Street
Suite 108
Miami, FL 33137
Email:  joe@packlaw.com; jessey@packlaw.com

If to Purchaser, addressed to:

>Westside Investment Partners, Inc.
>Attn: Otis C. Moore, III
>4100 East Mississippi Avenue, Suite 500
>Denver, CO 80246
>Email: omoore@westsideinv.com

With a copy (which shall not constitute notice hereunder) to:

>Steven L. Daniels, Esq.
>Saul Ewing LLP
>515 N. Flagler Drive
>Suite 1400
>West Palm Beach, FL 33401
>Email: steven.daniels@saul.com

All such Notices shall be deemed given one Business Day after delivery by overnight courier. Any Party from time to time may change its address or other information for the purpose of notices to that Party by giving notice specifying the change to the other Parties.

10.7    <u>Expenses</u>.  Except as otherwise expressly provided herein, each Party shall bear its own costs with respect to the drafting and negotiation of this Agreement, any court or regulatory proceedings related thereto, the consummation of the transactions contemplated hereby, and such Party's compliance with all its agreements and conditions contained herein, including, without limitation, all legal and accounting fees and disbursements and all costs of obtaining necessary consents.  The provisions of this Section 10.7 shall survive the Closing or earlier termination of this Agreement.

10.8    <u>Brokerage Commissions and Fees</u>.  Purchaser warrants and represents that no brokerage commissions or fees are due any broker as a result of Purchaser's actions in connection with the transactions contemplated by this Agreement and Purchaser agrees that should any claim be made for commissions or fees by any broker against Sellers, Purchaser shall indemnify and hold Sellers harmless from and against any and all such claims in connection therewith.  Sellers warrant and represent that no brokerage commissions or fees are due to any brokers other than amounts due to Keen-Summit, Sellers' marketing agent and broker, and Sellers agree that Sellers shall indemnify and hold Purchaser harmless from and against any and all such claims in connection therewith (including, without limitation, any claim for compensation due to Keen-Summit).  Notwithstanding anything contained herein to the contrary, the provisions of this Section 10.8 shall survive the Closing or any earlier termination of this Agreement.

10.9    <u>Waiver</u>.  Any term, provision or condition of this Agreement may be waived, or the time for its performance may be extended, at any time by the Party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term, provision or condition being waived, and shall be executed by an authorized officer of the Party granting such waiver.  The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor to affect in any way the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.  Notwithstanding the foregoing, a waiver hereunder by Sellers of

31

any material term or condition shall not be effective without an order of the Bankruptcy Court in relation to such waiver.

10.10    <u>Amendment</u>.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of all Parties hereto.

10.11    <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered via PDF.

10.12    <u>Continuing Jurisdiction</u>.  The Parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

10.13    <u>Choice of Law</u>.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation, company or limited liability company that is a Party to or the subject of this Agreement, as to which the law of the jurisdiction of incorporation or organization of such entity shall govern, and in all cases subject to the provisions of the U.S. Bankruptcy Code. Venue shall be Palm Beach County, Florida.

10.14    <u>No Partnership or Joint Venture</u>.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of a seller and a purchaser between the Parties hereto.

10.15    <u>No Third-Party Beneficiaries</u>.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.  It is the explicit intention of the Parties hereto that no Person other than the Parties hereto and their successors and permitted assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any Party hereto, and the assumptions, indemnities, covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties hereto or their respective successors and permitted assigns.

10.16    <u>Prevailing Agreement Between the Parties</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of any other transaction document, other than the Bid Procedures Order or the Sale Order, the provisions of this Agreement shall prevail in the determination of the respective rights and obligations of the Parties as between themselves.  In the event of any conflict between any provision of this Agreement and the Bid Procedures Order or the Sale Order, the terms of the Bid Procedures Order shall govern over this Agreement, and the terms of the Sale Order shall govern over each.

(a)    Each of the Parties acknowledges and agrees that the other Parties (collectively, the "<u>Enforcing Parties</u>") would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that each of the Parties may have under Law or equity, each of the Parties shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof (except as otherwise expressly set forth herein).

(b)    Each of the Parties agrees that it shall not oppose the granting of specific performance or an injunction sought on the basis that the Enforcing Parties have an adequate remedy at law or that any award of specific performance is, for any reason, not an appropriate remedy (except as otherwise expressly set forth herein). The Enforcing Parties shall not be required to provide any bond or other security in connection with any such injunction or other equitable remedy. The End Date shall be tolled from the date any of the Enforcing Parties files a petition seeking specific performance or an injunction under this Section 10.16 until a final, non-appealable, decision regarding this matter is obtained from a court of competent jurisdiction.

10.17    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

10.18    Computation of Time.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

10.19    Mutual Drafting.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

10.20    Counterparts; Facsimile and Email Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

10.21    Time of Essence. Time is of the essence of this Agreement.

10.22    **WAIVERS OF JURY TRIAL**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE AGREEMENTS CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

**Banyan Cay Investment, LLC**

By: _Jerry McHale_
Name: Jerry McHale of McHale, P.A.
Title: Proposed Chief Restructuring Officer

**Banyan Cay Mezzanine Borrower, LLC**

By: _Jerry McHale_
Name: Jerry McHale of McHale, P.A.
Title: Proposed Chief Restructuring Officer

**Banyan Cay Resort & Golf, LLC**

By: _Jerry McHale_
Name: Jerry McHale of McHale, P.A.
Title: Proposed Chief Restructuring Officer

**Banyan Cay Dev. LLC**

By: _Jerry McHale_
Name: Jerry McHale of McHale, P.A.
Title: Proposed Chief Restructuring Officer

**Banyan Cay Villas, LLC**

By: _Jerry McHale_
Name: Jerry McHale of McHale, P.A.
Title: Proposed Chief Restructuring Officer

**Banyan Cay Maintenance, LLC**

By: _Jerry McHale_
Name: Jerry McHale of McHale, P.A.
Title: Proposed Chief Restructuring Officer

**Westside Property Investment Company, Inc.**

By: *  /s/Andy Klein  *

Name:  Andy R. Klein

Title:  President

## SCHEDULE 1

### PREMISES

PARCEL I (FRONT NINE):

A PORTION OF TRACT "B", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGE 72, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTH CORNER OF TRACT "B" OF SAID PLAT THENCE SOUTH 57°00'00" EAST ALONG THE NORTH LINE OF TRACT "B", 392.64 FEET; THENCE SOUTH ALONG A RADIAL LINE SOUTH 33°00'30" WEST, 60.00 FEET TO THE POINT OF BEGINNING (SAID POINT ALSO BEING THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 842.04 FEET, A CENTRAL ANGLE OF 00°10'47" AN ARC LENGTH OF 2.64 FEET; THENCE SOUTH 26°42'09" EAST, 78.89 FEET; THENCE NORTH 71°50'50" EAST, 87.95 FEET; THENCE NORTH 88°26'53" EAST, 87.00 FEET; THENCE SOUTH 58°34'14" EAST, 41.83 FEET; THENCE SOUTH 54°04'40" EAST, 75.76 FEET; THENCE NORTH 56°50'56" EAST, 70.00 FEET; THENCE SOUTH 07°00'44" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 06°57'47" WEST); THENCE EAST ALONG SAID CURVE HAVING A RADIUS OF 797.04 FEET AND CENTRAL ANGLE OF 22°19'31" AN ARC LENGTH OF 310.57 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE HAVING A RADIUS OF 305.00 FEET, A CENTRAL ANGLE OF 42°16'16" AN ARC LENGTH OF 225.02 FEET TO THE END OF SAID CURVE; THENCE SOUTH 62°48'15" EAST, 98.36 FEET TO A POINT OF CURVATURE OF A NON CONCENTRIC CURVE CONCAVE TO THE SOUTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 44°48'38" EAST); THENCE SOUTHEASTERLY ALONG SAID CURVE, HAVING A RADIUS OF 320.00 FEET, A CENTRAL ANGLE OF 30°38'13" AN ARC LENGTH OF 171.11 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 83°34'35" AN ARC DISTANCE OF 36.47 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 180.00 FEET, A CENTRAL ANGLE OF 102°03'14" AN ARC LENGTH OF 320.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 79°22'42" AN ARC LENGTH OF 34.64 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 1085.00 FEET, A CENTRAL ANGLE OF 54°59'52" AN ARC LENGTH OF 1041.48 FEET; THENCE SOUTH 08°39'28" EAST, 468.07 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 19°42'49" AN ARC LENGTH OF 263.21 FEET; THENCE NORTH 78°56'09" WEST (RADIAL TO SAID CURVE), 10.00 FEET; THENCE SOUTH 22°52'49" WEST, 149.38 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH WEST, HAVING A RADIUS OF 739.00 FEET, A CENTRAL ANGLE OF 14°00'20" AN ARC LENGTH OF 180.64 FEET TO THE END OF SAID CURVE; THENCE NORTH 53°33'16" WEST, 4.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT IS SOUTH 53°32'46" EAST) THENCE ALONG SAID CURVE HAVING A RADIUS OF 735.02 FEET, A CENTRAL ANGLE OF 13°38'11" AN ARC LENGTH OF 174.93 FEET TO THE END OF SAID CURVE; THENCE SOUTH 43°38'15" WEST, 145.11 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 29°02'42" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 01°29'52" AN ARC LENGTH OF 20.00 FEET TO THE END OF SAID CURVE; THENCE SOUTH 77°37'28" WEST, 100.68 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 20°03'10" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 745.00 FEET, A CENTRAL ANGLE OF 25°31'37" AN ARC LENGTH OF 331.92 FEET TO THE END OF SAID CURVE; THENCE SOUTH 05°27'57" WEST, 5.00 FEET; THENCE NORTH 84°32'08" WEST, 295.96 FEET; THENCE SOUTH 05°28'27" WEST, 15.00 FEET; THENCE NORTH 84°32'03" WEST, 87.64 FEET TO A BEGINNING OF A CURVE CONCAVE TO THE WEST ( A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 85°35'11" EAST); THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 990.00 FEET, A CENTRAL ANGLE OF 14°23'04" AN ARC LENGTH OF 248.55 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 88°18'23" AN ARC LENGTH OF 38.53 FEET TO A POINT OF TANGENCY; THENCE NORTH 69°03'00" EAST, 397.44 FEET; THENCE SOUTH 20°30'00" EAST, 25.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (THE PREVIOUS BEARING BEING RADIAL); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 739.25 FEET, A CENTRAL ANGLE OF 14°05'38" AN ARC LENGTH OF 181.84 FEET; THENCE NORTH 56°42'50" EAST ALONG A NON TANGENT LINE, 51.93 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE (A  RADIAL BEARING FROM ITS RADIUS POINT BEARS

SOUTH 38°35'47" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 742.25 FEET, A CENTRAL ANGLE OF 22°15'00" AN ARC LENGTH OF 288.24 FEET TO A POINT OF TANGENCY; THENCE NORTH 29°08'43" EAST, 152.03 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 218.00 FEET, A CENTRAL ANGLE OF 126°00'00" AN ARC LENGTH OF 479.41 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 131.28 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 69.88 FEET TO A POINT OF TANGENCY; THENCE SOUTH 52°39'13" WEST, 44.02 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 206.00 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 109.66 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 345.00 FEET, A CENTRAL ANGLE OF 15°47'37" AN ARC LENGTH OF 95.10 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS BEARS SOUTH 66°42'44" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 345.99 FEET, A CENTRAL ANGLE OF 12°53'21" AN ARC LENGTH OF 77.83 FEET; THENCE SOUTH 53°49'23" EAST (RADIAL TO SAID CURVE), 28.26 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 375.25 FEET, A CENTRAL ANGLE OF 33°15'11 AN ARC LENGTH OF 217.79 FEET TO A POINT OF TANGENCY; THENCE SOUTH 69°30'00" WEST, 393.96 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 98°40'54" AN ARC LENGTH OF 43.06 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 290.00 FEET, A CENTRAL ANGLE OF 31°52'53" AN ARC LENGTH OF 161.37 FEET TO A POINT OF TANGENCY; THENCE NORTH 20°00'00" EAST, 175.73 FEET; THENCE SOUTH 70°00'00" EAST, 15.00 FEET; THENCE NORTH 20°00'00" EAST, 224.67 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 595.00 FEET, A CENTRAL ANGLE OF 11°21'37" AN ARC LENGTH OF 117.97 FEET TO THE END OF SAID CURVE; THENCE NORTH 81°27'13" WEST 15.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 580.00 FEET, A CENTRAL ANGLE OF 07°25'24" AN ARC LENGTH OF 75.15 FEET TO THE END OF SAID CURVE; THENCE NORTH 87°56'12" EAST, 45.00 FEET; THENCE NORTH 17°15'54" EAST, 161.68 FEET; THENCE NORTH 11°56' 22" EAST, 408.45 FEET; TO THE SOUTHEAST CORNER OF TRACT "D" OF BANYAN CAY RESORT, PLAT BOOK 125, PAGE 116, THENCE CONTINUE ALONG THE NEXT FIVE COURSES OF TRACT "D"; THENCE NORTH 11°56' 22" EAST, 59.86 FEET; THENCE NORTH 48°03'38" WEST, 64.70 FEET; THENCE NORTH 01°11'51" EAST, 109.65 FEET; THENCE NORTH 76°19'06" WEST, 19.24 FEET; THENCE NORTH 27°09'45" EAST, 843.47 FEET BACK TO THE POINT OF BEGINNING.

PARCEL II (BACK NINE):

A PORTION OF TRACT "C", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 29, PAGE 72 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF LOT 1 OF SAID PLAT (ALSO THE NORTH RIGHT OF WAY LINE OF CONGRESS AVENUE); THENCE NORTH 57°00'00" WEST ALONG THE SAID NORTH RIGHT OF WAY LINE, 170.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 57°00'00" WEST, 10.92 FEET; THENCE NORTH 33°00'00" EAST, 175.00 FEET; THENCE NORTH 57°00'00" WEST, 600.00 FEET; THENCE SOUTH 35°28'31" WEST, 87.42 FEET; THENCE NORTH 20°08'04" WEST, 100.09' FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°36'10" WEST) THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 1515.99 FEET, A CENTRAL ANGLE OF 06°59'55", AN ARC LENGTH OF 185.18 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 50.00 FEET, A CENTRAL ANGLE OF 89°53'08", AN ARC LENGTH OF 78.44 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 190.00 FEET, A CENTRAL ANGLE OF 111°36'33", AN ARC LENGTH OF 370.11 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 48.51 FEET, A CENTRAL ANGLE OF 36°29'47", AN ARC LENGTH OF 30.90 FEET TO A POINT OF COMPOUND CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 1335.99 FEET, A CENTRAL ANGLE OF 30°39'23", AN ARC LENGTH OF 714.83 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°11'51" EAST, 264.88 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE WEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 58°31'04" EAST); THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CURVE HAVING A RADIUS OF 175.00 FEET, A CENTRAL ANGLE OF 126°43'54", AN ARC LENGTH OF 387.08 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST; THENCE WESTERLY AND NORTHERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 95°43'47", AN ARC

LENGTH OF 41.77 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°01'51" EAST, 401.00 FEET; THENCE SOUTH 88°48'00" EAST, 160.03 FEET TO A POINT OF CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 100 FEET, A CENTRAL ANGLE  OF  56°30'18", AN ARC LENGTH OF 98.62 FEET TO A POINT OF TANGENCY; THENCE SOUTH 32°18'00" EAST, 312.76 FEET; THENCE SOUTH 09°16'39" EAST, 105.00 FEET; THENCE SOUTH 77°36'02" EAST, 18.00 FEET; THENCE SOUTH 53°06'11" EAST, 104.04 FEET; THENCE SOUTH 50°56'54" EAST, 50.01 FEET; THENCE SOUTH 44°05'31" EAST, 50.25 FEET; THENCE SOUTH 35°45'59" EAST, 32.95 FEET; THENCE SOUTH 23°16'19" EAST, 20.16 FEET; THENCE SOUTH 16°01'43" EAST, 21.47 FEET TO A POINT OF A CURVE CONCAVE TO THE EAST (A RADIAL BEARING FROM ITS RADIUS  POINT BEARS NORTH 73°40'02" WEST); THENCE SOUTH ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 22°14'06", AN ARC LENGTH OF 86.54 FEET TO A  POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 65.00 FEET, A CENTRAL ANGLE OF 08°48'53", AN ARC LENGTH OF 10.00 FEET; TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEAST ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 71°29'56", AN ARC LENGTH OF 278.28 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEASTERLY  ALONG SAID CURVE HAVING A RADIUS OF 96.38 FEET, A CENTRAL ANGLE OF 32°13'15", AN ARC LENGTH OF 54.20 FEET TO A POINT OF TANGENCY; THENCE SOUTH 54°03'06" EAST, 26.71 FEET; THENCE NORTH 35°56'54" EAST, 112.00 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 39°53'17" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 185.00 FEET, A CENTRAL ANGLE OF 28°39'01", AN ARC LENGTH OF 92.51 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 68°18'26" WEST) THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 58°41'38", AN ARC LENGTH OF 25.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 09°26'02" WEST); THENCE ALONG SAID CURVE EASTERLY HAVING A RADIUS OF 300.00 FEET, A CENTRAL ANGLE OF 06°04'40", AN ARC LENGTH OF 31.82 FEET; THENCE SOUTH 17°31'14" EAST, 10.00 FEET; THENCE NORTH 75°33'55" EAST, 64.11 FEET; THENCE NORTH 67°40'25" EAST, 137.00 FEET; THENCE NORTH 85°10'25" EAST, 281.37 FEET; THENCE NORTH 11°09'00" EAST, 12.00 FEET; THENCE NORTH 78°51'00 " WEST 273.94 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 55°58'33" EAST; THENCE NORTH ALONG SAID CURVE HAVING A RADIUS OF 330.00 FEET, A CENTRAL ANGLE OF 00°34'11" AN ARC LENGTH OF 3.28 FEET; THENCE SOUTH 80°00'00" EAST, 276.63 FEET; THENCE SOUTH 00°42'42" EAST 332.57 FEET; THENCE SOUTH 70°00'00" EAST, 143.00 FEET; THENCE SOUTH 20°00'00" WEST, 325.91 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 625.00 FEET, A CENTRAL ANGLE OF 40°29'58" AN ARC LENGTH OF 441.78 FEET TO A POINT OF TANGENCY; THENCE SOUTH 20°00'00" EAST, 320.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 655.00 FEET, A CENTRAL ANGLE OF 50°04'01" AN ARC LENGTH OF 572.36 FEET; THENCE NORTH 60°26'00" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 60°26'00" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 640.00 FEET, A CENTRAL ANGLE OF 04°48'42" AN ARC LENGTH OF 53.75 FEET TO THE END OF SAID CURVE; THENCE NORTH 55°37'20" WEST, 40.40 FEET; THENCE SOUTH 08°24'57" WEST, 11.34 FEET; THENCE SOUTH 38°35'47" WEST, 39.50 FEET; THENCE SOUTH 64°40'58" WEST, 45.94 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE  NORTH, HAVING A RADIUS OF 80.00 FEET, A CENTRAL ANGLE OF 62°22'25" AN ARC LENGTH OF 87.09 FEET TO A POINT OF TANGENCY; THENCE NORTH 52°56'25" WEST, 94.23 FEET; THENCE NORTH 66°43'06" WEST, 14.52 FEET; THENCE NORTH 81°30'16" WEST, 24.17 FEET; THENCE NORTH 87°22'10" WEST, 24.19 FEET; THENCE SOUTH 52°57'50" WEST, 79.92 FEET;  THENCE SOUTH 70°31'03" WEST, 63.47 FEET; THENCE NORTH 69°15'28" WEST, 36.37 FEET; THENCE  NORTH 45°05'26" WEST, 34.89 FEET; THENCE NORTH 24°02'28" WEST, 16.14 FEET; THENCE SOUTH 33°00'00" WEST, 56.00 FEET BACK TO THE POINT OF BEGINNING.

PARCEL III:

TRACTS C1, C2, D, HC AND H2, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IV:

LOT 3, PLAT 1, THE PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76,

INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, LESS THE SOUTHERLY 3.0 FEET THEREOF.

PARCEL V: INTENTIONALLY DELETED.

PARCEL VI:

TRACT MF, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL VII:

TRACT L3, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL VIII:

LOTS 18 AND 19, PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGES 72 THROUGH 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IX:

TRACT M, BANYAN CAY RESORT COMMUNITY PLAT 1, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 124, PAGES 182 THROUGH 186, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA

TOGETHER WITH THE FOLLOWING ADDITIONALLY INSURED PARCELS WHICH BENEFIT THE PARCELS ABOVE:

THOSE CERTAIN "OUT OF BOUNDS" EASEMENT RIGHTS AND BENEFITS GRANTED IN THAT CERTAIN EASEMENT AGREEMENT RECORDED IN OFFICIAL RECORDS BOOK 22745, PAGE 868, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN 15 FOOT EASEMENT RIGHTS AND BENEFITS FOR INGRESS AND EGRESS GRANTED IN THAT CERTAIN SPECIAL WARRANTY DEED RECORDED IN OFFICIAL RECORD BOOK 2787, PAGE 1231, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, SUBJECT TO THE MAINTENANCE OBLIGATION SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS ESTABLISHED BY THAT CERTAIN AMENDED AND RESTATED MASTER DECLARATION OF COVENANTS AND RESTRICTIONS RECORDED IN OFFICIAL RECORD BOOK 22293, PAGE 83, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN RIGHTS AND BENEFITS GRANTED BY THAT CERTAIN GOLF COURSE ACCESS EASEMENT RECORDED IN OFFICIAL RECORDS BOOK 25002, PAGE 290, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA. SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFICIAL RIGHTS TO USE COMMON AREAS ESTABLISHED BY THAT CERTAIN DECLARATION OF MASTER COVENANTS OF BANYAN CAY RESORT RECORDED IN OFFICIAL RECORD BOOK 29679, PAGE 227, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS TO USE A GOLF CART PATH ACROSS LOT 18, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, GRANTED BY THAT CERTAIN CART PATH EASEMENT RECORDED IN OFFICIAL RECORD BOOK 29932, PAGE 112, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

## **<u>SCHEDULE 2</u>**

### **ASSUMED CONTRACTS**

**None at this time.**

## SCHEDULE 3

## INTELLECTUAL PROPERTY

All of Sellers' rights to the names "Banyan Cay," "Banyan Cay Resort & Golf," "Banyan Cay Golf Club," the domain names and websites related to the Premises or the Banyan Cay Golf Club Facilities, any logos associated with the same, the intellectual property regarding the same, if any, and the Banyan Cay Golf Club phone number.

## SCHEDULE 4

**LICENSES AND PERMITS**

**[TO COME]**

## SCHEDULE 5

## PERSONAL PROPERTY

All of Sellers' Personal Property that is not an Excluded Asset, as set forth in Section 2.2 of the Agreement or Schedule 6 Excluded Assets attached thereto.

## SCHEDULE 6

## EXCLUDED ASSETS

### EXCLUDED REAL PROPERTY:

**L2 ESTATE LOTS:** TRACT L2 OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 125, PAGE 114 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA**.**

**LOT 21:** LOT 21 OF BANYAN CAY RESORT REPLAT OF TRACT "L1", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 127, PAGE 18, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

### EXCLUDED BC MEZZ PROPERTY:

For the avoidance of doubt, each of the following property of BC Mezz shall be an Excluded Asset, in each case to the extent that BC Mezz has an interest in such property or proceeds therefrom:

(a)     The membership interests in each of Banyan Cay Resort & Golf, LLC; Banyan Cay Dev. LLC; and Banyan Cay Villas, LLC (collectively, the "Pledged Securities");

(b)     all securities, additional equity interests, moneys or property representing dividends, distributions, cash or interest on any of the Pledged Securities;

(c)     any amounts payable under any insurance policy resulting from loss or damage to the Pledged Securities or the Assets (as defined in this Agreement);

(d)     all "accounts", "general intangibles", "instruments" and "investment property" relating to the foregoing; and

(e)     all proceeds of any of the foregoing.

## <u>SCHEDULE 7</u>

### LIABILITIES ASSUMED BY PURCHASER

**None.**

## SCHEDULE 8

**ALLOCATION OF PURCHASE PRICE**

**[TO COME]**

# EXHIBIT A

**QUIT CLAIM DEED**


**[TO COME]**

# **EXHIBIT B**

**BILL OF SALE**


**[TO COME]**

**<u>Exhibit B-1 to Bid Procedures Order</u>**

**Bid Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12386 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## BID PROCEDURES

In the exercise of their good faith reasonable business judgment, the above-captioned debtors and debtors in possession (the "Debtors") have executed an Asset Purchase Agreement (the "Stalking Horse Agreement") with Westside Property Investment Company, Inc., or an affiliated assignee (the "Stalking Horse Bidder"), pursuant to which (i) the Stalking Horse Bidder proposes to (a) purchase, acquire, and take assignment and delivery of the Assets (as defined in the Stalking Horse Agreement) and (b) assume certain Assumed Contracts, Permits and Licenses, and Assumed Liabilities (each as defined in the Stalking Horse Agreement), and (ii) the Debtors propose to, upon the termination of the Stalking Horse Agreement, as set forth therein , pay the Stalking Horse Bidder a fee in an amount equal to $2,250,000 (the "Break-Up Fee") and an expense reimbursement of up to $400,000 limited to actual legal fees and actual costs incurred in connection with the Stalking Horse Agreement (the "Expense Reimbursement"), to be paid to the Stalking Horse Bidder in the event of and upon the closing of a sale of the Assets to another bidder, in accordance with the terms and conditions of the Stalking Horse Agreement, provided however, that the Break-Up Fee and the Expense Reimbursement shall not constitute a lien under any circumstances on the collateral of U.S. Real Estate Credit Holdings III-A, LP, the Bellefrau Collateral, or the ZJC Collateral and provided further that in the event the Bellefrau Collateral or the ZJC Collateral is sold separately from the other Assets under the Stalking Horse Agreement, including through a credit bid, then there shall be no Break-Up Fee or Expense Reimbursement due or paid in connection therewith.

On April 28, 2023, the Bankruptcy Court entered an order [Docket No. [__]] (the "Bid Procedures Order") approving, *inter alia*, these bid procedures (the "Bid Procedures").

These Bid Procedures set forth the process by which the Debtors are authorized to conduct the auction (the "Auction") for the sale (the "Sale") of the Assets. Subject to the entry of the Sale Order, the Sale may be implemented pursuant to the terms and conditions of the Stalking Horse

---

[1] The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

Agreement, as the same may be amended pursuant to the terms thereof, subject to the receipt of higher or otherwise better Bids (as defined below) in accordance with these Bid Procedures. Pursuant to the Bid Procedures, the Debtors will determine the highest or otherwise best price for the sale of the Assets.

### A.  Important Dates

- (All times are prevailing Eastern Time)

- **June 8, 2023 at 5:00 p.m.:** Deadline to submit Bid to be considered for the Auction

- **June 13, 2023 at 10:00 a.m.:** Sate of Auction

- **June 13, 2023 at 5:00 p.m.:** Debtors to file notice of Successful Bidder

- **June 8, 2023 at 5:00 p.m.:** Deadline to file and serve objections to relief requested at Sale Hearing (except for any objection that arises at the Auction)

- **June 15, 2023 at 1:30 p.m.:** Date of Sale Hearing

### B.  Marketing Process

### 1.    Auction Qualification Process

To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "<u>Bid</u>"), and each party submitting such Bid (each, a "<u>Bidder</u>"), must be determined by the Debtors to satisfy each of the following conditions:

(i) <u>Stalking Horse Bidder</u>. The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall be deemed to be a Qualified Bid (the "<u>Stalking Horse Bid</u>"), without the need to comply with any of the requirements set forth in this section.

(ii) <u>Form and Contents</u>. All Bids shall be in the form of an offer letter from a person or persons that the Debtors, in their reasonable discretion taking into account their fiduciary duties, deem financially able to consummate the purchase of the Assets, which letter shall substantially conform to the form of letter provided to each Bidder by the Debtors, and which letter shall state and include:

(A) <u>Marked Agreement</u>. Each Bid must state the Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed and attached complete asset purchase agreement prepared and executed by the Bidder (an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to price and the time of closing (the "<u>Proposed Agreement</u>");

(B) <u>Purchase Price</u>. Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, such as certain liabilities to be assumed by the Bidder as part of the Transaction, for example (the "<u>Purchase Price</u>");

(C) <u>Overbid</u>. Each Bid or combination of Bids (a) must propose a purchase price equal to or greater than the sum of (i) the value of the Stalking Horse Agreement, as determined by the Debtors; and (ii) an initial overbid of at least **$3,250,000.00** (the "<u>Initial Overbid</u>"), and (b) must obligate the Bidder(s) to pay, to the extent provided in the Agreement, all amounts which the Stalking Horse Bidder under the Agreement has agreed to pay, including (if any) assumed liabilities (as set forth in the Stalking Horse Agreement);

(D) <u>Contingencies; No Financing or Diligence Outs</u>. A Bid shall not be conditioned on a Bidder obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions;

(E) <u>Evidence of Financial Ability to Close</u>. A Bid shall be accompanied by reasonable evidence (in the form of current bank statements, funds availability letters from an acceptable financial institution, or other evidence of available funding) of the Bidder's financial ability to promptly consummate its Bid;

(F) <u>Identity</u>. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise financially participating in connection with such Bid (including equity holders or other financial backers of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid must also include contact information for the specific person(s) and counsel the Debtors' advisors should contact regarding such Bid;

(G) <u>Authorization</u>. Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid;

(H) <u>Substantial Contribution Waiver</u>. Each Bid must contain an express waiver, effective upon submission of the Qualified Bid, of any substantial contribution claims by the Bidder;

(I) <u>Expenses; Disclaimer to Fees</u>. Each Bid must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, substantial contribution, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

(J) <u>Consummation</u>. Each Bid must include a statement that the Bidder is prepared to consummate the transaction, upon entry of an order of this Court approving the Sale to the Successful Bidder (the "<u>Sale Order</u>");

(K) <u>Irrevocability</u>. Each Bid must include a statement that, in the event the Bidder becomes the Successful Bidder or the Back-up Bidder (as defined below), such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the sale of the Assets;

(L) <u>Banyan Cay Maintenance Allocation</u>.  Notwithstanding anything herein to the contrary. each Bid must set forth an allocation that, at a minimum, discloses the portion of the Purchase Price that shall be allocated to each of the Bellefrau Collateral and the ZJC Collateral (as such terms are defined in the Bid Procedures Order) in an amount at least equal to the allocation in the Stalking Horse Agreement as set forth in the Bid Procedures Order;

(M) <u>Improvements Escrow</u>.  Each Bid must include a statement, consistent with Section 4.9 of the Stalking Horse Agreement, that at the Closing such Bidder shall escrow $2,700,000 in immediately available funds for the sole purpose of the "Improvements" (as defined therein and as explained in greater detail in that certain *Twentieth Amendment to Agreement for Purchase and Sale of Real Property* [Docket No. 97-B])

(N) <u>Actual Value</u>. The Bid must state the proposed actual value of such Bidder's bid to the Debtors' estates.

(iii) <u>As Is, Where Is</u>.  The sale of the Assets shall be on an "as is, where is" and "with all defects" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder.

(iv) <u>Good Faith Deposit</u>. Each Bid must be accompanied by a cash deposit in an amount equal to 5% of the aggregate value of the cash consideration of the Bid to be held in an escrow account to be identified and established by the Debtors (the "<u>Deposit</u>").

(v) <u>Binding Effect</u>. By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures and to refrain from submitting a Qualified Bid or seeking to reopen the Auction after conclusion of the Auction.

**(vi)**<u>Time Frame for Closing</u>. A Bid by a Bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, but in no event later than July 14, 2023.

A Bid received before the Bid Deadline will be considered a "<u>Qualified Bid</u>" and each Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>" if the Debtors determines that such Bid meets the requirements above for a Bid as set forth in these Bid Procedures.

<u>**Bid Deadline.**</u> The Debtors must receive a Bid in writing, on or before **June 8, 2023 at 5:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "<u>Bid Deadline</u>"). Bids must be sent to the following by the Bid Deadline to be considered: the Debtors' chief restructuring officer, McHale, P.A., at 1601 Jackson Street, # 200, Fort Myers, Florida 33901, jerrym@thereceiver.com; the counsel to the Debtors, Pack Law, at 51 NE 24th Street, #108, Miami, Florida 33137, joe@packlaw.com and jessey@packlaw.com; and the marketing agent and broker of the Debtors, Keen-Summit Capital Partners, LLC, at 1 Huntington Quadrangle, Suite 2C04, Melville, New York 11747, mbordwin@keen-summit.com.

Within two (2) business days after the Bid Deadline, the Debtors will notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties, as well as the Stalking Horse Bidder with a copy of each Qualified Bid.

Between the date that the Debtors notify a Bidder that it is a Qualified Bidder and the Auction date, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase its Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth in the Bidding Procedures. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures. The Stalking Horse shall be deemed a Qualified Bidder at all times, and the Stalking Horse Agreement shall be a Qualified Bid.

Prior to the Auction, the Debtors and their advisors will evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' reasonable business judgment, the highest or otherwise best bid (the "<u>Baseline Bid</u>" and the Bidder making such Baseline Bid, the "<u>Baseline Bidder</u>"), and shall notify the Stalking Horse Bidder and all Qualifying Bidders with Qualifying Bids of the Baseline Bid no later than the opening of the Auction.

### 2.    Credit Bid

To the fullest extent permissible under Bankruptcy Code section 363(k), the Prepetition Secured Lender, ZJC, LLC, and Bellefrau may credit bid, as a Qualified Bid or subsequent Bid at the Auction, in their sole and absolute discretion, any portion and up to the entire amount of their secured claim with respect to the portion of the Assets secured thereby (the "Credit Bid").  Each of the Prepetition Secured Lender, ZJC, LLC, Bellefrau, and the Debtors reserve their respective rights with respect to the amount of such secured claims; *provided, however*, that the Bankruptcy Court has retained jurisdiction to hear any matters related to the determination and liquidation of the amount of such secured claims *for the purposes of the Credit Bid only without prejudice as to the ultimate allowable amount of such claims*, and the amount of such secured claims may be mutually agreed to between each of the Prepetition Secured Lender and the Debtors, ZJC, LLC and the Debtors, or Bellefrau and the Debtors prior to the Auction without further order from the Bankruptcy Court.  For the avoidance of doubt, each of the Prepetition Secured Lender, ZJC, LLC, and Bellefrau shall at all times be deemed a Qualified Bidder with respect to such Credit Bids and shall not be required to comply with any of the other requirements for a Qualified Bid set forth herein.

### C.    Auction

If more than one Qualified Bid is received by the Bid Deadline (including the Stalking Horse Agreement), the Debtors will conduct the Auction to determine the highest and best Qualified Bid or combination of Qualified Bids.  This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, *inter alia,* the following: (a) the amount and nature of the consideration; (b) the ability of the Qualified Bidder to close the proposed Transaction and the conditions related thereto, and the timing thereof; (c) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (d) any purchase price adjustments; € the impact of the transaction on any actual or potential litigation; (f) the after-tax consideration of the Debtors' estates; (g) the tax consequences of such Qualified Bid; and (h) the consent of the parties in interest and/or the cost and expense to the Debtors of resolving sale issues before Closing (collectively, the "Bid Assessment Criteria").

If no Qualified Bids other than the Stalking Horse Bid are received prior to the Bid Deadline, then the Auction will not occur, the Stalking Horse Agreement shall be deemed the Successful Bid, and, subject to the termination rights under the Stalking Horse Agreement, the Debtors will pursue entry of an order by the Bankruptcy Court authorizing the Sale to the Stalking Horse Bidder as soon as practicable.

## Procedures for Auction

The Auction, if necessary, will take place on **June 13, 2023 at 1900 Banyan Club Road, West Palm Beach, Florida 33401 at 10:00 a.m. (prevailing Eastern Time)** or such later time on such day or other place as the Debtors shall notify all Bidders who have submitted Qualified Bids.

### 1.    The Debtors Shall Conduct the Auction

The Debtors and Keen-Summit Capital Partners, LLC, their court-approved marketing agent and broker, shall direct and preside over the Auction and the Auction shall be transcribed or videotaped.  Prior to the commencement of the Auction, the Debtors shall determine which of the Qualified Bids, at such time, is the highest and best bid for purposes of constituting the opening bid of the Auction, and shall promptly notify the Stalking Horse Purchaser and all Qualified Bidders with Qualified Bids of the Baseline Bid.  To participate at the Auction, each Qualified Bidder must have at least one person physically present at the Auction, though other parties may appear virtually with the consent of the Debtors.

The Debtors and their professionals shall have the right to adjourn or cancel the Auction at or prior to the Auction, without the need for further approval by the Bankruptcy Court.

All Bids made after the start of the Auction shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all Bidders who have submitted Qualified Bids. The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Starting Bid and all Overbids.  The Prepetition Secured Lender, ZJC, LLC, and Bellefrau, together with their professionals, shall be allowed to attend the Auction.

### 2.    Terms of Overbids

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Starting Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

#### (1)    Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least bidding on the Assets must be in initial minimum overbid increments of at least $250,000.00, which increment may be reduced as appropriate (the "Minimum Overbid Increment"), provided that the Minimum Overbid Requirement for the Bellefrau Collateral and the ZJC Collateral, if either is to be sold separate from the Assets, shall be $10,000. Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; *provided*, *however* that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment.

(2)    **Stalking Horse Credit Bid Rights**

As part of any Overbid made by the Stalking Horse Bidder, the Stalking Horse Bidder shall be entitled to credit bid, to the fullest extent possible under section 363(k) of the Bankruptcy Code, the Break-Up Fee and Expense Reimbursement.

(3)    **Remaining Terms Are the Same as for Qualified Bids**

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; *provided, however*, the Bid Deadline shall not apply, and no additional Good Faith Deposit shall be required beyond the Deposit previously submitted by a Qualified Bidder. Any Overbid must include, in addition to the amount and form of consideration of the Overbid, a description of all changes (if any) requested by the Qualified Bidder to the Stalking Horse Agreement or a previously submitted Modified Purchase Agreement, in connection therewith (including any changes to the designated assigned contracts and leases and assumed liabilities). Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid.

(4)    **No Collusion; Good-Faith *Bona Fide* Offer**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction (i) it has not engaged in any collusion with respect to the Sale or bidding (including it has no agreement with any other Bidder or Qualified Bidder to control the price) and (ii) its Qualified Bid is the good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

(5)    **Backup Bidder**

Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party(ies) with the second highest or second best Qualified at the Auction, as determined by the Debtors, in the exercise of their business judgment, shall be required to serve as backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid(s) (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until two (2) business days after the closing of the sale of the Assets (the "Outside Backup Date").

3.    **Closing the Auction**

The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids that the Debtors determine, in their reasonable business judgment, is the highest and best Qualified Bid(s) at the Auction (the "Successful Bid" and the Bidder(s) submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, in the Debtors' discretion, to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed Transaction Documents memorializing the terms of the Successful Bid.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

**D.  Sale Hearing**

The Bankruptcy Court has scheduled a hearing (the "Sale Hearing") on **June 15, 2023, at 1:30 p.m. (prevailing Eastern Time)**, at which hearing the Debtors may, in their discretion, seek approval of the Sale with the Successful Bidder.  Objections to the sale of the Assets to the Successful Bidder or Backup Bidder must be filed, comply with the Bankruptcy Rules and Local Rules, and be served so they are actually received by no later than **5:00 p.m. (prevailing Eastern Time) on June 8, 2023** (except for any objection that arises at the Auction).

**E.  Reservation of Rights**

The Debtors reserve their rights to modify these Bid Procedures in its reasonable business judgment in any manner that will best promote the goals of the bidding process.  Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not (i) impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Agreement, or (ii) the rights of the Prepetition Secured Lender, ZJC, LLC, or Bellefrau contained herein.

## Exhibit B-2 to Bid Procedures Order

**Sale Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) | |
| | ) | Case No. 23-12386 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF BID PROCEDURES, AUCTION, HEARING AND DEADLINES
RELATING TO THE SALE OF CERTAIN PROPERTY OF THE DEBTORS' ESTATES**

**PLEASE TAKE NOTICE** that on April 2, 2023, the above-captioned debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Bankruptcy Cases"), filed that certain Motion [Docket Nos. 31] (the "Bid Procedures and Sale Motion") seeking, *inter alia*, approval of certain bid procedures, setting the date for an auction of certain property of the Debtors' estates, and setting the date for a hearing to approve of such sale.[2] The Debtors seek to complete a sale (the "Sale") of nearly all of their real property, as well as other assets related thereto (the "Assets") to a prevailing bidder or bidders (the "Successful Bidder") at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code section 363 (the "Auction").

**PLEASE TAKE FURTHER NOTICE** that, on April 28, 2023 the Bankruptcy Court entered an order [Docket No. _____] (the "Bid Procedures Order") approving the Bid Procedures set forth in the Bid Procedures and Sale Motions (the "Bid Procedures"), which set the key dates and times related to the sale of the Assets. **All interested bidders should carefully read the Bid Procedures**. To the extent there are any inconsistencies between the Bid Procedures and the summary description of its terms and conditions contained in this notice, the terms of the Bid Procedures shall control.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures, the Debtors must receive a Qualified Bid from interested bidders in writing, on or before **June 8, 2023 at 5:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "Bid Deadline"). To be considered, Qualified Bids must be sent to the following at or before the Bid Deadline: the Debtors' chief restructuring officer, McHale, P.A., at 1601 Jackson Street, # 200, Fort Myers, Florida 33901, jerrym@thereceiver.com; the counsel to the Debtors, Pack Law, at 51 NE 24th Street, #108, Miami, Florida 33137, joe@packlaw.com and jessey@packlaw.com; and the marketing agent and broker of the Debtors, Keen-Summit Capital Partners, LLC, at 1 Huntington Quadrangle, Suite 2C04, Melville, New York 11747, mbordwin@keen-summit.com.

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

[2]  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bid Procedures and Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, if the Debtors receive one or more Qualified Bids (other than the Stalking Horse Agreement) by the Bid Deadline, the Auction will be conducted on **June 13, 2023 at 1900 Banyan Club Road, West Palm Beach, Florida 33401 at 10:00 a.m. (prevailing Eastern Time)**, or at such other place, date and time as may be designated by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Assets to the Successful Bidder free and clear of liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code (the "Sale Hearing") before the Honorable Erik P. Kimball, U.S. Bankruptcy Court for the Southern District of Florida, on **June 15, 2023 at 10:00 p.m. (prevailing Eastern Time)**, or at such time thereafter as counsel may be heard or at such other time as the Bankruptcy Court may determine. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or on the agenda for such Sale Hearing. Objections to the sale of the Assets to the Successful Bidder must be filed and served so they are received no later than **5:00 p.m. (prevailing Eastern Time) on June 8, 2023.** A party's failure to object shall be deemed to be a consent for purposed of section 363(f) of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are seeking to waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) in order for the Sale to close immediately upon entry of the Sale Order by this Court.

**PLEASE TAKE FURTHER NOTICE** that this notice is subject to the full terms and conditions of the Bid Procedures and Sale Motion, the Bid Procedures Order, and the Bid Procedures, which shall control in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Copies of the Bid Procedures and Sale Motion, the Bid Procedures, and the Bid Procedures Order may be obtained for free by contacting the Debtors' undersigned counsel.

Dated:    [__], 2023

Respectfully submitted,

**PACK LAW**
*Counsel to the Debtors and*
*Debtors-in-Possession*
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Telephone: (305) 916-4500

By:    */s/ [DRAFT]*
Joseph A. Pack
Email: joe@packlaw.com
Florida Bar No. 117882
Jessey J. Krehl
Email: jessey@packlaw.com
Florida Bar No. 1025848

**Exhibit B-3 to Bid Procedures Order**

**Post-Auction Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) |
|  | ) Case No. 23-12386 |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**NOTICE OF SUCCESSFUL BIDDER AND BACKUP BIDDER WITH**
**RESPECT TO THE SALE OF PROPERTY OF THE DEBTORS' ESTATES**

**PLEASE TAKE NOTICE** that on April 2, 2023, the above-captioned debtors and debtors in possession (the "Debtors") in the above-captioned case (the "Bankruptcy Case"), filed that certain Motion [Docket No. 31] (the "Bid Procedures and Sale Motion") seeking, *inter alia*, approval of certain bid procedures, setting the date for an auction of certain property of the Debtors' estates, and setting the date for a hearing to approve of such sale.[2]  Pursuant to the Bid Procedures and Sale Motions, the Debtors sought to complete a sale (the "Sale") of certain property of the Debtors' estates (the "Assets") to a prevailing bidder or bidders (the "Successful Bidder") at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code section 363 (the "Auction").

**PLEASE TAKE FURTHER NOTICE** that, on April 28, 2023 the Bankruptcy Court entered an order [Docket Nos. _____] (the "Bid Procedures Order") approving the Bid Procedures set forth in the Bid Procedures and Sale Motion (the "Bid Procedures"), which set the key dates and times related to the sale of the Assets.

**PLEASE TAKE FURTHER NOTICE** that on June 13, 2023 at 10:00 a.m. (EST), pursuant to the Bid Procedures Order and the Bid Procedures, the Debtors conducted the Auction with respect to the Assets.

**PLEASE TAKE FURTHER NOTICE** that at the conclusion of the Auction, the Debtors, in consultation with their professionals, selected [__] as the Successful Bidder(s) with a bid of [__], and [__] as the Backup Bidder(s) with a bid of [__].

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

[2]  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bid Procedures and Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider the approval of the Sale of the Assets to the Successful Bidder <u>free and clear of all liens, claims, interests, and encumbrances,</u> in accordance with section 363(f) of the Bankruptcy Code, will be held before the Honorable Erik P. Kimball, United States Bankruptcy Judge for the Southern District of Florida, on June 15, 2023 at 1:30 p.m. (EST).

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in the above-captioned case.

**PLEASE TAKE FURTHER NOTICE** that, at the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of a breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized to close with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the terms and conditions of the Bid Procedures and Sale Motions, the Bid Procedures Order, and the Bid Procedures, and the Debtors encourage parties in interest to review such documents in their entirety. Parties with questions regarding this Notice should contact the Debtors' counsel at the contact information provided herein.

Dated:    [__], 2023

Respectfully submitted,

**PACK LAW**
*Counsel to the Debtors and*
*Debtors-in-Possession*
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Telephone: (305) 916-4500

By:  */s/ [DRAFT]*
    Joseph A. Pack
    Email:  joe@packlaw.com
    Florida Bar No. 117882

    Jessey J. Krehl
    Email:  jessey@packlaw.com
    Florida Bar No. 1025848