

**ORDERED in the Southern District of Florida on June 26, 2023.**

Erik P. Kimball, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Banyan Cay Resort & Golf, LLC, *et al.*[1] | ) |
| | ) Case No. 23-12368 |
| | ) |
| Debtors. | ) (Jointly Administered) |

**ORDER (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN
PROPERTY OF THE DEBTORS, FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS AND (II) GRANTING RELATED RELIEF**

**THIS MATTER** came on before the Court for final hearing on June 15, 2023 at 1:30 p.m.

(the "<u>Sale Hearing</u>") upon the Motion of the above-captioned debtors and debtors in possession

(the "<u>Debtors</u>"), pursuant to 11 U.S.C. §§105, 363, Fed. R. Bankr. P. 2002, 6004 and 9014 and

---

[1] The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC.  The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

Local Rules 2002-1(C)(2) and 6004-1 for the entry of an order approving, *inter alia*, the sale of certain property of the Debtors' estates. The Sale Hearing was conducted pursuant to the Court's Order approving such hearing and approving the bid procedures for the Sale (the "Bid Procedures Order") [Docket No. 109].

Pursuant to the Bid Procedures Order, the Debtors did not receive any Qualified Bids[2] other than the Stalking Horse Agreement prior to the Bid Deadline. The Auction was accordingly **CANCELLED**. *See* [Docket No. 158].

Therefore, pursuant to paragraph 12 of the Bid Procedures Order, the Stalking Horse Agreement was deemed the successful bid (the "Successful Bid") and Westside Property Investment Company, Inc., a Colorado corporation, or an affiliate assignee, as Stalking Horse Bidder, was deemed the successful bidder (the "Successful Bidder").

The Court, having read and considered the Motion, the Bid Procedures Order, having obtained proffers on the record at the Sale Hearing from the Debtors' CRO and Matthew Bordwin of Keen-Summit, which proffers were subject to the right of cross-examination and which were accepted by the Court, having reviewed the objections filed by each of U.S. Real Estate Credit Holdings III-A, LP (the "Prepetition Secured Lender") [Docket No. 152] (the "Prepetition Secured Lender Objection"), Bellefrau Group, LLC ("Bellefrau") [Docket No. 153] (the "Bellefrau Objection"), and ZJC, LLC ("ZJC") [Docket No. 156] (the "ZJC Objection," and together with the Prepetition Secured Lender Objection and the Bellefrau Objection, the "Lender Objections") (the Prepetition Secured Lender, Bellefrau, and ZJC are sometimes referred to herein collectively as the "Lenders"), and the timely objection filed by Florida Exotic A Landscape Co. Inc. ("Florida Exotic")[Docket No. 154] (the "Florida Exotic Objection"), and the untimely objections filed by

---

[2] All capitalized terms used herein shall have the same meaning ascribed to them in the Motion, the Bid Procedures Order, or the Final DIP Order, (as defined below), as applicable, unless otherwise defined.

Can-Am Electric LLC ("Can-Am") [Docket No. 162] (the "Can-Am Objection") and (collectively) Atlantic Doors & Hardware, Inc., Fagan Engineering, Inc., Hardrives of Delray, Inc. d/b/a Hardrives, Inc., WM D Adeimy Jr. Inc. (collectively, the "Lienor Group") [Docket No. 163] (the "Lienor Group Objection," and together with the Florida Exotic Objection and the Can-Am Objection, the "Lienor Objections") (Florida Exotic, Can-Am, and the Lienor Group are sometimes referred to herein collectively as the "Objecting Lienors"), having considered the statements of counsel for the Debtors on the record at the Sale Hearing, having noted no objections to the Bid Procedures Order, and having considered all other matters of record in the instant case, after due deliberation, has determined that the relief requested in the Motion is in the best interests of the Debtors' estates and their creditors, and that good and sufficient cause has been shown in support of such relief, and it appearing that due and appropriate notice of the Motion, the Bid Procedures Order, the Bid Procedures, and the Sale Hearing having been given, and it appearing that no other notice of the relief granted by this Order need be given, and the Court having conducted the Sale Hearing, at which time all parties in interest were offered an opportunity to be heard with respect to the Motion and the Sale, and the Debtors' CRO and Keen-Summit having conducted a marketing process in compliance with the Bid Procedures Order and determined that the Successful Bidder has submitted the highest and best bid for the Assets, and all parties in interest having been heard, or having had the opportunity to be heard, regarding entry of this Order and the approval and confirmation of the Successful Bidder's bid and the Sale to the Successful Bidder, this Court, based upon the arguments, testimony and evidence presented to it, makes the following findings of fact and conclusions of law:[3]

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

A.    This Court has jurisdiction to hear and determine the Motion and to grant the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.    This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D.    The statutory predicates for the relief requested in the Motion are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

E.    As evidenced by the certificates of service filed with the Court, and based upon the representations of counsel at the Sale Hearing, (i) proper, timely and adequate notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, and the Bid Deadline has been provided in accordance with Bankruptcy Rules 2002, 6004, 9007 and 9014, (ii) such notice was good, sufficient and appropriate under the circumstances, and (iii) no other or further notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, or the Bid Deadline is necessary or shall be required.

F.    In compliance with the Bid Procedures Order, actual written notice of the Motion and the Sale Hearing and a reasonable opportunity to object or be heard with respect to the Motion and the Sale has been afforded to all interested persons and entities, including, without limitation: (i) the Office of the United States Trustee for the Southern District of Florida; (ii) counsel to the

Successful Bidder; (iii) all entities known to have asserted any lien, interest, or encumbrance upon the Assets; (iv) appropriate state regulatory agencies; (v) all creditors of the Debtors, and (vi) all other parties who filed requests for notice under Bankruptcy Rule 2002 in this case. Moreover, the Debtors provided publication notice, as contemplated in the Bid Procedures Order through print advertising in *Palm Beach Post* on May 9, 11, and 14, 2023; *The Wall Street Journal (Florida Edition)* on May 10 and 13, 2023; *The Wall Street Journal (Southern Edition)* on May 3 and 6, 2023; and *The Wall Street Journal (National Edition)* on May 3, 2023. [See Docket No. 166]. Accordingly, no other or further notice with respect to such matters is necessary or shall be required.

G.     Notice, as specified in the preceding paragraphs and as evidenced by the certificates of service filed with the Court, has been timely provided in the form and manner specified in the Motion and required by the Bid Procedures Order, and the Court finds that notice is adequate and sufficient in all respects to bind all creditors and parties in interest in this proceeding.

H.     The process for the sale of the Assets was conducted in accordance with the Bid Procedures Order and in a non-collusive, fair and good faith manner.

I.     Prior to the Auction, the Debtors solicited offers to purchase the Assets from a wide variety of parties. In so doing, the Debtors' CRO and Keen-Summit afforded potential bidders with confidential due diligence access to provide any such bidders an opportunity to submit Qualified Bids.

L.     The Bid Procedures were designed to obtain the highest value for Assets for the Debtors and their estates. The Successful Bidder's bid represents the highest and best offer for the Assets. The Debtors' determination that the Successful Bidder's bid constitutes the highest and

best offer for the Assets, was a reasonable, valid and sound exercise of the Debtors' business judgment, and complied with the provisions of the Bid Procedures and the Bid Procedures Order.

M.      The Successful Bidder is purchasing the Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is, therefore, entitled to the protection of that provision.  The Successful Bidder has proceeded in good faith in all respects in connection with these chapter 11 cases in that, *inter alia*, (i) the Successful Bidder recognized that the Debtors were free to deal with any other party interested in acquiring the Assets; (ii) the Assets were all subject to the competitive bidding procedures set forth in the Bid Procedures Order; (iii) all payments to be made by the Successful Bidder in connection with the Sale and chapter 11 cases, if any, have been disclosed; and (iv) the Successful Bidder has not violated section 363(n) of the Bankruptcy Code by any action or inaction.

N.      The Asset Purchase Agreement (the "APA") attached hereto as **Exhibit A** was negotiated, proposed and entered into by the Debtors and the Successful Bidder without collusion, in good faith and from arms-length bargaining positions.  Neither the Debtors nor the Successful Bidder nor any other party-in-interest has engaged in any conduct that would cause or permit the Sale or any part of the transactions contemplated by the APA to be avoidable under section 363(n) of the Bankruptcy Code.

O.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors afforded interested potential purchasers a full and fair opportunity to qualify as Qualified Bidders under the Bid Procedures and to submit an offer for the Assets.

P.      The consideration provided by the Successful Bidder, as the successful bidder for the Assets pursuant to the APA: (i) is fair and reasonable; (ii) is the highest and best offer for the

6

Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Florida's Uniform Fraudulent Transfer Act and all other applicable laws.

Q.      The Debtors have demonstrated a sufficient basis and compelling circumstances to support the sale of the Assets under section 363 of the Bankruptcy Code pursuant thereto. Furthermore, such actions are appropriate exercises of the Debtors' sound business judgment inasmuch as they are in the best interests of the Debtors, their estates, and their creditors.

R.      The marketing and bidding processes implemented by the Debtors' CRO and Keen-Summit, as set forth in the Motion, were fair, proper, and reasonably calculated to result in the best value received for the Assets.

S.      The Successful Bidder would not have entered into the APA and would not consummate the Sale, thus adversely affecting the Debtors, their estates, and creditors, if the Assets were not sold to it free and clear of all liens, claims, security interests, encumbrances, and any other interests (collectively, "Claims and Encumbrances"), or if the Successful Bidder would, or in the future could, be held liable for any such liens, claims, security interests and/or encumbrances against the Debtors or the Assets, other than those liens, claims, security interests and encumbrances which the Successful Bidder has agreed to.

T.      Subject to certain conditions and requirements set forth herein with respect to the liens of the Lenders, including the payment and/or escrow of sale proceeds as set forth in Paragraph 3 hereof, the provisions of section 363(f) of the Bankruptcy Code have been satisfied as to the holders of all Claims and Encumbrances.

U.      The Debtors anticipate that the Sale contemplated under the APA be done under, in connection with, and as part of the implementation of the Debtors' proposed Plan of Liquidation [ECF No. 160] (as it may be amended, and as the Debtors have indicated shall be materially

amended and modified on the record at the Sale Hearing, on the record at the hearing before the

Court on June 14, 2023, and pursuant to that certain amended and supplemented motion of the

Debtors regarding confirmation scheduling [Docket No. 164]) (the "Plan") for all purposes,

including specifically section 1146(a) of the Bankruptcy Code.  As a result, subject to confirmation

of the Debtors' Plan, the Debtors are and shall be entitled to all of the benefits under section

1146(a) of the Bankruptcy Code, including specifically the exemption for documentary or transfer

taxes or stamps on the sale of the Assets.

      BASED ON THE FOREGOING, IT IS ORDERED, ADJUDGED AND DECREED,

EFFECTIVE IMMEDIATELY, AS FOLLOWS:

1.    The relief requested in the Motion is **GRANTED** and approved in all respects,

subject to the terms of this Order and the modifications as set forth in this Order. The Debtors'

entry into the APA and the consummation of the Sale is hereby approved in all respects. Any

objections to the relief sought in the Motion that have not been previously resolved or withdrawn

or are addressed and/or reserved in this Order, are hereby overruled on their merits.

2.    The Debtors and the Successful Bidder are authorized and directed to take any and

all actions necessary or appropriate to: (i) consummate the Sale in accordance with the Motion,

the APA and this Order, and (ii) perform, consummate, implement and close fully the Sale,

together with all additional instruments and documents that may be reasonably necessary or

desirable to implement the APA.  After the date of entry of this Order, the Debtors and the

Successful Bidder may enter into any amendment, supplement, or modification to the APA that is

not material or adverse to the Debtors' estates or any of the Lenders or Florida Exotic without the

need of further notice and hearing or Court order.  Section 2.6 of the APA is hereby modified to

reflect that the Closing shall occur on or before July 31, 2023, unless otherwise agreed to in writing

by the Successful Bidder, the Prepetition Secured Lender, and the Debtors, with notice to Bellefrau and ZJC (the "Closing Deadline").  Section 2.5(a)(i) of the APA is modified to increase the Purchase Price by $400,000.00 (the "Purchase Price Increase") on account of the Closing occurring on or before July 31, 2023, such that the amount set forth in Section 2.5(a)(i) as $102,100,000.00 shall be $102,500,000.00.  The Purchase Price Increase is in exchange for the Debtors' waiver of any rights to seek any further reimbursement or compensation from the Successful Bidder for the costs and expenses of operating the Debtors' estates through and until July 31, 2023.  Section 2.5(b)(ii) of the APA is modified to provide that the Purchase Price adjustment for the FFE shall not exceed $500,000.00.  Additionally, Section 2.5(b)(ii) of the APA is modified so that the Successful Bidder shall notify the Debtors and the Prepetition Secured Lender as to any adjustment to the Purchase Price for the FFE, on or before the later of June 30, 2023 or five (5) business days after the Successful Bidder is provided access to the warehouse in which the FFE is being stored, subject to the FFE remaining in substantially the same condition as exists as of June 30, 2023 (the "FFE Adjustment," and together with the Purchase Price Increase, the "Purchase Price Adjustments").  Such notice shall include the Successful Bidder's basis for the FFE Adjustment. Any dispute regarding the FFE Adjustment by the Successful Bidder shall be adjudicated by this Court.  The Debtors shall provide notice of the FFE Adjustment to Bellefrau and ZJC promptly after receipt thereof.  The Prepetition Secured Lender agrees to extend the Outside Closing Date milestone until July 31, 2023, as set forth in the *Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Authorizing the Debtors to Obtain Postpetition Financing, and (IV) Granting Super Priority Claims to the DIP Lender* (the "Final DIP Order") [Docket No. 131].  Except with respect to the Purchase Price Adjustments set forth herein, there

shall be no other adjustments to the Purchase Price, other than as provided in the APA.   No other deadlines set forth in the Final DIP Order are extended or modified in any respect.

3.    Upon the Closing and subject to the conditions below, the Assets transferred, sold and delivered to the Successful Bidder shall be free and clear of all Claims and Encumbrances of any person or entity, pursuant to section 363(f) of the Bankruptcy Code.   The Debtors are directed to pay the Lenders the amounts set forth in this Paragraph 3 at Closing as the first out proceeds from the Sale, prior to the payment of any other expenses and no other expenses or claims shall be paid absent Court Order, which payments will be made pursuant to instructions to be provided by each such Lender.

a.    The Assets shall be free and clear of the Claims and Encumbrances of Bellefrau provided that: (a) Bellefrau receives payment at Closing of an amount equal to the amount asserted in Bellefrau's Proof of Claim [Claim No. 4; Case No. 23-12389], $1,671,750.00, less the Debtors' Apportioned Obligations (as defined in Section 5.6(c) of the APA) owed to the Palm Beach County Tax Collector at the time of Closing on the Bellefrau Collateral and the pro rata portion of U.S. Trustee fees owed by Banyan Cay Maintenance, LLC for the calendar quarter in which the Closing takes place that are attributable to the distribution to Bellefrau (the "Bellefrau Proceeds"); or (b)  subject to the other provisions of this Order, in the event that the Prepetition Secured Lender does not receive payment at the Closing of the Sale and the simultaneous closing of the sale of the L2 Lots (the "L2 Lots Sale") as contemplated under this Court's Order [Docket No. 105] granting that certain *Motion for Entry of an Order (A) Authorizing the Debtors to Assume Purchase and Sale Agreement with Banyan Cay Estates, LLC, (B) Compromising*

*Controversies Therebetween, and (C) Granting Related Relief* [Docket No. 97]  for the full amount of the Pre-Petition Obligations and the DIP Obligations, including accruing interest, attorneys' fees and costs, the Bellefrau Proceeds shall be placed in an escrow (the "Bellefrau Proceeds Escrow") held by Old Republic National Title Insurance Company (the "Title Company") to be disbursed upon an allocation of the proceeds to be agreed upon solely by and between the Prepetition Secured Lender and Bellefrau or as determined by the Court upon the request of either the Prepetition Secured Lender or Bellefrau.

b.  The Assets shall be free and clear of the Claims and Encumbrances of ZJC provided that: (a) ZJC receives payment at Closing of an amount equal to the amount asserted in ZJC's Proof of Claim [Claim No. 1; Case No. 23-12389], $1,300,198.08, less the Debtors' Apportioned Obligations (as defined in Section 5.6(c) of the APA) owed to the Palm Beach County Tax Collector at the time of Closing on the ZJC Collateral and the pro rata portion of U.S. Trustee fees owed by Banyan Cay Maintenance, LLC for the calendar quarter in which the Closing takes place that are attributable to the distribution to ZJC (the "ZJC Proceeds"); or (b) subject to the other provisions of this Order, in the event that the Prepetition Secured Lender does not receive payment at the Closing of the Sale and the simultaneous closing of the L2 Lots Sale for the full amount of the Pre-Petition Obligations and the DIP Obligations, including accruing interest, attorneys' fees and costs, the ZJC Proceeds shall be placed in an escrow (the "ZJC Proceeds Escrow") held by the Title Company to be disbursed upon an allocation of the proceeds to be agreed upon solely by and between the Prepetition Secured Lender and ZJC, or as

determined by the Court upon the request of either the Prepetition Secured Lender or ZJC.

   c.   The Assets shall be free and clear of the Claims and Encumbrances of the Prepetition Secured Lender (including in its capacity as the DIP Lender) provided that the closing of the L2 Lots Sale takes place simultaneously with the Closing of the Sale of the Assets and the Prepetition Secured Lender is paid at Closing the remaining net proceeds up to the amount necessary to pay the Pre-Petition Obligations and the DIP Obligations, including accruing interest, attorneys' fees and costs (with the DIP Obligations being repaid first), prior to the payment of any administrative expense.

4.      The holders of Claims and Encumbrances and other non-Debtor parties who did not object are deemed to have consented to this Order, the Bid Procedures Order, the Sale and the APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against the Successful Bidder, its affiliates, any agent of the foregoing or the Assets to recover any claim which such person or entity has solely against Debtors or any of their affiliates, including the Claims and Encumbrances.

5.      Any Claims and Encumbrances shall attach to the proceeds of the Sale attributable to such Assets in which such Claim and Encumbrance, if any, is asserted, in the same order of priority and with the same validity, force, and effect that the holder of such Claim and Encumbrance had in the Assets prior to the Sale, subject in all respects to the terms of this Order.

6.      At the Closing, the Debtors are authorized and directed to pay from the net proceeds of the Sale: (a) the Bellefrau Proceeds to Bellefrau (subject to the provisions of Paragraph 3(a)); (b) the ZJC Proceeds to ZJC (subject to the provisions of Paragraph 3(b)); and (c) the remaining

net proceeds to the Prepetition Secured Lender up to the amount necessary to pay the Pre-Petition Obligations and the DIP Obligations, including accruing interest and attorneys' fees, costs  and expenses.

7.       To the extent the Successful Bidder fails to close on or before the Closing Deadline, the Prepetition Secured Lender reserves the right to credit bid pursuant to Section 363(k) up to the full amount of its debt and to close on the Sale of the Assets pursuant to Section 363.  In the event Bellefrau is not paid the Bellefrau Proceeds at the closing of the Sale of the Assets, then Bellefrau shall have and hereby reserves the right to credit bid on the Bellefrau Collateral pursuant to Section 363(k) up to the full amount of the Bellefrau Proceeds, and in connection therewith Bellefrau shall be authorized to close on the purchase of the Bellefrau Collateral pursuant to Section 363 by providing five (5) business days' notice thereof to the Debtors and the Successful Bidder subsequent to the Closing Deadline.  In the event ZJC is not paid the ZJC Proceeds at the closing of the Sale of the Assets, then ZJC shall have and hereby reserves the right to credit bid on the ZJC Collateral pursuant to Section 363(k) up to the full amount of the ZJC Proceeds and in connection therewith ZJC shall be authorized to close on the purchase of the ZJC Collateral pursuant to Section 363 by providing five (5) business days' notice thereof to the Debtors and the Successful Bidder subsequent to the Closing Deadline.  In the event of a credit bid by any of the Lenders in accordance herewith, the Debtors shall cooperate with and execute and deliver any and all documents reasonable required to consummate such purchase(s).  The Court reserves jurisdiction to hear and address any disputes related to the reservations of rights set forth in this paragraph, which may be heard on an emergency or expedited basis, including the entry of an order confirming a purchase and sale to any of the Lenders in respect of their Section 363(k) rights.

8.      Subject to the Prepetition Secured Lender having been paid in full and receiving the Indefeasible Payment (as defined in the Final DIP Order) of the DIP Obligations and the Pre-Petition Obligations (including post-petition interest, expenses, costs, and attorneys' fees, in each case consistent with the Final DIP Order), all closing costs, and the payment in full at Closing to ZJC and Bellefrau as set forth in Paragraph 3, the Prepetition Secured Lender shall agree, subject in all respects to the terms and conditions set forth herein, for the avoidance of doubt, including but not limited to the requirement that the Prepetition Secured Lender shall have been paid Indefeasible Payment of the DIP Obligations and Pre-Petition Obligations, to carve-out from its surplus proceeds from the Sale of the Assets an allocation of no less than $2,323,000 to fund a reserve (the "Allocation Carve-Out"), of which $560,622.20 shall be reserved for Florida Exotic as the sole lienor who filed a timely objection; provided however, that such reserve amount shall not preclude the Debtors from disputing the allowance of any lienor claim, and with such sums being utilized to fund payments to lienors or mechanics lienors (the "Lienors"), including but not necessarily limited to Florida Exotic and the other Objecting Lienors, in amounts as may be reasonably negotiated by the Debtors and each Lienor, and agreed to by the Prepetition Secured Lender.  For the avoidance of doubt the Allocation Carve-Out is not a payment by the Prepetition Secured Lender, it is rather an agreement that the Secured Lender will be paid from its collateral pursuant to an allocation that allows for proceeds to be set aside for the Allocation Carve-Out and "surplus proceeds", mean proceeds above the full payment of the Prepetition Obligations and the DIP Obligations, including accruing interest, attorneys' fees and expenses. Any proposed resolution with a Lienor is subject to Court approval, by way of separate Order or by an Order confirming a Plan with such resolution included in the terms thereof, and this Order does not approve any payment to or recovery of any Lienor from the Allocation Carve-Out.  Lienors who

receive payment from the Allocation Carve-Out shall, upon receipt of any payment, simultaneously provide mutually agreeable general releases to the Prepetition Secured Lender regarding any and all amounts owed to the Lienors by the Prepetition Secured Lender. This Allocation Carve-Out from the proceeds of Sale of the Assets is conditioned upon the simultaneous closing by the Successful Bidder under the APA and the sale as contemplated under [Docket No. 105] (the "BC Estates Order") to Banyan Cay Estates, LLC, the closings of each of which are required to occur simultaneously pursuant to the terms of the APA and the BC Estates Order.

9.      Notwithstanding the existence of the Allocation Carve-Out or the amount thereof, the Debtors shall reserve all rights to dispute any claims of any Lienors, whether such claim is listed in the Debtors' respective Schedules of Assets and Liabilities, whether such claim is asserted by a Proof of Claim in the Debtors' respective cases, or otherwise, and such reservation shall extend to disputes regarding, *inter alia*, the existence *and* the amount of the Debtors' liability to such Lienors; *provided*, *however,* that to the extent the Debtors and an applicable Lienor move this Court to compromise the controversies therebetween that sets out the existence or amount of liability, any Order compromising such controversy shall govern with respect to such Lienor's claim and any amounts to be paid thereto pursuant to the Allocation Carve-Out if so ordered.

10.      The transfer of the Assets to the Successful Bidder constitutes a legal, valid, and effective transfer and conveyance of the Assets and shall vest the Successful Bidder with all of the Debtors' right, title, and interest in and to the Assets described in and required by the APA and this Order.

11.      Subject in all respects to the satisfaction of the requirements of Section 1146 of the Bankruptcy Code, including the confirmation of the Plan, under Section 1129 of the Bankruptcy Code, to the fullest extent permitted by Section 1146(a), the Sale of the Assets may not be taxed

under any law imposing a stamp tax, real estate, transfer tax, sales or use tax, or other similar tax, including but not limited to the tax imposed by Fla. Stat. § 201.02. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions made under the Plan. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded, is ordered and directed to accept such instrument, without requiring the payment of any documentary recording tax, stamp tax, deed stamps, transfer tax, mortgage tax, intangible tax, or similar tax. Upon the closing of the Sale, the Debtors, the Successful Bidder, and the post-confirmation estate may rely on 11 U.S.C. § 1146 to avoid the payment of the foregoing taxes pursuant to *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326 (2008).  For the avoidance of doubt, the relief granted in this Order and the Debtors' authority to proceed with the Sale is not conditioned on the confirmation of the Plan.

12.    The Successful Bidder reserves the right to object to any Claim or Encumbrance (other than those of the Lenders) that it has agreed to pay, if any, including, without limitation, the claims of the Palm Beach County Tax Collector and the claims of any state or federal agency related to any amounts owed in connection with the Debtors' licenses, permits, registrations, and governmental authorizations or approvals.  To the extent necessary, the Debtors agree to cooperate with the Successful Bidder in bringing an objection to any Claim or Encumbrance.  The Successful Bidder agrees to provide additional funding to the Debtors' estates solely for the reasonable fees incurred by Debtors' counsel in bringing an objection to a Claim or Encumbrance at the direction of the Successful Bidder.

13.    Upon the Closing of the Assets by the Successful Bidder as set forth herein, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete

general assignment, conveyance and transfer of the Assets to the Successful Bidder, pursuant to the terms of the APA.

14.     As set forth in the APA, the Assets include, but are not limited to, the real property described therein.

15.     Effective on the date of entry of this Order and subject to the provisions of this Order, all entities, including, but not limited to, the Debtors and their creditors, employees, former employees, members, equity owners, as well as administrative agencies, tax and regulatory authorities, governmental agencies, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any Claim and Encumbrances against the Debtors or the Assets, shall be permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Assets or the Successful Bidder (or its members, representatives, or affiliates) as alleged successor or purchaser, with respect to: (i) any Claims and Encumbrances on, in respect of or against the Debtors, the Assets; and (ii) recovering on any claim which such person or entity had or may have against the Debtors.

16.     Each and every term, provision and exhibit of the APA, together with the terms and provisions of this Order, shall be binding in all respects upon all entities, including, but not limited to the Debtors, the Successful Bidder, creditors, and members, equity holders, administrative agencies, governmental agencies, secretaries of state, federal, state and local officials and their respective successors or assigns, including but not limited to, persons asserting any Claim and Encumbrance against or interest in the Debtors' estates or the Assets, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

17.    Upon the Closing and subject to the terms of this Order, all entities holding a Claim and Encumbrance of any kind and nature, including but not limited to mechanic's lien claims against the Assets hereby are barred from asserting such Claim and Encumbrance against the Successful Bidder and/or the Assets.

18.    This Order: (i) is and shall be effective as a determination that, upon Closing in accordance herewith, all Claims and Encumbrances, including but not limited to mechanic's lien claims, existing as to the Assets conveyed to the Successful Bidder have been and hereby are adjudged to be unconditionally released, discharged and terminated: and (ii) shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental agencies or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets conveyed to the Successful Bidder.  All Claims and Encumbrances of record as of the date of this Order shall be removed and stricken as against the Assets in accordance with and subject to the terms of this Order the foregoing.

19.    Subject to the terms of this Order, if any person or entity which has filed financing statements, mortgages, notices of *lis pendens*, construction liens, judgments, or other documents or agreements evidencing any Claim and Encumbrance encumbering the Assets shall not have delivered to the Debtors prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all Claims and

Encumbrances which the person or entity has or may assert with respect to the Assets, then to the extent this Order does not do so without the need of further action of any party, the Debtors and/or the Successful Bidder are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.  Upon Closing of the Sale, the Debtors' creditors are authorized and directed to execute such documents and take all such actions as may be necessary to release their respective Claims and Encumbrances against the Assets.

20.    Upon Closing, the Successful Bidder (or any Lender who exercises a credit bid right and purchases its respective collateral) shall not be deemed to be: (a) a successor-in-interest to the Debtors; (b) a party to a *de facto* merger of the Successful Bidder and the Debtors; or (c) a mere continuation of the Debtors.  Without limiting the generality of the foregoing, and except as specifically provided in the APA, the Successful Bidder (or any Lender who exercises a credit bid right and purchases its respective collateral) shall not be liable for any claims against the Debtors or any of their predecessors, other than as expressly provided for in such APA or this Order. Further, except as expressly provided in the APA or in this Order, the Successful Bidder is not assuming nor shall it in any way be liable or responsible, as successor or otherwise, for any claims, liabilities, debts, obligations, or Claims or Encumbrances of the Debtors or their estates of any kind or character in any way whatsoever relating to or arising from the Assets or the Debtors' operation or use of the Assets prior to the Closing, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, under the laws of the United States, any state, territory, or possession of the United States, the District of Columbia, or any other country or foreign jurisdiction.

21.     The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered: (i) confirming or consummating any plan of liquidation of Debtors; (ii) converting Debtors' bankruptcy case from chapter 11 to chapter 7; (iii) dismissing Debtors' bankruptcy case; or (iv) appointing a chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Order and the APA shall continue in this or any superseding case and shall be binding upon the Debtors, the Successful Bidder, and their respective successors and permitted assigns.

22.     Each and every federal, state and local governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and a copy of this Order may be filed in any place where federal, state, or local law permits filing or recording.

23.     The consideration provided by the Successful Bidder for the Assets under the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Florida Uniform Fraudulent Transfer Act, and all other applicable laws.

24.     Nothing contained in any order of any type or kind entered in these chapter 11 cases or any related proceeding subsequent to entry of this Order, nor in any chapter 11 plan confirmed in these chapter 11 cases, shall conflict with or derogate from the provisions of the APA or the terms of this Order, which shall be expressly preserved under the terms of such plan.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of an order confirming any plan of liquidation of the Debtors or any other party, the conversion of Debtors' bankruptcy cases from chapter 11 to a case under chapter 7 of the Bankruptcy Code or the dismissal of Debtors' bankruptcy cases.

25.     The APA is authorized and approved in its entirety.  The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the APA (and any amendments thereto executed subsequent to the date of this Order) and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

26.     To the extent anything contained in this Order conflicts with a provision in the APA, this Order shall govern and control.

27.     The Successful Bidder (or any Lender who exercises a credit bid right and purchases its respective collateral) is purchasing Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full rights, benefits, privileges and protections of that provision.  The consideration provided by the Successful Bidder (or any Lender who exercises a credit bid right and purchases its respective collateral) for the Assets is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

28.     This Court retains jurisdiction, even after conversion of Debtors' chapter 11 cases to cases under chapter 7 (should such conversion occur), to: (i) interpret, implement and enforce the terms and provisions of this Order (including any injunctive relief provided in this Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (ii) protect the Successful Bidder and the Assets from and against any of the Claims and Encumbrances; (iii) resolve any disputes arising under or related to the APA or the Sale; (iv) adjudicate all issues concerning Claims and Encumbrances and any other interest(s) in and to Assets; and (v) adjudicate any and all issues and/or disputes relating to Debtors' right, title or interest in the Assets, the Motion and/or the APA.

29.     From and after the date hereof, the Debtors and the Successful Bidder shall act in accordance with the terms of the APA and execute and deliver all documents in connection therewith.

30.     This Order and the APA with the Successful Bidder shall be binding in all respects upon all creditors and equity holders (whether known or unknown) of the Debtors, all successors and assigns of the Successful Bidder, the Debtors and their affiliates, the Assets, and any subsequent trustees appointed in the Debtors' chapter 11 cases or chapter 7 cases or upon: (i) a conversion of the Debtors' chapter 11 cases to cases under chapter 7; or (ii) dismissal of the Debtors' bankruptcy cases.

31.     The Successful Bidder is not assuming any contracts or leases and for the avoidance of doubt shall further not be responsible for any obligations to pay any contractors or materialmen under any contracts for any labor, materials or otherwise with respect to any contracts related to any construction relating to Assets and Successful Bidders only purchasing the rights to any warranties related to the Assets and/or the completed construction.

32.     The provisions of this Order are non-severable and mutually dependent.

33.     This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.

34.     The automatic stay pursuant to section 362(a) of Bankruptcy Code is hereby modified, lifted, and annulled with respect to the Debtors and the Successful Bidder, to the extent necessary, without further order of this Court, to (a) allow the Successful Bidder to deliver any notice provided for in the APA, and (b) allow the Successful Bidder to take any and all actions permitted under the APA or this Order.

35. This Court shall retain jurisdiction to interpret, implement and enforce the terms and provisions of this Order, the APA, all amendments thereto, and any waivers and consents thereunder, and each other document or agreement executed in connection therewith.

###

**Submitted by:**
Jessey Krehl, Esq.
Counsel for the Debtors and Debtors-in-Possession
Pack Law, P.A.
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Tel: 305-916-4500
Email: jessey@packlaw.com

**Exhibit 1 to Order**
**APA Between Debtors and Successful Bidder**

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of April 28, 2023 (the "Agreement"), between BANYAN CAY INVESTMENT, LLC, a Florida limited liability company ("BC Investment"), BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company ("BC Mezz"), BANYAN CAY DEV. LLC, a Delaware limited liability company ("BC Dev"), BANYAN CAY RESORT & GOLF, LLC, a Delaware limited liability company ("BCRG"), BANYAN CAY VILLAS, LLC, a Delaware limited liability company ("BC Villas"), BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company ("BC Maintenance" and together with BC Investment, BC Mezz, BC Dev, BCRG, and BC Villas, collectively, the "Sellers," and each, a "Seller"), each a debtor and debtor in possession in Case No. 23-12390 (EPK), Case No. 23-11281 (EPK), Case No. 23-12386 (EPK), Case No. 23-12387 (EPK), Case No. 23-12388 (EPK), and Case No. 23-12389 (EPK) (each, a "Chapter 11 Case," and together, the "Chapter 11 Cases"), pending in the United States Bankruptcy Court for the Southern District of Florida  (the "Bankruptcy Court") respectively, and  Westside Property Investment Company, Inc., a Colorado corporation, or an affiliate assignee ("Purchaser," and together with Sellers, the "Parties").

## RECITALS

**WHEREAS**, Sellers own various parcels of real estate and personal property assets, and holds various rights, in each case relating to operating a resort and golf development located in West Palm Beach, Florida;

**WHEREAS**, BC Investment owns a one hundred percent (100%) interest in BC Mezz;

**WHEREAS**, BC Mezz owns a one hundred percent (100%) interest in each of BC Dev, BCRG, and BC Villas;

**WHEREAS**, Purchaser desires to purchase certain assets of the Sellers, and to assume certain liabilities of the Sellers, and the Sellers desire to sell such assets to the Purchaser and to assign such liabilities to the Purchaser and have the Purchaser assume the same as described hereinafter and in the Schedules to this Agreement,[1] all on the terms and conditions set forth in this Agreement, the Bid Procedures Order and the Sale Order, and in accordance with sections 105, 363 and 365 of Title 11 of the United States Code (as in effect for the Chapter 11 Cases filed on the Petition Date, the "Bankruptcy Code") and other applicable provisions of the Bankruptcy Code (the "Acquisition");

**WHEREAS**, the Bankruptcy Court conducted hearings on April 17, 2023 and April 28, 2023, approving (i) the Debtors' entry into this Agreement, together with the amendments and restatements contained herein, (ii) the entry of the Bid Procedures Order (as defined herein); and (iii) the Financial Bid Protections set forth in Section 6.1(b) hereof.

**NOW THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, the Parties hereby agree as follows:

---

[1] Unless specifically defined when initially used in this Agreement, capitalized terms shall have the meaning ascribed to such terms in Article I of this Agreement.

# ARTICLE I
## DEFINITIONS

1.1    <u>Definitions</u>.  As used in this Agreement, the following terms have the following meanings:

"<u>Agreement</u>" shall mean this Asset Purchase Agreement, including the Schedules and Exhibits attached hereto.

"<u>Assets</u>" shall have the meaning set forth in Section 2.1 of this Agreement.

"<u>Administrative Claim</u>" shall mean any Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"<u>Affiliate</u>," when used with reference to another Person, means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"<u>Assignment and Assumption Agreement</u>" shall mean the agreement(s) to assume the Assumed Liabilities identified on **Schedule 7**.

"<u>Assumed Contracts</u>" shall mean those executory contracts, Option Agreements and leases being assumed by and assigned to Purchaser by any Sellers under the terms of this Agreement.  Subject to Section 6.2 of this Agreement, the contracts and leases being assumed and assigned shall be the contracts and leases identified on **Schedule 2** attached hereto and made a part hereof.  For the avoidance of doubt, "Assumed Contracts" shall not include any of those contracts or leases that are not identified on **Schedule 2** and/or any contracts or leases rejected by the Sellers pursuant to section 365 of the Bankruptcy Code.

"<u>Assumed Liabilities</u>" shall mean the liabilities and obligations set forth in Section 2.3 of this Agreement.

"<u>Assumed Permits</u>" means all Permits, Development Orders, plats, site plans, and zoning approvals relating to the Assets that are transferable in accordance with their terms or by operation of law, but excluding all Permits to the extent related to any Excluded Asset (including any contract or lease that is not an Assumed Contract).

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the above Recitals.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the above Recitals.

"<u>Bid Deadline</u>" shall have the meaning set forth in the Bid Procedures Order.

"<u>Bid Procedures Order</u>" shall mean the Order: (A) Approving Bid Procedures For the Sale of Some or All of the Debtors' Assets; (B) Approving Assumption Procedures For Certain Executory Contracts and Unexpired Leases; (C) Approving A Break-Up Fee, Expenses Reimbursement and Overbid Protections; and (D) Approving A Form of Notice Of Sale entered by the Bankruptcy Court, the form of which shall be reasonably acceptable to Purchaser.

"<u>Business Day</u>" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

2

"Casualty Loss" shall mean any loss, damage or destruction of the Assets that occurs during the period between the effective date of this Agreement and the Closing Date (or earlier termination of this Agreement) for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets for production of goods in the ordinary course of the Sellers' business.

"Chapter 11 Cases" shall have the meaning set forth in the above Recitals.

"Claim(s)" shall have the meaning set forth in the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code and shall include, among other things, any and all claims or orders arising under Environmental Laws and any and all claims or rights based on successor, tort and products liability.

"Closing" shall have the meaning set forth in Section 2.6 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 2.6 of this Agreement.

"Confidentiality Agreement" means that certain letter agreement, dated as of March 19, 2023, by and between Sellers and Westside Property Investment Company, Inc., regarding the terms and conditions on which Sellers would make available certain information.

"Consent" shall mean any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Control" shall mean, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Country Club Operations" means all material facilities, vendors, employees, contracts, equipment and systems involved with the operation of the existing golf course and clubhouse within the Premises as of the date of the execution of this Agreement.

"Cure Amounts" shall have the meaning set forth Section 6.2 of this Agreement.

"Cure Notice" shall have the meaning set forth Section 6.2 of this Agreement.

"Current Employees" means all employees of the Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Deposit" shall have the meaning set forth in Section 2.4(a) of this Agreement.

"DIP Borrowers" shall mean Sellers, as borrowers under the DIP Financing Agreement and debtors in possession.

"DIP Collateral" shall have the meaning set forth in the DIP Order.

"DIP Financing Agreement" shall mean any Debtor-in-Possession Credit Agreement, among DIP Lender, as lender, and DIP Borrowers, as borrowers and debtors in possession, as the same may have been or be amended, modified, restated, or supplemented and in effect from time to time, as approved by the Bankruptcy Court.

"DIP Financing Obligations" shall mean the "Obligations" as defined under the DIP Financing Agreement.

"DIP Lender" shall mean Purchaser or an affiliate of Purchaser, to the extent the same enters into the DIP Financing Agreement with DIP Borrowers.

"DIP Order" shall mean any interim and final order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, authorizing and approving the DIP Financing Agreement, in form and substance acceptable to the DIP Lender in its sole discretion, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time with the express consent of the DIP Lender, as to which no stay has been entered and which has not been reversed, vacated or overturned, and from which no appeal or motion to reconsider has been timely filed or, if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the DIP Lender waives such requirement in writing.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"End Date" shall mean July 31, 2023.

"Environmental Laws" shall mean all applicable laws, regulations or rules relating to pollution or protection of human health or the environment (including, without limitation, ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources (including without limitation applicable laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, or use of, or release or threatened release into the environment of, any Hazardous Substances.

"ERISA" shall mean the United States Employee Retirement Income Security Act of 1974.

"Escrow Account" shall have the meaning set forth in Section 2.4 of this Agreement.

"Excluded Assets" shall have the meaning set forth in Section 2.2 of this Agreement.

"Final Order" shall mean an order, judgment, or other decree of the Bankruptcy Court that has not been reversed, vacated or stayed and (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order, judgment or decree has been affirmed by the highest court to which such order, judgment or decree was appealed or certiorari has been denied, or

reargument or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Equipment" means tangible personal property (other than Inventory and Intellectual Property), which is used or held for use in the ordinary course of the Sellers' or its Affiliates' businesses.

"Governmental Entity" shall mean and include any agency, board, bureau, executive, court, commission, department, tribunal, instrumentality or administration of the United States or any State, and any local or other governmental body in a State, or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Governmental Permits" shall mean and include all licenses, permits, approvals, consents, certificates, waivers, variances, exemptions, orders and other authorizations or similar right issued, granted, given or otherwise obtained from or by any and all Governmental Entities.

"Hazardous Substance" means any substance or material defined in or governed by any Environmental Law as a dangerous, toxic or hazardous pollutant, contaminant, chemical, waste, material or substance, and also expressly includes ureaformaldehyde, polychlorinated biphenyls, dioxin, radon, asbestos, asbestos containing materials, nuclear fuel or waste, radioactive materials, explosives, carcinogens and petroleum products, including, but not limited to, crude oil or any fraction thereof, natural gas, natural gas liquids, gasoline and synthetic gas, or any other waste, material, substance, pollutant or contaminant which would subject the owner or operator of any assets transferred hereunder to any damages, penalties or liabilities under any applicable Environmental Laws, which, for the avoidance of doubt, includes any material or substance listed, defined, designated or classified as, or included in the definition of, "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants" or "pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law or any other substance regulated pursuant thereto, or the presence or release of, or exposure to which could reasonably be expected to form the basis for liability under any applicable Environmental Law, in each case because of its dangerous or deleterious properties or characteristics.

"Intellectual Property" shall mean all: (i) trademarks, service marks, trade names, trade dress, logos and corporate names and registrations and applications for registration, together with all of the goodwill associated therewith; (ii) Registered copyrights; (iii) computer software (other than general commercial software), data, databases and documentation thereof; (v) domain names and URLs; and (vi) Technology used by Sellers in the ordinary course of their businesses. The Intellectual Property of Sellers includes, but is not limited to, the Intellectual Property identified on **Schedule 3** attached hereto and made a part hereof.

"Inventory" means inventories of raw materials and supplies, manufactured, spare and purchased parts, goods in process and finished goods, in each case, that are used or held for use in the operation of the Sellers' or its Affiliates' businesses, whether or not prepaid and whether in transit to or from Sellers and whether in Sellers' warehouses, distributions facilities, stores, outlets, held by third parties or otherwise.

"Knowledge," or the phrase "to the best of Seller's knowledge" and similar phrases, means with respect to Sellers means none of the Sellers, the shareholders or directors, officers or managers of either of the Sellers has any actual conscious awareness of facts or other information that the

statement made is incorrect, and for this purpose, "implied knowledge" means all information in the books, records and files of Seller and all information that any of such persons should have known in the course of operating and managing the business and affairs of either of the Sellers.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or decree of any Governmental Entity.

"Liability" means any liability, indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured).

"Licenses and Permits" shall mean those Governmental Permits being assigned to Purchaser by Sellers.  The Governmental Permits being assigned shall be the Governmental Permits identified on **Schedule 4** attached hereto and made a part hereof.

"Liens" shall mean any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Authority or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that is materially adverse to the financial condition or results of operations of the Sellers' business (taken as a whole); *provided, however*, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, Equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the business relative to the adverse effect that such changes have on other companies in the industry in which the business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on business relative to the adverse effect that such changes have on other companies in the industry in which the business operates; (iii) any change in GAAP or Law; (iv) compliance with this Agreement or any agreement in

connection herewith, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any changes directly attributable to the announcement of this Agreement or any agreement in connection herewith; (vi) any act of God or other force majeure event (including natural disasters); (vii) in the case of Sellers or the business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; or (viii) seasonal changes in the results of operations.

"Premises" means the real property owned by Sellers including all mineral, air, and water rights, or easements to which Seller has rights, all as applicable, and described on **Schedule 1** attached hereto and made a part hereof. The Premises shall be transferred and conveyed to Purchaser at Closing pursuant to the terms of a Quitclaim Deed substantially in the form attached hereto as **Exhibit A**.

"Personal Property" means any and all personal property of any kind or nature owned by Sellers and its Affiliates, and includes Intellectual Property, inventory, all furniture, fixtures and equipment of Sellers and its Affiliates, vehicles of Sellers and its Affiliates, books and records of Sellers and its Affiliates, customer lists of Sellers and its Affiliates, corporate records and minutes of Sellers and its Affiliates, and the names of Sellers and its Affiliates and all assumed names. Personal Property includes, but is not limited to, the Personal Property identified on **Schedule 5** attached hereto and made a part hereof. The Personal Property (except for any Excluded Assets) shall be transferred and conveyed to Purchaser at Closing pursuant to the terms of Quitclaim Bills of Sales substantially in the form attached hereto as **Exhibit B**.

"Permitted Exceptions" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and procedures; (b)with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property; (c) the title exceptions listed on Schedule B-II of the title commitment issued to Purchaser by Old Republic National Title Insurance Company, effective March 28, 2023; and (d) matters on the Survey provided by Sellers to Purchaser.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" shall mean the day on which the Chapter 11 Cases commenced.

"Plan" shall mean a plan of reorganization proposed to the Bankruptcy Court.

"Priority Claim" shall mean a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Purchase Price" shall have the meaning set forth in Section 2.5 of this Agreement.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Release" shall mean any spilling, emitting, leaking, pumping, pouring, emptying, injecting, escaping, dumping, disposing, discharging, migrating or leaching into, onto or through the environment.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, Representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Motion" shall mean the motion or motions, in form and substance reasonably acceptable to Purchaser, filed and served by Sellers in the Chapter 11 Cases, among other things, to obtain entry of the Sale Order, approve the transactions contemplated by this Agreement, and authorize the assumption and assignment of the Assumed Contracts, Licenses and Permits, and the Intellectual Property to Purchaser in accordance with this Agreement.

"Sale Order" shall mean a Final Order acceptable to Purchaser entered by the Bankruptcy Court approving the sale of the Assets pursuant to this Agreement and under the applicable provisions of the Bankruptcy Code that, among other things, contains usual and customary findings of fact and conclusions of law by the Bankruptcy Court and, except to the extent otherwise agreed to in writing between the Purchaser and Sellers (each acting reasonably), (i) grants the Sale Motion; (ii) approves, authorizes and directs Sellers to enter into this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and consummate the transactions contemplated hereby; (iii) determines that this Agreement was proposed by Purchaser in good faith and represents the highest and best offer for the Assets and should be approved; (iv) determines that Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated; (v) authorizes and directs Sellers to sell the Assets to Purchaser pursuant to this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and all applicable provisions of the Bankruptcy Code, free and clear of all Liens, Claims and rights (including any and all "interests" in the Assets within the meaning of section 363(f) of the Bankruptcy Code) as provided in this Agreement, other than the Assumed Liabilities and the Permitted Exceptions; (vi) authorizes and directs Sellers to execute, deliver, perform under, consummate and implement this Agreement (or any amended version of such agreement agreed upon by the Parties in writing), together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (vii) authorizes the assignment and assumption of the Assumed Contracts and Intellectual Property in accordance with section 365 of the Bankruptcy Code and establishes the Cure Amounts with respect to same that are acceptable to Purchaser in its reasonable discretion; (viii) provides that Purchaser is not the successor to either Seller or the Sellers or their respective bankruptcy estates by reason of any theory of law or equity and that Purchaser has not assumed any liability or obligation of either of the Sellers or their respective bankruptcy estates, except as otherwise expressly provided in this Agreement; (ix) provides that the Assumed Contracts and Intellectual Property are transferred and assigned at Closing to Purchaser and that such Assumed Contracts and Intellectual Property will remain in full force and effect in accordance with their respective terms and notwithstanding any provisions in any such Assumed Contracts and Intellectual Property contracts that prohibit, restrict or condition such assignment or transfer; (x) provides that Purchaser has no obligation to pay any liabilities or obligations of Sellers of any kind, except as expressly provided in this Agreement; (xi) to the extent enforceable under applicable law, enjoins the holder of any Lien or interest in Sellers or any of the Assets from interfering with Purchaser's title or use and enjoyment of the Assets based upon or related to such lien or interest; (xii) provides for the Bankruptcy Court to obtain jurisdiction to enforce or implement the terms and provisions of this Agreement and the Sale Order; and (xiii) provides that, notwithstanding Bankruptcy

8

Rule 6004(h) and 6006(d), the Sale Order shall be effective and enforceable immediately upon its entry, shall be self-executing and shall authorize Sellers and Purchaser, in the absence of any stay pending appeal, to consummate the transactions contemplated by this Agreement.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other Persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Substantial Contribution" shall mean a Claim under sections 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Cases.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Internal Revenue Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale Equipment, inventory management Equipment, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Transfer Tax" shall have the meaning set forth in Section 5.6(b) of this Agreement.

"Transferred Employee" shall have the meaning set forth in Section 5.7(b) of this Agreement.

"Utility Deposit" means any and all utility deposits for electric, water and sewer, gas and similar items, if any, which can be assigned to Purchaser and shall be added to the Purchase Price at Closing if Purchaser is not the DIP Lender, to the extent requested by Purchaser.

**ARTICLE II**
**PURCHASE AND SALE OF ASSETS**

2.1     Purchase and Sale.  Excepting any and all Excluded Assets, upon the terms and subject to the conditions set forth in this Agreement, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the Closing Date, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase and assume from Sellers, all of Sellers' right, title and interest in and to all of the Sellers' properties, assets, and rights in and to the Premises, the Personal Property, the Assumed Contracts and the Licenses and Permits (collectively, the "Assets"), in each case free and clear of any encumbrances, Liens, Claims, rights, remedies or interests, existing as of the Closing except for the Permitted Exceptions and as specifically permitted herein, as approved for sale, transfer and assignment pursuant to the Sale Order.  **The Assets shall not include the Excluded Assets**.

2.2     Excluded Assets.  Notwithstanding anything else to the contrary set forth in this Agreement, the Assets shall not include, and Purchaser shall not buy or have any liability or obligation with respect to, any of the following (collectively, the "Excluded Assets"):

(a)     Sellers' cash, cash equivalents, accounts, accounts receivable, securities, credits, rights of reimbursement, set off rights, and rights of recoupment, including, without limitation, any reimbursement rights or other rights arising out of governmental programs; and/or any amounts due for the sale of tax credits.  For the avoidance of doubt, BC Investment's membership interest in BC Mezz and BC Mezz's membership interests in BC Dev, BCRG, and BC Villas are Excluded Assets;

(b)     Any and all causes of action of any Seller, whether known or unknown on the Closing Date, including without limitation, those arising under chapter 5 of the Bankruptcy Code; *provided however*, that notwithstanding anything to the contrary herein, any and all causes of action that could affect either materially or immaterially the operation of the Assets, the Assumed Liabilities, or the Assumed Contracts after the Closing Date shall be included in the definition of "Assets";

(c)     Except as set forth in section 9.1(b)(v) solely with respect to a Casualty Loss occurring after the entry of the Sale Order, any Seller's rights and interests under any insurance policies;

(d)     Except as identified as an Assumed Contract, any and all: (i) employment, consulting, advisory or service agreements, plans, commitments, arrangements or understandings; (ii) leases or consignment agreements and arrangements; (iii) employee benefit, deferred compensation and/or severance agreements, plans, commitments, arrangements or understandings including, without limitation, all stock option, stock purchase, bonus, incentive and similar agreements, plans, commitments, arrangements or understandings; (iv) collective bargaining agreements, commitments, arrangements or understandings with employees; and (v) agreements, obligations and liabilities with respect to or relating to any "pension plan" or "welfare plan" (as such terms are defined in ERISA);

(e)     Sellers' rights under this Agreement;

(f)     All contracts and leases to which a Seller is a party (and Sellers' related rights), in each case other than the Assumed Contracts assigned to and assumed by Purchaser;

10

(g)    Sellers' minute books, filed Tax Returns for the five year period prior to the Closing Date (provided that Purchaser shall have the right to copies of such Tax Returns and all documentation related to the preparation of the Tax Returns) books of account, and all books and records that a Seller is prohibited from disclosing or transferring to Purchaser under applicable Law; and

(h)    Any and all additional Excluded Assets identified on **Schedule 6** attached hereto and made a part hereof.

2.3    Assumption and Assignment of Liabilities.  Purchaser shall not assume any liabilities or obligations of any Seller, except for those specifically identified on **Schedule 7** attached hereto and made a part hereof (the "Assumed Liabilities") and the liabilities and obligations assumed in relation to the Assumed Contracts and the Licenses and Permits.

2.4    Deposit.

(a)    Within three (3) Business Days of execution of this Agreement, Purchaser shall deliver to an escrow agent that is mutually agreeable to each of the Purchaser and the Sellers (the "Escrow Agent") the sum of $3,063,000.00 (the "Deposit"), which shall be held by the Escrow Agent in escrow in an interest bearing account to be agreed upon by Purchaser and disbursed pursuant to the Terms of this Agreement, only and not otherwise subject to being part of Seller's estate.  If not funded within three (3) Business Days of execution, the Agreement may be terminated by Sellers.  The Deposit shall be allocated as between Sellers in the same manner as the Purchase Price is allocated.  The Deposit (and any interest accrued thereon) shall be credited (in addition to the credits described in Section 2.5(b)(i) of this Agreement) as a partial payment of the Purchase Price payable at the Closing.

(b)    In the event that: (i) the Parties terminate this Agreement pursuant to Section 9.1(a); (ii) Purchaser terminates this Agreement pursuant to section 5.12 or 9.1(b); or (iii) Sellers terminate this Agreement pursuant to Section 9.1(c)(i) or Section 9.1(c)(ii), then the Deposit (and any interest accrued thereon) shall be returned immediately and in full to Purchaser (plus those amounts described in Sections 6.1(b) and Sections 6.1(h) of this Agreement).

2.5    Purchase Consideration.

(a)    Purchase Price.  In consideration of the sale of the Assets to Purchaser, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Assets (the "Purchase Price") shall consist of:

(i)    Subject to adjustment and prorations as set forth in this Agreement, (i) $102,100,000.00 in cash payable by means of a completed federal funds wire transfer to an account or accounts designated by Sellers in writing not later than three (3) Business Days prior to the Closing Date the ("Cash Purchase Price"), less

(ii)    the Deposit;

(iii)    a credit bid pursuant to section 363(k) of the Bankruptcy Code of all the DIP Financing Obligations held by Purchaser, which may include any DIP Financing Obligations assigned to, and assumed by, the Purchaser by the DIP Lender, if a party other than the Purchaser holds DIP Financing Obligations at any relevant time; and

(iv) the assumption by Purchaser of any Assumed Liabilities, as set forth on **Schedule 7** hereof.

The Purchase Price shall be allocated as between Sellers as provided for on **Schedule 8** attached hereto and made a part hereof.  Except as otherwise specified herein, the term "Dollars" or "$" as used in this Agreement refers to United States Dollars.

(b) Adjustment to Purchase Price.

(i) Assumed Liabilities Adjustment.  The parties have set the Cash Purchase Price at $102,100,000.00 based upon an assumption that the amount of the Assumed Liabilities set forth on **Schedule 7**, shall be $0.00 (the "Assumed Liabilities Target"). In the event the aggregate amount of the Assumed Liabilities exceeds the Assumed Liabilities Target, the Purchase Price shall be adjusted down on a dollar-for-dollar basis by an amount equal to such excess, in accordance with Section 2.5(a)(iv) hereof. In the event the amount of the Assumed Liabilities is less than the Assumed Liabilities Target, the Purchase Price shall be adjusted upward on a dollar-for-dollar basis by an amount equal to such shortfall.  The Parties shall engage in best efforts to reconcile in advance of Closing any adjustment to the Purchase Price pursuant to this Section 2.5(b). Nevertheless, if the need for an adjustment to the Cash Purchase Price is discovered or otherwise determined after Closing, then the party owing a payment hereunder on the basis of such adjustment shall make such payment to the party entitled to receive such payment as soon as practicable following determination of the adjustment.

(ii) FF&E Package Adjustment.  Purchaser understands that the complete Furniture, Fixtures & Equipment ("FFE") package for the hotel property is currently in storage and is part of the Assets being acquired by Purchaser, but has been unable to verify the completeness and condition of the FFE package (i.e., whether the FFE package is sufficient to outfit all 150 hotel rooms). Purchaser is valuing the FFE at $30,000 per hotel room. To the extent that the FFE package is either not complete or in a condition that cannot be used, the Purchase Price shall be adjusted by the number of incomplete rooms multiplied by $30,000.

2.6 Closing.  The closing (the "Closing") shall occur on or within thirty (30) Business Days following the date upon which the Sale Order approving the sale of the Assets to Purchaser in accordance with this Agreement shall have become a Final Order or such earlier date as may be agreed to by the Parties.  Unless otherwise agreed by the Parties, the Closing shall take place remotely via the exchange of documents and signatures, and shall be effective as of 11:59 p.m. West Palm Beach, Florida, time on the date of Closing (the "Closing Date").

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Sellers each hereby represent and warrant to Purchaser as follows as of the date of this Agreement, conditioned upon and subject to the entry of the Sale Order:

3.1 Organization and Authority.  Sellers are each duly organized and validly existing under the laws of the jurisdiction of their organization and, subject to any required approval of the Bankruptcy Court, and any required approval of applicable Governmental Entities, each has the power and authority to own and lease the Assets, and to enter into the transactions contemplated by this Agreement.

3.2     Good Standing.  Each Seller is duly authorized to do business and is in good standing in each jurisdiction where the ownership or operation of the Assets or the conduct of the business as of the execution of this Agreement requires such qualification.

3.3     As Is/Where Is.  Purchaser shall acquire the Assets on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis, free and clear of any Liens, Claims, rights and interests, including any and all expenses and express and implied warranties of any kind or nature, in each case except as specifically provided in this Agreement and as approved for sale, transfer, and assignment pursuant to the Sale Order.  Except for the representations and warranties contained in this Agreement and as approved for sale, transfer, and assignment pursuant to the Sale Order, Sellers make no express or implied representation or warranty with respect to Sellers, the Assets or the transaction contemplated by this Agreement, and Sellers hereby disclaim any other representations or warranties, whether made by any Seller or any of its Representatives.

3.4     Authority and Binding Agreement.  This Agreement and those agreements executed in connection herewith have been duly authorized, executed and delivered by each of the Sellers and, subject to the approval of the Bankruptcy Court, are the valid and binding obligations of each of the Sellers.

3.5     Consents and Approvals.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be made or obtained by Sellers in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer each of Sellers' interest in any Assets, the title to which is governed by filing in the public records; and (c) the filing of such documents as may be necessary to reflect the release of any Liens that are a matter of public record.

3.6     Title to and Condition of Assets.  Sellers each have good, and upon entry of the Sale Order, marketable title to all of their respective Assets and may transfer each of the Assets free and clear of all liabilities, Liens (including tax liens), rights and interests of any kind whatsoever, all to the extent provided for by the terms of this Agreement and the Sale Order.

3.7     Compliance with Laws.  Sellers are in compliance with all material Laws applicable to the business or the Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect, and no Seller has received any written notice within the past twelve months relating to violations or alleged violations or material defaults under any decree or any Governmental Permit, in each case, with respect to the Sellers' business.

3.8     Title to Assets.  Sellers, as of the Closing, will have good, valid,  and upon entry of the Sale Order, marketable title to, or, in the case of leased assets, have good and valid leasehold interests in, the Assets, free and clear of all Liens and Claims (except for Permitted Exceptions).  At the Closing or such time as title is conveyed under this Agreement from Seller to Purchaser, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Assets, free and clear of all Liens and Claims (except for Permitted Exceptions), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

13

3.9    Contracts.

(a)    The Sellers have made available to Purchaser or its Representatives true and complete copies of each of the Assumed Contracts in the data room of Keen-Summit, the Sellers' marketing agent and broker, in each case as in effect on the effective date of this Agreement.

(b)    With respect to each such Assumed Contract, to Sellers' Knowledge, such Assumed Contract is in full force and effect and constitutes the valid and legally-binding obligation of a Seller and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

3.10    Intellectual Property.

(a)    The Sellers have provided to Purchaser a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller and used in or related to the Sellers' business, (ii) all material contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all such Registered Intellectual Property free and clear of all Liens and Claims (except for Permitted Exceptions), and, to Sellers' Knowledge, all such Registered Intellectual Property is valid, subsisting and enforceable, and is not subject to any outstanding decree adversely affecting Sellers' use thereof or rights thereto. Immediately after the Closing, Purchaser will own or have the right to, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, use all of the Intellectual Property included in the Assets on the same terms and conditions as in effect for Sellers immediately prior to the Closing, to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

(b)    To Sellers' Knowledge, none of the use of the Intellectual Property included in the Assets, the conduct of the business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person.  To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Assets.

(c)    To Seller's Knowledge, no Litigation is currently pending or threatened against any Seller that challenges the validity, ownership, registrability, enforceability, infringement or use of any material Intellectual Property owned by any Seller.

3.11    Master Declaration.  The Sellers have provided to Purchaser all declarations of covenants, conditions, restrictions (or similarly named instruments) that affects all or any portion of the Premises, and Assignment of Declarant's Rights.

3.12    Employees and Employment Matters. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement), and within the ninety (90) day period ending on the date hereof, and no Seller has implemented any plant closing or layoff of the Current Employees (as determined as of the date of this Agreement) in violation of the United States Worker Adjustment and Retraining Notification Act, or any similar applicable Law (collectively, the "WARN Act"). Within five (5) days after the date hereof, Sellers shall make available to Purchaser a list of all

14

Current Employees with personally identifying information redacted to the extent required by applicable Law.

3.13    Litigation.  Other than those certain matters disclosed in the Sellers' Statements of Financial Affairs [Docket No. 75, Part 3 Annex, in Case No. 23-12386] (the "Disclosed Actions"), there is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Entity pending, or, to the knowledge of Seller, threatened against Seller that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Seller's Knowledge, there are no circumstances or facts, including for the avoidance of doubt the circumstances and facts alleged in the Disclosed Actions, that would prevent Seller from engaging in the transactions contemplated in this Agreement.

3.14    Assumed Permits.  The Sellers have provided to Purchaser, to the best of Sellers' Knowledge, a list of all material Licenses and Permits that Sellers hold as of the date hereof in connection with the operations of the Sellers' business, including the assigned Licenses and Permits, any thereof to be an Excluded Asset, and other governmental and land development approvals required for the operation and development of the Premises and/or Assets.

3.15    Insurance. The Sellers have made available to Purchaser a list, as of the date hereof, of all material insurance policies.

3.16    Country Club Operations.  All Country Club Operations will continue to operate in their current manner through the date of Closing without interruption or modification, to the extent within the control of Sellers, unless specifically requested by Purchaser.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to each of Sellers as follows:

4.1    Organization and Authority.  Purchaser is duly organized and validly existing under the laws of the jurisdiction of its organization and has the power and authority and all necessary approvals of all Governmental Entities to enter into the transactions contemplated by this Agreement.

4.2    Authority and Binding Agreement.  This Agreement has been duly authorized, executed and delivered by Purchaser and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Purchaser.

4.3    Consents and Approvals.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer each of Sellers' interests in any Assets, the title to which is governed by filing in the public records; (c) consents and approvals necessary to transfer the Licenses and Permits being transferred to Purchaser hereunder; (d) any necessary approval, authorization or exemption by any Governmental Entity with jurisdiction over and the right to approve the sale; and (e) consents, approvals, authorizations, declarations, filings or registrations which, if not obtained, individually or in the aggregate, would not have a material adverse effect on the transactions contemplated in this Agreement.

15

4.4     Litigation.  There is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Entity pending, or, to the knowledge of Purchaser, threatened against Purchaser that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Purchaser's Knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement.

4.5     Good Faith Purchaser.  Purchaser is a "good faith" purchaser, as such term as such term is used in the Bankruptcy Code and the court decisions thereunder.  Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Assets and has negotiated and entered into this Agreement in good faith and without collusion or fraud of any kind.

4.6     WHERE-IS/AS-IS.  Except as otherwise expressly stated in this Agreement, Purchaser and any designee agree to accept the Assets in a "**WHERE-IS, AS-IS**" condition as of the Closing Date free and clear of any Liens, Claims, rights and interests, except as specifically permitted in this Agreement and all to the extent provided by the terms of the Sale Order.  Without limitation of the foregoing, Purchaser acknowledges, represents and warrants to Sellers that Purchaser has not been induced to execute this Agreement by any act, statement or representation of Sellers or their agents, employees or other Representatives not expressly set forth in this Agreement.  In addition, Purchaser acknowledges that Purchaser has not executed or authorized the execution of this Agreement in reliance upon any promise, representation or warranty not expressly set forth in this Agreement and that it will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement.

4.7     Adequate Assurances Regarding Executory Contracts.  Purchaser as of the Closing Date will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

4.8     Financing.  At the Closing, Purchaser shall have sufficient and immediately available funds to pay the Purchase Price and all other amounts payable pursuant to this Agreement, the other agreements contemplated herein, and the transactions contemplated herein and thereby.  Upon the consummation of the transactions contemplated herein, Purchaser shall not be insolvent, be left with unreasonably small capital, or have incurred debts beyond its ability to pay such debts as they mature.

4.9     Improvements Escrow.  Purchaser acknowledges and agrees that it shall enter into an agreement between and among itself, Banyan Cay Estates, LLC ("BC Estates"), and the Sellers, as applicable, the terms of which shall contain and substantially conform to the following, subject only to final documentation:

(a)     At the simultaneous Closing of the transactions set forth in this Agreement and those certain transactions set forth in that certain *Agreement for Purchase and Sale of Real Property* (together with the supplements, revisions, and amendments thereto, attached as Exhibit A and Exhibit B to Docket No. 97 in Case No. 23-12386, the "Estate Lots Agreement"), Purchaser shall escrow $2,700,000 in immediately available funds (the "Improvements Escrow Funds") for the sole purpose of the completion of the improvements set forth in Schedule A to the Twentieth Amendment to the Estate Lots Agreement (collectively, the "Improvements"), subject to a mutually acceptable escrow agreement.

(b)     BC Estates may elect to construct the Improvements within 30 days after the Closing.  In the event BC Estates does not so elect, then Purchaser may elect to construct the

16

Improvements. The electing party may be referred to herein as the "Constructing Party."

(c)    The Constructing Party may, no more frequently than monthly, submit invoices to the escrow agent and other party for approval and disbursement from escrow agent of Improvements Escrow Funds for the payment of the costs of completion of the Improvements, accompanied by certification of the percentage of completion of the Improvements from the project engineer in accordance with approved plans and customary lien waivers from all contractors and material providers.

(d)    In the event the Constructing Party fails to complete the Improvements in accordance with a mutually acceptable construction schedule, the other party may elect to complete the Improvements and submit invoices for the costs to so complete the Improvements in accordance with the terms set forth above.

(e)    Any costs incurred by the Constructing Party to complete the Improvements in excess of the Improvements Escrow Funds shall be the sole obligation of the Constructing Party.

## ARTICLE V
## COVENANTS PRIOR TO AND IN FURTHERANCE OF CLOSING

5.1    Affirmative and Negative Covenants Pending Closing. Except as expressly set forth below, during the period from the date hereof to the Closing Date (or earlier valid termination of this Agreement), the Parties expressly agree (except as otherwise expressly stated to apply to a different period):

(a)    Certain Efforts; Cooperation.

(i)    Subject to Sections 5.8 and 6.4 of this Agreement, each of the Parties shall use commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement on or prior to the End Date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby), except as otherwise provided in Section 5.2. Without limiting the generality of the foregoing, but subject to Section 5.8 with respect to Topping Bids and Section 6.4 of this Agreement, each of the Parties shall use its commercially reasonable efforts not to take any action, or permit any of its Affiliates or Representatives to take any action, to diminish the ability of any other Party to consummate, or delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result directly or indirectly in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby.

(ii)    On and after the Closing, Sellers and Purchaser shall use their commercially reasonable efforts to take, or cause to be taken by themselves or any of their respective Affiliates and/or Representatives, all appropriate action, to do or cause to be done by Sellers and Purchaser or any of their respective Affiliates all things reasonably necessary, reasonably proper or reasonably advisable under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in Purchaser all of Sellers' right, title and interest to the Assets, free and clear of any encumbrances, Liens, Claims, rights, remedies or interests, existing

17

as of the Closing except for the Permitted Exceptions and as specifically permitted herein and by the Sale Order.

(iii)     This Section 5.1(a) of this Agreement shall survive the closing of the transactions contemplated by this Agreement.

5.2     <u>Notice, Consents and Further Actions</u>.

(a)     To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party consents or sublicenses.  To the extent that any Intellectual Property licenses held by a Seller cannot be assigned to Purchaser hereunder without obtaining the consent of the licensor or grantor thereof (provided such licensor or grantor is not an Affiliate of Sellers), such consent to assignment shall not be deemed a condition of Closing hereunder and the inability of the applicable Seller to obtain such consent to assignment following exercise of its commercially reasonable efforts to obtain the same shall not constitute a breach of this Agreement.

(b)     Sellers and Purchaser shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the transactions contemplated hereby and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

(c)     Subject to the terms and conditions set forth in this Agreement and applicable Law, Purchaser and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the transactions contemplated by this Agreement, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers or Purchaser and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and to consider incorporation of the other Party's reasonable comments.

5.3     <u>Asset Maintenance</u>.  From the date hereof until the Closing (or earlier termination of this Agreement), the Sellers shall maintain the Assets owned or operated by each of the Sellers consistent with Sellers' standard practice, subject only to ordinary wear and tear and in consultation with the Purchaser.

5.4     <u>Notice of Developments</u>.  From the date hereof until the Closing Date, Sellers (with respect to each, as to itself), as the case may be, shall promptly disclose to Purchaser, on the one hand, and Purchaser shall promptly disclose to Sellers, on the other hand, in writing after attaining knowledge (as applicable to each of Sellers and Purchaser) of any material failure of any of Sellers or Purchaser to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; *provided*, *however*, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement.

5.5     Access.

(a)     Upon reasonable advance written request by Purchaser, Sellers shall permit Purchaser and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, records and contracts related to the Sellers' business, in each case, for the sole purpose of evaluating the Sellers' business; *provided, however*, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

(b)     All information obtained pursuant to this Section 5.5 shall be subject to the terms and conditions of the Confidentiality Agreement.

5.6     Tax Cooperation and Exchange of Information.

(a)     Information Access. Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Sellers and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Assets or the Sellers' business as it relates to the Assets.

(b)     Allocation of Taxes. Within thirty (30) calendar days after the Closing Date, Purchaser shall in good faith, to the extent necessary, prepare an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate), which allocation shall be binding upon Sellers and Purchaser unless Sellers notify Purchaser in writing within thirty (30) calendar days after their receipt of Purchaser's allocation that Sellers object to one or more items reflected in Purchaser's allocation. In the event of any such objection, Sellers and Purchaser shall negotiate in good faith to resolve such dispute. To the extent necessary, Purchaser and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the allocation established in accordance with this section. Neither Purchaser nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation established in accordance with this section unless required to do so by applicable Law.  In the event that, notwithstanding the provisions of section 1146(a) of the Bankruptcy Code or for any other reason, any sales, use, transfer, documentary and all other non-income taxes, or any fees incurred in connection with the purchase and sale of the Assets (the "Transfer Taxes") are assessed at Closing or at any time thereafter on the transfer of any Assets, then in each instance such taxes or charges incurred as a result of the transactions contemplated hereby shall be paid by Seller.  Purchaser and Sellers shall engage in best efforts to provide each other with any appropriate resale exemption certifications and other similar documentation.

(c)     Real Estate Taxes. All Real Estate Taxes for a Tax period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing Date (with respect to any such Tax period, the "Post-Closing Tax Period"). Sellers

19

shall be liable for the proportionate amount of such Real Estate Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Real Estate Taxes that is attributable to the Post-Closing Tax Period using the maximum allowable discount, if available. If Closing takes place prior to issuance of the real estate tax notice for the year of Closing, then the Real Estate Taxes shall be prorated as described herein based on the Real Estate Tax from the immediately preceding year. There shall not be any re-proration of Real Estate Taxes, after Closing.

       5.7    Employee Matters.

       (a)    Sellers shall provide to Purchaser within twenty-one (21) days after execution of this Agreement a list of all the Current Employees with all personally identifying information redacted to the extent required by applicable Law, and Purchaser shall provide to Sellers at least ten (10) days before the Closing Date a list of those Current Employees that Purchaser wishes to hire effective as of the Closing Date (such list, the "Retainee List"). Purchaser may amend or supplement the Retainee List from time to time prior to the Closing Date. Purchaser acknowledges and agrees that Sellers retain the right to terminate or otherwise alter the terms of employment of all employees prior to Closing other than those whose names are listed on the Retainee List.

       (b)    For purposes of this Agreement, a Current Employee who is hired by Purchaser on or after the Closing Date shall be referred to as a "Transferred Employee." It is the intention of Purchaser, and Sellers hereby acknowledge and agree with such position, that the Transferred Employees will be new employees of Purchaser, and all such Transferred Employees shall be entitled only to such compensation and employee benefits as are agreed to by such employees and Purchaser or as are otherwise provided by Purchaser, in its sole discretion, except with respect to Assumed Liabilities.

       (c)    Except with respect to the Assumed Liabilities, Sellers shall retain the responsibility for all liabilities and obligations relating to compensation earned by a Current Employee on or before the Closing Date, including without limitation all "bonuses" and similar compensation arrangements with Current Employees.

       (d)    No provision of this Section 5.7 shall create any rights in any individual who is not a Party hereto, including any employee or former employee (including any beneficiary or dependent thereof) of a Seller except with respect to Assumed Liabilities. Further, this Section 5.7 shall not in itself create any right to continued employment or service (or resumed employment or service) with Sellers or Purchaser or its Affiliates with respect to any employee, independent contractor or consultant, and except as provided herein, no provision of this Section 5.7 shall create any rights in any Person with respect to any benefits that may be provided, directly or indirectly, under any plan or arrangement established by a Seller or any of its Affiliates or any plan or arrangement that may be established by Purchaser or any of its Affiliates.

       5.8    Return of Deposit. This Agreement is subject to other offers presented to Sellers solely in accordance with the Bid Procedures Order. In the event that the Bankruptcy Court, in accordance with the Bid Procedures Order, determines that an offer or offers submitted pursuant to the Bid Procedures Order is higher and better than the terms set forth in this Agreement, or is superior to this Agreement and approves such offer or offers ("Topping Bid") in lieu of this Agreement, then Sellers shall return the Deposit (and any interest accrued thereon) to Purchaser in accordance with Section 2.4(b) of this Agreement, and Purchaser may in its sole discretion agree to serve as the back-up bidder.

5.9    Public Announcement.  The Parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or other public statements with respect to this Agreement or the transactions contemplated hereby.  Except as may be required by applicable Law or the Bankruptcy Court, the Parties shall not cause or permit the issuance of any such release or any such public statement without the consent of all of the Parties hereto, which consent shall not be unreasonably withheld or delayed.

5.10    Bulk Transfer Laws. Purchaser acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Assets shall be free and clear of any Liens, Claims, or interests in the Assets, including any Liens, Claims, or interests arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

5.11    Suppliers.  Sellers shall, following the request thereof by Purchaser, seek and use their respective commercially reasonable efforts to arrange meetings and telephone conferences with material suppliers of Sellers as may be reasonably requested by Purchaser and necessary and appropriate for Purchaser to coordinate transition of such suppliers following the Closing. For the avoidance of doubt, Purchaser shall be permitted to contact any customers, suppliers or licensors pertaining to Seller's operation of the Assets in connection with or pertaining to any matter; *provided, however*, that during the period from the date hereof until the Closing, (i) Purchaser shall give prior notice to Sellers, and (ii) Sellers shall be permitted, but shall not be obligated, to attend and participate in any meeting or telephone conference with such customers, suppliers or licensors to the extent reasonably requested.

5.12    Title Insurance.  Seller shall deliver to Purchaser within two (2) business days of this Agreement, a copy of the existing title policy for the Premises together with copies of all title exceptions referenced therein. Purchaser shall, within ten (10) business days and at the expense of Purchaser and Seller in equal shares, have a title commitment ("Title Commitment") prepared by Saul Ewing ("Title Agent") as Agent for Old Republic Title Insurance Company ("Title Underwriter") insuring the Premises in the amount of the Purchase Price allocated to the Premises. If the Title Commitment includes any exceptions other than the Permitted Exceptions, the Purchaser shall have the option to either (i) terminate the Agreement and receive the return of the Deposit including interest earned therein, or (ii) proceed to Closing pursuant to the terms of this Agreement. Purchaser shall notify Seller of any title objections within five (5) business days of receipt of the Title Commitment.  The cost of any policy issued pursuant to the Title Commitment shall be at the expense of Purchaser and Seller in equal shares.

5.13    CDD Disclosure.  Purchaser acknowledges and agrees that the Assets are subject to the Banyan Cay Community Development District ("CDD") formed pursuant to Chapter 190, Florida Statutes to provide a variety of improvements and services for the Assets and that the Assets are subject to the CDD.  Purchaser specifically acknowledges that CDD assessments ("CDD Assessments") have been and/or may be levied and certified for collection against the Assets, including for repayment of special assessment bonds and for annual maintenance assessments due to the CDD, which may vary from year to year.  Within five (5) days of the effective date of this Agreement, or such later date that is mutually agreeable to the Parties, the Sellers shall provide to Purchaser a list of (i) the amount of bonds that have been issued, (ii) the amount of CDD Assessments that have been levied and certified for collection against the Assets, and (iii) the amount in which Sellers have the right to receive a cost or other reimbursement from the CDD ("Seller CDD Reimbursement").  The Assets shall include the

21

Seller CDD Reimbursement.

5.14    CDD Operations/CDD Closing Obligations.

(a)    Within three (3) business days from the effective date of this Agreement, Sellers shall provide copies of the following to Purchaser: (i) CDD budgets, (ii) CDD meeting minutes and CDD resolutions, (iii) contracts and other agreements reasonably requested by Purchaser.

(b)    At Closing, Sellers shall assign their rights to and obligations under the Seller CDD Reimbursement to Purchaser in a manner reasonably acceptable to Purchaser ("CDD Reimbursement Assignment") and obtain and deliver to Purchaser CDD consent to the CDD Reimbursement Assignment in a manner reasonably acceptable to Purchaser, along with and any other consents required under Chapter 190, Florida Statutes, if any ("CDD Consents").

(c)    In the event Sellers are unable to obtain and deliver the CDD Consents to the CDD Reimbursement as set forth above, then Purchaser shall have the right to terminate this Agreement and shall receive a refund of the Deposit and the Parties shall have no further rights or obligations under the Agreement.

(d)    On or before Closing, and as a condition precedent thereto, Sellers shall procure and deliver to Purchaser the following pursuant to Chapter 190, Florida Statutes: (i) resignations of the current Board of Supervisors of the CDD, and (ii) proof of appointment of a Board of Supervisors designated by Purchaser.  Additionally, Sellers shall engage in commercially reasonable best efforts to procure a legal opinion letter from CDD counsel that such resignation, designation and appointment of the new Board of Supervisors is in compliance with Chapter 190, Florida Statutes and does not violate or cause a default under Florida law or the obligations of the CDD, including without limitation, any such bonds issued by the CDD, and deliver such legal opinion letter to Purchaser on or before Closing.

5.15    L2 Lots Acquisition Right.  In the event that BC Estates, as purchaser under the Estate Lots Agreement, fails to acquire the L2 Lots (as defined in the Estate Lots Agreement) for any reason, Sellers shall provide notice to Purchaser of such failure to acquire the L2 Lots after the Closing, and Purchaser shall have the right, by providing written notice thereof to Sellers (the "Election Notice") no later than thirty (30) days after receipt of notice from Sellers of such failed acquisition, to acquire the L2 Lots for the same Purchase Price (as defined in the Estate Lots Agreement) and on the same terms and conditions contained in the Estate Lots Agreement, *mutatis mutandis*.

## ARTICLE VI
## BID AND AUCTION PROCESS

6.1    Bankruptcy Court Actions.

(a)    Filing of Stalking Horse Motion.  Sellers shall file within three (3) Business Days after the execution date of this Agreement with the Bankruptcy Court and prosecute in good faith, the Sale Motion and all such necessary motions or applications seeking approval of this Agreement, subject to higher and better offers (the "Bid Procedures Motion"), in accordance with the terms of this Agreement and the Bid Procedures Order (the "Bid Procedures"), which Bid Procedures shall be incorporated into the Bid Procedures Order.  Sellers shall use good faith diligent efforts to effectuate the entry of the Sale Order as soon as reasonably practicable under the circumstances.

22

(b)　Financial Bid Protections.　The Bid Procedures shall provide for, *inter alia*: (i) a break-up fee of $2,250,000 to be paid to Purchaser in the event of and upon the closing of a sale of the Assets to any other bidder, which break-up fee shall be paid from the sale proceeds as a cost of closing; (ii) an expense reimbursement of up to $400,000, limited to actual legal fees and actual costs incurred in connection with this Agreement, to be paid to Purchaser in the event of and upon the closing of a sale of the Assets to any other bidder, which expense reimbursement shall be paid from the sale proceeds as a cost of closing; (iii) "credit" bidding protections for such bidding protections in the case in which Purchaser participates in an auction, in addition to Purchaser's credit bidding rights under Section 2.5 of this Agreement; and (iv) a requirement that any competing bid must be at least $3,250,000 greater than the Purchase Price under this Agreement.

(c)　Compliance.　Each of the Parties shall comply (or obtain an order from a competent court waiving compliance) with all applicable laws, rules and regulations, including, without limitation, requirements under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules of procedure of the Bankruptcy Court.

(d)　Notice.　The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.

(e)　Appeals of Orders.　If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use their reasonable best efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(f)　Administrative and Priority Claims.　Notwithstanding anything expressed or implied herein to the contrary, Sellers shall not consent or agree to the allowance or re-classification of any Claim as an Administrative Claim or a Priority Claim without the prior written consent of Purchaser.

(g)　New Leases and Agreements.　Sellers shall not, without the prior written consent of Purchaser (which shall not be unreasonably withheld), enter into any new leases and/or other agreements, except in the ordinary course of business.

(h)　Substantial Contribution by Purchaser.　Because Purchaser has requested a "work fee," and Sellers could not provide such fee, Sellers acknowledge that the efforts expended by Purchaser have added substantial value to the Sellers, and shall not oppose the Purchaser's filing, and seeking allowance of, a Substantial Contribution Claim if the Purchaser is not selected as the "stalking horse bidder" and is not granted the bid protections described in Section 6.1 of this Agreement pursuant to the Bid Procedures Order.　In no event shall such a Substantial Contribution Claim exceed the amount of allowable expenses for legal fees and hard expenses capped under the Bid Procedures pursuant to Section 6.1(b).

6.2　Contract Assumption and Cure.

(a)　Cure Notice.　On or before the day that is five (5) Business Days after entry of the Bid Procedures Order, Sellers shall serve a cure notice (the "Cure Notice") by first class mail on all

non-debtor counterparties to all potentially Assumed Contracts and provide a copy of the same to Purchaser. The Cure Notice shall inform each recipient that its respective contract or lease may be designated by Purchaser as either assumed or rejected, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the contract or lease, (ii) the name of the contract or lease counterparty, (iii) Sellers' good faith estimates of the Cure Amounts required in connection with such contract or lease (the "Cure Amounts"), (iv) the identity of Purchaser and (v) the deadline by which any such contract or lease counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto.

(b)     Closing Assumed Contract List.  Purchaser shall, prior to the hearing on the Sale Motion, identify the contracts and leases that Purchaser has decided will be Assumed Contracts to be assumed and assigned to Purchaser on the Closing Date by providing a list thereof to Sellers (as updated in accordance with this Agreement, the "Closing Assumed Contract List").  Up to one (1) Business Day prior to the Closing Date, Purchaser may, in its sole discretion, add or remove any contract or lease as an Assumed Contract to be assumed and assigned to Purchaser on the Closing Date by amending the Closing Assumed Contract List, and, in connection with the Closing, the applicable Seller shall move in the Bankruptcy Court to assign any such contract or lease on the Closing Assumed Contract List to Purchaser, and at the Closing shall assume and assign to, and Purchaser shall accept the assignment of and assume such contract or lease. In advance of the Closing Date, Purchaser may, in its sole discretion, designate a contract or lease for exclusion and rejection by delivering written notice to Sellers and, in connection with the Closing, the applicable Seller shall move to reject any such contract or lease as of the Closing Date (which date shall constitute the Rejection Effective Date with respect thereto).

(c)     From and after the Closing Date with respect to any contract or lease that was neither included on the Closing Assumed Contract List nor excluded and rejected as of the Closing Date, and is then in effect, Purchaser may, in its sole discretion, designate such contract or lease as an Assumed Contract by providing written notice to Sellers, specifying the contracts or leases to be assumed by Sellers and assigned to Purchaser by providing written notice to Sellers.  Upon delivery of a notification by Purchaser with respect to any contract or lease under Section 6.2 of this Agreement, the applicable Seller shall move in the Bankruptcy Court within 5 days of receipt of such notice to assign such contract or lease to Purchaser and shall assume and assign to, and Purchaser shall accept the assignment of and assume such contract or lease. The foregoing provisions of this Section 6.2(c) are subject to the right of the Sellers at any time from and after the Closing Date, with respect to any contract or lease that was neither included on the Closing Assumed Contract List nor excluded and rejected as of the Closing Date, as then in effect, to provide the Purchaser written notice of the appliable Seller's intent to exclude and reject a given such contract (a "Post-Closing Rejection Notice"). If the Purchaser does not object to a Post-Closing Rejection Notice in writing delivered to the applicable Seller within ten (10) Business Days of the applicable Seller's delivery of the Post-Closing Rejection Notice to the Purchaser, the Purchaser's rights under this Section 6.2(c) to designate the contract(s) or lease(s) described in such Post-Closing Rejection Notice as Assumed Contracts shall automatically terminate and the applicable Seller may make a motion to reject the subject contract(s) or lease(s) at any time thereafter.  For the avoidance of doubt, any Cure Amount paid or payable by the Purchaser with respect to any contract or lease designated as an Assumed Contract following the Closing Date pursuant to this Section 6.2(c) shall be for the Purchaser's sole account, and notwithstanding any other provision of this Agreement, shall not give rise to any Purchase Price adjustment.

24

6.3    Compliance with Bid Procedures; Maintenance of Confidentiality.

(a)    The Parties shall comply with the Bid Procedures established or approved by the Bankruptcy Court.

(b)    A Party shall not release any Person from, or waive any provisions of, any confidentiality agreement entered into in accordance with the Bid Procedures, without the other Party's prior written consent.

6.4    Intentionally Omitted.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

7.1    Conditions to Sellers' Obligation to Close.  Each of Sellers' obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Sellers, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)    Representations and Warranties; Covenants.

(i)    All representations and warranties of Purchaser contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which shall have been true and correct as of such date), and Sellers shall have received a certificate, dated as of the Closing Date and signed by an authorized Representative of Purchaser, to that effect.

(ii)    Purchaser shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date, and each of Sellers shall have received a certificate, dated as of the Closing Date and signed by an authorized Representative of Purchaser, to that effect.

(b)    No Injunction.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

(c)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order.

(d)    Purchaser's Deliveries.  Purchaser shall have paid the Purchase Price and shall have duly executed and delivered to each of the Sellers each of the documents, instruments and agreements required to be delivered pursuant to Section 7.3(b) of this Agreement.

(e)    Governmental Permits.  All Governmental Permits, authorizations and/or exemptions required to be obtained in connection with the consummation of the transactions contemplated by this Agreement shall have been obtained and be in full force and effect.

(f)    No exceptions to title, other than Permitted Exceptions exist as of the date of Closing.

25

7.2    <u>Conditions to Purchaser's Obligation to Close</u>.  Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)    <u>Representations and Warranties; Covenants</u>.

(i)    All representations and warranties of each of the Sellers contained in this Agreement and any related transaction documents shall have, to the applicable Seller's Knowledge been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties in this Agreement that, by their terms, apply only as of an earlier date, which will be true and correct as of such date and except that Sellers may, if they become aware before Closing that additional disclosures are required in order to make any of Sellers' representations and warranties in this Agreement true and correct, disclose information to Purchaser as is necessary to make those representations and warranties true and correct, and in that case any then-existing breach of Seller's representations and warranties will be cured to the extent of the additional information disclosed, and, if Sellers disclose a Material Adverse Effect (but not otherwise), Purchaser will have the option to either terminate this Agreement or to waive the matter and proceed to Closing without any adjustment to the Purchase Price), and each of the Sellers shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized Representative of each of the Sellers, to that effect.

(ii)    Each of the Sellers shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by each of the Sellers prior to or at the Closing Date, and each of the Sellers shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized Representative of each Seller, to that effect.

(b)    <u>Sellers' Deliveries</u>.  Each of the Sellers shall have duly executed and delivered to Purchaser each of the documents, instruments and agreements required to be delivered by each of the Sellers pursuant to Section 7.3(a) of this Agreement.

(c)    <u>Material Adverse Effect</u>.  From the date of this Agreement until the Closing Date, there shall not have occurred and be continuing a Material Adverse Effect.

(d)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order (with respect to the Assets) in form and substance reasonably satisfactory to Purchaser, and such order shall have become a Final Order.

(e)    <u>No Injunction or Challenge</u>.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.  No law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Entity or any other Person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or decree) which would prevent the consummation at the Closing of, or restrain or invalidate, the transactions contemplated by this Agreement.

(f)    All Consents and Approvals described in Section 3.5 herein have been issued and delivered to Purchaser.

7.3     Deliveries at Closing.

(a)     Deliveries by Sellers.  At the Closing, Sellers (as applicable) shall deliver or cause the delivery of the following to Purchaser:

(i)     a certified copy of the Sale Order;

(ii)     Separate Bills of Sale and Assignment without warranty or other covenants, duly executed by each Seller, in a form reasonably satisfactory to Purchaser and quitclaim deed(s) in relation to the Premises;

(iii)     the Intellectual Property Assumption and Assignment Agreements;

(iv)     the Assignment and Assumption Agreement(s);

(v)     all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Sellers at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably requested by Purchaser to deliver the Assets free and clear of any Liens, Claims, rights or interests, each in form and substance reasonably satisfactory to Purchaser and Sellers;

(vi)     any applicable local, state or federal transfer tax forms;

(vii)     Documents reasonably required by the Title Agent or Title Underwriter;

(viii)     Assignment of all contract warranties still in effect; and

(ix)     Pro Forma Title Policy from title underwriter in form satisfactory to Purchaser.

(b)     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause the delivery of the following to each of the Sellers:

(i)     the Purchase Price (as allocated between the Sellers), in cash by means of a completed federal funds wire transfer to an account or accounts designated by Sellers in writing not later than three (3) Business Days prior to the Closing Date; and

(ii)     all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Purchaser or its designee at or prior to the Closing Date pursuant to this Agreement, each in the form specified by this Agreement, or if the form is not specified by this Agreement, in form and substance reasonably satisfactory to Purchaser and each of the Sellers.

7.4     Possession.  On the Closing Date, possession of the Assets shall be delivered to Purchaser with possession meaning providing access to Purchaser to the Premises and such possession shall not be interfered with by any party or entity that has not asserted or had adjudicated in its favor a right to access.

7.5     Closing Costs.  Buyer shall pay any applicable recording fees and Transfer Taxes in accordance with Section 5.6 hereof unless otherwise provided by the Sale Order.  Other costs associated

with the Closing and transactions contemplated under the Agreement shall be allocated as provided elsewhere in this Agreement. Sellers shall request that the Bankruptcy Court waive all transfer, stamp and other Transfer Taxes due and owing as result of transfer of Assets from Sellers to Purchaser. Purchaser agrees to be bound by the Bankruptcy Court's ruling on this request.

## ARTICLE VIII
## RESERVED

8.1     RESERVED.

## ARTICLE IX
## TERMINATION

9.1     <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby may be abandoned, and there shall thereafter be no liability of any Party to the other Party hereunder, as follows:

(a)     <u>Mutual Consent</u>. Upon the mutual written consent of Sellers and Purchaser.

(b)     <u>By Purchaser</u>.

(i)     By Purchaser, in the event of a material violation or material breach by the Sellers of Sellers' agreements, covenants, representations or warranties contained in this Agreement; <u>provided</u> that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Sellers (as applicable) of written notice of such breach from Purchaser (unless such condition shall become incapable of being satisfied by the Closing Date), and provided further that Purchaser is not then in material breach of the Agreement; or

(ii)     By Purchaser in accordance with Section 7.2(a)(i); or

(iii)     By Purchaser, if the Sale Order is not entered by the Bankruptcy Court on or before June 30, 2023 or the Sale Order shall not have become a Final Order by the 15th day following entry of the Sale Order on the Bankruptcy Court docket; or

(iv)     By Purchaser, if the Closing does not occur on or before the End Date (or on such other extended date upon which the Parties mutually agree in writing); or

(v)     By Purchaser if, prior to the Closing, a Casualty Loss occurs affecting a material portion of the Assets; *provided, however*, that Purchaser may elect to close and accept the Assets with no reduction in the Purchase Price and, in that event, any insurance proceeds (or proceeds of such condemnation proceeding) subsequently recovered by Sellers on account of such loss shall be transferred to Purchaser.

(c)     <u>By Sellers</u>.

(i)     By Sellers, in the event that a higher and better offer, from a Qualified Bidder (as defined in the Bid Procedures Order) other than Purchaser is: (i) accepted by Sellers in accordance with the terms of this Agreement and the Bid Procedures Order; (ii) approved by the Bankruptcy Court; and (iii) results in the closing of such sale, in which event this Agreement shall be deemed, without further action, to have been automatically terminated by Sellers on the date of the approval of such sale by the Bankruptcy Court; or

28

(ii)     By Sellers, provided that all conditions to Closing have been satisfied, if the Closing does not occur on or before the End Date (or on such other extended date upon which the Parties mutually agree in writing) as a result of any circumstances within Purchaser's control; or

(iii)     By Sellers, in the event of a material violation or material breach by Purchaser of its agreements, covenants, representations or warranties contained in this Agreement; provided that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Purchaser of written notice of such breach from Sellers, and provided further that Sellers are not then in material breach of the Agreement.

9.2     Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Party, and all further obligations of the Parties hereunder shall immediately and without further action terminate, except that the obligations set forth in Section 2.4, 5.4, 6.1, and this Section 9.2(a) shall survive in full force and effect, as shall any other provisions of this Agreement which are specifically designated to survive termination; *provided, however*, that if this Agreement is terminated by a Party because of the other Party's failure to comply with its obligations under this Agreement, the terminating Party's right to pursue all legal remedies for breach of contract or otherwise, including, without limitation, specific performance and damages relating thereto. Provided however, Seller's remedy against Purchaser for Purchaser's failure to comply with its obligations under this Agreement shall be limited to the Deposit and no other remedy, and which shall also survive such termination unimpaired.

(b)     Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(c)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Article IX shall relieve Purchaser or Sellers of their respective obligations under the Confidentiality Agreement.

## ARTICLE X
## MISCELLANEOUS

10.1     Entire Agreement.  This Agreement, the Schedules and the Exhibits and the Sale Order, together with the Confidentiality Agreement, contain the entire agreement among the Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings among the Parties.

10.2     Other Governmental Entities.  In the event any Party receives notice from any Governmental Entity that other notices, applications, filings or Governmental Permits are required with respect to this Agreement or the transactions contemplated hereby, Purchaser and Sellers (as applicable) shall make such notices, applications or filings and seek such Governmental Permits, unless they decide, in good faith, that such compliance is not necessary.

10.3     Additional Actions and Documents.  At and after the Closing, and without further consideration, Purchaser and/or Sellers (as applicable) shall promptly execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions, as any Party may

reasonably request in order to convey, assign and transfer to Purchaser all of Sellers' rights, title and interest in and to the Assets, or to clarify, identify or more precisely describe the Assets intended to be conveyed.

10.4    Descriptive Headings; Certain Interpretations.

(a)    Section headings are descriptive and for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(b)    Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "either" are not exclusive and "include" and "including" is not limiting; (iii) a reference to any agreement or other contract includes any schedules and exhibits thereto and permitted supplements and amendments thereof; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; (v) a reference to a Person includes a natural person or entity and its permitted successors and assigns; and (vi) a reference in this Agreement to an Article, Section, Schedule or Exhibit is to the Article, Section, Schedule or Exhibit of this Agreement.

10.5    Successors and Assigns.  This Agreement is made solely and specifically by and for the benefit of the Parties hereto, and their respective successors and assigns.  Purchaser shall be entitled to assign its rights hereunder to an affiliate or an entity related to Purchaser; *provided, however*, that such assignment shall not relieve Purchaser of its obligations hereunder.

10.6    Notices.  All notices, requests, and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered by overnight courier to the Parties at the following addresses:

If to Sellers, addressed to:

Jerry McHale
Banyan Cay Resort & Golf, LLC, *et al.*
1900 Banyan Club Road
West Palm Beach, FL 33401
Email:  jerrym@thereceiver.net

With copies (which shall not constitute notice hereunder) to:

Joseph A. Pack, Esq.
Jessey J. Krehl, Esq.
Pack Law
51 Northeast 24th Street
Suite 108
Miami, FL 33137
Email:  joe@packlaw.com; jessey@packlaw.com

If to Purchaser, addressed to:

> Westside Investment Partners, Inc.
> Attn: Otis C. Moore, III
> 4100 East Mississippi Avenue, Suite 500
> Denver, CO 80246
> Email: omoore@westsideinv.com

With a copy (which shall not constitute notice hereunder) to:

> Steven L. Daniels, Esq.
> Saul Ewing LLP
> 515 N. Flagler Drive
> Suite 1400
> West Palm Beach, FL 33401
> Email: steven.daniels@saul.com

All such Notices shall be deemed given one Business Day after delivery by overnight courier. Any Party from time to time may change its address or other information for the purpose of notices to that Party by giving notice specifying the change to the other Parties.

10.7    <u>Expenses</u>.  Except as otherwise expressly provided herein, each Party shall bear its own costs with respect to the drafting and negotiation of this Agreement, any court or regulatory proceedings related thereto, the consummation of the transactions contemplated hereby, and such Party's compliance with all its agreements and conditions contained herein, including, without limitation, all legal and accounting fees and disbursements and all costs of obtaining necessary consents.  The provisions of this Section 10.7 shall survive the Closing or earlier termination of this Agreement.

10.8    <u>Brokerage Commissions and Fees</u>.  Purchaser warrants and represents that no brokerage commissions or fees are due any broker as a result of Purchaser's actions in connection with the transactions contemplated by this Agreement and Purchaser agrees that should any claim be made for commissions or fees by any broker against Sellers, Purchaser shall indemnify and hold Sellers harmless from and against any and all such claims in connection therewith.  Sellers warrant and represent that no brokerage commissions or fees are due to any brokers other than amounts due to Keen-Summit, Sellers' marketing agent and broker, and Sellers agree that Sellers shall indemnify and hold Purchaser harmless from and against any and all such claims in connection therewith (including, without limitation, any claim for compensation due to Keen-Summit).  Notwithstanding anything contained herein to the contrary, the provisions of this Section 10.8 shall survive the Closing or any earlier termination of this Agreement.

10.9    <u>Waiver</u>.  Any term, provision or condition of this Agreement may be waived, or the time for its performance may be extended, at any time by the Party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term, provision or condition being waived, and shall be executed by an authorized officer of the Party granting such waiver.  The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor to affect in any way the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.  Notwithstanding the foregoing, a waiver hereunder by Sellers of

any material term or condition shall not be effective without an order of the Bankruptcy Court in relation to such waiver.

10.10    <u>Amendment</u>.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of all Parties hereto.

10.11    <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered via PDF.

10.12    <u>Continuing Jurisdiction</u>.  The Parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

10.13    <u>Choice of Law</u>.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation, company or limited liability company that is a Party to or the subject of this Agreement, as to which the law of the jurisdiction of incorporation or organization of such entity shall govern, and in all cases subject to the provisions of the U.S. Bankruptcy Code. Venue shall be Palm Beach County, Florida.

10.14    <u>No Partnership or Joint Venture</u>.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of a seller and a purchaser between the Parties hereto.

10.15    <u>No Third-Party Beneficiaries</u>.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.  It is the explicit intention of the Parties hereto that no Person other than the Parties hereto and their successors and permitted assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any Party hereto, and the assumptions, indemnities, covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties hereto or their respective successors and permitted assigns.

10.16    <u>Prevailing Agreement Between the Parties</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of any other transaction document, other than the Bid Procedures Order or the Sale Order, the provisions of this Agreement shall prevail in the determination of the respective rights and obligations of the Parties as between themselves.  In the event of any conflict between any provision of this Agreement and the Bid Procedures Order or the Sale Order, the terms of the Bid Procedures Order shall govern over this Agreement, and the terms of the Sale Order shall govern over each.

(a)    Each of the Parties acknowledges and agrees that the other Parties (collectively, the "<u>Enforcing Parties</u>") would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that each of the Parties may have under Law or equity, each of the Parties shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof (except as otherwise expressly set forth herein).

(b)    Each of the Parties agrees that it shall not oppose the granting of specific performance or an injunction sought on the basis that the Enforcing Parties have an adequate remedy at law or that any award of specific performance is, for any reason, not an appropriate remedy (except as otherwise expressly set forth herein). The Enforcing Parties shall not be required to provide any bond or other security in connection with any such injunction or other equitable remedy. The End Date shall be tolled from the date any of the Enforcing Parties files a petition seeking specific performance or an injunction under this Section 10.16 until a final, non-appealable, decision regarding this matter is obtained from a court of competent jurisdiction.

10.17    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

10.18    Computation of Time.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

10.19    Mutual Drafting.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

10.20    Counterparts; Facsimile and Email Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

10.21    Time of Essence. Time is of the essence of this Agreement.

10.22    **WAIVERS OF JURY TRIAL**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE AGREEMENTS CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

**Banyan Cay Investment, LLC**

By: _Jerry McHale_
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Mezzanine Borrower, LLC**

By: _Jerry McHale_
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Resort & Golf, LLC**

By: _Jerry McHale_
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Dev. LLC**

By: _Jerry McHale_
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Villas, LLC**

By: _Jerry McHale_
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Maintenance, LLC**

By: _Jerry McHale_
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Westside Property Investment Company, Inc.**

By: _/s/Andy Klein_____
Name:  Andy R. Klein
Title:  President

## SCHEDULE 1

### PREMISES

PARCEL I (FRONT NINE):

A PORTION OF TRACT "B", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGE 72, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTH CORNER OF TRACT "B" OF SAID PLAT THENCE SOUTH 57°00'00" EAST ALONG THE NORTH LINE OF TRACT "B", 392.64 FEET; THENCE SOUTH ALONG A RADIAL LINE SOUTH 33°00'30" WEST, 60.00 FEET TO THE POINT OF BEGINNING (SAID POINT ALSO BEING THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 842.04 FEET, A CENTRAL ANGLE OF 00°10'47" AN ARC LENGTH OF 2.64 FEET; THENCE SOUTH 26°42'09" EAST, 78.89 FEET; THENCE NORTH 71°50'50" EAST, 87.95 FEET; THENCE NORTH 88°26'53" EAST, 87.00 FEET; THENCE SOUTH 58°34'14" EAST, 41.83 FEET; THENCE SOUTH 54°04'40" EAST, 75.76 FEET; THENCE NORTH 56°50'56" EAST, 70.00 FEET; THENCE SOUTH 07°00'44" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 06°57'47" WEST); THENCE EAST ALONG SAID CURVE HAVING A RADIUS OF 797.04 FEET AND CENTRAL ANGLE OF 22°19'31" AN ARC LENGTH OF 310.57 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE HAVING A RADIUS OF 305.00 FEET, A CENTRAL ANGLE OF 42°16'16" AN ARC LENGTH OF 225.02 FEET TO THE END OF SAID CURVE; THENCE SOUTH 62°48'15" EAST, 98.36 FEET TO A POINT OF CURVATURE OF A NON CONCENTRIC CURVE CONCAVE TO THE SOUTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 44°48'38" EAST); THENCE SOUTHEASTERLY ALONG SAID CURVE, HAVING A RADIUS OF 320.00 FEET, A CENTRAL ANGLE OF 30°38'13" AN ARC LENGTH OF 171.11 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 83°34'35" AN ARC DISTANCE OF 36.47 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 180.00 FEET, A CENTRAL ANGLE OF 102°03'14" AN ARC LENGTH OF 320.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 79°22'42" AN ARC LENGTH OF 34.64 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 1085.00 FEET, A CENTRAL ANGLE OF 54°59'52" AN ARC LENGTH OF 1041.48 FEET; THENCE SOUTH 08°39'28" EAST, 468.07 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 19°42'49" AN ARC LENGTH OF 263.21 FEET; THENCE NORTH 78°56'09" WEST (RADIAL TO SAID CURVE), 10.00 FEET; THENCE SOUTH 22°52'49" WEST, 149.38 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH WEST, HAVING A RADIUS OF 739.00 FEET, A CENTRAL ANGLE OF 14°00'20" AN ARC LENGTH OF 180.64 FEET TO THE END OF SAID CURVE; THENCE NORTH 53°33'16" WEST, 4.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT IS SOUTH 53°32'46" EAST) THENCE ALONG SAID CURVE HAVING A RADIUS OF 735.02 FEET, A CENTRAL ANGLE OF 13°38'11" AN ARC LENGTH OF 174.93 FEET TO THE END OF SAID CURVE; THENCE SOUTH 43°38'15" WEST, 145.11 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 29°02'42" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 01°29'52" AN ARC LENGTH OF 20.00 FEET TO THE END OF SAID CURVE; THENCE SOUTH 77°37'28" WEST, 100.68 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 20°03'10" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 745.00 FEET, A CENTRAL ANGLE OF 25°31'37" AN ARC LENGTH OF 331.92 FEET TO THE END OF SAID CURVE; THENCE SOUTH 05°27'57" WEST, 5.00 FEET; THENCE NORTH 84°32'08" WEST, 295.96 FEET; THENCE SOUTH 05°28'27" WEST, 15.00 FEET; THENCE NORTH 84°32'03" WEST, 87.64 FEET TO A BEGINNING OF A CURVE CONCAVE TO THE WEST ( A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 85°35'11" EAST); THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 990.00 FEET, A CENTRAL ANGLE OF 14°23'04" AN ARC LENGTH OF 248.55 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 88°18'23" AN ARC LENGTH OF 38.53 FEET TO A POINT OF TANGENCY; THENCE NORTH 69°03'00" EAST, 397.44 FEET; THENCE SOUTH 20°30'00" EAST, 25.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (THE PREVIOUS BEARING BEING RADIAL); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 739.25 FEET, A CENTRAL ANGLE OF 14°05'38" AN ARC LENGTH OF 181.84 FEET; THENCE NORTH 56°42'50" EAST ALONG A NON TANGENT LINE, 51.93 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE (A RADIAL BEARING FROM ITS RADIUS POINT BEARS

SOUTH 38°35'47" EAST); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 742.25 FEET, A CENTRAL ANGLE OF 22°15'00" AN ARC LENGTH OF 288.24 FEET TO A POINT OF TANGENCY; THENCE NORTH 29°08'43" EAST, 152.03 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE  SOUTHWEST, HAVING A  RADIUS OF 218.00 FEET, A CENTRAL ANGLE OF 126°00'00" AN ARC LENGTH OF 479.41 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 131.28 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 69.88 FEET TO A POINT OF TANGENCY; THENCE SOUTH 52°39'13" WEST, 44.02 FEET TO  A POINT OF CURVATURE OF A CURVE CONCAVE  TO THE SOUTHEAST, HAVING A  RADIUS OF 206.00 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 109.66 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 345.00 FEET, A CENTRAL ANGLE OF 15°47'37" AN ARC LENGTH OF 95.10 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS BEARS SOUTH 66°42'44" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 345.99 FEET, A CENTRAL ANGLE OF 12°53'21" AN ARC LENGTH OF 77.83 FEET; THENCE SOUTH 53°49'23" EAST (RADIAL TO SAID CURVE), 28.26 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST, HAVING  A RADIUS OF 375.25 FEET, A CENTRAL ANGLE  OF 33°15'11 AN ARC LENGTH OF 217.79 FEET TO A POINT OF TANGENCY; THENCE SOUTH 69°30'00" WEST, 393.96 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE  NORTH HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 98°40'54" AN ARC LENGTH OF 43.06 FEET TO  A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 290.00 FEET, A CENTRAL ANGLE OF 31°52'53" AN ARC LENGTH OF 161.37 FEET TO A POINT OF TANGENCY; THENCE NORTH 20°00'00" EAST, 175.73 FEET; THENCE SOUTH 70°00'00" EAST, 15.00 FEET; THENCE NORTH 20°00'00" EAST, 224.67 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE  WEST, HAVING A RADIUS OF 595.00 FEET, A CENTRAL ANGLE OF 11°21'37" AN ARC LENGTH OF 117.97 FEET TO THE END OF SAID CURVE; THENCE NORTH 81°27'13" WEST 15.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 580.00 FEET, A CENTRAL ANGLE  OF 07°25'24" AN ARC LENGTH OF 75.15 FEET TO THE END OF SAID CURVE; THENCE NORTH 87°56'12" EAST, 45.00 FEET; THENCE NORTH 17°15'54" EAST, 161.68 FEET; THENCE NORTH 11°56' 22" EAST, 408.45 FEET; TO THE SOUTHEAST CORNER OF TRACT "D" OF BANYAN CAY RESORT, PLAT BOOK 125, PAGE 116, THENCE CONTINUE ALONG THE NEXT FIVE COURSES OF TRACT "D"; THENCE NORTH 11°56' 22" EAST, 59.86 FEET; THENCE NORTH 48°03'38" WEST, 64.70 FEET; THENCE NORTH 01°11'51" EAST, 109.65 FEET; THENCE NORTH 76°19'06" WEST, 19.24 FEET; THENCE NORTH 27°09'45" EAST, 843.47 FEET BACK TO THE POINT OF BEGINNING.

PARCEL II (BACK NINE):

A PORTION OF TRACT "C", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 29, PAGE 72 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF LOT 1 OF SAID PLAT (ALSO THE NORTH RIGHT OF WAY LINE OF CONGRESS AVENUE); THENCE NORTH 57°00'00" WEST ALONG THE SAID NORTH RIGHT OF WAY LINE, 170.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 57°00'00" WEST, 10.92 FEET; THENCE NORTH 33°00'00" EAST, 175.00 FEET; THENCE NORTH 57°00'00" WEST, 600.00 FEET; THENCE SOUTH 35°28'31" WEST, 87.42 FEET; THENCE NORTH 20°08'04" WEST, 100.09' FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°36'10" WEST) THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 1515.99 FEET, A CENTRAL ANGLE OF 06°59'55", AN ARC LENGTH OF 185.18 FEET TO A POINT OF  REVERSE CURVE CONCAVE TO THE  EAST HAVING A RADIUS OF 50.00 FEET, A CENTRAL ANGLE OF 89°53'08", AN ARC LENGTH OF 78.44 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 190.00 FEET, A CENTRAL ANGLE OF 111°36'33", AN ARC LENGTH OF 370.11 FEET TO A POINT OF REVERSE CURVE  CONCAVE  TO THE  NORTHEAST, HAVING A RADIUS OF 48.51 FEET, A CENTRAL ANGLE OF 36°29'47", AN ARC LENGTH OF  30.90 FEET TO A POINT OF COMPOUND CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 1335.99 FEET, A CENTRAL ANGLE OF 30°39'23", AN ARC LENGTH OF 714.83 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°11'51" EAST, 264.88 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE WEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 58°31'04" EAST); THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CURVE HAVING A RADIUS OF 175.00 FEET, A CENTRAL ANGLE OF 126°43'54", AN ARC LENGTH OF 387.08 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST; THENCE WESTERLY AND NORTHERLY ALONG SAID CURVE  HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 95°43'47", AN ARC

LENGTH OF 41.77 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°01'51" EAST, 401.00 FEET; THENCE SOUTH 88°48'00" EAST, 160.03 FEET TO A POINT OF CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 100 FEET, A CENTRAL ANGLE OF 56°30'18", AN ARC LENGTH OF 98.62 FEET TO A POINT OF TANGENCY; THENCE SOUTH 32°18'00" EAST, 312.76 FEET; THENCE SOUTH 09°16'39" EAST, 105.00 FEET; THENCE SOUTH 77°36'02" EAST, 18.00 FEET; THENCE SOUTH 53°06'11" EAST, 104.04 FEET; THENCE SOUTH 50°56'54" EAST, 50.01 FEET; THENCE SOUTH 44°05'31" EAST, 50.25 FEET; THENCE SOUTH 35°45'59" EAST, 32.95 FEET; THENCE SOUTH 23°16'19" EAST, 20.16 FEET; THENCE SOUTH 16°01'43" EAST, 21.47 FEET TO A POINT OF A CURVE CONCAVE TO THE EAST (A RADIAL BEARING FROM ITS RADIUS  POINT BEARS NORTH 73°40'02" WEST); THENCE SOUTH ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 22°14'06", AN ARC LENGTH OF 86.54 FEET TO A  POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 65.00 FEET, A CENTRAL ANGLE OF 08°48'53", AN ARC LENGTH OF 10.00 FEET; TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEAST ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 71°29'56", AN ARC LENGTH OF 278.28 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEASTERLY  ALONG SAID CURVE HAVING A RADIUS OF 96.38 FEET, A CENTRAL ANGLE OF 32°13'15", AN ARC LENGTH OF 54.20 FEET TO A POINT OF TANGENCY; THENCE SOUTH 54°03'06" EAST, 26.71 FEET; THENCE NORTH 35°56'54" EAST, 112.00 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 39°53'17" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 185.00 FEET, A CENTRAL ANGLE OF 28°39'01", AN ARC LENGTH OF 92.51 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 68°18'26" WEST) THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 58°41'38", AN ARC LENGTH OF 25.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 09°26'02" WEST); THENCE ALONG SAID CURVE EASTERLY HAVING A RADIUS OF 300.00 FEET, A CENTRAL ANGLE OF 06°04'40", AN ARC LENGTH OF 31.82 FEET; THENCE SOUTH 17°31'14" EAST, 10.00 FEET; THENCE NORTH 75°33'55" EAST, 64.11 FEET; THENCE NORTH 67°40'25" EAST, 137.00 FEET; THENCE NORTH 85°10'25" EAST, 281.37 FEET; THENCE NORTH 11°09'00" EAST, 12.00 FEET; THENCE NORTH 78°51'00 " WEST 273.94 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 55°58'33" EAST; THENCE NORTH ALONG SAID CURVE HAVING A RADIUS OF 330.00 FEET, A CENTRAL ANGLE OF 00°34'11" AN ARC LENGTH OF 3.28 FEET; THENCE SOUTH 80°00'00" EAST, 276.63 FEET; THENCE SOUTH 00°42'42" EAST 332.57 FEET; THENCE SOUTH 70°00'00" EAST, 143.00 FEET; THENCE SOUTH 20°00'00" WEST, 325.91 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 625.00 FEET, A CENTRAL ANGLE OF 40°29'58" AN ARC LENGTH OF 441.78 FEET TO A POINT OF TANGENCY; THENCE SOUTH 20°00'00" EAST, 320.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 655.00 FEET, A CENTRAL ANGLE OF 50°04'01" AN ARC LENGTH OF 572.36 FEET; THENCE NORTH 60°26'00" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 60°26'00" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 640.00 FEET, A CENTRAL ANGLE OF 04°48'42" AN ARC LENGTH OF 53.75 FEET TO THE END OF SAID CURVE; THENCE NORTH 55°37'20" WEST, 40.40 FEET; THENCE SOUTH 08°24'57" WEST, 11.34 FEET; THENCE SOUTH 38°35'47" WEST, 39.50 FEET; THENCE SOUTH 64°40'58" WEST, 45.94 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE  NORTH, HAVING A RADIUS OF 80.00 FEET, A CENTRAL ANGLE OF 62°22'25" AN ARC LENGTH OF 87.09 FEET TO A POINT OF TANGENCY; THENCE NORTH 52°56'25" WEST, 94.23 FEET; THENCE NORTH 66°43'06" WEST, 14.52 FEET; THENCE NORTH 81°30'16" WEST, 24.17 FEET; THENCE NORTH 87°22'10" WEST, 24.19 FEET; THENCE SOUTH 52°57'50" WEST, 79.92 FEET;  THENCE SOUTH 70°31'03" WEST, 63.47 FEET; THENCE NORTH 69°15'28" WEST, 36.37 FEET; THENCE  NORTH 45°05'26" WEST, 34.89 FEET; THENCE NORTH 24°02'28" WEST, 16.14 FEET; THENCE SOUTH 33°00'00" WEST, 56.00 FEET BACK TO THE POINT OF BEGINNING.

PARCEL III:

TRACTS C1, C2, D, HC AND H2, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IV:

LOT 3, PLAT 1, THE PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76,

INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, LESS THE SOUTHERLY 3.0 FEET THEREOF.

PARCEL V: INTENTIONALLY DELETED.

PARCEL VI:

TRACT MF, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL VII:

TRACT L3, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL VIII:

LOTS 18 AND 19, PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGES 72 THROUGH 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IX:

TRACT M, BANYAN CAY RESORT COMMUNITY PLAT 1, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 124, PAGES 182 THROUGH 186, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA

TOGETHER WITH THE FOLLOWING ADDITIONALLY INSURED PARCELS WHICH BENEFIT THE PARCELS ABOVE:

THOSE CERTAIN "OUT OF BOUNDS" EASEMENT RIGHTS AND BENEFITS GRANTED IN THAT CERTAIN EASEMENT AGREEMENT RECORDED IN OFFICIAL RECORDS BOOK 22745, PAGE 868, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN 15 FOOT EASEMENT RIGHTS AND BENEFITS FOR INGRESS AND EGRESS GRANTED IN THAT CERTAIN SPECIAL WARRANTY DEED RECORDED IN OFFICIAL RECORD BOOK 2787, PAGE 1231, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, SUBJECT TO THE MAINTENANCE OBLIGATION SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS ESTABLISHED BY THAT CERTAIN AMENDED AND RESTATED MASTER DECLARATION OF COVENANTS AND RESTRICTIONS RECORDED IN OFFICIAL RECORD BOOK 22293, PAGE 83, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN RIGHTS AND BENEFITS GRANTED BY THAT CERTAIN GOLF COURSE ACCESS EASEMENT RECORDED IN OFFICIAL RECORDS BOOK 25002, PAGE 290, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA. SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFICIAL RIGHTS TO USE COMMON AREAS ESTABLISHED BY THAT CERTAIN DECLARATION OF MASTER COVENANTS OF BANYAN CAY RESORT RECORDED IN OFFICIAL RECORD BOOK 29679, PAGE 227, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS TO USE A GOLF CART PATH ACROSS LOT 18, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, GRANTED BY THAT CERTAIN CART PATH EASEMENT RECORDED IN OFFICIAL RECORD BOOK 29932, PAGE 112, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

## **SCHEDULE 2**

**ASSUMED CONTRACTS**


**None at this time.**

**SCHEDULE 3**

**INTELLECTUAL PROPERTY**

All of Sellers' rights to the names "Banyan Cay," "Banyan Cay Resort & Golf," "Banyan Cay Golf Club," the domain names and websites related to the Premises or the Banyan Cay Golf Club Facilities, any logos associated with the same, the intellectual property regarding the same, if any, and the Banyan Cay Golf Club phone number.

## SCHEDULE 4

## LICENSES AND PERMITS

| Permit # | Grantor | Grantee | Type | Description | Status |
|---|---|---|---|---|---|
| 108027 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort Hotel | Hotel | Elevator | Temporary |
| 108029 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort Hotel | Hotel | Elevator | Temporary |
| 108030 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort Hotel | Hotel | Elevator | Temporary |
| 108031 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort Hotel | Hotel | Elevator | Temporary |
| 16120084 | City of West Palm Beach | Banyan Cay Development, LLC | Construction | GH Landscape | Revoked |
| 112989 | State of Florida Department of Business & Professional Regulation | Banyan Cay Hotel | Hotel | Elevator | Temporary |
| 16110061 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Clubhouse Master | Open |
| 16110573 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Golf Course regrass | Open |
| 17010998 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Club Structural | Open |
| 17902660 | City of West Palm Beach | Banyan Cay Dev, LLC | Construction | Landscape Permit | Open |
| 17020796 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Hotel Master | Open |
| 17100943 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Club Electrical | Open |
| 17110150 | City of West Palm Beach | Banyan Cay Dev, LLC | Construction | Trailer Landscape | Open |
| 17120115 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Club Plumbing | Open |
| 17120579 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Landscape L1-16 | Open |
| 18081071 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Landscape Clubhouse L25-31 | Open |
| 18120725 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Electrical Hotel | Open |
| 19011357 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Plumbing sub-permit | Open |
| 19021168 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Revision Gutters, downspouts, kitchen | Open |
| 19030265 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Parking Deck Landscape L29, L31, L32 | Open |
| 19040195 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Panel Schedule Revision | Open |
| 20121011 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Revision - in the field | Open |
| 21011136 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Mechanical Sub | Open |
| 21031583 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Fire Sprinkler | Open |
| 21040258 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Mechanical Hood | Open |
| 21040921 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Roofing Sub | Open |
| 21040922 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Roofing Sub | Open |
| 21041297 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Hood Suppression | Open |
| 21050543 | City of West Palm Beach | Banyan Cay Dev, LLC | Construction | Gas | Open |
| 21050827 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Estate Home C | Open |
| 21050835 | City of West Palm Beach | Banyan Cay Resort & Golf, LLC | Construction | Irrigation | Open |
| 21050945 | City of West Palm Beach | Banyan Cay Golf & Resort, LLC | Construction | Landscape - landscaping for hotel | Open |
| 21060827 | City of West Palm Beach | Banyan Cay Villas, LLC | Construction | Landscaping for Villas | Open |
| 21071553 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | Master Irrigation | Open |
| 21071554 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | Landscape | Open |
| 21080032 | City of West Palm Beach | Banyan Cay Resoort & Golf LLC | Construction | Com-Misc, sails on parking garage | Open |
| 21090103 | City of West Palm Beach | Banyan Cay Villas, LLC | Construction | Villa BLDG 7 - 2175 & 2179 | Open |
| 21100293 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | Underground fire line | Open |
| 21110364 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | BDA-System | Open |
| 22020694 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | LVT Whispermat | Open |
| 22051545 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | Com-Misc, 5 Tennis & 1 Pickleball | Open |
| 22061491 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | Electrical , pool deck lighting | Open |
| 22090199 | City of West Palm Beach | Banyan Cay Resort & Golf LLC | Construction | COM-REV, master tempered mua | Open |
| "0000050767" | City of West Palm Beach | Banyan Cay Resort & Golf | F&B Operations | Clubhouse Operations | Open |
| 138298-701 | Florida Department of Public Health | Banyan Cay Development, LLC | Construction | Released per engineering cert | Open |
| 138298-701-DSGP | Florida Department of Public Health | BC DEV, LLC | Land Development | No objection to water line extensions | Open |
| 138298-702-DWC | Florida Department of Public Health | Banyan Cay Development, LLC | Construction | Released per engineering cert | Open |
| 50-00224-W | South Florida Water Management District Permit | The President Country Club | Water Quality | Decrease in landscaping water allocation | Open |
| 50-00224-W | South Florida Water Management District Permit | The President Country Club | Water Quality | Water Use Permit | Open |
| BEV6000518 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | GC - Retailer of Alcoholic Beverages | Open |
| BEV6018239 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | Dual Beverage and Tobacco License | Open |
| CE10033895 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | Hotel | Cosmetology Salon | Open - Delinquent |
| DE46739 | State of Florida Department of Business & Professional Regulation | Banyan Cay Villas, LLC | Villas | Developer | Open |
| MA72205 | State of Florida Department of Business & Professional Regulation | Villas at Banyan Cay Condo Assn, Inc. | Villas | Managing Entity for Condos | Open |
| OR79482 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | Hotel | Cosmetologist Owner | Open |
| PR77091 | State of Florida Department of Business & Professional Regulation | Villas at Banyan Cay Condo Assn, Inc. | Villas | Condominium Project | Open |
| RE4880 | State of Florida Department of Business & Professional Regulation | Villas at Banyan Cay, A Condo | Villas | Reservation Program | Open |
| SEA6022096 | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | The Seating Food Service (2010) | Open |
| TBD | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | Permanent Food Service (Banquet Hall) | Pending |
| TBD | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | Permanent Food Service (Main Kitchen) | Pending |
| TBD | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | Hotel | Hotel | Pending |
| TBD | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | Permanent Food Service (Deep End) | Pending |
| TBD | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | Permanent Food Service (Club Room) | Pending |
| TBD | State of Florida Department of Business & Professional Regulation | Banyan Cay Resort & Golf LLC | F&B Operations | Permanent Food Service (Coffee) | Pending |

## SCHEDULE 5

## PERSONAL PROPERTY

All of Sellers' Personal Property that is not an Excluded Asset, as set forth in Section 2.2 of the Agreement or Schedule 6 Excluded Assets attached thereto.

## **SCHEDULE 6**

## **EXCLUDED ASSETS**

### **EXCLUDED REAL PROPERTY:**

**L2 ESTATE LOTS:** TRACT L2 OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 125, PAGE 114 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA**.**

**LOT 21:** LOT 21 OF BANYAN CAY RESORT REPLAT OF TRACT "L1", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 127, PAGE 18, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

### **EXCLUDED BC MEZZ PROPERTY:**

For the avoidance of doubt, each of the following property of BC Mezz shall be an Excluded Asset, in each case to the extent that BC Mezz has an interest in such property or proceeds therefrom:

(a)　　The membership interests in each of Banyan Cay Resort & Golf, LLC; Banyan Cay Dev. LLC; and Banyan Cay Villas, LLC (collectively, the "Pledged Securities");

(b)　　all securities, additional equity interests, moneys or property representing dividends, distributions, cash or interest on any of the Pledged Securities;

(c)　　any amounts payable under any insurance policy resulting from loss or damage to the Pledged Securities or the Assets (as defined in this Agreement);

(d)　　all "accounts", "general intangibles", "instruments" and "investment property" relating to the foregoing; and

(e)　　all proceeds of any of the foregoing.

## **SCHEDULE 7**

### **LIABILITIES ASSUMED BY PURCHASER**

**None.**

**SCHEDULE 8**

**ALLOCATION OF PURCHASE PRICE**

As set forth in Section 2.5 of the Agreement, the allocation provided in this Schedule 8 is for the purposes of allocating the Purchase Price among the Sellers only.  Any allocation of the Purchase Price for the purposes of any taxes or any taxable value, depreciation, or otherwise, shall be governed in all respects by Section 5.6(b) of the Agreement.

| Debtor | Case Number | Allocation ($) |
|---|---|---|
| Banyan Cay Resort & Golf, LLC | 23-12386 | 82,069,299.18 |
| Banyan Cay Dev. LLC | 23-12387 | 13,898,660.45 |
| Banyan Cay Villas, LLC | 23-12388 | 3,160,092.29 |
| Banyan Cay Maintenance, LLC | 23-12389 | 2,971,948.08 |
| Banyan Cay Investment, LLC | 23-12390 | 0.00 |
| Banyan Cay Mezzanine Borrower, LLC | 23-11281 | 0.00 |
| **Total** | **-** | **102,100,000.00** |

# EXHIBIT A

## QUIT CLAIM DEED

This instrument prepared by
and return to:
Steven Daniels, Esq.
Saul Ewing LLP
515 N. Flagler Drive, Suite 1400
West Palm Beach, FL  33401

## QUIT-CLAIM DEED

     **THIS QUIT-CLAIM DEED**, executed this _____ day of _____, 2023, by **BANYAN CAY INVESTMENT, LLC, a Florida limited liability company; BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company; BANYAN CAY DEV, LLC, a Delaware limited liability company; BANYAN CAY RESORT AND GOLF, LLC,  a Delaware limited liability company; BANYAN CAY VILLAS, LLC,  a Delaware limited liability company; and BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company,** whose mailing address is 1601 Jackson Street,  # 200, Fort Myers, Florida 33901 ("Grantor")**[GRANTORS TO BE CONFIRMED]**, to **WESTSIDE PROPERTY INVESTMENT COMPANY, INC., a Colorado corporation,** whose address is: 4100 East Mississippi Avenue, #500, Denver, Colorado 80246, or its affiliated Assignee ("Grantee").

     (Wherever used herein, the terms "Grantor" and "Grantee" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and assigns of corporations, wherever the context so limits or requires.)

     WITNESSETH, that said Grantor, for and in consideration of the sum of Ten and no/100 ($10.00) Dollars, and other good and valuable considerations to said Grantor in hand paid by the said Grantee, the receipt whereof is hereby acknowledged, does hereby remise, release and quit-claim unto the said Grantee forever, all the right, title, interest, claim and demand which the said Grantor has in and to the following described lot, piece or parcel or land, situated, lying and being in the County of Palm Beach, State of Florida, to wit:

     See Exhibit "A" attached hereto.

     To have and to hold the same together with all and singular the mineral, air and water rights, easements and appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of said Grantor, either in law or equity, to the only proper use, benefit and behoof of the said Grantee forever.

     Grantor is a debtor in possession in the Chapter 11 bankruptcy cases consolidated as Case No. 23-12386 pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").  On June __, 2023, the Bankruptcy Court entered _____ ("Order") approving the sale of the property in accordance with 11 U.S.C. 363(f), and the conveyance of property by this Deed free and clear of all liens, claims, and interests other than certain Permitted Exceptions under the Amended and Restated Asset Purchase Agreement, dated April __, 2023, between Grantor and Grantee, and as specifically set forth in the Order.

     **NOTE TO RECORDER:** _____
                              _____
                              _____

IN WITNESS WHEREOF, The said Grantor has signed and sealed these presents the day and year first above written.


Signed, sealed and delivered in presence of:


_____     **BANYAN CAY INVESTMENT, LLC,**
Signature of Witness                                                a Florida limited liability company

_____
Printed Name of Witness

                                                                          By: _____
                                                                                 Jerry McHale

                                                                          Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness


STATE OF _____

COUNTY OF _____


The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.


                                                                   _____
                                                                   Notary Public


                                                                   _____
                                                                   Printed Name of Notary Public
My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____

Signature of Witness

                                                  **BANYAN CAY MEZZANINE BORROWER,**

_____    **LLC,** a Delaware limited liability company

Printed Name of Witness


By: _____

      Jerry McHale

_____

Signature of Witness                                Title: Chief Restructuring Officer

_____

Printed Name of Witness


STATE OF _____

COUNTY OF _____


The foregoing instrument was acknowledged before me by means of \_\_\_\_\_ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Mezzanine Borrower, LLC, a Delaware limited liability company, who produced _____ as identification.


_____

Notary Public


_____

Printed Name of Notary Public

My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____

Signature of Witness

_____

Printed Name of Witness


_____

Signature of Witness

_____

Printed Name of Witness

**BANYAN CAY DEV, LLC,**
a Delaware limited liability company


By: _____
    Jerry McHale

Title: Chief Restructuring Officer


STATE OF _____

COUNTY OF _____


The foregoing instrument was acknowledged before me by means of \_\_\_\_\_ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.


_____

Notary Public


_____

Printed Name of Notary Public

My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____

Signature of Witness

**BANYAN CAY RESORT AND GOLF, LLC,**
a Delaware limited liability company

_____

Printed Name of Witness

By: _____
        Jerry McHale

Title: Chief Restructuring Officer

_____

Signature of Witness

_____

Printed Name of Witness


STATE OF _____

COUNTY OF _____


The foregoing instrument was acknowledged before me by means of \_\_\_\_\_ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.


_____

Notary Public


_____

My commission expires:                    Printed Name of Notary Public


(SEAL)

Signed, sealed and delivered in presence of:

_____

**BANYAN CAY VILLAS, LLC,**

Signature of Witness

a Delaware limited liability company

_____

Printed Name of Witness

By: _____

    Jerry McHale

Title: Chief Restructuring Officer

_____

Signature of Witness

_____

Printed Name of Witness

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me by means of \_\_\_\_\_ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.

_____

Notary Public

_____

Printed Name of Notary Public

My commission expires:

(SEAL)

Signed, sealed and delivered in presence of:

_____
Signature of Witness

_____
Printed Name of Witness

**BANYAN CAY MAINTENANCE, LLC,**
a Florida limited liability company


By: _____
    Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness


STATE OF _____

COUNTY OF _____


The foregoing instrument was acknowledged before me by means of \_\_\_\_\_ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Maintenance, LLC, a Florida limited liability company, who produced _____ as identification.


_____
Notary Public


_____
Printed Name of Notary Public

My commission expires:


(SEAL)

## **EXHIBIT B**

**BILL OF SALE**

**QUIT CLAIM BILL OF SALE**

**BANYAN CAY INVESTMENT, LLC, a Florida limited liability company; BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company; BANYAN CAY DEV, LLC, a Delaware limited liability company; BANYAN CAY RESORT AND GOLF, LLC, a Delaware limited liability company; BANYAN CAY VILLAS, LLC,  a Delaware limited liability company; and BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company** ("Sellers"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and for other good and valuable consideration paid to Grantor by **WESTSIDE PROPERTY INVESTMENT COMPANY, INC., a Colorado corporation,** [or an affiliate assignee] ("Purchaser"), the receipt and sufficiency of which are hereby acknowledged, does hereby ASSIGN, SELL, CONVEY and DELIVER unto Purchaser all of Sellers' right, title and interest in and to the following;

All tangible and intangible personal property owned by Sellers that is not an Excluded Asset (as defined in Section 2.2 of the Amended and Restated Asset Purchase Agreement between Sellers and Purchaser, dated as of April 28, 2023 (the "APA")), including, but not limited to, all: (a) inventory; (b) furniture, fixtures, equipment, and appliances; (c) rights to (i) the names "Banyan Cay", "Banyan Cay Resort & Golf", and "Banyan Cay Golf Club", (ii) the domain names and websites related to the Premises (as defined in the APA) or the Banyan Cay Golf Club Facilities, (iii) any logos associated with the same, the intellectual property regarding the same, if any, (iv) the Banyan Cay Golf Club phone number(s), and all other Intellectual Property (as defined in the APA); (d) vehicles; (e) Licenses and Permits on Schedule 4 of the APA; (f) books and records, corporate records and minutes, customer lists, transferable utility contracts, and transferable telephone exchange numbers; and (g) all permits, plats, development orders, site plans, construction plans, entitlements, engineering documents, soils, environmental and other reports and studies, governmental approvals, mineral and mineral rights, water and water rights, water and sewer taps, hook ups and connections, warranties, plans and specifications, engineering plans and studies, floor plans and landscape plans relating to the same or any part of the same, shop drawings and other technical descriptions prepared for the construction, repair or alteration of the Premises or on the improvements thereon.

Sellers are debtors in possession in the chapter 11 bankruptcy cases consolidated as Case No. 23-12386 pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").  On June __, 2023, the Bankruptcy Court entered an Order approving the sale of the property under the APA in accordance with 11 U.S.C. §§ 363(b) and 363(f).  The conveyance of property by this Bill of Sale is free and clear of all liens, claims, and interests other than certain Permitted Exceptions under the APA.  Sellers acknowledge that Purchaser is not assuming any liabilities or obligations of Sellers other than those in the Licenses and Permits on Schedule 4 of the APA.

**[SIGNATURES ON NEXT PAGE]**

EXECUTED this _____ day of _____, 2023.


Signed, sealed and delivered in presence of:


_____
Signature of Witness

_____
Printed Name of Witness

**GRANTOR:**

**BANYAN CAY INVESTMENT, LLC,**
a Florida limited liability company


By: _____
    Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____


The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.


_____
Notary Public


_____
Printed Name of Notary Public

My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____  **GRANTOR:**
Signature of Witness

_____  **BANYAN CAY MEZZANINE BORROWER,**
Printed Name of Witness                            **LLC,** a Delaware limited liability company


By: _____
    Jerry McHale

_____  Title: Chief Restructuring Officer
Signature of Witness

_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____


The foregoing instrument was acknowledged before me by means of \_\_\_\_\_ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Mezzanine Borrower, LLC, a Delaware limited liability company, who produced _____ as identification.


_____
Notary Public


_____
Printed Name of Notary Public

My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____          **GRANTOR:**
Signature of Witness

_____          **BANYAN CAY DEV, LLC,**
Printed Name of Witness                   a Delaware limited liability company


                                          By: _____
                                              Jerry McHale

                                          Title: Chief Restructuring Officer
_____
Signature of Witness

_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____


The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.


                                          _____
                                          Notary Public


                                          _____
                                          Printed Name of Notary Public

My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____
Signature of Witness

_____
Printed Name of Witness

**GRANTOR:**

**BANYAN CAY RESORT AND GOLF, LLC,**
a Delaware limited liability company


By: _____
   Jerry McHale

Title: Chief Restructuring Officer


_____
Signature of Witness

_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____


The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.


_____
Notary Public


_____
Printed Name of Notary Public

My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____
Signature of Witness

_____
Printed Name of Witness




_____
Signature of Witness

_____
Printed Name of Witness



**GRANTOR:**


**BANYAN CAY VILLAS, LLC,**
a Delaware limited liability company


By: _____
    Jerry McHale

Title: Chief Restructuring Officer


STATE OF _____
COUNTY OF _____


The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.


_____
Notary Public


_____
Printed Name of Notary Public

My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:


_____          **GRANTOR:**
Signature of Witness

_____          **BANYAN CAY MAINTENANCE, LLC,**
Printed Name of Witness                                                     a Florida limited liability company


                                                                                     By: _____
                                                                                             Jerry McHale

_____          Title: Chief Restructuring Officer
Signature of Witness

_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____


The foregoing instrument was acknowledged before me by means of \_\_\_\_\_ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Maintenance, LLC, a Florida limited liability company, who produced _____ as identification.


                                                                    _____
                                                                    Notary Public


                                                                    _____
                                                                    Printed Name of Notary Public

My commission expires:


(SEAL)