## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                                Chapter 11

BANYAN CAY RESORT & GOLF, LLC,                        Case No. 23-12386-EPK
*et al* [1]

                                                      (Jointly Administered)

            Debtors.

_____/

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP'S EMERGENCY MOTION TO (I) COMPEL DEBTORS TO COMPLY WITH PARAGRAPH 7 OF THE SALE ORDER; (II) AMEND THE SALE ORDER TO SUBSTITUTE LENDER'S APA; AND (III) AUTHORIZE U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP'S CREDIT BID**

> Lender requests the Court schedule an Emergency Hearing on this Motion on or about August 16, 2023 so that Lender can promptly move forward under its exercise of its Credit Bid Rights (as defined herein) and to avoid further diminution of value and irreparable harm to Lender's collateral.

U.S. Real Estate Credit Holdings III-A, LP ("U.S. Real Estate" or the "Lender"), the primary senior secured creditor and DIP Lender in the above-captioned Chapter 11 Cases and Banyan Cay Resort and Golf, LLC, and the above captioned debtors and debtors in possession herein (collectively, the "Debtors"), by and through undersigned counsel, pursuant to 11 U.S.C. §§ 105, 363(k), the Sale Order, and the Final DIP And Cash Collateral Order (as each defined herein), files this *Emergency Motion To (I) Compel Debtors to Comply with Paragraph 7 of the Sale Order; (ii) Amend the Sale Order to Substitute Lender's APA; and Amend Sale Order and Authorize U.S. Real Estate Credit Holdings III-A, LP's Credit Bid* (the "Motion"), and respectfully represent as follows:

---

[1]  The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

## <u>INTRODUCTION</u>

1.      As the Court is aware, the Lender has reluctantly accommodated and supported the Debtors' bankruptcy cases, funding and allowing the Debtors to run multiple sale processes (both within and out of the bankruptcy cases) despite Lender obtaining its Foreclosure Judgement after contentious pre-petition prepetition resistance and a tumultuous lending relationship with the Debtors. Throughout the Chapter 11 Cases, Lender has been consistent in its desire to be paid in full. Based upon the Debtors' representations that there was a stalking horse bidder that would be able to close on a sale transaction, Lender provided the DIP Loan to finance a sale process. Notwithstanding, Lender preserved its rights to credit bid on all of its collateral (including collateral pledged under the DIP Loan) in the event that the sale did not go forward or result in Lender being paid in full.  As of the July 31, 2023, the Debtors' sale process failed.   The Debtors now lack funding to insure, maintain and otherwise preserve the collateral, pay employees and fund operations.   Lender has offered to fund operations and agreed upon professional fees[2] related to closing to: i) preserve what value is left in the Property, ii) have an orderly transition of the Property to Lender, iii) allow ongoing vendors to be paid;  and iv)  to otherwise do the things the Debtors have been unable, or unwilling, to do to prevent further diminution in value and harm to the Property, the constituents, and the community where the Property is situated.  The sale process is over and the Debtors need to abide by the terms of the Sale Order which authorizes the Lender as backup bidder to take control of the property through its credit bid.  Such action is reasonable and in the best interest of the estates at this time.   The Debtors  and Keen-Summit should cease marketing the property.  Such efforts are only confusing the marketplace, further diminishing the value of the collateral and are a delay tactic by the Debtors in the further "hope" of a new buyer

---

2  Unfortunately, a final agreement has not been reached.  Lender remains committed to reasonable funding options, but not in the face of continued obstruction and unreasonable demands.

emerging.

2.      The Lenders exercise of its Credit Bid Rights (as defined herein) is authorized by the Final DIP and Cash Collateral Order, the Sale Order and 11 U.S.C. §363(k).  The Debtors are out of options after having received multiple chances from the Lender and this Court.  The alternative is for stay relief to be granted and for the Lender to proceed to re-set its foreclosure sale.  That is not what was agreed to by the Debtors nor what is in the best interest of the Property or constituents.  A re-set foreclosure sale will only serve to delay, add expense,  present risk to the Property and further risk to the Lender.  Lender is prepared to do what needs to be done to immediately stabilize the Property and work to restore value.  This saga needs to end and the Debtors need to recognize that.  While the Debtors and its professionals have previously assured Lender they would cooperate with Lender's Credit Bid Rights, such assurance has wavered or been conditioned for reasons that seem transparent and not in the best interest of the estates or the Property3.   The Court should require full compliance.

### BACKGROUND[4]

1.      On February 16, 2023, Banyan Cay Mezzanine Borrower, LLC ("Mezz Borrower") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in this Court.  On March 29, 2023 (the "Petition Date"), the Debtors other above-captioned debtors (the "Operating Debtors" and collectively with Mezz Borrower, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

---

3 The Lender and the CRO have been engaged in direct discussions to try to resolve these issues to move forward, but no agreement has yet been reached.  Due to the immediate needs of the Debtors for funding, including insurance, the Lender is filing this Motion, while at the same time continuing discussions.
[4] All capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the DIP Financing Motion and or the Sale Order.

2.      The Debtors' cases (the "<u>Chapter 11 Cases</u>") are being jointly administered.

3.      The Debtors continue to operate their business and manage its affairs as debtors-in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

5.      No committee has been appointed in the Debtors' Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

6.      Prior to the commencement of the Chapter 11 Cases, Lender obtained an Amended Final Foreclosure Judgment against certain of the Debtors in the amount of $95,084,509.61, plus accruing interest, fees and expenses ("<u>Foreclosure Judgment</u>") in a foreclosure action in the Palm Beach County Circuit Court, Case No. 50-2022-CA-006815-XXXX-MB ("<u>State Court Case</u>") against the Sellers and several other entities and individuals encumbering the Property (as defined herein). The Foreclosure Judgment provides the Lender with valid, binding, properly perfected, enforceable, first-priority lien and security interests in all the Property, including substantially all of the real and personal property of the Sellers, as described in the Loan Agreements between the parties.

7.      On May 18, 2023, the Court entered the *Final Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(a), 362, 364(c), and 364(d), and (IV) Granting Super Priority Claims to the DIP Lender Pursuant to 11 U.S.C. 364(c)* (ECF No. 131, the "<u>Final DIP & Cash Collateral Order</u>").

8.      The Final DIP & Cash Collateral Order provided for the use of Cash Collateral (as defined therein) by the Debtors during the pendency of the Chapter 11 Cases and the provision of a DIP Loan up to $3.8 million in debtor in possession financing ("<u>DIP Loan</u>") to cover the Debtors'

operational expenses pursuant to 13 Week Budget (the "Budget").  The Budget for funding of the Debtors operations ran through July 16, 2023[5].

9.    On May 1, 2023, the Court entered the Bid Procedures Order approving the Bid Procedures and the Amended and Restated Asset Purchase Agreement (the "Stalking Horse Agreement") between the Debtors and Westside Property Investment Company, Inc. (the "Stalking Horse Bidder").

10.    The Stalking Horse Agreement proposed a sale of Lender's collateral, as defined in the Bid Procedures Order (the "Sale") for $102,100,000.00 (the "Stalking Horse Sale Proceeds").

11.    On June 26, 2023, the Court entered the *Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and Interest and (II) Granting Related Relief* [ECF No. 183, the "Sale Order"]. As part of the Sale Order, the Lender agreed to extend the expiration of the Final DIP & Cash Collateral Order from July 16, 2023, to July 31, 2023 to accommodate the closing and an expedited confirmation process.

12.    Additionally, on April 28, 2023, the Court entered an *Order Granting Motion for Entry of an Order (A) Authorizing the Debtors to Assume Purchase and Sale Agreement with Banyan Cay Estates, LLC; (B) compromising Controversy Therebetween, and (C) Granting Related Relief* [ECF No. 105, the "Estate Lots Sale"]. The purchase price for the Estate Lots Sale is $10,500,00.00 ("Estate Lot Sale Proceeds" collectively, with the Stalking Horse Sale Proceeds, the "Proceeds").

---

5 The Final DIP and Cash Collateral Order also contained a negotiated "burial fee" providing that the Lender would advance $25,000 after a termination event.  This would typically cover some of the fees related to the relief requested herein and transitioning the collateral.  Despite the $25,000 sum, Lender has been willing to fund sums over and above the $25,000 to get to a closing on the Credit Bid Transaction.

13.     The Sale Order required the transactions to close simultaneously and set an Outside Closing Date for both the Stalking Horse Sale and the Estate Lots Sale on July 31, 2023, with the Proceeds to be paid to the Lender at Closing.

14.     On or about July 25, 2023, Lender was advised that the Stalking Horse sale transaction would not occur on or before the Outside Closing Date.

15.     On July 28, 2023, based upon the prospective breach of the Stalking Horse Agreement and pursuant to the Final DIP & Cash Collateral Order, the Lender transmitted a Termination Declaration to the Debtors indicating Lender's intention to exercise its Default Remedies, under the Final DIP & Cash Collateral Order including, but not limited to: i) terminating any further commitment to extend credit to the Borrowers without further written approval from Lender; ii) imposing the default interest rate of 15%; and iii) exercising its credit bid rights under Paragraph 7 of the Sale Order and Section 25 of the Final DIP & Cash Collateral Order (the "Credit Bid Rights").

16.     On July 31, 2023, the Stalking Horse Bidder, as defined in the Sale Order, failed to close on the transaction and the Stalking Horse Agreement and the Estate Lots Sale were terminated.[6]

17.     As of the date hereof, the Debtors are in default of the Final DIP & Cash Collateral Order and are out of funds to continue their operations.   Significantly, certain insurance premiums are due on August 10, 2023 in the approximate amount of $140,000.  Lender will need (and intends) to advance such payment as a protective advance.

18.     On August 7, 2023, the Lender provided the Debtors with a draft APA, which is attached hereto as **Exhibit "A"** (the "Lender APA") exercising its Credit Bid Rights under

---

6 These transactions were required to close simultaneously.  Accordingly, the Lender will credit bid as to all the collateral, including the Estate Lots and then seek to negotiate with the proposed purchaser of the Estate Lots.

Paragraph 7 of the Sale Order, Paragraph 25 of the Final DIP and Cash Collateral Order and 11 U.S.C §363(k) to purchase its collateral including the property identified in the Stalking Horse Agreement and the Estate Lots Sale (the "Credit Bid Transaction")[7]. The property subject to the Lender's Credit Bid Transaction, which includes all of its collateral shall hereinafter be referred to as the "Property".

19.    The Lender expects to close on the Credit Bid Transaction on or before August 31, 2023.  As stated above, the Lender had offered to supplement the Final DIP and Cash Collateral Order to provide Debtors with additional funding for the sole purpose of maintaining the Debtors' operations, prior to the prospective Closing.

20.    The Lender requests the Court enter the Order attached hereto as **Exhibit "B"**: i) compelling the Debtor to comply with Paragraph 7 of the Sale Order; ii) authorizing the Credit Bid Transaction to purchase the Property; and iii) substituting the Lender APA attached hereto as **Exhibit "A"** for the Stalking Horse Agreement in the Sale Order.

## **Relief Requested**

21.    The Court should compel[8] the Debtors to comply with the Sale Order, including Paragraph 7 of same and authorize Lender's Credit Bid Transaction to purchase the Property. Section 363(k) of the Bankruptcy Code, which grants a secured creditor the right to credit bid at a sale, provides as follows:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

---

7 The Credit Bid Transaction does not include the property encumbered by Bellefrau Group LLC or ZJC, LLC but does include Lot 21, as defined in the Final DIP and Cash Collateral Order.

8 Again, Lender regrets the need to seek to compel based upon the language in the Sale Order and the prior assurances of cooperation from the Debtors professionals and hopes that continued discussions regarding cooperation will continue.

11.S.C. § 363(k). To be entitled to credit bid under section 363(k), a creditor must demonstrate

only that the property being sold is subject to a lien that secures that creditor's allowed claim. *In*

*re SunCruz Casinos*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003).

22.    There is no dispute that the Property is encumbered by and is the Lender's

collateral. Other than Lot 21, the Property was encumbered by the Lender's prepetition liens and

Foreclosure Judgment. The Property, including Lot 21 was also pledged to the Lender as a part of

the DIP Loan and memorialized in the Final DIP and Cash Collateral Order.

23.    Paragraph 25 of the Final DIP and Cash Collateral Order specifically preserved

Lender's right to credit bid the Property, which provides:

> The DIP Lender and Prepetition Secured Lender shall be permitted, but not
> compelled, to credit bid up to the full amount of the (x) Pre-Petition Obligations,
> plus (y) the DIP Obligations in connection with any sale of the Collateral under or
> pursuant to (i) section 363 of the Bankruptcy Code. . .
>
> See ¶25. Final DIP and Cash Collateral Order.

24.    Paragraph 7 of the Sale Order specifically authorized Lender to credit bid the

Property, which provided:

> To the extent the Successful Bidder fails to close on or before the Closing Deadline,
> the Prepetition Secured Lender reserves the right to credit bid pursuant to Section
> 363(k) up to the full amount of its debt and to close on the Sale of the Assets
> pursuant to Section 363. . . . The Court reserves jurisdiction to hear and address any
> disputed related to the reservations of rights set forth in this paragraph, which may
> be heard on an emergency or expedited basis, including the entry of an order
> confirming a purchase and sale to any of the Lenders in respect of their Section
> 363(k) rights. See ¶7 of the Sale Order.

25.    The Sale Order also contemplated that the Lender, in its exercise of its Credit Bid

Rights, would be deemed a good faith purchaser subject to the protections of 363(m) of the

Bankruptcy Code and would not be deemed a successor-in-interest:

a. Upon Closing, the Successful Bidder **(or any Lender who exercises a credit bid right and purchases its respective collateral)** shall not be deemed to be: (a) a successor-in-interest to the Debtors; (b) a party to a de facto merger of the Successful Bidder and the Debtors; or (c) a mere continuation of the Debtors. Without limiting the generality of the foregoing, and except as specifically provided in the APA, the Successful Bidder **(or any Lender who exercises a credit bid right and purchases its respective collateral)** shall not be liable for any claims against the Debtors or any of their predecessors, other than as expressly provided for in such APA or this Order. See ¶ 20. Sale Order (*emphasis added*).

b. The Successful Bidder **(or any Lender who exercises a credit bid right and purchases its respective collateral)** is purchasing Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full rights, benefits, privileges and protections of that provision. The consideration provided by the Successful Bidder **(or any Lender who exercises a credit bid right and purchases its respective collateral)** for the Assets is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code. See ¶ 27 Sale Order (*emphasis added*).

26.    As discussed above, due to Lender's lien on substantially all of the Debtors' assets, and the rights reserved in the Sale Order and Final DIP and Cash Collateral Order, there can be no question that Lender is entitled to consummate the Credit Bid Transaction on the Property. To the extent, the Lender's right to credit bid on the Estate Lots is not included in the Sale Order, such rights are preserved in the Final DIP and Cash Collateral Order and authorized pursuant to 11 U.S.C. 363(k).   It is in the best interest of the Debtors and the estates for the Credit Bid Transaction to proceed.  Absent Lender taking title and control of the Property, further damage will result, which will increase Lender's deficiency claims, harm vendors, and harm the overall community. The community  needs to see this project stabilized  and completed as opposed to the continued disarray imposed on it by the Debtors and which would result from further delay.

27.    As set forth in the Sale Order, "the Bid Procedures were designed to obtain the highest value for Assets for the Debtors and their estates. The Successful Bidder's bid represents the highest and best offer for the Assets." see ¶ L Sale Order. The Successful Bidder's bid is no

longer at play and therefore Lender's Credit Bid Rights, as authorized in the Sale Order, represents the highest and best offer for the Property.

28.    The Credit Bid Transaction provides as follows:

   a.  Purchaser: USREC BANYAN CAY, LLC a Delaware limited liability company, or an affiliate or assignee.

   b.  Purchase Price[9]:

      i.  Credit Bid Amount: $96,500,000.00

      ii.  Lot 21 Credit Bid Amount: $400,000.00

      iii.  Assumed Liabilities identified on Schedule 7: TBD[10]

   c.  Contract Assumption: TBD[11].

   d.  Closing Date: On or about August 31, 2023.

29.    In order to consummate the Credit Bid Transaction, Lender requests the Court compel the Debtors to execute the Lender APA and substitute the Lender APA, for that of the Stalking Horse Agreement in the Sale Order. The Lender APA provides for a swift transfer of the Property, with the intended closing to occur on or before August 31, 2023. Such transaction is beneficial not only to the Property but to all of the Debtors' constituents-- the Property requires a significant amount of funding on a monthly basis to preserve the Property's operations and to maintain its employees and critical relationships with its vendors and members. Additionally, the Property requires a substantial amount of insurance which is subject to renewal and unattainable by the Debtors without Lender's continued funding. The Credit Bid Transaction will preserve jobs,

---

9 The credit bid amounts set forth herein are without prejudice to any and all rights the Lender has against any and all Guarantors and all rights, claims and defenses are preserved.

10 Surprisingly, the Debtors' schedules list no executory contracts and the Stalking Horse Bidder's APA did not identify any executory contracts either. The Lender has been working diligently to get an understanding of the Debtors' continued operations and what executory contracts exist (there are many) and are vital to continued operations of the golf course, clubhouse, and continued construction. The proposed APA provides the Lender with a modest amount of time to determine which contracts must be assumed and what liabilities are tied thereto.

11 See FN 5.

vendor relationships and is currently the only option that will lead to completion of the hotel, condominium, estate lots, villas, and clubhouse, a benefit to the community.

30. As this case continues to twist itself around the axle, it is not only critical, but equitable, that Lender be authorized to exercise its Credit Bid Rights and consummate the Lender APA with Debtors full cooperation.

**WHEREFORE**, U.S. Real Estate Credit Holdings III-A, LP requests the Court enter the Order attached hereto as **Exhibit "B"**: i) compelling the Debtor to comply with the Sale Order and execute the Lender APA; ii) authorizing the Credit Bid Transaction to purchase the Property free and clear of all liens; iii) substituting the Lender APA attached hereto as **Exhibit "A,"** for the Stalking Horse Agreement in the Sale Order; (iv) requiring the Debtors and Keen-Summit to cease all marketing efforts and notify the marketplace that the Credit Bid Transaction is moving forward; and (v) granting such other and further relief as may be appropriate under the circumstances.

Respectfully submitted,

BERGER SINGERMAN LLP
Attorneys for Lender
313 Monroe Street, Suite 301
Tallahassee, FL  32301
Telephone No.  (850) 561-3010
Facsimile No.  (954) 561-3013

By:  s/ *Brian G. Rich*
  Brian G. Rich
  Florida Bar No.38229
  brich@bergersingerman.com
  Jordi Guso
  Florida Bar No. 863580
  jguso@bergersingerman.com
  Michael J. Niles
  Florida Bar No. 107203
  mniles@bergersingerman.com

**CERTIFICATE OF SERVICE**

     **I HEREBY CERTIFY** that a true and correct copy of the forgoing was served on August 9, 2023, by electronic transmission through the Court's CM/ECF system upon all parties registered to receive electronic notice in this case as reflected on the attached CM/ECF Service List.


                      By:  s/ *Brian G. Rich*
                           Brian G. Rich

## CM/ECF SERVICE LIST

- Paul J. Battista     pjbattista@venable.com,
  cascavone@venable.com;jnunez@venable.com;imalcolm@venable.com;heburke@venable.com
- Ryan E Davis     rdavis@whww.com,
  thiggens@whww.com;thiggens@ecf.courtdrive.com
- Heidi A Feinman     Heidi.A.Feinman@usdoj.gov
- Robert C Furr     ltitus@furrcohen.com,
  atty_furrcohen@bluestylus.com;jcrane@furrcohen.com;staff1@furrcohen.com;furrrr84158@notify.bestcase.com
- Jordi Guso     jguso@bergersingerman.com,
  fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Jessey J Krehl     jessey@packlaw.com
- Isaac M Marcushamer     isaac@dgimlaw.com,
  colleen@dgimlaw.com;isaac_876@ecf.courtdrive.com;eservice@dgimlaw.com
- Michael Jordan Niles     mniles@bergersingerman.com,
  efile@bergersingerman.com;efile@ecf.courtdrive.com;zmorton@bergersingerman.com
- Office of the US Trustee     USTPRegion21.MM.ECF@usdoj.gov
- Joseph A Pack     joe@packlaw.com
- Hampton Peterson     legalservices@PBCTax.com
- Brian G Rich     brich@bergersingerman.com,
  efile@bergersingerman.com;efile@ecf.courtdrive.com;zmorton@bergersingerman.com
- Traci H Rollins     trollins@gunster.com, crossodivita@gunster.com
- James S Telepman     jst@cohennorris.com

# **<u>EXHIBIT A</u>**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of August ____, 2023 (the "Agreement") is authorized and drawn under that certain Sale Order (defined below and attached hereto) between BANYAN CAY INVESTMENT, LLC, a Florida limited liability company ("BC Investment"), BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company ("BC Mezz"), BANYAN CAY DEV. LLC, a Delaware limited liability company ("BC Dev"), BANYAN CAY RESORT & GOLF, LLC, a Delaware limited liability company ("BCRG"), BANYAN CAY VILLAS, LLC, a Delaware limited liability company ("BC Villas"), BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company ("BC Maintenance" and together with BC Investment, BC Mezz, BC Dev, BCRG, and BC Villas, collectively, the "Sellers," and each, a "Seller"), each a debtor and debtor in possession in Case No. 23-12390 (EPK), Case No. 23-11281 (EPK), Case No. 23-12386 (EPK), Case No. 23-12387 (EPK), Case No. 23-12388 (EPK), and Case No. 23-12389 (EPK) (each, a "Chapter 11 Case," and together, the "Chapter 11 Cases"), pending in the United States Bankruptcy Court for the Southern District of Florida  (the "Bankruptcy Court") respectively, and USREC BANYAN CAY, LLC a Delaware limited liability company, or an affiliate assignee ("Purchaser," and together with Sellers, the "Parties").

## RECITALS

**WHEREAS,** on February 16, 2023, BC Mezz filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in this Court. On March 29, 2023 (the "Petition Date"), the other above-captioned debtors (the "Operating Debtors" and collectively with BC Mezz, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code

**WHEREAS**, prior to the commencement of the Bankruptcy Case, U.S. Real Estate Credit Holdings III-A, LP (the "Lender") obtained a Amended Final Foreclosure Judgment against certain of the Debtors in the amount of $95,084,509.61, plus accruing interest, fees and expenses ("Foreclosure Judgment") in a foreclosure action in the Palm Beach County Circuit Court, Case No. 50-2022-CA-006815-XXXX-MB ("State Court Case") against the Sellers and several other entities and individuals encumbering the Assets (as defined herein). The Foreclosure Judgment provides the Lender with valid, binding, properly perfected, enforceable, first-priority lien and security interests in all the Property, including substantially all of the real and personal property of the Sellers, as described in the Loan Agreements between the parties

**WHEREAS**, on May 18, 2023, the Court entered the *Final Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(a), 362, 364(c), and 364(d), and (IV) Granting Super Priority Claims to the DIP Lender Pursuant to 11 U.S.C. 364(c)* (ECF No. 131, the "Final DIP & Cash Collateral Order").

**WHEREAS**, the Final DIP & Cash Collateral Order provided for the use of Cash Collateral (as defined therein) by the Debtors during the pendency of the Chapter 11 Cases and the provision of a DIP Loan by the Lender up to $3.8 million in debtor in possession financing ("DIP Loan"). In addition to the real and personal property encumbered by the Lender's pre-petition liens and the Foreclosure Judgement, the DIP Loan encumbered Lot 21 (as defined herein).

**WHEREAS**, On June 26, 2023, the Court entered the *Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and*

12349784-5

*Interest and (II) Granting Related Relief* [ECF No. 183, the "Sale Order"] approving an Asset Purchase Agreement with Westside Property Investment Company, Inc. (the "Successful Bidder")

**WHEREAS**, on the terms and conditions set forth in the Final DIP & Cash Collateral Order, the Debtors consented to, and the Bankruptcy Court authorized, the Lender to make a "credit bid" up to the full amount of the (x) Pre-Petition Obligations, plus (y) the DIP Obligations in connection with any sale of the Collateral under or pursuant to section 363 of the Bankruptcy Code.

**WHEREAS,** on the terms and conditions set forth in the Sale Order, to the extent the Successful Bidder failed to close on or before July 31, 2023, the Lender reserved the right to credit bid pursuant to Section 363(k) up to the full amount of its debt and to close on the sale of the Assets pursuant to Section 363. Successful Bidder failed to close.

**WHEREAS**, the Lender has designated Purchaser(s) as the entity to purchase the Assets (as defined below) and to assume the Assumed Liabilities (as defined below) pursuant to the credit bid.

**WHEREAS**, Sellers are obligated to and desire to sell, transfer, convey, assign and deliver to Purchaser the Assets and to assign to Purchaser the Assumed Liabilities, and Purchaser desires to purchase and acquire such Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the transactions contemplated by this Agreement (the "Transaction") have been approved of the Bankruptcy Court and will be consummated pursuant to the Sale Order (as defined below) entered in the Bankruptcy Case under Sections 105(a), 363, 365 and other applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and other good and valuable considerations, the receipt and adequacy of which are conclusively acknowledged, in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.  As used in this Agreement, the following terms have the following meanings:

"Agreement" shall mean this Asset Purchase Agreement, including the Schedules and Exhibits attached hereto.

"Assets" shall have the meaning set forth in Section 2.1 of this Agreement.

"Administrative Claim" shall mean any Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

12349784-5

"<u>Affiliate</u>," when used with reference to another Person, means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"<u>Assignment and Assumption Agreement</u>" shall mean the agreement(s) to assume the Assumed Liabilities identified on **<u>Schedule 7</u>**.

"<u>Assumed Contracts</u>" shall mean those executory contracts, Option Agreements and leases designated to be assumed and which are being assumed by and assigned to Purchaser by any Sellers under the terms of this Agreement.  Subject to Section 6.2 of this Agreement, the contracts and leases being assumed and assigned shall be the contracts and leases identified on **<u>Schedule 2</u>** attached hereto and made a part hereof.  For the avoidance of doubt, "Assumed Contracts" shall not include any of those contracts or leases that are not identified on **<u>Schedule 2</u>** and/or any contracts or leases rejected by the Sellers pursuant to section 365 of the Bankruptcy Code.

"<u>Assumed Liabilities</u>" shall mean the liabilities and obligations set forth in Section 2.3 of this Agreement.

"<u>Assumed Permits</u>" means all Permits, Development Orders, plats, site plans, and zoning approvals relating to the Assets that are transferable in accordance with their terms or by operation of law, but excluding all Permits to the extent related to any Excluded Asset (including any contract or lease that is not an Assumed Contract).

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the above Recitals.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the above Recitals.

"<u>Business Day</u>" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

"<u>Casualty Loss</u>" shall mean any loss, damage or destruction of the Assets that occurs during the period between the effective date of this Agreement and the Closing Date (or earlier termination of this Agreement) for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets for production of goods in the ordinary course of the Sellers' business.

"CDD" means the Banyan Cay Community Development District.

"CDD Assessments" has the meaning set forth in Section 5.10.

"CDD Consent" has the meaning set forth in Section 5.11.

"<u>Chapter 11 Cases</u>" shall have the meaning set forth in the above Recitals.

12349784-5

"Claim(s)" shall have the meaning set forth in the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code and shall include, among other things, any and all claims or orders arising under Environmental Laws and any and all claims or rights based on successor, tort and products liability.

"Closing" shall have the meaning set forth in Section 2.6 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 2.6 of this Agreement.

"Consent" shall mean any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Control" shall mean, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Credit Bid Amount" means $96,500,000.00

"Country Club Operations" means all material facilities, vendors, employees, contracts, equipment and systems involved with the operation of the existing golf course and clubhouse within the Premises as of the date of the execution of this Agreement.

"Cure Amounts" shall have the meaning set forth Section 6.2 of this Agreement.

"Cure Notice" shall have the meaning set forth Section 6.2 of this Agreement.

"Current Employees" means all employees of the Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Declarations" means Declaration of Master Covenants for Banyan Cay Resort recorded in OR Book 29679, page 227, as amended by Scrivener's Affidavit recorded in OR Book 29793, page 1148 as affected by Assignment of Declarant's Rights recorded in Official Records Book 29932, page 106, and as further amended by Supplemental Declaration recorded in Official Records Book 29932, page 192, and as further affected by Assignment of Declarant's Rights recorded in Official Records Book 31827, page 150, and in Official Records Book 32852 Page 48, Public Records of Palm Beach County, Florida; .

"Development Orders" means

"DIP Obligations" means the collective reference to (i) all loans made to the Debtors pursuant to the DIP Facility Documents, as defined in the Final DIP and Cash Collateral Order and (ii) all other obligations of the Debtors under the DIP Facility Documents or this Final Order owing to the DIP Lender

4

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as such term is defined in section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"<u>End Date</u>" shall mean August 31, 2023.

"<u>Environmental Laws</u>" shall mean all applicable laws, regulations or rules relating to pollution or protection of human health or the environment (including, without limitation, ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources (including without limitation applicable laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, or use of, or release or threatened release into the environment of, any Hazardous Substances.

"<u>ERISA</u>" shall mean the United States Employee Retirement Income Security Act of 1974.

"<u>Escrow Account</u>" shall have the meaning set forth in Section 2.4 of this Agreement.

"<u>Excluded Assets</u>" shall have the meaning set forth in Section 2.2 of this Agreement.

"<u>Final Order</u>" shall mean an order, judgment, or other decree of the Bankruptcy Court that has not been reversed, vacated or stayed and (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order, judgment or decree has been affirmed by the highest court to which such order, judgment or decree was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"<u>Equipment</u>" means tangible personal property (other than Inventory and Intellectual Property), which is used or held for use in the ordinary course of the Sellers' or its Affiliates' businesses.

"<u>Governmental Entity</u>" shall mean and include any agency, board, bureau, executive, court, commission, department, tribunal, instrumentality or administration of the United States or any State, and any local or other governmental body in a State, or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"<u>Governmental Permits</u>" shall mean and include all licenses (including liquor licenses), permits, approvals, consents, certificates, waivers, variances, exemptions, orders and other authorizations or similar right issued, granted, given or otherwise obtained from or by any and all Governmental Entities.

"<u>Hazardous Substance</u>" means any substance or material defined in or governed by any Environmental Law as a dangerous, toxic or hazardous pollutant, contaminant, chemical, waste,

material or substance, and also expressly includes ureaformaldehyde, polychlorinated biphenyls, dioxin, radon, asbestos, asbestos containing materials, nuclear fuel or waste, radioactive materials, explosives, carcinogens and petroleum products, including, but not limited to, crude oil or any fraction thereof, natural gas, natural gas liquids, gasoline and synthetic gas, or any other waste, material, substance, pollutant or contaminant which would subject the owner or operator of any assets transferred hereunder to any damages, penalties or liabilities under any applicable Environmental Laws, which, for the avoidance of doubt, includes any material or substance listed, defined, designated or classified as, or included in the definition of, "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants" or "pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law or any other substance regulated pursuant thereto, or the presence or release of, or exposure to which could reasonably be expected to form the basis for liability under any applicable Environmental Law, in each case because of its dangerous or deleterious properties or characteristics.

"Intellectual Property" shall mean all: (i) trademarks, service marks, trade names, trade dress, logos and corporate names and registrations and applications for registration, together with all of the goodwill associated therewith; (ii) Registered copyrights; (iii) computer software (other than general commercial software), data, databases and documentation thereof; (v) domain names and URLs; and (vi) Technology used by Sellers in the ordinary course of their businesses.  The Intellectual Property of Sellers includes, but is not limited to, the Intellectual Property identified on **Schedule 3** attached hereto and made a part hereof.

"Inventory" means inventories of raw materials and supplies, manufactured, spare and purchased parts, goods in process and finished goods, in each case, that are used or held for use in the operation of the Sellers' or its Affiliates' businesses, whether or not prepaid and whether in transit to or from Sellers and whether in Sellers' warehouses, distributions facilities, stores, outlets, held by third parties or otherwise.

"Knowledge," or the phrase "to the best of Seller's knowledge" and similar phrases, means with respect to Sellers means none of the Sellers, the shareholders or directors, officers or managers of either of the Sellers has any actual conscious awareness of facts or other information that the statement made is incorrect, and for this purpose, "implied knowledge" means all information in the books, records and files of Seller and all information that any of such persons should have known in the course of operating and managing the business and affairs of either of the Sellers.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or decree of any Governmental Entity.

"Liability" means any liability, indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or

6

determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured).

"Licenses and Permits" shall mean those Governmental Permits being assigned to Purchaser by Sellers. The Governmental Permits being assigned shall be the Governmental Permits identified on **Schedule 4** attached hereto and made a part hereof.

"Liens" shall mean any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Authority or arbitrator.

"Lot 21": means that certain real property identified as Lot 21 Of Banyan Cay Resort Replat of Tract "L1", According To The Plat Thereof As Recorded In Plat Book 127, Page 18, Of The Public Records Of Palm Beach County, Florida.

"Lot 21 Credit Bid Amount": means a credit bit of $400,000.00 from the DIP Obligations.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that is materially adverse to the financial condition or results of operations of the Sellers' business (taken as a whole); *provided, however*, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, Equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the business relative to the adverse effect that such changes have on other companies in the industry in which the business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on business relative to the adverse effect that such changes have on other companies in the industry in which the business operates; (iii) any change in GAAP or Law; (iv) compliance with this Agreement or any agreement in connection herewith, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any changes directly attributable to the announcement of this Agreement or any agreement in connection herewith; (vi)  any act of God or

7

other force majeure event (including natural disasters); (vii) in the case of Sellers or the business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; or (viii) seasonal changes in the results of operations.

"Premises" means the real property owned by Sellers including all mineral, air, and water rights, or easements to which Seller has rights, all as applicable, and described on **Schedule 1** attached hereto and made a part hereof. The Premises shall be transferred and conveyed to Purchaser at Closing pursuant to the terms of a Special Warranty Deed substantially in the form attached hereto as **Exhibit A**.

"Permitted Exceptions" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and procedures; (b) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property; (c) the title exceptions listed on Schedule BII of the title commitment issued to Purchaser by the Title Company, effective July 21, 2023; and (d) matters on the Survey provided by Sellers to Purchaser.

"Personal Property" means any and all personal property of any kind or nature owned by Sellers and its Affiliates, and includes Intellectual Property, inventory, all furniture, fixtures and equipment of Sellers and its Affiliates, vehicles and golf carts of Sellers and its Affiliates, books and records of Sellers and its Affiliates, customer lists of Sellers and its Affiliates, corporate records and minutes of Sellers and its Affiliates, goodwill associated with the Sellers and its Affiliates and the names of Sellers and its Affiliates and all assumed names. Personal Property includes, but is not limited to, the Personal Property identified on **Schedule 5** attached hereto and made a part hereof. The Personal Property (except for any Excluded Assets) shall be transferred and conveyed to Purchaser at Closing pursuant to the terms of the *Omnibus Bill of Sale and Assignment and Assumption Agreement* (and each of the conveyance documents attached thereto), in each case, substantially in the form attached hereto as **Exhibit B**.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" shall mean the day on which the Chapter 11 Cases commenced.

"Priority Claim" shall mean a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Purchase Price" shall have the meaning set forth in Section 2.5 of this Agreement.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Release" shall mean any spilling, emitting, leaking, pumping, pouring, emptying, injecting, escaping, dumping, disposing, discharging, migrating or leaching into, onto or through the environment.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, Representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Order" shall mean that certain *Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and Interest and (II) Granting Related Relief* [ECF No. 183] or such other Final Order acceptable to Purchaser and the Title Company entered by the Bankruptcy Court approving the sale of the Assets pursuant to this Agreement and under the applicable provisions of the Bankruptcy Code that, among other things, contains usual and customary findings of fact and conclusions of law by the Bankruptcy Court and, except to the extent otherwise agreed to in writing between the Purchaser and Sellers (each acting reasonably), (i) grants the Sale Motion; (ii) approves, authorizes and directs Sellers to enter into this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and consummate the transactions contemplated hereby; (iii) determines that this Agreement was proposed by Purchaser in good faith and represents the highest and best offer for the Assets and should be approved; (iv) determines that Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated; (v) authorizes and directs Sellers to sell the Assets to Purchaser pursuant to this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and all applicable provisions of the Bankruptcy Code, free and clear of all Liens, Claims and rights (including any and all "interests" in the Assets within the meaning of section 363(f) of the Bankruptcy Code) as provided in this Agreement, other than the Assumed Liabilities and the Permitted Exceptions; (vi) authorizes and directs Sellers to execute, deliver, perform under, consummate and implement this Agreement (or any amended version of such agreement agreed upon by the Parties in writing), together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (vii) authorizes the assignment and assumption of the Assumed Contracts and Intellectual Property in accordance with section 365 of the Bankruptcy Code and establishes the Cure Amounts with respect to same that are acceptable to Purchaser in its reasonable discretion; (viii) provides that Purchaser is not the successor to either Seller or the Sellers or their respective bankruptcy estates by reason of any theory of law or equity and that Purchaser has not assumed any liability or obligation of either of the Sellers or their respective bankruptcy estates, except as otherwise expressly provided in this Agreement; (ix) provides that the Assumed Contracts and Intellectual Property are transferred and assigned at Closing to Purchaser and that such Assumed Contracts and Intellectual Property will remain in full force and effect in accordance with their respective terms and notwithstanding any provisions in any such Assumed Contracts and Intellectual Property contracts that prohibit, restrict or condition such assignment or transfer; (x) provides that Purchaser has no obligation to pay any liabilities or obligations of Sellers of any kind, except as expressly provided in this Agreement; (xi) to the extent enforceable under applicable law, enjoins the holder of any Lien or interest in Sellers or any of the Assets from interfering with Purchaser's title or use and enjoyment of the Assets based upon or related to such lien or interest; (xii) provides for the Bankruptcy Court to obtain jurisdiction to enforce or implement the terms and provisions of this Agreement and the Sale Order; and (xiii) provides that, notwithstanding Bankruptcy Rule 6004(h) and 6006(d), the Sale Order shall be effective

and enforceable immediately upon its entry, shall be self-executing and shall authorize Sellers and Purchaser, in the absence of any stay pending appeal, to consummate the transactions contemplated by this Agreement.

"Seller" has the meaning set forth in the preamble to this Agreement.

"Seller Reimbursement Amount" has the meaning set forth in Section 5.10.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other Persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Supplemental DIP Order" means *Stipulated and Supplemental Final Order Authorizing Use Of Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361 And 363, (III) Authorizing The Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105(A), 362, 364(c), And 364(d), And (IV) Granting Super Priority Claims To The DIP Lender Pursuant To 11 U.S.C. 364(c)* [ECF No. _____]

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Internal Revenue Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale Equipment, inventory management Equipment, software, software code (in

10

any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Title Company" shall mean Old Republic Title Company.

"Transfer Tax" shall have the meaning set forth in Section 5.6(b) of this Agreement.

"Transferred Employee" shall have the meaning set forth in Section 5.7(b) of this Agreement.

"Utility Deposit" means any and all utility deposits for electric, water and sewer, gas and similar items, if any, which can be assigned to Purchaser and shall be added to the Purchase Price at Closing, to the extent requested by Purchaser.

**ARTICLE II**
**PURCHASE AND SALE OF ASSETS**

2.1    Purchase and Sale.  Excepting any and all Excluded Assets, upon the terms and subject to the conditions set forth in this Agreement, pursuant to the Sale Order and  sections 105, 363 and 365 of the Bankruptcy Code, on the Closing Date, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase and assume from Sellers, all of Sellers' right, title and interest in and to all of the Sellers' properties, assets, and rights in and to the Premises, the Personal Property, the Assumed Contracts and the Licenses and Permits, Developer's Rights, the Declarant's Rights, the CDD Reimbursements and all other rights, incidents and privileges Seller exercise or may exercise over or affecting the Premises (collectively, the "Assets"), in each case free and clear of any encumbrances, Liens, Claims, rights, remedies or interests, existing as of the Closing except for the Permitted Exceptions and as specifically permitted herein, as approved for sale, transfer and assignment pursuant to the Sale Order.  **The Assets shall not include the Excluded Assets**.

2.2    Excluded Assets.  Notwithstanding anything else to the contrary set forth in this Agreement, the Assets shall not include, and Purchaser shall not buy or have any liability or obligation with respect to, any of the following (collectively, the "Excluded Assets"):

(a)    Sellers' cash, cash equivalents, accounts, accounts receivable, securities, credits, rights of reimbursement, set off rights, and rights of recoupment, including, without limitation, any reimbursement rights or other rights arising out of governmental programs; and/or any amounts due for the sale of tax credits.  For the avoidance of doubt, BC Investment's membership interest in BC Mezz and BC Mezz's membership interests in BC Dev, BCRG, and BC Villas are Excluded Assets;

(b)    Any and all causes of action of any Seller, whether known or unknown on the Closing Date, including without limitation, those arising under chapter 5 of the Bankruptcy Code; *provided however*, that notwithstanding anything to the contrary herein, any and all causes of action that could affect either materially or immaterially the operation of the Assets, the Assumed Liabilities, or the Assumed Contracts after the Closing Date shall be included in the definition of "Assets";

11

(c)    Except as set forth in section 7.1(b) solely with respect to a Casualty Loss occurring after the entry of the Sale Order, any Seller's rights and interests under any insurance policies;

(d)    Except as identified as an Assumed Contract, any and all: (i) employment, consulting, advisory or service agreements, plans, commitments, arrangements or understandings; (ii) leases or consignment agreements and arrangements; (iii) employee benefit, deferred compensation and/or severance agreements, plans, commitments, arrangements or understandings including, without limitation, all stock option, stock purchase, bonus, incentive and similar agreements, plans, commitments, arrangements or understandings; (iv) collective bargaining agreements, commitments, arrangements or understandings with employees; and (v) agreements, obligations and liabilities with respect to or relating to any "pension plan" or "welfare plan" (as such terms are defined in ERISA);

(e)    Sellers' rights under this Agreement;

(f)    All contracts and leases to which a Seller is a party (and Sellers' related rights), in each case other than the Assumed Contracts assigned to and assumed by Purchaser;

(g)    Sellers' minute books, filed Tax Returns for the five-year period prior to the Closing Date (provided that Purchaser shall have the right to copies of such Tax Returns and all documentation related to the preparation of the Tax Returns) books of account, and all books and records that a Seller is prohibited from disclosing or transferring to Purchaser under applicable Law; and

(h)    Any and all additional Excluded Assets identified on **Schedule 6** attached hereto and made a part hereof.

2.3    <u>Assumption and Assignment of Liabilities</u>.  Purchaser shall not assume any liabilities or obligations of any Seller, except for those specifically identified on **Schedule 7** attached hereto and made a part hereof (the "<u>Assumed Liabilities</u>") and the liabilities and obligations assumed in relation to the Assumed Contracts and the Licenses and Permits or as otherwise expressly stated herein.

2.4    <u>Purchase Consideration</u>. In consideration for the sale, transfer and delivery of the Assets, Purchaser shall pay to Sellers, as credit bid to reduce the amount of the Foreclosure Judgment as permitted by the Sale Order: (i) the Credit Bid Amount[1]; (ii) the Lot 21 Credit Amount; plus (iii) the assumption by Purchaser of any Assumed Liabilities, as set forth on **Schedule 7** hereof (the "<u>Purchase Price</u>"). In no event shall the Credit Bid Amount be payable by Purchaser in cash.

2.5    <u>Closing</u>.  The closing (the "<u>Closing</u>") shall occur on or about August 31, 2023. Unless otherwise agreed by the Parties, the Closing shall take place remotely via the exchange of documents and signatures, and shall be effective as of 11:59 p.m. West Palm Beach, Florida, time on the date of Closing (the "<u>Closing Date</u>").

---

[1] The Credit Bid Amount set forth herein are without prejudice to any and all rights the Lender has against any and all Guarantors and all rights, claims and defenses are preserved.

12349784-5

2.6    <u>Transfer of Possession and Deliveries</u>. By way of illustration and not limitation, at the Closing, the Sellers or Parent (as applicable) shall deliver, or shall cause to be delivered, to Purchaser the following:

(a)    The Special Warranty Deed(s) executed by each Seller owing any of the real property included in the Assets, in substantially the form attached hereto as <u>Exhibit A</u>;

(b)    The Quit Claim Deeds executed by each Seller with respect to the real property included in the Assets, in substantially the form attached hereto as <u>Exhibit B</u>;

(c)    The Omnibus Bill of Sale and Assignment and Assumption Agreement without warranty or other covenants, duly executed by each Seller, in a form reasonably satisfactory to Purchaser and other conveyance documents in relation to the Assets described below, in substantially the form attached hereto as <u>Exhibit C</u>:

Schedule 1 – Bill(s) of Sale,

Schedule 2 – Assignment(s) and Assumption of Intangible Property,

Schedule 3 – Assignment(s) of Declarant's Rights, and

Schedule 4 – Assignments and Assumption of Development Rights, Licenses, Permits and Developer's Rights;

(c)    A Seller's affidavit meeting the requirements of Section 627.7842, Florida Statutes in substantially the form attached hereto as <u>Exhibit </u>D.

(d)    One (1) original affidavit in substantially the form attached hereto as <u>Exhibit E</u>, executed by each Seller and stating its taxpayer identification number for federal income tax purposes and that such Seller is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code (the "<u>FIRPTA Certificate</u>");

(d)    all other documents, closing statements, affidavits, instruments and writings required to be delivered by Sellers at or prior to the Closing Date pursuant to this Agreement or otherwise requested by Purchaser to deliver the Assets free and clear of any Liens, Claims, rights or interests, each in form and substance reasonably satisfactory to Purchaser and Sellers;

(e)    physical possession of all of the Assets capable of delivery, including all keys, key cards, combinations and codes relating to the operation of the improvements located on the Premises.

(f)    any applicable local, state or federal transfer tax forms;

(g)    documents reasonably required by the Title Company to consummate the transactions contemplated by this Agreement.;

12349784-5

(h)    certificates of title and title transfer documents to all titled motor vehicles and golf carts included in the Assets;

(i)    assignment of all contract warranties still in effect;

(j)    a properly executed IRS Form W-9 from each Selling Entity;

(k)    a consent of the **[members/managers/board of managers]** of each Seller authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder;

(l)    A written certificate stating that all representations and warranties contained in Article 3 remain, as of the Closing Date, true, correct, and complete in all material respects as when first made hereunder (the "Bring-Down Certificate"); and

(m)    all other customary documents, instruments and writings reasonably requested by Purchaser to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

2.7    Possession.    On the Closing Date, possession of the Assets shall be delivered to Purchaser with possession meaning providing access to Purchaser to the Premises and such possession shall not be interfered with by any party or entity that has not asserted or had adjudicated in its favor a right to access.

2.8    Closing Costs.    Purchaser shall pay any applicable recording fees and Transfer Taxes unless otherwise provided by the Sale Order.    Except as set forth in this Section or elsewhere in this Agreement, each of the Parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the Transaction contemplated hereby.

2.9    Right of Purchaser to Acquire Assets in Different Legal Entities.    Notwithstanding anything to the contrary set forth in this Agreement, on or before the Closing Date, Purchaser shall have the right to designate to Seller the legal name of different legal entities specified by Purchaser to acquire from Seller certain assets included in the Assets and to allocate the ownership of such Assets among the legal entities designated by Purchaser.    To the extent requested by Purchaser, Seller shall execute and deliver separate conveyance documents described in Section 2.6 of this Agreement for each entity designated by Purchaser to acquire any portion of the Assets.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, each hereby represent and warrant to Purchaser as follows as of the date of this Agreement:

3.1    Organization and Authority.    Sellers are each duly organized and validly existing under the laws of the jurisdiction of their organization and, subject to any required approval of the Bankruptcy Court, and any required approval of applicable Governmental Entities, each has the power and authority to own and lease the Assets, and to enter into the transactions contemplated by this Agreement.

14

3.2     Good Standing.  Each Seller is duly authorized to do business and is in good standing in each jurisdiction where the ownership or operation of the Assets or the conduct of the business as of the execution of this Agreement requires such qualification.

3.3     As Is/Where Is.  Except for the representations and warranties contained in this Agreement and as approved for sale, transfer, and assignment pursuant to the Sale Order, Sellers make no express or implied representation or warranty with respect to Sellers, the Assets or the transaction contemplated by this Agreement.

3.4     Authority and Binding Agreement.  This Agreement and those agreements executed in connection herewith have been duly authorized, executed and delivered by each of the Sellers and, subject to the approval of the Bankruptcy Court, are the valid and binding obligations of each of the Sellers.

3.5     Consents and Approvals.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be made or obtained by Sellers in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer each of Sellers' interest in any Assets, the title to which is governed by filing in the public records; and (c) the filing of such documents as may be necessary to reflect the release of any Liens that are a matter of public record.

3.6     Title to and Condition of Assets.  Sellers each have good marketable title to all of their respective Assets and may transfer each of the Assets free and clear of all liabilities, Liens (including tax liens), rights and interests of any kind whatsoever, all to the extent provided for by the terms of this Agreement and the Sale Order.

3.7     Compliance with Laws.  Sellers are in compliance with all material Laws applicable to the business or the Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect, and no Seller has received any written notice within the past twelve months relating to violations or alleged violations or material defaults under any decree or any Governmental Permit, in each case, with respect to the Sellers' business.

3.8     Title to Assets.  Sellers, as of the Closing, have good, valid, and marketable title to, or, in the case of leased assets, have good and valid leasehold interests in, the Assets, free and clear of all Liens and Claims (except for Permitted Exceptions).  At the Closing or such time as title is conveyed under this Agreement from Seller to Purchaser, Sellers will convey good and valid title to, or valid leasehold interests in, all of the Assets, free and clear of all Liens and Claims (except for Permitted Exceptions), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

3.9     Intellectual Property.

(a)     The Sellers have provided to Purchaser a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller and used in or related to the Sellers' business, (ii) all material contracts pursuant to which any Seller obtains the right to use any Intellectual

12349784-5

Property, and (iii) all material contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all such Registered Intellectual Property free and clear of all Liens and Claims (except for Permitted Exceptions), and, to Sellers' Knowledge, all such Registered Intellectual Property is valid, subsisting and enforceable, and is not subject to any outstanding decree adversely affecting Sellers' use thereof or rights thereto. Immediately after the Closing, Purchaser will own or have the right to use all of the Intellectual Property included in the Assets on the same terms and conditions as in effect for Sellers immediately prior to the Closing, to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

(b)     To Sellers' Knowledge, none of the use of the Intellectual Property included in the Assets, the conduct of the business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person.  To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Assets.

(c)     To Seller's Knowledge, no Litigation is currently pending or threatened against any Seller that challenges the validity, ownership, registrability, enforceability, infringement or use of any material Intellectual Property owned by any Seller.

3.10     Master Declaration.   The Sellers have provided to Purchaser all declarations of covenants, conditions, restrictions (or similarly named instruments) that affects all or any portion of the Premises, and Assignment of Declarant's Rights. The Sellers have not received any notice from any Governmental Authority or any other Person of (A) any actual or potential violation of the Declaration or CDD, or (B) any fine, fee, or expense owed by the Sellers pursuant to any declaration or CDD encumbering the Assets.

3.11     Employees and Employment Matters. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement), and within the ninety (90) day period ending on the date hereof, and no Seller has implemented any plant closing or layoff of the Current Employees (as determined as of the date of this Agreement) in violation of the United States Worker Adjustment and Retraining Notification Act, or any similar applicable Law (collectively, the "WARN Act"). Within five (5) days after the date hereof, Sellers shall make available to Purchaser a list of all Current Employees with personally identifying information redacted to the extent required by applicable Law.

3.12     Litigation.   Other than those certain matters disclosed in the Sellers' Statements of Financial Affairs [Docket No. 75, Part 3 Annex, in Case No. 23-12386] (the "Disclosed Actions"), there is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Entity pending, or, to the knowledge of Seller, threatened against Seller that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Seller's Knowledge, there are no circumstances or facts, including for the avoidance of doubt the circumstances and facts alleged in the Disclosed Actions, that would prevent Seller from engaging in the transactions contemplated in this Agreement.

3.13    <u>Assumed Licenses and Permits</u>.  The Sellers have provided to Purchaser, to the best of Sellers' Knowledge, a list of all material Licenses and Permits that Sellers hold as of the date hereof in connection with the operations of the Sellers' business, including the assigned Licenses and Permits, any thereof to be an Excluded Asset, and other governmental and land development approvals required for the operation and development of the Premises and/or Assets. The Sellers have not received any notice from any Governmental Authority or any other Person of (A) any actual or potential violation of any Permit, or (B) any actual or potential revocation, withdrawal, suspension, cancellation, termination of or modification of any such Permit and all applications for renewal and other filings required to have been made with respect to the Selling Entity's Governmental Permits have been duly made on a timely basis with the appropriate Governmental Authorities, in each case, except as would not be, individually or in the aggregate, material to the Seller's business, the Assets and the Assumed Liabilities, taken as a whole.

3.14    <u>Insurance</u>. The Sellers have made available to Purchaser a list, as of the date hereof, of all material insurance policies.

3.15    <u>Country Club Operations</u>.  All Country Club Operations will continue to operate in their current manner through the date of Closing without interruption or modification, to the extent within the control of Sellers, unless specifically requested by Purchaser.

3.16    <u>Brokers</u>. No broker, investment banker or other Person engaged by Seller is entitled to any broker's finder's or other similar fee or commission payable by Purchaser in connection with the Transaction contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

## ARTICLE IV
## <u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>

Purchaser hereby represents and warrants to each of Sellers as follows:

4.1    <u>Organization and Authority</u>.  Purchaser is duly organized and validly existing under the laws of the jurisdiction of its organization and has the power and authority and all necessary approvals of all Governmental Entities to enter into the transactions contemplated by this Agreement.

4.2    <u>Authority and Binding Agreement</u>.  This Agreement has been duly authorized, executed and delivered by Purchaser and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Purchaser and no consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.

4.3    <u>Adequate Assurances Regarding Executory Contracts</u>.  Purchaser as of the Closing Date will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

## ARTICLE V
## <u>COVENANTS PRIOR TO AND IN FURTHERANCE OF CLOSING</u>

12349784-5

5.1    <u>Affirmative and Negative Covenants Pending Closing</u>.  Except as expressly set forth below, during the period from the date hereof to the Closing Date (or earlier valid termination of this Agreement), the Parties expressly agree (except as otherwise expressly stated to apply to a different period):

(a)    <u>Certain Efforts; Cooperation</u>.

(i)    On and after the Closing, Sellers and Purchaser shall use their commercially reasonable efforts to take, or cause to be taken by themselves or any of their respective Affiliates and/or Representatives, all appropriate action, to do or cause to be done by Sellers and Purchaser or any of their respective Affiliates all things reasonably necessary, reasonably proper or reasonably advisable under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in Purchaser all of Sellers' right, title and interest to the Assets, free and clear of any encumbrances, Liens, Claims, rights, remedies or interests, existing as of the Closing except for the Permitted Exceptions and as specifically permitted herein and by the Sale Order.

(ii)    <u>Power of Attorney</u>.  Seller hereby constitutes and appoints Purchaser, its successors and assigns, the true and lawful attorney and attorneys of the Seller, with full power of substitution, in the name of the Purchaser or in the name and stead of the Seller, but on behalf of and for the benefit of the Purchaser, its successors and assigns:

1. to collect, demand and receive any and all Assets transferred hereunder and to give receipts and releases for and in respect of the same;

2. to institute and prosecute in the Seller's name, or otherwise, at the expense and for the benefit of the Purchaser any and all actions, suits or proceedings, at law, in equity or otherwise, which the Purchaser may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Assets hereby sold and assigned to Purchaser or intended so to be, to defend or compromise any and all such actions, suits or proceedings in respect of any of such Assets, and to do all such acts and things in relation thereto as Purchaser shall deem advisable for the collection or reduction to possession of any of such Assets;

3. to take any and all other reasonable action designed to vest more fully in Purchaser the Assets hereby sold and assigned to the Purchaser or intended so to be and in order to provide for the Purchaser the benefit, use, enjoyment and possession of such Assets; and

4. to do all reasonable acts and things in relation to the Assets sold and assigned hereunder.

Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by it or upon its subsequent dissolution or in any manner or for any reason.  Purchaser shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers,

18

including any amounts payable as interest with respect thereto.  Seller shall from time to time pay to Purchaser, when received, any amounts that shall be received directly or indirectly by Seller (including amounts received as interest) in respect of any Assets sold, assigned or transferred to Purchaser pursuant hereto.

(iii)    This Section 5.1(a) of this Agreement shall survive the closing of the transactions contemplated by this Agreement.

5.2    <u>Notice, Consents and Further Actions</u>.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party consents or sublicenses.  To the extent that any Intellectual Property licenses held by a Seller cannot be assigned to Purchaser hereunder without obtaining the consent of the licensor or grantor thereof (provided such licensor or grantor is not an Affiliate of Sellers), such consent to assignment shall not be deemed a condition of Closing hereunder and the inability of the applicable Seller to obtain such consent to assignment following exercise of its commercially reasonable efforts to obtain the same shall not constitute a breach of this Agreement.

(b)    Sellers and Purchaser shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the transactions contemplated hereby and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

(c)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Purchaser and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the transactions contemplated by this Agreement, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers or Purchaser and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and to consider incorporation of the other Party's reasonable comments.

5.3    <u>Notice of Developments</u>.  From the date hereof until the Closing Date, Sellers (with respect to each, as to itself), as the case may be, shall promptly disclose to Purchaser, on the one hand, and Purchaser shall promptly disclose to Sellers, on the other hand, in writing after attaining knowledge (as applicable to each of Sellers and Purchaser) of any material failure of any of Sellers or Purchaser to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; *provided*, *however*, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement

19

5.4    <u>Substitution Motion</u>. Within two (2) days of execution of this Agreement, the Sellers shall prepare and file an emergency motion with the Bankruptcy Court (the "<u>Substitution Motion</u>") to substitute this Agreement for that of the Successful Bidder's APA and the Purchaser as the Successful Bidder in the Sale Order which shall designate Purchaser as purchasing the Assets in good faith and is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision. Such Substitution Motion and order shall effectively substitute Purchaser as the Successful Bidder and provide Purchaser with all protections and benefits of the Sale Order as if the Purchaser.

5.5    <u>Asset Maintenance</u>.  From the date hereof until the Closing (or earlier termination of this Agreement), the Sellers shall maintain the Assets owned or operated by each of the Sellers consistent with Sellers' standard practice, subject only to ordinary wear and tear and in consultation with the Purchaser and subject to the Supplemental DIP Order.

5.6    <u>Access</u>. From the date hereof until the Closing (or earlier termination of this Agreement), Sellers shall permit Purchaser and its Representatives to have reasonable access to all premises, properties, personnel, records and contracts related to the Sellers' business.

5.7    <u>Employee Matters</u>.

(a)    Sellers shall provide to Purchaser within two (2) days after execution of this Agreement a list of all the Current Employees with all personally identifying information redacted to the extent required by applicable Law, and Purchaser shall provide to Sellers at least one (1) day before the Closing Date a list of those Current Employees that Purchaser wishes to hire effective as of the Closing Date (such list, the "<u>Retainee List</u>"). Purchaser may amend or supplement the Retainee List from time to time prior to the Closing Date.  Purchaser acknowledges and agrees that Sellers retain the right to terminate or otherwise alter the terms of employment of all employees prior to Closing other than those whose names are listed on the Retainee List.

(b)    For purposes of this Agreement, a Current Employee who is hired by Purchaser on or after the Closing Date shall be referred to as a "<u>Transferred Employee</u>." It is the intention of Purchaser, and Sellers hereby acknowledge and agree with such position, that the Transferred Employees will be new employees of Purchaser, and all such Transferred Employees shall be entitled only to such compensation and employee benefits as are agreed to by such employees and Purchaser or as are otherwise provided by Purchaser, in its sole discretion, except with respect to Assumed Liabilities.

(c)    Except with respect to the Assumed Liabilities, Sellers shall retain the responsibility for all liabilities and obligations relating to compensation earned by a Current Employee on or before the Closing Date, including without limitation all "bonuses" and similar compensation arrangements with Current Employees.

(d)    No provision of this <u>Section 5.6</u> shall create any rights in any individual who is not a Party hereto, including any employee or former employee (including any beneficiary or dependent thereof) of a Seller except with respect to Assumed Liabilities.  Further, this <u>Section 5.6</u> shall not in itself create any right to continued employment or service (or resumed employment or

20

service) with Sellers or Purchaser or its Affiliates with respect to any employee, independent contractor or consultant, and except as provided herein, no provision of this Section 5.6 shall create any rights in any Person with respect to any benefits that may be provided, directly or indirectly, under any plan or arrangement established by a Seller or any of its Affiliates or any plan or arrangement that may be established by Purchaser or any of its Affiliates.

5.8     Bulk Transfer Laws. Purchaser acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Assets shall be free and clear of any Liens, Claims, or interests in the Assets, including any Liens, Claims, or interests arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

5.9     Liquor Licenses. To the extent applicable, Purchaser shall use commercially reasonable efforts to obtain, at Purchaser's expense, the necessary consents and approvals (the "Liquor License Approvals") to transfer the liquor licenses held or used by or on behalf of any Seller for sale of alcohol or to obtain the issuance of a new liquor license, including making filings with any Governmental Authority with respect to any of the Liquor Licenses. Sellers shall reasonably cooperate with Purchaser in connection with Purchaser's efforts to obtain the Liquor License Approvals, provided that Sellers shall not be required to expend any amounts to obtain (or assist Purchaser in obtaining) any Liquor License Approvals.

5.10    Name Change. Within two (2) days after the Closing, but except as may be required for filings with the Bankruptcy Court, Sellers shall take all steps necessary to effect a change in their respective corporate names to remove the word "**Banyan**" and any other trade names utilized by Sellers in the business as reasonably identified by Purchaser (collectively, the "Seller Names") from such names. Sellers agree that they shall (i) as promptly as practicable after the Closing Date and in any event within five (5) days following the Closing Date, cease to make any use of the Seller Names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or any of the Intellectual Property Rights or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"), and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business. As promptly as practicable, Sellers shall remove, strike over, cover, block or substantially obliterate all Seller Marks from any vehicles, displays, signs, promotional materials or other similar materials then owned by them and not included in the Assets

5.11    CDD Disclosure. Purchaser acknowledges and agrees that the Assets are subject to the CDD formed pursuant to Chapter 190, Florida Statutes to provide a variety of improvements and services for the Assets and that the Assets are subject to the CDD. Purchaser specifically acknowledges that CDD assessments ("CDD Assessments") have been and/or may be levied and certified for collection against the Assets, including for repayment of special assessment bonds and for annual maintenance assessments due to the CDD, which may vary from year to year. Within two (2) days of the effective date of this Agreement, or such later date that is mutually agreeable to the Parties, the Sellers shall provide to Purchaser a list of (i) the amount of bonds that have been issued, (ii) the amount of CDD Assessments that have been levied and certified for collection against the Assets, and (iii) the

21

amount in which Sellers have the right to receive a cost or other reimbursement from the CDD ("Seller CDD Reimbursement").  The Assets shall include the Seller CDD Reimbursement.

5.12    CDD Operations/CDD Closing Obligations.

(a)    Within two (2) days from the effective date of this Agreement, Sellers shall provide copies of the following to Purchaser: (i) CDD budgets, (ii) CDD meeting minutes and CDD resolutions, (iii) contracts and other agreements reasonably requested by Purchaser.

(b)    At Closing, Sellers shall assign their rights to and obligations under the Seller CDD Reimbursement to Purchaser in a manner reasonably acceptable to Purchaser ("CDD Reimbursement Assignment") and obtain and deliver to Purchaser the CDD consent to the CDD Reimbursement Assignment in a manner reasonably acceptable to Purchaser, along with and any other consents required under Chapter 190, Florida Statutes, if any ("CDD Consents").

(c)    In the event Sellers are unable to obtain and deliver the CDD Consents to the Seller CDD Reimbursement as set forth above, then Purchaser shall have the right to terminate this Agreement and shall receive a refund of the Deposit and the Parties shall have no further rights or obligations under the Agreement.

(d)    On or before Closing, and as a condition precedent thereto, Sellers shall procure and deliver to Purchaser the following pursuant to Chapter 190, Florida Statutes: (i) resignations of the current Board of Supervisors of the CDD, and (ii) proof of appointment of a Board of Supervisors designated by Purchaser.  Additionally, Sellers shall engage in commercially reasonable best efforts to procure a legal opinion letter from CDD counsel that such resignation, designation and appointment of the new Board of Supervisors is in compliance with Chapter 190, Florida Statutes and does not violate or cause a default under Florida law or the obligations of the CDD, including without limitation, any such bonds issued by the CDD, and deliver such legal opinion letter to Purchaser on or before Closing.

5.13    Conditions to Purchaser's Obligation to Close.  Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)    Representations and Warranties; Covenants.

(i)    All representations and warranties of each of the Sellers contained in this Agreement and any related transaction documents shall have, to the applicable Seller's Knowledge been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties in this Agreement that, by their terms, apply only as of an earlier date, which will be true and correct as of such date and except that Sellers may, if they become aware before Closing that additional disclosures are required in order to make any of Sellers' representations and warranties in this Agreement true and correct, disclose information to Purchaser as is necessary to make those representations and warranties true and correct, and in that case any then-existing breach of Seller's representations and warranties will be cured to the extent of the additional information

22

disclosed, and, if Sellers disclose a Material Adverse Effect (but not otherwise), Purchaser will have the option to either terminate this Agreement or to waive the matter and proceed to Closing without any adjustment to the Purchase Price), and each of the Sellers shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized Representative of each of the Sellers, to that effect.

(ii)    Each of the Sellers shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by each of the Sellers prior to or at the Closing Date, and each of the Sellers shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized Representative of each Seller, to that effect.

(b)    <u>Sellers' Deliveries</u>.  Each of the Sellers shall have duly executed and delivered to Purchaser each of the documents, instruments and agreements required to be delivered by each of the Sellers pursuant to Section 2.6 of this Agreement.

(c)    <u>Material Adverse Effect</u>.  From the date of this Agreement until the Closing Date, there shall not have occurred and be continuing a Material Adverse Effect.

(d)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order (with respect to the Assets) in form and substance reasonably satisfactory to Purchaser, and the Title Company and such order shall have become a Final Order.

(e)    <u>Title Commitment</u>. The Title Commitment insuring title to all of the Premises includes any exceptions other than the Permitted Exceptions.

(f)    <u>No Injunction or Challenge</u>.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.  No law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Entity or any other Person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or decree) which would prevent the consummation at the Closing of, or restrain or invalidate, the transactions contemplated by this Agreement.

## ARTICLE VI
## CONTRACT ASSUMPTION

6.1    <u>Cure Notice</u>.  On or before the day that is five (5) days after execution of this Agreement, Sellers shall serve a cure notice (the "<u>Cure Notice</u>") by first class mail on all non-debtor counterparties to all potentially Assumed Contracts and provide a copy of the same to Purchaser. The Cure Notice shall inform each recipient that its respective contract or lease may be designated by Purchaser as either assumed or rejected, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the contract or lease, (ii) the name of the contract or lease counterparty, (iii) Sellers' good faith estimates of the Cure Amounts required in connection with such contract or lease (the "<u>Cure Amounts</u>"), (iv) the identity of Purchaser and (v) the deadline by which any such contract or lease counterparty may file an objection to the proposed assumption and assignment and/or cure,

12349784-5

and the procedures relating thereto.

6.2    Contract Assumption.  Up to one (1) day prior to the Closing Date, Purchaser may, in its sole discretion, add or remove any contract or lease as an Assumed Contract to be assumed and assigned to Purchaser on the Closing Date by amending the Closing Assumed Contract List, and, in connection with the Closing, the applicable Seller shall move in the Bankruptcy Court to assign any such contract or lease on the Closing Assumed Contract List to Purchaser, and at the Closing shall assume and assign to, and Purchaser shall accept the assignment of and assume such contract or lease. In advance of the Closing Date, Purchaser may, in its sole discretion, designate a contract or lease for exclusion and rejection by delivering written notice to Sellers and, in connection with the Closing, the applicable Seller shall move to reject any such contract or lease as of the Closing Date (which date shall constitute the Rejection Effective Date with respect thereto). On or prior to thirty (30) days following the Closing date (the "Retained Contracts Period"), Purchaser may, in its sole discretion ,change the designation of an Assumed Contract to a Rejected Contract or a Rejected Contract to an Assumed Contract by amending the Closing Assumed Contract List, if a non-Seller Contract counterparty objects to proposed Cure Amounts and either (i) Purchaser is unable to reach a satisfactory agreement with the non-Seller Contract counterparty as to the total amount of the Cure Costs or (ii) an order is entered establishing the Cure Costs in greater amounts unsatisfactory to Purchaser. In additional to all other rights granted to the Purchaser regarding the designation of Assumed Contracts, the Purchaser shall have the right after the Closing to designate in writing, additional Contracts as Assumed Contracts, in each case to the extent permitted by applicable Law, until such Contracts are sold, transferred, rejected or wound down by the Sellers. The Sellers shall provide timely and proper written notice of such assumption and assignment to all parties to any such additional Assumed Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by the Debtor entities and assigned to the Purchaser pursuant to 365 of the Bankruptcy Code. The Purchaser shall be responsible for any Cure Amounts due and owing under such Assumed Contracts so designated by the Purchaser post-Closing.

6.3    No Successor Liability. The Parties intend that upon the Closing the Purchaser and its respective Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, the Employee Retirement Income Security Act of 1974, or other Applicable Laws; (b) have any responsibility or Liability for any obligations of Seller (other than the Assumed Liabilities), or any Affiliate of Seller based on any theory of successor or similar theories of Liability; (c) have, de facto or otherwise, merged with or into any of Seller; (d) be an alter ego or a mere continuation or substantial continuation of Seller (and there is no continuity of enterprise between the Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of Sellers or their respective estates.

12349784-5

## ARTICLE VII
## TERMINATION

7.1     <u>Termination</u>.

(a)     This Agreement may be terminated, as follows:

(i)     By Purchaser, in the event of a violation or breach by the Sellers of Sellers' agreements, covenants, representations or warranties contained in this Agreement or a Casualty Loss occurs; or

(ii)     By Purchaser if, prior to the Closing, a Casualty Loss occurs affecting a material portion of the Assets; provided, however, that Purchaser may elect to close and accept the Assets with no reduction in the Purchase Price and, in that event, any insurance proceeds (or proceeds of such condemnation proceeding) subsequently recovered by Sellers on account of such loss shall be transferred to Purchaser.

(iii)     By Purchaser, if the Closing Date fails to occur on or before the End Date, for any reason or for no reason.

(iv)     By Order of the Bankruptcy Court.

## ARTICLE VIII
## MISCELLANEOUS

8.1     <u>Entire Agreement</u>.  This Agreement, the Schedules and the Exhibits and the Sale Order, contain the entire agreement among the Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings among the Parties.

8.2     <u>Other Governmental Entities</u>.  In the event any Party receives notice from any Governmental Entity that other notices, applications, filings or Governmental Permits are required with respect to this Agreement or the transactions contemplated hereby, Purchaser and Sellers (as applicable) shall make such notices, applications or filings and seek such Governmental Permits, unless they decide, in good faith, that such compliance is not necessary.

8.3     <u>Additional Actions and Documents</u>.  At and after the Closing, and without further consideration, Sellers (as applicable) shall promptly execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions, as Purchaser may request to effectuate this Agreement in full or to clarify, identify or more precisely describe the Assets intended to be conveyed.

8.4     <u>Descriptive Headings; Certain Interpretations</u>.

(a)     Section headings are descriptive and for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(b)     Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "either" are not exclusive and "include" and "including" is not limiting; (iii)

a reference to any agreement or other contract includes any schedules and exhibits thereto and permitted supplements and amendments thereof; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; (v) a reference to a Person includes a natural person or entity and its permitted successors and assigns; and (vi) a reference in this Agreement to an Article, Section, Schedule or Exhibit is to the Article, Section, Schedule or Exhibit of this Agreement.

8.5    _Successors and Assigns_.  This Agreement is made solely and specifically by and for the benefit of the Parties hereto, and their respective successors and assigns.  Purchaser shall be entitled to assign its rights hereunder to an affiliate or an entity designated by Purchaser after which the Purchaser shall have no further obligations hereunder.

8.6    _Notices_.  All notices, requests, and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered by overnight courier to the Parties at the following addresses:

If to Sellers, addressed to:

Jerry McHale
Banyan Cay Resort & Golf, LLC, *et al.*
1601 Jackson Street
Suite 200
Fort Myers, FL 33901
Email:  jerrym@thereceiver.net

With copies (which shall not constitute notice hereunder) to:

Joseph A. Pack, Esq.
Jessey J. Krehl, Esq.
Pack Law
51 Northeast 24th Street
Suite 108
Miami, FL 33137
Email:  joe@packlaw.com; jessey@packlaw.com

If to Purchaser, addressed to:

USREC BANYAN CAY, LLC
c/o Calmwater Capital
11755 Wilshire Blvd., Suite 1425
Los Angeles, California 90025
Attn: Dean Chang (Dean@calmwatercapital.com)
Attn: Simond Lavian (simond@calmwatercapital.com)

&

U.S. Real Estate Credit Holdings III-A, LP

26

12349784-5

c/o Calmwater Capital
11755 Wilshire Blvd., Suite 1425
Los Angeles, California 90025
Attn: Dean Chang (Dean@calmwatercapital.com)
Attn: Simond Lavian (simond@calmwatercapital.com)

With a copy (which shall not constitute notice hereunder) to:

Brian G. Rich, Esq.
313 Monroe Street, Suite 301
Tallahassee, FL 32301
Telephone No. (850) 561-3010
Brich@bergersingerman.com
mniles@bergersingerman.com

All such Notices shall be deemed given one Business Day after delivery by overnight courier. Any Party from time to time may change its address or other information for the purpose of notices to that Party by giving notice specifying the change to the other Parties.

8.7    Expenses.  Except as otherwise expressly provided herein, each Party shall bear its own costs with respect to the drafting and negotiation of this Agreement, any court or regulatory proceedings related thereto, the consummation of the transactions contemplated hereby, and such Party's compliance with all its agreements and conditions contained herein, including, without limitation, all legal and accounting fees and disbursements and all costs of obtaining necessary consents.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

8.8    Amendment.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of all Parties hereto.

8.9    Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered via PDF.

8.10    Continuing Jurisdiction.  The Parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

8.11    Choice of Law.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation, company or limited liability company that is a Party to or the subject of this Agreement, as to which the law of the jurisdiction of incorporation or organization of such entity shall govern, and in all cases subject to the provisions of the U.S. Bankruptcy Code. Venue shall be the United States Bankruptcy Court for the Southern District of Florida.

12349784-5

8.12    No Partnership or Joint Venture.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of a seller and a purchaser between the Parties hereto.

8.13    No Third-Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.  It is the explicit intention of the Parties hereto that no Person other than the Parties hereto and their successors and permitted assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any Party hereto, and the assumptions, indemnities, covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties hereto or their respective successors and permitted assigns.

8.14    Prevailing Agreement Between the Parties.  In the event of any conflict between the provisions of this Agreement and the provisions of any other transaction document, including  the Sale Order, the provisions of this Agreement shall prevail in the determination of the respective rights and obligations of the Parties as between themselves.

(a)    Each of the Parties acknowledges and agrees that the other Parties (collectively, the "Enforcing Parties") would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that each of the Parties may have under Law or equity, each of the Parties shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof (except as otherwise expressly set forth herein).

(b)    Each of the Parties agrees that it shall not oppose the granting of specific performance or an injunction sought on the basis that the Enforcing Parties have an adequate remedy at law or that any award of specific performance is, for any reason, not an appropriate remedy (except as otherwise expressly set forth herein). The Enforcing Parties shall not be required to provide any bond or other security in connection with any such injunction or other equitable remedy. The End Date shall be tolled from the date any of the Enforcing Parties files a petition seeking specific performance or an injunction under this Section 8.14 until a final, non-appealable, decision regarding this matter is obtained from a court of competent jurisdiction.

8.15    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

8.16    <u>Computation of Time</u>.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

8.17    <u>Mutual Drafting</u>.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

8.18    <u>Time of Essence</u>. Time is of the essence of this Agreement.

8.19    **<u>WAIVERS OF JURY TRIAL</u>**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE AGREEMENTS CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

[*Signature Pages Follow*]

12349784-5

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

**Banyan Cay Investment, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Mezzanine Borrower, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Resort & Golf, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Dev. LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Villas, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

**Banyan Cay Maintenance, LLC**

By:_____
Name:  Jerry McHale of McHale, P.A.
Title:  Proposed Chief Restructuring Officer

## SCHEDULE 1

### PREMISES

PARCEL I (FRONT NINE):

A PORTION OF TRACT "B", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGE 72, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTH CORNER OF TRACT "B" OF SAID PLAT THENCE SOUTH 57°00'00" EAST ALONG THE NORTH LINE OF TRACT "B", 392.64 FEET; THENCE SOUTH ALONG A RADIAL LINE SOUTH 33°00'30" WEST, 60.00 FEET TO THE POINT OF BEGINNING (SAID POINT ALSO BEING THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 842.04 FEET, A CENTRAL ANGLE OF 00°10'47" AN ARC LENGTH OF 2.64 FEET; THENCE SOUTH 26°42'09" EAST, 78.89 FEET; THENCE NORTH 71°50'50" EAST, 87.95 FEET; THENCE NORTH 88°26'53" EAST, 87.00 FEET; THENCE SOUTH 58°34'14" EAST, 41.83 FEET; THENCE SOUTH 54°04'40" EAST, 75.76 FEET; THENCE NORTH 56°50'56" EAST, 70.00 FEET; THENCE SOUTH 07°00'44" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 06°57'47" WEST); THENCE EAST ALONG SAID CURVE HAVING A RADIUS OF 797.04 FEET AND CENTRAL ANGLE OF 22°19'31" AN ARC LENGTH  OF 310.57 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE HAVING A RADIUS OF 305.00 FEET, A CENTRAL ANGLE OF 42°16'16" AN ARC LENGTH OF 225.02 FEET TO THE END OF SAID CURVE; THENCE SOUTH 62°48'15" EAST, 98.36 FEET TO A POINT OF CURVATURE OF A NON CONCENTRIC CURVE CONCAVE TO THE SOUTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 44°48'38" EAST); THENCE SOUTHEASTERLY ALONG SAID CURVE, HAVING A RADIUS OF 320.00 FEET, A CENTRAL ANGLE OF 30°38'13" AN ARC LENGTH OF 171.11 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 83°34'35" AN ARC DISTANCE OF 36.47 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 180.00 FEET, A CENTRAL ANGLE OF 102°03'14" AN ARC LENGTH OF 320.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 79°22'42" AN ARC LENGTH OF 34.64 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 1085.00 FEET, A CENTRAL ANGLE OF 54°59'52" AN ARC LENGTH OF 1041.48 FEET; THENCE SOUTH 08°39'28" EAST, 468.07 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 19°42'49" AN ARC LENGTH OF 263.21 FEET; THENCE NORTH 78°56'09" WEST (RADIAL TO SAID CURVE), 10.00 FEET; THENCE SOUTH 22°52'49" WEST, 149.38 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH WEST, HAVING A RADIUS  OF 739.00 FEET, A CENTRAL ANGLE OF 14°00'20" AN ARC LENGTH OF

31

180.64 FEET TO THE END OF SAID CURVE; THENCE NORTH 53°33'16" WEST, 4.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT IS SOUTH 53°32'46" EAST) THENCE ALONG SAID CURVE HAVING A RADIUS OF 735.02 FEET, A CENTRAL ANGLE OF 13°38'11" AN ARC LENGTH OF 174.93 FEET TO THE END OF SAID CURVE; THENCE SOUTH 43°38'15" WEST, 145.11 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 29°02'42" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 01°29'52" AN ARC LENGTH OF 20.00 FEET TO THE END OF SAID CURVE; THENCE SOUTH 77°37'28" WEST, 100.68 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT  BEARS SOUTH 20°03'10" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 745.00 FEET, A CENTRAL ANGLE OF 25°31'37" AN ARC LENGTH OF 331.92 FEET TO THE END OF SAID CURVE; THENCE SOUTH 05°27'57" WEST, 5.00 FEET; THENCE NORTH 84°32'08" WEST, 295.96 FEET; THENCE SOUTH 05°28'27" WEST, 15.00 FEET; THENCE NORTH 84°32'03" WEST, 87.64 FEET TO A BEGINNING OF A CURVE CONCAVE TO THE WEST ( A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 85°35'11" EAST); THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 990.00 FEET, A CENTRAL ANGLE OF 14°23'04" AN ARC LENGTH OF 248.55 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 88°18'23" AN ARC LENGTH OF 38.53 FEET TO A POINT OF TANGENCY; THENCE NORTH 69°03'00" EAST, 397.44 FEET; THENCE SOUTH 20°30'00" EAST, 25.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (THE PREVIOUS BEARING BEING RADIAL); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 739.25 FEET, A CENTRAL ANGLE OF 14°05'38" AN ARC LENGTH OF 181.84 FEET; THENCE NORTH 56°42'50" EAST ALONG A NON TANGENT LINE, 51.93 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE (A  RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°35'47" EAST); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 742.25 FEET, A CENTRAL ANGLE OF 22°15'00" AN ARC LENGTH OF 288.24 FEET TO A POINT OF TANGENCY; THENCE NORTH 29°08'43" EAST, 152.03 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE  SOUTHWEST, HAVING A RADIUS OF 218.00 FEET, A CENTRAL ANGLE OF 126°00'00" AN ARC LENGTH OF 479.41 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 131.28 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 69.88 FEET TO A POINT OF TANGENCY; THENCE SOUTH  52°39'13" WEST, 44.02 FEET TO  A POINT OF CURVATURE OF A CURVE CONCAVE  TO THE SOUTHEAST, HAVING A  RADIUS OF 206.00 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 109.66 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 345.00 FEET, A CENTRAL ANGLE OF 15°47'37" AN ARC LENGTH OF 95.10 FEET TO A POINT OF A NON CONCENTRIC CURVE

32

CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS BEARS SOUTH 66°42'44" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 345.99 FEET, A CENTRAL ANGLE OF 12°53'21" AN ARC LENGTH OF 77.83 FEET; THENCE SOUTH 53°49'23" EAST (RADIAL TO SAID CURVE), 28.26 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST, HAVING  A RADIUS OF 375.25 FEET, A CENTRAL ANGLE  OF 33°15'11 AN ARC LENGTH OF 217.79 FEET TO A POINT OF  TANGENCY; THENCE SOUTH 69°30'00" WEST, 393.96 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE  TO THE  NORTH HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 98°40'54" AN ARC LENGTH OF 43.06 FEET TO  A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 290.00 FEET, A CENTRAL ANGLE OF 31°52'53" AN ARC LENGTH OF 161.37 FEET TO  A POINT OF TANGENCY; THENCE NORTH 20°00'00" EAST, 175.73 FEET; THENCE SOUTH 70°00'00" EAST, 15.00 FEET; THENCE NORTH 20°00'00" EAST, 224.67 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE  WEST, HAVING A RADIUS OF 595.00 FEET, A CENTRAL ANGLE OF 11°21'37" AN ARC LENGTH OF 117.97 FEET TO THE END OF SAID CURVE; THENCE NORTH 81°27'13" WEST 15.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 580.00 FEET, A CENTRAL ANGLE OF 07°25'24" AN ARC LENGTH OF 75.15 FEET TO THE END OF SAID CURVE; THENCE NORTH 87°56'12" EAST, 45.00 FEET; THENCE NORTH 17°15'54" EAST, 161.68 FEET; THENCE NORTH 11°56' 22" EAST, 408.45 FEET; TO THE SOUTHEAST CORNER OF TRACT "D" OF BANYAN CAY RESORT, PLAT BOOK 125, PAGE 116, THENCE CONTINUE ALONG THE NEXT FIVE COURSES OF TRACT "D"; THENCE NORTH 11°56' 22" EAST, 59.86 FEET; THENCE NORTH 48°03'38" WEST, 64.70 FEET; THENCE NORTH 01°11'51" EAST, 109.65 FEET; THENCE NORTH 76°19'06" WEST, 19.24 FEET; THENCE NORTH 27°09'45" EAST, 843.47 FEET BACK TO THE POINT OF BEGINNING.

PARCEL II (BACK NINE):

A PORTION OF TRACT "C", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 29, PAGE 72 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF LOT 1 OF SAID PLAT (ALSO THE NORTH RIGHT OF WAY LINE OF CONGRESS AVENUE); THENCE NORTH 57°00'00" WEST ALONG THE SAID NORTH RIGHT OF WAY  LINE, 170.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 57°00'00" WEST, 10.92 FEET; THENCE NORTH 33°00'00" EAST, 175.00 FEET; THENCE NORTH 57°00'00" WEST, 600.00 FEET; THENCE SOUTH 35°28'31" WEST, 87.42 FEET; THENCE NORTH 20°08'04" WEST, 100.09' FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°36'10" WEST) THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 1515.99 FEET, A CENTRAL ANGLE OF 06°59'55", AN ARC LENGTH OF 185.18 FEET TO A POINT OF  REVERSE CURVE

CONCAVE TO THE  EAST HAVING A RADIUS OF 50.00 FEET, A CENTRAL ANGLE OF 89°53'08", AN ARC LENGTH OF 78.44 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 190.00 FEET, A CENTRAL ANGLE OF 111°36'33", AN ARC LENGTH OF 370.11 FEET TO A POINT OF REVERSE CURVE  CONCAVE  TO THE NORTHEAST, HAVING A RADIUS OF 48.51 FEET, A CENTRAL ANGLE OF 36°29'47", AN ARC LENGTH OF  30.90 FEET TO A POINT OF COMPOUND CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 1335.99 FEET, A CENTRAL ANGLE OF 30°39'23", AN ARC LENGTH OF 714.83 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°11'51" EAST, 264.88 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE WEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 58°31'04" EAST); THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CURVE HAVING A RADIUS OF 175.00 FEET, A CENTRAL ANGLE OF 126°43'54", AN ARC LENGTH OF 387.08 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST; THENCE WESTERLY AND NORTHERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 95°43'47", AN ARC LENGTH OF 41.77 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°01'51" EAST, 401.00 FEET; THENCE SOUTH 88°48'00" EAST, 160.03 FEET TO A POINT OF CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 100 FEET, A CENTRAL ANGLE  OF 56°30'18", AN ARC LENGTH OF 98.62 FEET TO A POINT OF TANGENCY; THENCE SOUTH 32°18'00" EAST, 312.76 FEET; THENCE SOUTH 09°16'39" EAST, 105.00 FEET; THENCE SOUTH 77°36'02" EAST, 18.00 FEET; THENCE SOUTH 53°06'11" EAST, 104.04 FEET; THENCE SOUTH 50°56'54" EAST, 50.01 FEET; THENCE SOUTH 44°05'31" EAST, 50.25 FEET; THENCE SOUTH 35°45'59" EAST, 32.95 FEET; THENCE SOUTH 23°16'19" EAST, 20.16 FEET; THENCE SOUTH 16°01'43" EAST, 21.47 FEET TO A POINT OF A CURVE CONCAVE TO THE EAST (A RADIAL BEARING FROM ITS RADIUS  POINT BEARS NORTH 73°40'02" WEST); THENCE SOUTH ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 22°14'06", AN ARC LENGTH OF 86.54 FEET TO A  POINT  OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 65.00 FEET, A CENTRAL ANGLE OF 08°48'53", AN ARC LENGTH OF 10.00 FEET; TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEAST ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 71°29'56", AN ARC LENGTH OF 278.28 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEASTERLY  ALONG SAID CURVE HAVING A RADIUS OF 96.38 FEET, A CENTRAL ANGLE OF 32°13'15", AN ARC LENGTH OF 54.20 FEET TO A POINT OF TANGENCY; THENCE SOUTH 54°03'06" EAST, 26.71 FEET; THENCE NORTH 35°56'54" EAST, 112.00 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 39°53'17" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 185.00 FEET, A CENTRAL ANGLE OF 28°39'01", AN ARC LENGTH OF 92.51 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 68°18'26" WEST) THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A

34

CENTRAL ANGLE OF 58°41'38", AN ARC LENGTH OF 25.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 09°26'02" WEST); THENCE ALONG SAID CURVE EASTERLY HAVING A RADIUS OF 300.00 FEET, A CENTRAL ANGLE OF 06°04'40", AN ARC LENGTH OF 31.82 FEET; THENCE SOUTH 17°31'14" EAST, 10.00 FEET; THENCE NORTH 75°33'55" EAST, 64.11 FEET; THENCE NORTH 67°40'25" EAST, 137.00 FEET; THENCE NORTH 85°10'25" EAST, 281.37 FEET; THENCE NORTH 11°09'00" EAST, 12.00 FEET; THENCE NORTH 78°51'00 " WEST 273.94 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 55°58'33" EAST; THENCE NORTH ALONG SAID CURVE HAVING A RADIUS OF 330.00 FEET, A CENTRAL ANGLE OF 00°34'11" AN ARC LENGTH OF 3.28 FEET; THENCE SOUTH 80°00'00" EAST, 276.63 FEET; THENCE SOUTH 00°42'42" EAST 332.57 FEET; THENCE SOUTH 70°00'00" EAST, 143.00 FEET; THENCE SOUTH 20°00'00" WEST, 325.91 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 625.00 FEET, A CENTRAL ANGLE OF 40°29'58" AN ARC LENGTH OF 441.78 FEET TO A POINT OF TANGENCY; THENCE SOUTH 20°00'00" EAST, 320.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 655.00 FEET, A CENTRAL ANGLE OF 50°04'01" AN ARC LENGTH OF 572.36 FEET; THENCE NORTH 60°26'00" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 60°26'00" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 640.00 FEET, A CENTRAL ANGLE OF 04°48'42" AN ARC LENGTH OF 53.75 FEET TO THE END OF SAID CURVE; THENCE NORTH 55°37'20" WEST, 40.40 FEET; THENCE SOUTH 08°24'57" WEST, 11.34 FEET; THENCE SOUTH 38°35'47" WEST, 39.50 FEET; THENCE SOUTH 64°40'58" WEST, 45.94 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE  NORTH, HAVING A RADIUS OF 80.00 FEET, A CENTRAL ANGLE OF 62°22'25" AN ARC LENGTH OF 87.09 FEET TO A POINT OF TANGENCY; THENCE NORTH 52°56'25" WEST, 94.23 FEET; THENCE NORTH 66°43'06" WEST, 14.52 FEET; THENCE NORTH 81°30'16" WEST, 24.17 FEET; THENCE NORTH 87°22'10" WEST, 24.19 FEET; THENCE SOUTH 52°57'50" WEST, 79.92 FEET;  THENCE SOUTH 70°31'03" WEST, 63.47 FEET; THENCE NORTH 69°15'28" WEST, 36.37 FEET; THENCE  NORTH 45°05'26" WEST, 34.89 FEET; THENCE NORTH 24°02'28" WEST, 16.14 FEET; THENCE SOUTH 33°00'00" WEST, 56.00 FEET BACK TO THE POINT OF BEGINNING.

PARCEL III:

TRACTS C1, C2, D, HC AND H2, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IV:

12349784-5

LOT 3, PLAT 1, THE PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, LESS THE SOUTHERLY 3.0 FEET THEREOF.

PARCEL V: INTENTIONALLY DELETED.

PARCEL VI:

TRACT MF, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL VII:

TRACT L3, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

TOGETHER WITH THE FOLLOWING ADDITIONALLY INSURED PARCELS WHICH BENEFIT THE PARCELS ABOVE:

THOSE CERTAIN "OUT OF BOUNDS" EASEMENT RIGHTS AND BENEFITS GRANTED IN THAT CERTAIN EASEMENT AGREEMENT RECORDED IN OFFICIAL RECORDS BOOK 22745, PAGE 868, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN 15 FOOT EASEMENT RIGHTS AND BENEFITS FOR INGRESS AND EGRESS GRANTED IN THAT CERTAIN SPECIAL WARRANTY DEED RECORDED IN OFFICIAL RECORD BOOK 2787, PAGE 1231, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, SUBJECT TO THE MAINTENANCE OBLIGATION SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS ESTABLISHED BY THAT CERTAIN AMENDED AND RESTATED MASTER DECLARATION OF COVENANTS AND RESTRICTIONS RECORDED IN OFFICIAL RECORD BOOK 22293, PAGE 83, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN RIGHTS AND BENEFITS GRANTED BY THAT CERTAIN GOLF COURSE ACCESS EASEMENT RECORDED IN OFFICIAL RECORDS BOOK 25002, PAGE 290, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA. SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFICIAL RIGHTS TO USE COMMON AREAS ESTABLISHED BY THAT CERTAIN DECLARATION OF MASTER COVENANTS OF BANYAN CAY RESORT RECORDED IN OFFICIAL RECORD BOOK 29679, PAGE 227, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS TO USE A GOLF CART PATH ACROSS LOT 18, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK

12349784-5

29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, GRANTED BY THAT CERTAIN CART PATH EASEMENT RECORDED IN OFFICIAL RECORD BOOK 29932, PAGE 112, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

TRACT L2 – ESTATE LOTS

TRACT L2, BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 125, PAGE 114, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IDENTIFICATION NUMBER:        74-43-43-07-13-012-0020

LOT 21:

LOT 21 OF BANYAN CAY RESORT REPLAT OF TRACT "L1", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 127, PAGE 18, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

**Schedule 2**
**Assumed Contracts**

**SCHEDULE 3**
**Intellectual Property**

All of Sellers' rights to the names "Banyan Cay," "Banyan Cay Resort & Golf," "Banyan Cay Golf Club," the domain names and websites related to the Premises or the Banyan Cay Golf Club Facilities, any logos associated with the same, the intellectual property regarding the same, if any, and the Banyan Cay Golf Club phone number

**SCHEDULE 4**
**Licenses and Permits**

**SCHEDULE 5**
**Personal Property**

All of Sellers' Personal Property that is not an Excluded Asset, as set forth in Section 2.2 of the Agreement or Schedule 6 Excluded Assets attached thereto

**SCHEDULE 6**
**Excluded Assets**

**SCHEDULE 7**
**Liabilities Assumed By Purchaser**

## **<u>LIST OF EXHIBITS</u>**

### **EXHIBIT A**

**Form of Special Warranty Deed**

### **EXHIBIT B**

**Form of Quit Claim Deed**

### **EXHIBIT C**

**Form of Omnibus Bill of Sale and Assignment and Assumption Agreement**

12349784-5

**EXHIBIT D**

**Form of FIRPTA Affidavit**

**EXHIBIT E**

**Form of Seller's Gap or Owner's Affidavit**

12349784-5

# EXHIBIT A

This instrument prepared by
and return to:

Brian G. Rich, Esq.
Berger Singerman LLP
313 North Monroe
Suite 301
Tallahassee, Florida 32301

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED executed this _____ day of _____, 2023, by **BANYAN CAY DEV, LLC**, a Delaware limited liability company; **BANYAN CAY RESORT AND GOLF, LLC**, a Delaware limited liability company; and **BANYAN CAY VILLAS, LLC**, a Delaware limited liability company whose mailing address is _____ ("Grantor), to **USREC BANYAN CAY, LLC**, a _____ limited liability company, whose address is: _____, its successors or assigns ("Grantee").

(Wherever used herein, the terms "Grantor" and "Grantee" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and assigns of corporations, wherever the context so limits or requires.)

WITNESSETH, that said Grantor, for and in consideration of the sum of Ten and no/100 ($10.00) Dollars, and other good and valuable considerations to said Grantor in hand paid by the said Grantee, the receipt whereof is hereby acknowledged, does hereby grants, bargains, sells, conveys and confirms unto the said Grantee forever, all the right, title, interest, claim and demand which the said Grantor has in and to the following described lot, piece or parcel or land, situated, lying and being in the County of Palm Beach, State of Florida, to wit:

See Exhibit "A" attached hereto. (the "Property")

To have and to hold the same together with all and singular the mineral, air and water rights, easements and appurtenances, and improvements, thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of said Grantor, either in law or equity, to the only proper use, benefit and behoof of the said Grantee forever. Grantor is a debtor in possession in the Chapter 11 bankruptcy cases consolidated as Case No. 23-12386 pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"). On June __, 2023, the Bankruptcy Court entered _____ ("Order") approving the sale of the property in accordance with 11 U.S.C. 363(f), and the conveyance of property by this Deed free and clear of all liens, claims, and interests other than certain Permitted Exceptions under the Asset Purchase Agreement, dated _____ __, 2023, between Grantor and Grantee, and as specifically set forth in the Order.

AND Grantor hereby covenants with the Grantee that, as provided in the Order, Grantor has good right and lawful authority to sell and convey the Property, and, as provided in Order, the conveyance of the Property is warranted to Grantee, and Grantee's successors and assigns, against

12349513-1

every person claiming or purporting to claim the same or any part thereof by, through or under Grantee, but not otherwise.

IN WITNESS WHEREOF, the said Grantor has signed and sealed these presents the day and year

first above written.

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY INVESTMENT, LLC,**
Signature of Witness                                        a Florida limited liability company


_____
Printed Name of Witness


By: _____
                    Jerry McHale


Title: Chief Restructuring Officer



_____
Signature of Witness


_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public


My commission expires:

(SEAL)

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY DEV, LLC,**
a Delaware limited liability company

_____
Printed Name of Witness

By: _____
                Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

12349513-1

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY RESORT AND GOLF, LLC,**
Signature of Witness                                      a Delaware limited liability company

_____
Printed Name of Witness

                                   By: _____
                                              Jerry McHale

                                   Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.

                                     _____
                                        Notary Public

                                     _____
                                        Printed Name of Notary Public

My commission expires:

(SEAL)

12349513-1

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY VILLAS, LLC,**
a Delaware limited liability company

_____
Printed Name of Witness

By: _____
　　　　　Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

12349513-1

## EXHIBIT A
## LEGAL DESCRIPTION

PARCEL I (FRONT NINE):

A PORTION OF TRACT "B", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGE 72, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTH CORNER OF TRACT "B" OF SAID PLAT THENCE SOUTH 57°00'00" EAST ALONG THE NORTH LINE OF TRACT "B", 392.64 FEET; THENCE SOUTH ALONG A RADIAL LINE SOUTH 33°00'30" WEST, 60.00 FEET TO THE POINT OF BEGINNING (SAID POINT ALSO BEING THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 842.04 FEET, A CENTRAL ANGLE OF 00°10'47" AN ARC LENGTH OF 2.64 FEET; THENCE SOUTH 26°42'09" EAST, 78.89 FEET; THENCE NORTH 71°50'50" EAST, 87.95 FEET; THENCE NORTH 88°26'53" EAST, 87.00 FEET; THENCE SOUTH 58°34'14" EAST, 41.83 FEET; THENCE SOUTH 54°04'40" EAST, 75.76 FEET; THENCE NORTH 56°50'56" EAST, 70.00 FEET; THENCE SOUTH 07°00'44" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 06°57'47" WEST); THENCE EAST ALONG SAID CURVE HAVING A RADIUS OF 797.04 FEET AND CENTRAL ANGLE OF 22°19'31" AN ARC LENGTH OF 310.57 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE HAVING A RADIUS OF 305.00 FEET, A CENTRAL ANGLE OF 42°16'16" AN ARC LENGTH OF 225.02 FEET TO THE END OF SAID CURVE; THENCE SOUTH 62°48'15" EAST, 98.36 FEET TO A POINT OF CURVATURE OF A NON CONCENTRIC CURVE CONCAVE TO THE SOUTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 44°48'38" EAST); THENCE SOUTHEASTERLY ALONG SAID CURVE, HAVING A RADIUS OF 320.00 FEET, A CENTRAL ANGLE OF 30°38'13" AN ARC LENGTH OF 171.11 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 83°34'35" AN ARC DISTANCE OF 36.47 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 180.00 FEET, A CENTRAL ANGLE OF 102°03'14" AN ARC LENGTH OF 320.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 79°22'42" AN ARC LENGTH OF 34.64 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 1085.00 FEET, A CENTRAL ANGLE OF 54°59'52" AN ARC LENGTH OF 1041.48 FEET; THENCE SOUTH 08°39'28" EAST, 468.07 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 19°42'49" AN ARC LENGTH OF 263.21 FEET; THENCE NORTH 78°56'09" WEST (RADIAL TO SAID CURVE), 10.00 FEET; THENCE SOUTH 22°52'49" WEST, 149.38 FEET TO A POINT OF CURVATURE

OF A CURVE CONCAVE TO THE NORTH WEST, HAVING A RADIUS OF 739.00 FEET, A CENTRAL ANGLE OF 14°00'20" AN ARC LENGTH OF 180.64 FEET TO THE END OF SAID CURVE; THENCE NORTH 53°33'16" WEST, 4.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT IS SOUTH 53°32'46" EAST) THENCE ALONG SAID CURVE HAVING A RADIUS OF 735.02 FEET, A CENTRAL ANGLE OF 13°38'11" AN ARC LENGTH OF 174.93 FEET TO THE END OF SAID CURVE; THENCE SOUTH 43°38'15" WEST, 145.11 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 29°02'42" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 01°29'52" AN ARC LENGTH OF 20.00 FEET TO THE END OF SAID CURVE; THENCE SOUTH 77°37'28" WEST, 100.68 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 20°03'10" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 745.00 FEET, A CENTRAL ANGLE OF 25°31'37" AN ARC LENGTH OF 331.92 FEET TO THE END OF SAID CURVE; THENCE SOUTH 05°27'57" WEST, 5.00 FEET; THENCE NORTH 84°32'08" WEST, 295.96 FEET; THENCE SOUTH 05°28'27" WEST, 15.00 FEET; THENCE NORTH 84°32'03" WEST, 87.64 FEET TO A BEGINNING OF A CURVE CONCAVE TO THE WEST ( A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 85°35'11" EAST); THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 990.00 FEET, A CENTRAL ANGLE OF 14°23'04" AN ARC LENGTH OF 248.55 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 88°18'23" AN ARC LENGTH OF 38.53 FEET TO A POINT OF TANGENCY; THENCE NORTH 69°03'00" EAST, 397.44 FEET; THENCE SOUTH 20°30'00" EAST, 25.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (THE PREVIOUS BEARING BEING RADIAL); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 739.25 FEET, A CENTRAL ANGLE OF 14°05'38" AN ARC LENGTH OF 181.84 FEET; THENCE NORTH 56°42'50" EAST ALONG A NON TANGENT LINE, 51.93 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°35'47" EAST); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 742.25 FEET, A CENTRAL ANGLE OF 22°15'00" AN ARC LENGTH OF 288.24 FEET TO A POINT OF TANGENCY; THENCE NORTH 29°08'43" EAST, 152.03 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE  SOUTHWEST, HAVING A  RADIUS OF 218.00 FEET, A CENTRAL ANGLE OF 126°00'00" AN ARC LENGTH OF 479.41 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 131.28 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 69.88 FEET TO A POINT OF TANGENCY; THENCE SOUTH 52°39'13" WEST, 44.02 FEET TO  A POINT OF CURVATURE OF A CURVE CONCAVE  TO THE SOUTHEAST, HAVING A RADIUS OF 206.00 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 109.66 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 345.00 FEET, A CENTRAL ANGLE OF 15°47'37" AN ARC LENGTH OF 95.10 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS BEARS SOUTH 66°42'44" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 345.99 FEET, A CENTRAL ANGLE OF 12°53'21" AN ARC LENGTH OF 77.83 FEET; THENCE SOUTH

53°49'23" EAST (RADIAL TO SAID CURVE), 28.26 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 375.25 FEET, A CENTRAL ANGLE OF 33°15'11 AN ARC LENGTH OF 217.79 FEET TO A POINT OF TANGENCY; THENCE SOUTH 69°30'00" WEST, 393.96 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 98°40'54" AN ARC LENGTH OF 43.06 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 290.00 FEET, A CENTRAL ANGLE OF 31°52'53" AN ARC LENGTH OF 161.37 FEET TO A POINT OF TANGENCY; THENCE NORTH 20°00'00" EAST, 175.73 FEET; THENCE SOUTH 70°00'00" EAST, 15.00 FEET; THENCE NORTH 20°00'00" EAST, 224.67 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 595.00 FEET, A CENTRAL ANGLE OF 11°21'37" AN ARC LENGTH OF 117.97 FEET TO THE END OF SAID CURVE; THENCE NORTH 81°27'13" WEST 15.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 580.00 FEET, A CENTRAL ANGLE OF 07°25'24" AN ARC LENGTH OF 75.15 FEET TO THE END OF SAID CURVE; THENCE NORTH 87°56'12" EAST, 45.00 FEET; THENCE NORTH 17°15'54" EAST, 161.68 FEET; THENCE NORTH 11°56' 22" EAST, 408.45 FEET; TO THE SOUTHEAST CORNER OF TRACT "D" OF BANYAN CAY RESORT, PLAT BOOK 125, PAGE 116, THENCE CONTINUE ALONG THE NEXT FIVE COURSES OF TRACT "D"; THENCE NORTH 11°56' 22" EAST, 59.86 FEET; THENCE NORTH 48°03'38" WEST, 64.70 FEET; THENCE NORTH 01°11'51" EAST, 109.65 FEET; THENCE NORTH 76°19'06" WEST, 19.24 FEET; THENCE NORTH 27°09'45" EAST, 843.47 FEET BACK TO THE POINT OF BEGINNING.

PARCEL II (BACK NINE):

A PORTION OF TRACT "C", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 29, PAGE 72 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF LOT 1 OF SAID PLAT (ALSO THE NORTH RIGHT OF WAY LINE OF CONGRESS AVENUE); THENCE NORTH 57°00'00" WEST ALONG THE SAID NORTH RIGHT OF WAY LINE, 170.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 57°00'00" WEST, 10.92 FEET; THENCE NORTH 33°00'00" EAST, 175.00 FEET; THENCE NORTH 57°00'00" WEST, 600.00 FEET; THENCE SOUTH 35°28'31" WEST, 87.42 FEET; THENCE NORTH 20°08'04" WEST, 100.09' FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°36'10" WEST) THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 1515.99 FEET, A CENTRAL ANGLE OF 06°59'55", AN ARC LENGTH OF 185.18 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 50.00 FEET, A CENTRAL ANGLE OF 89°53'08", AN ARC LENGTH OF 78.44 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 190.00 FEET, A CENTRAL ANGLE OF 111°36'33", AN ARC LENGTH OF 370.11 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 48.51 FEET, A CENTRAL ANGLE OF 36°29'47", AN ARC LENGTH OF 30.90 FEET TO A POINT OF COMPOUND CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 1335.99 FEET, A CENTRAL ANGLE OF 30°39'23", AN ARC LENGTH OF 714.83 FEET TO

A POINT OF TANGENCY; THENCE NORTH 01°11'51" EAST, 264.88 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE WEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 58°31'04" EAST); THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CURVE HAVING A RADIUS OF 175.00 FEET, A CENTRAL ANGLE OF 126°43'54", AN ARC LENGTH OF 387.08 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST; THENCE WESTERLY AND NORTHERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 95°43'47", AN ARC LENGTH OF 41.77 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°01'51" EAST, 401.00 FEET; THENCE SOUTH 88°48'00" EAST, 160.03 FEET TO A POINT OF CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 100 FEET, A CENTRAL ANGLE OF 56°30'18", AN ARC LENGTH OF 98.62 FEET TO A POINT OF TANGENCY; THENCE SOUTH 32°18'00" EAST, 312.76 FEET; THENCE SOUTH 09°16'39" EAST, 105.00 FEET; THENCE SOUTH 77°36'02" EAST, 18.00 FEET; THENCE SOUTH 53°06'11" EAST, 104.04 FEET; THENCE SOUTH 50°56'54" EAST, 50.01 FEET; THENCE SOUTH 44°05'31" EAST, 50.25 FEET; THENCE SOUTH 35°45'59" EAST, 32.95 FEET; THENCE SOUTH 23°16'19" EAST, 20.16 FEET; THENCE SOUTH 16°01'43" EAST, 21.47 FEET TO A POINT OF A CURVE CONCAVE TO THE EAST (A RADIAL BEARING FROM ITS RADIUS  POINT BEARS NORTH 73°40'02" WEST); THENCE SOUTH ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 22°14'06", AN ARC LENGTH OF 86.54 FEET TO A  POINT  OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 65.00 FEET, A CENTRAL ANGLE OF 08°48'53", AN ARC LENGTH OF 10.00 FEET; TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEAST ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 71°29'56", AN ARC LENGTH OF 278.28 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 96.38 FEET, A CENTRAL ANGLE OF 32°13'15", AN ARC LENGTH OF 54.20 FEET TO A POINT OF TANGENCY; THENCE SOUTH 54°03'06" EAST, 26.71 FEET; THENCE NORTH 35°56'54" EAST, 112.00 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 39°53'17" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 185.00 FEET, A CENTRAL ANGLE OF 28°39'01", AN ARC LENGTH OF 92.51 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 68°18'26" WEST) THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 58°41'38", AN ARC LENGTH OF 25.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 09°26'02" WEST); THENCE ALONG SAID CURVE EASTERLY HAVING A RADIUS OF 300.00 FEET, A CENTRAL ANGLE OF 06°04'40", AN ARC LENGTH OF 31.82 FEET; THENCE SOUTH 17°31'14" EAST, 10.00 FEET; THENCE NORTH 75°33'55" EAST, 64.11 FEET; THENCE NORTH 67°40'25" EAST, 137.00 FEET; THENCE NORTH 85°10'25" EAST, 281.37 FEET; THENCE NORTH 11°09'00" EAST, 12.00 FEET; THENCE NORTH 78°51'00 " WEST 273.94 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 55°58'33" EAST; THENCE NORTH ALONG SAID CURVE HAVING A RADIUS OF 330.00 FEET, A CENTRAL ANGLE OF 00°34'11" AN ARC LENGTH OF 3.28 FEET; THENCE SOUTH 80°00'00" EAST, 276.63 FEET; THENCE SOUTH 00°42'42" EAST 332.57 FEET; THENCE

SOUTH 70°00'00" EAST, 143.00 FEET; THENCE SOUTH 20°00'00" WEST, 325.91 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 625.00 FEET, A CENTRAL ANGLE OF 40°29'58" AN ARC LENGTH OF 441.78 FEET TO A POINT OF TANGENCY; THENCE SOUTH 20°00'00" EAST, 320.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 655.00 FEET, A CENTRAL ANGLE OF 50°04'01" AN ARC LENGTH OF 572.36 FEET; THENCE NORTH 60°26'00" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 60°26'00" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 640.00 FEET, A CENTRAL ANGLE OF 04°48'42" AN ARC LENGTH OF 53.75 FEET TO THE END OF SAID CURVE; THENCE NORTH 55°37'20" WEST, 40.40 FEET; THENCE SOUTH 08°24'57" WEST, 11.34 FEET; THENCE SOUTH 38°35'47" WEST, 39.50 FEET; THENCE SOUTH 64°40'58" WEST, 45.94 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH, HAVING A RADIUS OF 80.00 FEET, A CENTRAL ANGLE OF 62°22'25" AN ARC LENGTH OF 87.09 FEET TO A POINT OF TANGENCY; THENCE NORTH 52°56'25" WEST, 94.23 FEET; THENCE NORTH 66°43'06" WEST, 14.52 FEET; THENCE NORTH 81°30'16" WEST, 24.17 FEET; THENCE NORTH 87°22'10" WEST, 24.19 FEET; THENCE SOUTH 52°57'50" WEST, 79.92 FEET;  THENCE SOUTH 70°31'03" WEST, 63.47 FEET; THENCE NORTH 69°15'28" WEST, 36.37 FEET; THENCE  NORTH 45°05'26" WEST, 34.89 FEET; THENCE NORTH 24°02'28" WEST, 16.14 FEET; THENCE SOUTH 33°00'00" WEST, 56.00 FEET BACK TO THE POINT OF BEGINNING.

PARCEL III:

TRACTS C1, C2, D, HC AND H2, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IV:

LOT 3, PLAT 1, THE PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, LESS THE SOUTHERLY 3.0 FEET THEREOF.

PARCEL V: INTENTIONALLY DELETED.

PARCEL VI:

TRACT MF, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL VII:

TRACT L3, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

TOGETHER WITH THE FOLLOWING ADDITIONALLY INSURED PARCELS WHICH BENEFIT THE PARCELS ABOVE:

THOSE CERTAIN "OUT OF BOUNDS" EASEMENT RIGHTS AND BENEFITS GRANTED IN THAT CERTAIN EASEMENT AGREEMENT RECORDED IN OFFICIAL RECORDS BOOK 22745, PAGE 868, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN 15 FOOT EASEMENT RIGHTS AND BENEFITS FOR INGRESS AND EGRESS GRANTED IN THAT CERTAIN SPECIAL WARRANTY DEED RECORDED IN OFFICIAL RECORD BOOK 2787, PAGE 1231, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, SUBJECT TO THE MAINTENANCE OBLIGATION SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS ESTABLISHED BY THAT CERTAIN AMENDED AND RESTATED MASTER DECLARATION OF COVENANTS AND RESTRICTIONS RECORDED IN OFFICIAL RECORD BOOK 22293, PAGE 83, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN RIGHTS AND BENEFITS GRANTED BY THAT CERTAIN GOLF COURSE ACCESS EASEMENT RECORDED IN OFFICIAL RECORDS BOOK 25002, PAGE 290, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA. SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFICIAL RIGHTS TO USE COMMON AREAS ESTABLISHED BY THAT CERTAIN DECLARATION OF MASTER COVENANTS OF BANYAN CAY RESORT RECORDED IN OFFICIAL RECORD BOOK 29679, PAGE 227, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS TO USE A GOLF CART PATH ACROSS LOT 18, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, GRANTED BY THAT CERTAIN CART PATH EASEMENT RECORDED IN OFFICIAL RECORD BOOK 29932, PAGE 112, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.


TRACT L2 – ESTATE LOTS

TRACT L2, BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 125, PAGE 114, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IDENTIFICATION NUMBER:       74-43-43-07-13-012-0020

LOT 21:

LOT 21 OF BANYAN CAY RESORT REPLAT OF TRACT "L1", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 127, PAGE 18, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

# **EXHIBIT B**

This instrument prepared by
and return to:

Brian G. Rich, Esq.
Berger Singerman LLP
313 North Monroe
Suite 301
Tallahassee, Florida 32301

## QUIT CLAIM DEED

THIS QUIT CLAIM DEED executed this _____ day of _____, 2023, by **BANYAN CAY INVESTMENT, LLC**, a Florida limited liability company; **BANYAN CAY MEZZANINE BORROWER, LLC**, a Delaware limited liability company; **BANYAN CAY DEV, LLC**, a Delaware limited liability company; **BANYAN CAY RESORT AND GOLF, LLC**, a Delaware limited liability company; **BANYAN CAY VILLAS, LLC**, a Delaware limited liability company; and **BANYAN CAY MAINTENANCE, LLC**, a Florida limited liability company, whose mailing address is _____ ("Grantor"), to **USREC BANYAN CAY, LLC**, a _____ limited liability company, whose address is: _____, its successors or assigns ("Grantee").

(Wherever used herein, the terms "Grantor" and "Grantee" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and assigns of corporations, wherever the context so limits or requires.)

WITNESSETH, that said Grantor, for and in consideration of the sum of Ten and no/100 ($10.00) Dollars, and other good and valuable considerations to said Grantor in hand paid by the said Grantee, the receipt whereof is hereby acknowledged, does hereby remise, release and quit-claim unto the said Grantee forever, all the right, title, interest, claim and demand which the said Grantor has in and to the following described lot, piece or parcel or land, situated, lying and being in the County of Palm Beach, State of Florida, to wit:

See Exhibit "A" attached hereto.

To have and to hold the same together with all and singular the mineral, air and water rights, easements and appurtenances, and improvements thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of said Grantor, either in law or equity, to the only proper use, benefit and behoof of the said Grantee forever. Grantor is a debtor in possession in the Chapter 11 bankruptcy cases consolidated as Case No. 23-12386 pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"). On June __, 2023, the Bankruptcy Court entered _____ ("Order") approving the sale of the property in accordance with 11 U.S.C. 363(f), and the conveyance of property by this Deed free and clear of all liens, claims, and interests other than certain Permitted Exceptions under the Asset Purchase Agreement, dated _____ __, 2023, between Grantor and Grantee, and as specifically set forth in the Order.

NOTE TO RECORDER: _____

12349512-1

IN WITNESS WHEREOF, the said Grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY INVESTMENT, LLC,**
Signature of Witness                                       a Florida limited liability company

_____
Printed Name of Witness

By: _____
　　　　　　　Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

12349512-1

Signed, sealed and delivered in presence of:

_____
Signature of Witness

_____
Printed Name of Witness

**BANYAN CAY MEZZANINE BORROWER, LLC,** a Delaware limited liability company

By: _____
                  Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Mezzanine Borrower, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY DEV, LLC,**
Signature of Witness                                     a Delaware limited liability company

_____
Printed Name of Witness

                                                    By: _____
                                                                    Jerry McHale

                                                    Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.

                                                    _____
                                                              Notary Public

                                                    _____
                                                    Printed Name of Notary Public

My commission expires:

(SEAL)

12349512-1

Signed, sealed and delivered in presence of:

_____

Signature of Witness

**BANYAN CAY RESORT AND GOLF, LLC,**
a Delaware limited liability company

_____

Printed Name of Witness

By: _____
                 Jerry McHale

Title: Chief Restructuring Officer

_____

Signature of Witness

_____

Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

12349512-1

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY VILLAS, LLC,**
a Delaware limited liability company

_____
Printed Name of Witness


By: _____
Jerry McHale

Title: Chief Restructuring Officer


_____
Signature of Witness

_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.


_____
Notary Public

_____
Printed Name of Notary Public


My commission expires:


(SEAL)

Signed, sealed and delivered in presence of:

_____       **BANYAN CAY MAINTENANCE, LLC,**
Signature of Witness                   a Florida limited liability company

_____
Printed Name of Witness

                                       By: _____
                                                   Jerry McHale

                                       Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Maintenance, LLC, a Florida limited liability company, who produced _____ as identification.

                                       _____
                                             Notary Public

                                       _____
                                       Printed Name of Notary Public

My commission expires:

(SEAL)

12349512-1

**EXHIBIT A**
**LEGAL DESCRIPTION**

PARCEL I (FRONT NINE):

A PORTION OF TRACT "B", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 29, PAGE 72, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTH CORNER OF TRACT "B" OF SAID PLAT THENCE SOUTH 57°00'00" EAST ALONG THE NORTH LINE OF TRACT "B", 392.64 FEET; THENCE SOUTH ALONG A RADIAL LINE SOUTH 33°00'30" WEST, 60.00 FEET TO THE POINT OF BEGINNING (SAID POINT ALSO BEING THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 842.04 FEET, A CENTRAL ANGLE OF 00°10'47" AN ARC LENGTH OF 2.64 FEET; THENCE SOUTH 26°42'09" EAST, 78.89 FEET; THENCE NORTH 71°50'50" EAST, 87.95 FEET; THENCE NORTH 88°26'53" EAST, 87.00 FEET; THENCE SOUTH 58°34'14" EAST, 41.83 FEET; THENCE SOUTH 54°04'40" EAST, 75.76 FEET; THENCE NORTH 56°50'56" EAST, 70.00 FEET; THENCE SOUTH 07°00'44" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 06°57'47" WEST); THENCE EAST ALONG SAID CURVE HAVING A RADIUS OF 797.04 FEET AND CENTRAL ANGLE OF 22°19'31" AN ARC LENGTH OF 310.57 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE HAVING A RADIUS OF 305.00 FEET, A CENTRAL ANGLE OF 42°16'16" AN ARC LENGTH OF 225.02 FEET TO THE END OF SAID CURVE; THENCE SOUTH 62°48'15" EAST, 98.36 FEET TO A POINT OF CURVATURE OF A NON CONCENTRIC CURVE CONCAVE TO THE SOUTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 44°48'38" EAST); THENCE SOUTHEASTERLY ALONG SAID CURVE, HAVING A RADIUS OF 320.00 FEET, A CENTRAL ANGLE OF 30°38'13" AN ARC LENGTH OF 171.11 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 83°34'35" AN ARC DISTANCE OF 36.47 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 180.00 FEET, A CENTRAL ANGLE OF 102°03'14" AN ARC LENGTH OF 320.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 79°22'42" AN ARC LENGTH OF 34.64 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 1085.00 FEET, A CENTRAL ANGLE OF 54°59'52" AN ARC LENGTH OF 1041.48 FEET; THENCE SOUTH 08°39'28" EAST, 468.07 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 19°42'49" AN ARC LENGTH OF 263.21 FEET; THENCE NORTH 78°56'09" WEST (RADIAL TO SAID CURVE), 10.00 FEET; THENCE SOUTH 22°52'49" WEST, 149.38 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH WEST, HAVING A RADIUS OF 739.00 FEET, A CENTRAL ANGLE OF 14°00'20" AN ARC LENGTH OF 180.64 FEET TO THE END OF SAID CURVE; THENCE NORTH 53°33'16" WEST, 4.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT IS

SOUTH 53°32'46" EAST) THENCE ALONG SAID CURVE HAVING A RADIUS OF 735.02 FEET, A CENTRAL ANGLE OF 13°38'11" AN ARC LENGTH OF 174.93 FEET TO THE END OF SAID CURVE; THENCE SOUTH 43°38'15" WEST, 145.11 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 29°02'42" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 765.00 FEET, A CENTRAL ANGLE OF 01°29'52" AN ARC LENGTH OF 20.00 FEET TO THE END OF SAID CURVE; THENCE SOUTH 77°37'28" WEST, 100.68 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT  BEARS SOUTH 20°03'10" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 745.00 FEET, A CENTRAL ANGLE OF 25°31'37" AN ARC LENGTH OF 331.92 FEET TO THE END OF SAID CURVE; THENCE SOUTH 05°27'57" WEST, 5.00 FEET; THENCE NORTH 84°32'08" WEST, 295.96 FEET; THENCE SOUTH 05°28'27" WEST, 15.00 FEET; THENCE NORTH 84°32'03" WEST, 87.64 FEET TO A BEGINNING OF A CURVE CONCAVE TO THE WEST ( A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 85°35'11" EAST); THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 990.00 FEET, A CENTRAL ANGLE OF 14°23'04" AN ARC LENGTH OF 248.55 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 88°18'23" AN ARC LENGTH OF 38.53 FEET TO A POINT OF TANGENCY; THENCE NORTH 69°03'00" EAST, 397.44 FEET; THENCE SOUTH 20°30'00" EAST, 25.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST (THE PREVIOUS BEARING BEING RADIAL); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 739.25 FEET, A CENTRAL ANGLE OF 14°05'38" AN ARC LENGTH OF 181.84 FEET; THENCE NORTH 56°42'50" EAST ALONG A NON TANGENT LINE, 51.93 FEET TO THE BEGINNING OF A NON CONCENTRIC CURVE (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°35'47" EAST); THENCE NORTHEASTERLY ALONG  SAID CURVE HAVING A RADIUS OF 742.25 FEET, A CENTRAL ANGLE OF 22°15'00" AN ARC LENGTH OF 288.24 FEET TO A POINT OF TANGENCY; THENCE NORTH 29°08'43" EAST, 152.03 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE  SOUTHWEST, HAVING A  RADIUS OF 218.00 FEET, A CENTRAL ANGLE OF 126°00'00" AN ARC LENGTH OF 479.41 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 131.28 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 69.88 FEET TO A POINT OF TANGENCY; THENCE SOUTH 52°39'13" WEST, 44.02 FEET TO  A POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 206.00 FEET, A CENTRAL ANGLE OF 30°30'00" AN ARC LENGTH OF 109.66 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 345.00 FEET, A CENTRAL ANGLE OF 15°47'37" AN ARC LENGTH OF 95.10 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS BEARS SOUTH 66°42'44" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 345.99 FEET, A CENTRAL ANGLE OF 12°53'21" AN ARC LENGTH OF 77.83 FEET; THENCE SOUTH 53°49'23" EAST (RADIAL TO SAID CURVE), 28.26 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST, HAVING  A RADIUS OF 375.25 FEET, A CENTRAL ANGLE  OF 33°15'11 AN ARC LENGTH OF 217.79 FEET TO A POINT OF  TANGENCY; THENCE SOUTH 69°30'00" WEST, 393.96 FEET TO A POINT OF CURVATURE OF A CURVE

CONCAVE TO THE NORTH HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 98°40'54" AN ARC LENGTH OF 43.06 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 290.00 FEET, A CENTRAL ANGLE OF 31°52'53" AN ARC LENGTH OF 161.37 FEET TO A POINT OF TANGENCY; THENCE NORTH 20°00'00" EAST, 175.73 FEET; THENCE SOUTH 70°00'00" EAST, 15.00 FEET; THENCE NORTH 20°00'00" EAST, 224.67 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 595.00 FEET, A CENTRAL ANGLE OF 11°21'37" AN ARC LENGTH OF 117.97 FEET TO THE END OF SAID CURVE; THENCE NORTH 81°27'13" WEST 15.00 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 580.00 FEET, A CENTRAL ANGLE OF 07°25'24" AN ARC LENGTH OF 75.15 FEET TO THE END OF SAID CURVE; THENCE NORTH 87°56'12" EAST, 45.00 FEET; THENCE NORTH 17°15'54" EAST, 161.68 FEET; THENCE NORTH 11°56' 22" EAST, 408.45 FEET; TO THE SOUTHEAST CORNER OF TRACT "D" OF BANYAN CAY RESORT, PLAT BOOK 125, PAGE 116, THENCE CONTINUE ALONG THE NEXT FIVE COURSES OF TRACT "D"; THENCE NORTH 11°56' 22" EAST, 59.86 FEET; THENCE NORTH 48°03'38" WEST, 64.70 FEET; THENCE NORTH 01°11'51" EAST, 109.65 FEET; THENCE NORTH 76°19'06" WEST, 19.24 FEET; THENCE NORTH 27°09'45" EAST, 843.47 FEET BACK TO THE POINT OF BEGINNING.

PARCEL II (BACK NINE):

A PORTION OF TRACT "C", PLAT 1, THE PRESIDENT COUNTRY CLUB, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 29, PAGE 72 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF LOT 1 OF SAID PLAT (ALSO THE NORTH RIGHT OF WAY LINE OF CONGRESS AVENUE); THENCE NORTH 57°00'00" WEST ALONG THE SAID NORTH RIGHT OF WAY LINE, 170.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 57°00'00" WEST, 10.92 FEET; THENCE NORTH 33°00'00" EAST, 175.00 FEET; THENCE NORTH 57°00'00" WEST, 600.00 FEET; THENCE SOUTH 35°28'31" WEST, 87.42 FEET; THENCE NORTH 20°08'04" WEST, 100.09' FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 38°36'10" WEST) THENCE NORTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 1515.99 FEET, A CENTRAL ANGLE OF 06°59'55", AN ARC LENGTH OF 185.18 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 50.00 FEET, A CENTRAL ANGLE OF 89°53'08", AN ARC LENGTH OF 78.44 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 190.00 FEET, A CENTRAL ANGLE OF 111°36'33", AN ARC LENGTH OF 370.11 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 48.51 FEET, A CENTRAL ANGLE OF 36°29'47", AN ARC LENGTH OF 30.90 FEET TO A POINT OF COMPOUND CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 1335.99 FEET, A CENTRAL ANGLE OF 30°39'23", AN ARC LENGTH OF 714.83 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°11'51" EAST, 264.88 FEET TO A POINT OF A NON CONCENTRIC CURVE CONCAVE TO THE WEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 58°31'04" EAST); THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CURVE HAVING A RADIUS OF 175.00 FEET, A CENTRAL

ANGLE OF 126°43'54", AN ARC LENGTH OF 387.08 FEET TO A POINT OF REVERSE CURVE CONCAVE TO THE NORTHEAST; THENCE WESTERLY AND NORTHERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 95°43'47", AN ARC LENGTH OF 41.77 FEET TO A POINT OF TANGENCY; THENCE NORTH 01°01'51" EAST, 401.00 FEET; THENCE SOUTH 88°48'00" EAST, 160.03 FEET TO A POINT OF CURVE CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 100 FEET, A CENTRAL ANGLE OF 56°30'18", AN ARC LENGTH OF 98.62 FEET TO A POINT OF TANGENCY; THENCE SOUTH 32°18'00" EAST, 312.76 FEET; THENCE SOUTH 09°16'39" EAST, 105.00 FEET; THENCE SOUTH 77°36'02" EAST, 18.00 FEET; THENCE SOUTH 53°06'11" EAST, 104.04 FEET; THENCE SOUTH 50°56'54" EAST, 50.01 FEET; THENCE SOUTH 44°05'31" EAST, 50.25 FEET; THENCE SOUTH 35°45'59" EAST, 32.95 FEET; THENCE SOUTH 23°16'19" EAST, 20.16 FEET; THENCE SOUTH 16°01'43" EAST, 21.47 FEET TO A POINT OF A CURVE CONCAVE TO THE EAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 73°40'02" WEST); THENCE SOUTH ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 22°14'06", AN ARC LENGTH OF 86.54 FEET TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 65.00 FEET, A CENTRAL ANGLE OF 08°48'53", AN ARC LENGTH OF 10.00 FEET; TO A POINT OF COMPOUND CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEAST ALONG SAID CURVE, HAVING A RADIUS OF 223.00 FEET, A CENTRAL ANGLE OF 71°29'56", AN ARC LENGTH OF 278.28 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST; THENCE SOUTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 96.38 FEET, A CENTRAL ANGLE OF 32°13'15", AN ARC LENGTH OF 54.20 FEET TO A POINT OF TANGENCY; THENCE SOUTH 54°03'06" EAST, 26.71 FEET; THENCE NORTH 35°56'54" EAST, 112.00 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 39°53'17" EAST); THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 185.00 FEET, A CENTRAL ANGLE OF 28°39'01", AN ARC LENGTH OF 92.51 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE SOUTHEAST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 68°18'26" WEST) THENCE NORTHEASTERLY ALONG SAID CURVE HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 58°41'38", AN ARC LENGTH OF 25.61 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE TO THE NORTH (A RADIAL BEARING FROM ITS RADIUS POINT BEARS NORTH 09°26'02" WEST); THENCE ALONG SAID CURVE EASTERLY HAVING A RADIUS OF 300.00 FEET, A CENTRAL ANGLE OF 06°04'40", AN ARC LENGTH OF 31.82 FEET; THENCE SOUTH 17°31'14" EAST, 10.00 FEET; THENCE NORTH 75°33'55" EAST, 64.11 FEET; THENCE NORTH 67°40'25" EAST, 137.00 FEET; THENCE NORTH 85°10'25" EAST, 281.37 FEET; THENCE NORTH 11°09'00" EAST, 12.00 FEET; THENCE NORTH 78°51'00 " WEST 273.94 FEET TO A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 55°58'33" EAST; THENCE NORTH ALONG SAID CURVE HAVING A RADIUS OF 330.00 FEET, A CENTRAL ANGLE OF 00°34'11" AN ARC LENGTH OF 3.28 FEET; THENCE SOUTH 80°00'00" EAST, 276.63 FEET; THENCE SOUTH 00°42'42" EAST 332.57 FEET; THENCE SOUTH 70°00'00" EAST, 143.00 FEET; THENCE SOUTH 20°00'00" WEST, 325.91 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE EAST, HAVING A RADIUS OF 625.00 FEET, A CENTRAL ANGLE OF 40°29'58" AN ARC LENGTH OF 441.78 FEET TO A POINT OF TANGENCY; THENCE SOUTH 20°00'00" EAST, 320.00 FEET TO A POINT OF

CURVATURE OF A CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 655.00 FEET, A CENTRAL ANGLE OF 50°04'01" AN ARC LENGTH OF 572.36 FEET; THENCE NORTH 60°26'00" WEST, 15.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHWEST (A RADIAL BEARING FROM ITS RADIUS POINT BEARS SOUTH 60°26'00" EAST); THENCE SOUTHWESTERLY ALONG SAID CURVE HAVING A RADIUS OF 640.00 FEET, A CENTRAL ANGLE OF 04°48'42" AN ARC LENGTH OF 53.75 FEET TO THE END OF SAID CURVE; THENCE NORTH 55°37'20" WEST, 40.40 FEET; THENCE SOUTH 08°24'57" WEST, 11.34 FEET; THENCE SOUTH 38°35'47" WEST, 39.50 FEET; THENCE SOUTH 64°40'58" WEST, 45.94 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH, HAVING A RADIUS OF 80.00 FEET, A CENTRAL ANGLE OF 62°22'25" AN ARC LENGTH OF 87.09 FEET TO A POINT OF TANGENCY; THENCE NORTH 52°56'25" WEST, 94.23 FEET; THENCE NORTH 66°43'06" WEST, 14.52 FEET; THENCE NORTH 81°30'16" WEST, 24.17 FEET; THENCE NORTH 87°22'10" WEST, 24.19 FEET; THENCE SOUTH 52°57'50" WEST, 79.92 FEET;   THENCE SOUTH 70°31'03" WEST, 63.47 FEET; THENCE NORTH 69°15'28" WEST, 36.37 FEET; THENCE  NORTH 45°05'26" WEST, 34.89 FEET; THENCE NORTH 24°02'28" WEST, 16.14 FEET; THENCE SOUTH 33°00'00" WEST, 56.00 FEET BACK TO THE POINT OF BEGINNING.

PARCEL III:

TRACTS C1, C2, D, HC AND H2, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IV:

LOT 3, PLAT 1, THE PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, LESS THE SOUTHERLY 3.0 FEET THEREOF.

PARCEL V: INTENTIONALLY DELETED.

PARCEL VI:

TRACT MF, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL VII:

TRACT L3, OF THE PLAT OF BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 125, PAGE 114-117, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

TOGETHER WITH THE FOLLOWING ADDITIONALLY INSURED PARCELS WHICH BENEFIT THE PARCELS ABOVE:

THOSE CERTAIN "OUT OF BOUNDS" EASEMENT RIGHTS AND BENEFITS GRANTED IN THAT CERTAIN EASEMENT AGREEMENT RECORDED IN OFFICIAL RECORDS BOOK 22745, PAGE 868, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN 15 FOOT EASEMENT RIGHTS AND BENEFITS FOR INGRESS AND EGRESS GRANTED IN THAT CERTAIN SPECIAL WARRANTY DEED RECORDED IN OFFICIAL RECORD BOOK 2787, PAGE 1231, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, SUBJECT TO THE MAINTENANCE OBLIGATION SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS ESTABLISHED BY THAT CERTAIN AMENDED AND RESTATED MASTER DECLARATION OF COVENANTS AND RESTRICTIONS RECORDED IN OFFICIAL RECORD BOOK 22293, PAGE 83, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN RIGHTS AND BENEFITS GRANTED BY THAT CERTAIN GOLF COURSE ACCESS EASEMENT RECORDED IN OFFICIAL RECORDS BOOK 25002, PAGE 290, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA. SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SAID INSTRUMENT.

THOSE CERTAIN ACCESS RIGHTS AND BENEFICIAL RIGHTS TO USE COMMON AREAS ESTABLISHED BY THAT CERTAIN DECLARATION OF MASTER COVENANTS OF BANYAN CAY RESORT RECORDED IN OFFICIAL RECORD BOOK 29679, PAGE 227, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

THOSE CERTAIN ACCESS RIGHTS AND BENEFITS TO USE A GOLF CART PATH ACROSS LOT 18, PLAT 1, PRESIDENT COUNTRY CLUB, AS RECORDED IN PLAT BOOK 29, PAGES 72 THRU 76, INCLUSIVE, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, GRANTED BY THAT CERTAIN CART PATH EASEMENT RECORDED IN OFFICIAL RECORD BOOK 29932, PAGE 112, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.


TRACT L2 – ESTATE LOTS

TRACT L2, BANYAN CAY RESORT, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 125, PAGE 114, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL IDENTIFICATION NUMBER:        74-43-43-07-13-012-0020

LOT 21:

LOT 21 OF BANYAN CAY RESORT REPLAT OF TRACT "L1", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 127, PAGE 18, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

# EXHIBIT C

This instrument prepared by
and return to:

_____

_____

Property Identification Number:

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

## OMNIBUS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS OMNIBUS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made on this ____ day of August, 2023, by and amongst BANYAN CAY INVESTMENT, LLC, a Florida limited liability company; BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company; BANYAN CAY DEV, LLC, a Delaware limited liability company; BANYAN CAY RESORT AND GOLF, LLC, a Delaware limited liability company; BANYAN CAY VILLAS, LLC, a Delaware limited liability company; and BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company, each a debtor and debtor-in-possession pursuant to 11 U.S.C. Sections 1107 and 1108  in the Bankruptcy Court of the Southern District of Florida, Case No. 23-12386 ("Sellers" or "Assignors" or "Debtors" where contextually appropriate) and USREC BANYAN CAY, LLC, a _____ limited liability company ("Purchaser" or "Assignee" where contextually appropriate), (Assignors and Assignee, collectively, the "Parties").

## RECITALS:

A.     On June 26, 2023, the Bankruptcy Court of the Southern District of Florida, Case No. 23-12386, entered that certain Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and Interest and (II) Granting Related Relief [ECF No. 183, the "Sale Order"] approving an asset purchase agreement, by and between Debtors and an unrelated third party (the "Third-Party Bidder").  The Third-Party Bidder failed to close the acquisition of the Assets as contemplated by the Sale Order.  Pursuant to the Sale Order and as a result of the Third-Party Bidder's failure to acquire the Assets, Lender reserved the right to credit bid pursuant to Section 363(k) up to the full amount of its debt and to close on the sale of the Assets pursuant to Section 363 and Lender invoked such right by designating Purchaser to acquire the Assets.

B.     In connection with the sale of the Assets to Lender's designated purchaser, Assignors and Assignee have entered into an Asset Purchase Agreement ("APA"), incorporating the Sale Order, which, under its terms provides for the terms and conditions of the sale.

C.     Pursuant to the APA, all rights and property owned by Assignors, [EXCEPT FOR THE EXCLUDED ASSETS] are to be assigned, sold, transferred, conveyed and delivered to Assignee, free and clear of all liens, claims or encumbrances.

NOW, THEREFORE, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and for other good and valuable consideration paid to Lender by the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

12349736-6

1.      Recitals.  The above Recitals are true and correct and form a part of this Agreement as if set forth at length in this Agreement.

2.      Bill of Sale and Assignments.  Debtors do hereby irrevocably assign, sell, transfer, convey and deliver unto Purchaser, and Purchaser shall purchase and assume from Debtors, all of Debtors' properties, assets, rights, titles and interests as described in the following schedules (collectively, the "Assets"):

Schedule 1 – Bill of Sale

Schedule 2 – Assignment and Assumption of Intangible Property

Schedule 3 – Assignment of Declarant's Rights

Schedule 4 – Assignment and Assumption of Development Rights, Licenses, Permits and Developer's Rights

3.      Parties in Interest. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

4.      Power of Attorney.  Seller hereby constitutes and appoints Purchaser, its successors and assigns, the true and lawful attorney and attorneys of the Seller, with full power of substitution, in the name of the Purchaser or in the name and stead of the Seller, but on behalf of and for the benefit of the Purchaser, its successors and assigns:

        (a)      to collect, demand and receive any and all Assets transferred hereunder and to give receipts and releases for and in respect of the same;

        (b)      to institute and prosecute in the Seller's name, or otherwise, at the expense and for the benefit of the Purchaser any and all actions, suits or proceedings, at law, in equity or otherwise, which the Purchaser may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Assets hereby sold and assigned to Purchaser or intended so to be, to defend or compromise any and all such actions, suits or proceedings in respect of any of such Assets, and to do all such acts and things in relation thereto as Purchaser shall deem advisable for the collection or reduction to possession of any of such Assets;

        (c)      to take any and all other reasonable action designed to vest more fully in Purchaser the Assets hereby sold and assigned to the Purchaser or intended so to be and in order to provide for the Purchaser the benefit, use, enjoyment and possession of such Assets; and

        (d)      to do all reasonable acts and things in relation to the Assets sold and assigned hereunder.

        Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by it or upon its subsequent dissolution or in any manner or for any reason.  Purchaser shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest with respect thereto.  Seller shall from time to time pay to Purchaser, when received, any amounts that shall be received directly or indirectly by Seller (including amounts received as interest) in respect of any Assets sold, assigned or transferred to Purchaser pursuant hereto.

12349736-6

5.      <u>Counterparts</u>. This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered shall be an original, and all of which together shall constitute one and the same instrument. Any counterpart delivered by facsimile, PDF or other electronic means shall have the same import and effect as an original counterpart and shall be valid, enforceable and binding for the purposes of this Agreement.

6.      <u>Governing Law; Venue</u>. This Agreement and the rights and obligations of the Parties hereunder shall be governed by, and construed in accordance with, the laws of the State of Florida as applied to contracts made and performed entirely in such state and any applicable provisions of the Bankruptcy Code, without regard to conflict of laws principles.  In the event legal action shall become necessary under this Agreement, venue shall be in the United States Bankruptcy Court for the Southern District of Florida.

7.      <u>Conveyance Pursuant to APA and Subject to the Terms of the Sale Order</u>. The Assets are being conveyed by this Agreement (together with the conveyance documents attached hereto) pursuant to the APA and subject to the terms and provisions of the Sale Order.

8.      <u>Conflicts with APA</u>. In the event of any conflict between this Agreement and the APA, the terms of the APA shall control.

9.      <u>Definitions</u>. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the APA.

10.     <u>Additional Provisions</u>. In addition to the foregoing, the following provisions contained in Sections 8.10 (Continuing Jurisdiction), 8.13 (No Third-Party Beneficiaries), 8.14 (Prevailing Agreement Between the Parties), 8.17 (Mutual Drafting), 8.18 (Time of the Essence) and 8.19 (Waivers of Jury Trial) of the APA are hereby incorporated by reference into this Bill of Sale, *mutatis mutandis*, and made a part of this Assignment as if set forth fully herein.

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto, intending legally to be bound, have caused this Agreement to be duly executed and delivered as of the day and year first herein above written.

SELLERS:

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY INVESTMENT, LLC,**
Signature of Witness                                          a Florida limited liability company

_____
Printed Name of Witness

 

                                                                                 By: _____
                                                                                             Jerry McHale

                                                                                 Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.

                                                                     _____
                                                                                 Notary Public

                                                                     _____
                                                                     Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY MEZZANINE BORROWER, LLC,** a Delaware limited liability company

_____
Printed Name of Witness

By: _____
　　　　　Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Mezzanine Borrower, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY DEV, LLC,**
a Delaware limited liability company

_____
Printed Name of Witness

By: _____
               Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

12349736-6

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY RESORT AND GOLF, LLC,**
a Delaware limited liability company

_____
Printed Name of Witness

By: _____
         Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY VILLAS, LLC,**
Signature of Witness                                      a Delaware limited liability company

_____
Printed Name of Witness

                                                                 By: _____
                                                                            Jerry McHale

                                                                 Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.

                                                  _____
                                                               Notary Public

                                                  _____
                                                  Printed Name of Notary Public

My commission expires:

(SEAL)

                    [SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY MAINTENANCE, LLC,**
Signature of Witness                                   a Florida limited liability company

_____
Printed Name of Witness

By: _____
                   Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Maintenance, LLC, a Florida limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

12349736-6

<u>ASSIGNEE</u>:

Signed, sealed and delivered in presence of:

_____
Signature of Witness

_____
Printed Name of Witness

**USREC BANYAN CAY, LLC,**
a Florida limited liability company

By: _____
Name: _____
Title: _____

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by _____, as _____ for USREC Banyan Cay, LLC, a _____ limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[END OF SIGNATURES]

12349736-6

**SCHEDULE 1**

**BILL OF SALE**

THIS BILL OF SALE (this "Bill of Sale"), effective as of August ___, 2023, is made by BANYAN CAY INVESTMENT, LLC, a Florida limited liability company; BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company; BANYAN CAY DEV, LLC, a Delaware limited liability company; BANYAN CAY RESORT AND GOLF, LLC, a Delaware limited liability company; BANYAN CAY VILLAS, LLC, a Delaware limited liability company; and BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company, whose mailing address is _____, , each a debtor and debtor-in-possession pursuant to 11 U.S.C. Sections 1107 and 1108 1108  in the Bankruptcy Court of the Southern District of Florida, Case No. 23-12386  (collectively, "Seller"), to USREC BANYAN CAY, LLC, a _____ limited liability company, whose address is: _____, its successors or assigns ("Purchaser") Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to them in the APA (as defined below).

WHEREAS, Seller and Purchaser are both party to that certain Asset Purchase Agreement, dated as of August __, 2023 (the "APA");

WHEREAS, Pursuant to the APA, Sellers are conveying certain real property to Purchaser as approved by the Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and Interest and (II) Granting Related Relief [ECF No. 183, the "Sale Order"] approving an asset purchase agreement in the bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Florida, Case No. 23-12386.

WHEREAS, pursuant to the APA and the Sale Order, Seller is selling to Purchaser, and Purchaser is purchasing from Seller, all of Seller's right, title, and interest in the Assets free and clear of all Liens;

WHEREAS, the execution and delivery of this Bill of Sale is required under Section 2.6 of the APA; and

NOW THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and Purchaser agree as follows:

1.      Effective as of the Closing and upon the terms and subject to the conditions set forth in this Bill of Sale, the Sale Order and the APA, Seller hereby sells, assigns and transfers to Purchaser all of Seller's right, title, benefit, and interest in, to, and under the Assets, free and clear of all Liens, security interests, claims, and encumbrances. Notwithstanding anything herein to the contrary, the Excluded Assets will be retained by Seller.

2.      Notwithstanding anything herein to the contrary, the provisions of this Bill of Sale shall be subject to and governed by the provisions of the APA, including, without limitation, the representations, warranties, covenants, and agreements, which are incorporated herein by this reference. If and to the extent the provisions of this Bill of Sale are inconsistent in any way with the provisions of the APA, the provisions of the APA shall be controlling. Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms and provisions set forth in the APA. Nothing

12349736-6

contained in this Bill of Sale shall be construed as a waiver of any of the rights or remedies set forth in, or arising from, the APA, the Sale Order or any other instrument or document delivered pursuant to the APA.

3.      This Bill of Sale is governed by and construed in accordance with the internal laws of the State of Florida, any applicable provisions of the Bankruptcy Code and the Sale Order, without regard to conflict of laws principles.

4.      The Assets are being conveyed by this Bill of Sale pursuant to the APA and subject to the terms and provisions of the Sale Order.

5.      This Bill of Sale may be executed in multiple counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument. A facsimile or other electronic copy of a signature shall be deemed an original for purposes of this Bill of Sale.

6.      Each of the parties hereto covenant and agree to take such actions and do such things as the other party hereto reasonably requests to execute and deliver, or cause to be executed and delivered, all such additional documents, instruments, conveyances, agreements, and assurances and take such further actions as such other party may reasonably request to carry out evidencing or confirming the sale, assignment, transfer, conveyance, and delivery to Purchaser of the Assets.

7.      This Bill of Sale will bind and inure to the benefit of the successors, heirs and permitted assigns of each party hereto.

8.      If any term, provision, or clause of this Bill of Sale, or of any other agreement or document which is required to be provided under this Bill of Sale, is held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect or render invalid, illegal, or unenforceable any other provision or clause hereof or thereof, the consideration or mutuality of which can be given effect without such invalid, illegal, or unenforceable provision, and all of which shall remain in full force and effect. If any provision of this Bill of Sale is so broad as to be unenforceable, such provision shall be interpreted to be only as broad as is enforceable under applicable law.

9.      This Bill of Sale may not be amended or modified in any respect, except by a written instrument signed by Seller and Purchaser making specific reference to this Bill of Sale.  Each of the recitals to this Bill of Sale is true and correct and each recital is hereby incorporated into this Bill of Sale for all purposes.

10.     In addition to the foregoing, the following provisions contained in Sections 8.10 (Continuing Jurisdiction), 8.11 (Choice of Law), 8.13 (No Third-Party Beneficiaries), 8.14 (Prevailing Agreement Between the Parties), 8.17 (Mutual Drafting), 8.18 (Time of the Essence) and 8.19 (Waivers of Jury Trial) of the APA are hereby incorporated by reference into this Bill of Sale, *mutatis mutandis*, and made a part of this Bill of Sale as if set forth fully herein.

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

   IN WITNESS WHEREOF, the parties hereto, intending legally to be bound, have caused this Bill of Sale to be duly executed and delivered as of the day and year first herein above written.

SELLER:

BANYAN CAY RESORT AND GOLF, LLC, BANYAN CAY DEV, LLC,
 a Delaware limited liability company a Delaware limited liability company

By:_____ By:_____
Name: Jerry McHale Name: Jerry McHale
Title: Chief Restructuring Officer Title: Chief Restructuring Officer


BANYAN CAY VILLAS, LLC, BANYAN CAY MAINTENANCE, LLC,
a Delaware limited liability company a Delaware limited liability company

By:_____ By:_____
Name: Jerry McHale Name: Jerry McHale
Title: Chief Restructuring Officer Title: Chief Restructuring Officer


BANYAN CAY INVESTMENT, LLC a Delaware limited liability company

By:_____
Name: Jerry McHale
Title: Chief Restructuring Officer



Acknowledged and accepted:

PURCHASER:

USREC BANYAN CAY, LLC, a _____
limited liability company


By: _____
Name:  _____
Title:  _____

12349736-6

**SCHEDULE 2**

**ASSIGNMENT AND ASSUMPTION OF INTANGIBLE PROPERTY**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT OF INTANGIBLE PROPERTY (this "Assignment") dated as of _____, 2023, by and amongst BANYAN CAY INVESTMENT, LLC, a Florida limited liability company; BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company; BANYAN CAY DEV, LLC, a Delaware limited liability company; BANYAN CAY RESORT AND GOLF, LLC, a Delaware limited liability company; BANYAN CAY VILLAS, LLC, a Delaware limited liability company; and BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company, each a debtor and debtor-in-possession pursuant to 11 U.S.C. Sections 1107 and 1108 1108  in the Bankruptcy Court of the Southern District of Florida, Case No. 23-12386  ("Assignors") and USREC BANYAN CAY, LLC, a _____ limited liability company ("Assignee"), (Assignors and Assignee, collectively, the "Parties").

W I T N E S S E T H:


WHEREAS, Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of August ____ 2023 (the "APA");

WHEREAS, Pursuant to the APA, Assignors are conveying certain real property to Assignee as approved by the Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and Interest and (II) Granting Related Relief [ECF No. 183, the "Sale Order"] approving an asset purchase agreement in the bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Florida, Case No. 23-12386.

WHEREAS, in accordance with the terms of the APA and the Sale Order, Assignors and Assignee have agreed to enter into this Assignment, providing for (a) the assignment from Assignors to Assignee of all of Assignors' right, title and interest in, Intellectual Property, Assumed Permits, and Assumed Contracts and (collectively, the "Intangible Property") on and subject to the terms of the APA and (b) the acceptance by Assignee of such assignment and the assumption by Assignee of (i) all obligations to be performed by Assignors in connection with the Intangible Property accruing or arising from and after the date hereof and (ii) the other Assumed Liabilities (defined in Schedule 7).

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.     Recitals.  The above Recitals are true and correct and form a part of this Agreement as if set forth at length in this Agreement.

2.     Assignment. In accordance with and subject to the terms of the APA and the Sale Order, each Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee, to the extent that such are legally assignable and any necessary consents to assignment have been obtained, all of such Assignors' right, title and interest in, under and to the Intangible Property

3.     Acceptance and Assumption. In accordance with and subject to the terms of the APA and the Sale Order, Assignee hereby (a) purchases and accepts the sale, assignment, transfer,

conveyance and delivery to the extent that such are legally assignable and necessary consents to assignment have been obtained, of Assignors' right, title and interest in, under and to the Intangible Property; and (b) unconditionally and irrevocably assumes, undertakes and agrees to pay, satisfy, perform and discharge in full, as and when due, and release and discharge each Assignor completely and forever from, all obligations and liabilities of any kind arising out of, or required to be performed under, the Intangible Property accruing or arising from and after the date hereof.

4. <u>Parties Bound</u>. This Assignment shall be binding upon, and inure to the benefit of, the parties to this Assignment and their respective heirs, legal representations, successors and assigns.

5. <u>Governing Law and Selection of Forum</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Florida and any applicable provisions of the Bankruptcy Code, without regard to conflict of laws principles. In the event legal action shall become necessary under this Assignment, venue shall be in the United States Bankruptcy Court for the Southern District of Florida.

6. <u>Waiver</u>. No waiver of any of the provisions of this Assignment shall be effective unless it is in writing, signed by the party against whom it is asserted, and any such waiver shall only be applicable to the specific instance in which it relates and shall not be deemed to be a continuing or future waiver. Nothing contained in this Assignment shall be construed as a waiver of any of the rights or remedies set forth in, or arising from, the APA, the Sale Order or any other instrument or document delivered pursuant to the APA.

7. <u>Construction and Interpretation</u>. Neither party shall be considered the author of this Assignment since the parties hereto have participated in extensive negotiations and drafting of this document so as to arrive at the final Assignment; accordingly, the terms of this Assignment shall not be more strictly construed against either party based upon one party having initially drafted this Assignment, and this Assignment shall be interpreted as though each party contributed equally to its contents.

8. <u>Severability</u>. In the event any provision of this Assignment is held by a court of competent jurisdiction to be invalid or unenforceable, such ruling shall not affect the remaining portions of this Assignment and the remainder of this Assignment shall remain in full force and effect and shall be enforced as written.

9. <u>Captions</u>. The captions and paragraph headings contained in this Assignment are for reference and convenience only and in no way define, describe, extend or limit the scope or intent of this Assignment.

10. <u>Counterparts</u>. This Assignment may be executed in two or more counterparts, each of which will be deemed an original, and a complete set of which shall together constitute the same instrument.

11. <u>Additional Provisions</u>. In addition to the foregoing, the following provisions contained in Sections 8.10 (Continuing Jurisdiction), 8.11 (Choice of Law), 8.13 (No Third-Party Beneficiaries), 8.14 (Prevailing Agreement Between the Parties), 8.17 (Mutual Drafting), 8.18 (Time of the Essence) and 8.19 (Waivers of Jury Trial) of the APA are hereby incorporated by reference into this Bill of Sale, *mutatis mutandis*, and made a part of this Assignment as if set forth fully herein.

12349736-6

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto, intending legally to be bound, have caused this Assignment to be duly executed and delivered as of the day and year first herein above written.

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY INVESTMENT, LLC,**
a Florida limited liability company

_____
Printed Name of Witness

By: _____
        Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

**[SIGNATURES ON THE FOLLOWING PAGE]**

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY MEZZANINE BORROWER,**
Signature of Witness                                         **LLC,** a Delaware limited liability company

_____
Printed Name of Witness

By: _____
                     Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Mezzanine Borrower, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
                  Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____    **BANYAN CAY DEV, LLC,**
Signature of Witness    a Delaware limited liability company


_____
Printed Name of Witness


    By: _____
              Jerry McHale

    Title: Chief Restructuring Officer


_____
Signature of Witness


_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.


    _____
        Notary Public

    _____
    Printed Name of Notary Public


My commission expires:



(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____     **BANYAN CAY RESORT AND GOLF, LLC,**
Signature of Witness                                   a Delaware limited liability company

_____
Printed Name of Witness

                                                                    By: _____
                                                                                Jerry McHale

                                                                    Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.

                                                    _____
                                                            Notary Public

                                                    _____
                                                    Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY VILLAS, LLC,**
Signature of Witness                        a Delaware limited liability company

_____
Printed Name of Witness

                                            By: _____
                                                        Jerry McHale

                                            Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.

                                    _____
                                              Notary Public

                                    _____
                                     Printed Name of Notary Public

My commission expires:

(SEAL)

                    [SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY MAINTENANCE, LLC,**
Signature of Witness                      a Florida limited liability company

_____
Printed Name of Witness

                                          By: _____
                                                    Jerry McHale

                                          Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or
_____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Maintenance, LLC, a Florida limited liability company, who produced _____ as identification.

                                          _____
                                                    Notary Public

                                          _____
                                          Printed Name of Notary Public

My commission expires:

(SEAL)

                    [SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

12349736-6

ASSIGNEE:

Signed, sealed and delivered in presence of:

_____          **USREC BANYAN CAY, LLC,**
Signature of Witness                                    a Florida limited liability company

_____
Printed Name of Witness

                                                                By: _____
                                                                Name: _____
                                                                Title: _____

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by _____, as _____ for USREC Banyan Cay, LLC, a _____ limited liability company, who produced _____ as identification.

                                    _____
                                    Notary Public

                                    _____
                                    Printed Name of Notary Public

My commission expires:

(SEAL)

[END OF SIGNATURES]

12349736-6

**SCHEDULE 3**

**ASSIGNMENT OF DECLARANT'S RIGHTS**

THIS ASSIGNMENT OF DECLARANT'S RIGHTS (this "<u>Assignment</u>") is made as of the ___ day of August, 2023 by BANYAN CAY INVESTMENT, LLC, a Florida limited liability company; BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company; BANYAN CAY DEV, LLC, a Delaware limited liability company; BANYAN CAY RESORT AND GOLF, LLC, a Delaware limited liability company; BANYAN CAY VILLAS, LLC, a Delaware limited liability company; and BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company, each a debtor and debtor-in-possession pursuant to 11 U.S.C. Sections 1107 and 1108 1108 in the Bankruptcy Court of the Southern District of Florida, Case No. 23-12386 ("<u>Assignors</u>") to USREC BANYAN CAY, LLC, a _____ limited liability company (including its successors and assigns, "<u>Assignee</u>").

**R E C I T A L S:**

A.    Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of August_____ 2023 (the "<u>APA</u>"); Pursuant to the APA, Assignors are conveying certain real property to Assignee as approved by the Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and Interest and (II) Granting Related Relief [ECF No. 183, the "<u>Sale Order</u>"] approving an asset purchase agreement in the bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Florida, Case No. 23-12386 .

B.    Assignor/S [INSERT APPROPRIATE ASSIGNOR/S], is the holder of the rights and privileges ("<u>Rights</u>") of the "<u>Declarant</u>" under those certain Declaration of Covenants [ADD IN NAMES OF ALL DECLARATIONS] recorded on _____ ___, 20__ in Official Records Book _____, Page _____, of the Public Records of Palm Beach County, Florida (including all exhibits thereto, all as now or hereafter amended and/or supplemented, the "<u>Declaration</u>").

C.    Assignor assigns to Assignee, and Assignee assumes the assignment of the Rights, as more particularly set forth in this Assignment and the Sale Order.

**NOW, THEREFORE**, for Ten and No/100 Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree:

1.    <u>Recitals</u>.  The above Recitals are true and correct and form a part of this Assignment as if set forth at length in this Assignment.

2.    <u>Assignment</u>.  Assignor hereby assigns, remises, releases, and quitclaims to Assignee, all of Assignor's rights, titles and interests, if any, in the Rights as they relate to the Property pursuant and subject to the rights and limitations of the Sale Order.

3.    <u>Assumption</u>.  Assignee hereby assumes the Rights and assumes all duties, obligations and liabilities of Assignor with respect to the Rights pursuant and subject to the rights and limitations

of the Sale Order.

4.    Parties Bound.  This Assignment shall be binding upon, and inure to the benefit of, the parties to this Assignment and their respective heirs, legal representations, successors and assigns.

5.    Governing Law and Selection of Forum.  This Assignment shall be governed by and construed in accordance with the laws of the State of Florida and any applicable provisions of the Bankruptcy Code, without regard to conflict of laws principles.  In the event legal action shall become necessary under this Assignment, venue shall be in the United States Bankruptcy Court for the Southern District of Florida.

6.    Waiver.  No waiver of any of the provisions of this Assignment shall be effective unless it is in writing, signed by the party against whom it is asserted, and any such waiver shall only be applicable to the specific instance in which it relates and shall not be deemed to be a continuing or future waiver.  Nothing contained in this Assignment shall be construed as a waiver of any of the rights or remedies set forth in, or arising from, the APA, the Sale Order or any other instrument or document delivered pursuant to the APA.

7.    Construction and Interpretation.  Neither party shall be considered the author of this Assignment since the parties hereto have participated in extensive negotiations and drafting of this document so as to arrive at the final Assignment; accordingly, the terms of this Assignment shall not be more strictly construed against either party based upon one party having initially drafted this Assignment, and this Assignment shall be interpreted as though each party contributed equally to its contents.

8.    Severability.  In the event any provision of this Assignment is held by a court of competent jurisdiction to be invalid or unenforceable, such ruling shall not affect the remaining portions of this Assignment and the remainder of this Assignment shall remain in full force and effect and shall be enforced as written.

9.    Captions.  The captions and paragraph headings contained in this Assignment are for reference and convenience only and in no way define, describe, extend or limit the scope or intent of this Assignment.

10.    Counterparts.  This Assignment may be executed in two or more counterparts, each of which will be deemed an original, and a complete set of which shall together constitute the same instrument.

11.    Additional Provisions. In addition to the foregoing, the following provisions contained in Sections 8.10 (Continuing Jurisdiction), 8.11 (Choice of Law), 8.13 (No Third-Party Beneficiaries), 8.14 (Prevailing Agreement Between the Parties), 8.17 (Mutual Drafting), 8.18 (Time of the Essence) and 8.19 (Waivers of Jury Trial) of the APA are hereby incorporated by reference into this Bill of Sale, *mutatis mutandis*, and made a part of this Assignment as if set forth fully herein.

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

IN WITNESS WHEREOF, the parties hereto, intending legally to be bound, have caused this Assignment to be duly executed and delivered as of the day and year first herein above written.

<u>ASSIGNORS</u>:

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY INVESTMENT, LLC,**
Signature of Witness                        a Florida limited liability company

_____
Printed Name of Witness

                                            By: _____
                                                    Jerry McHale

                                            Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.

                                            _____
                                                    Notary Public

                                            _____
                                            Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY MEZZANINE BORROWER, LLC,** a Delaware limited liability company

_____
Printed Name of Witness

By: _____
        Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Mezzanine Borrower, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:


(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]


12349736-6

Signed, sealed and delivered in presence of:

**BANYAN CAY DEV, LLC,**
a Delaware limited liability company

_____
Signature of Witness

_____
Printed Name of Witness

By: _____
　　　　　　Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
　　　　　Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY RESORT AND GOLF, LLC,**
Signature of Witness                                    a Delaware limited liability company

_____
Printed Name of Witness


                    By: _____
                              Jerry McHale

                    Title: Chief Restructuring Officer


_____
Signature of Witness

_____
Printed Name of Witness


STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.


                    _____
                    Notary Public

                    _____
                    Printed Name of Notary Public


My commission expires:



(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY VILLAS, LLC,**
Signature of Witness                        a Delaware limited liability company

_____
Printed Name of Witness

                                            By: _____
                                                        Jerry McHale

                                            Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.

                                            _____
                                                  Notary Public

                                            _____
                                            Printed Name of Notary Public

My commission expires:

(SEAL)

                    [SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY MAINTENANCE, LLC,**
Signature of Witness                                              a Florida limited liability company

_____
Printed Name of Witness

By: _____
                  Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Maintenance, LLC, a Florida limited liability company, who produced _____ as identification.

_____
                  Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

12349736-6

<u>ASSIGNEE</u>:

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**USREC BANYAN CAY, LLC,**
a Florida limited liability company

_____
Printed Name of Witness

By: _____
Name: _____
Title: _____

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by _____, as _____ for USREC Banyan Cay, LLC, a _____ limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[END OF SIGNATURES]

## SCHEDULE 4

### ASSIGNMENT AND ASSUMPTION OF DEVELOPMENT RIGHTS, LICENSES, PERMITS AND DEVELOPER'S RIGHTS

THIS ASSIGNMENT AND ASSUMPTION OF DEVELOPMENT RIGHTS, LICENSES, PERMITS AND DEVELOPER'S RIGHTS (this "Assignment") is made as of the ___ day of _____, 2023 by BANYAN CAY INVESTMENT, LLC, a Florida limited liability company; BANYAN CAY MEZZANINE BORROWER, LLC, a Delaware limited liability company; BANYAN CAY DEV, LLC, a Delaware limited liability company; BANYAN CAY RESORT AND GOLF, LLC, a Delaware limited liability company; BANYAN CAY VILLAS, LLC, a Delaware limited liability company; and BANYAN CAY MAINTENANCE, LLC, a Florida limited liability company, each a debtor and debtor-in-possession pursuant to 11 U.S.C. Section 1107 and 1108 in the Bankruptcy Court of the Southern District of Florida, Case No. 23-12386  ("Assignors") to USREC BANYAN CAY, LLC, a _____ limited liability company (including its successors and assigns, "Assignee").

### RECITALS:

A.    Assignors and Assignee are parties to that certain Asset Purchase Agreement dates _____ ____, 2023 (the "APA").  Pursuant to the APA, Assignors are conveying certain real property to Assignee as approved by the Order (I) Authorizing and Approving the Sale of Certain Property of the Debtors, Free and Clear of Liens, Claims, Encumbrances and Interest and (II) Granting Related Relief [ECF No. 183, the "Sale Order"] approving an asset purchase agreement (the "Sale Order") in the bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Florida, Case No. 23-12386.

B.    Pursuant to this Assignment, Assignors assign to Assignee, without recourse, representation, warranty, or guaranty all development rights and contracts owned or held by Assignor with respect to the real property conveyed under the Sale Order as legally described in the APA (the "Property") including all permits, licenses, contracts, Seller CDD Reimbursement, development rights, air rights, subsurface rights, water rights and other rights obtained from third parties and Developer's Rights (collectively, the "Development Rights") and .

THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration to it paid, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

A.    Recitals.  The above Recitals are true and correct and form a part of this Assignment as if set forth at length in this Assignment.

1.    Assignment.  Assignor, subject to the terms of the Sale Order, hereby assigns, remises, releases, and quitclaims to Assignee, all of Assignor's rights, titles and interests, if any, in the Development Rights as they relate to the Property, pursuant and subject to the rights and limitations of the Sale Order.

2.    Assumption.  Assignee, subject to the terms of the Sale Order, hereby assumes the Development Rights and assumes the duties, obligations and liabilities of Assignor with respect to the

12349736-6

Development Rights, pursuant and subject to the rights and limitations of the Sale Order.

3.     Parties Bound.  This Assignment shall be binding upon, and inure to the benefit of, the parties to this Assignment and their respective heirs, legal representations, successors and assigns.

4.     Governing Law and Selection of Forum.  This Assignment shall be governed by and construed in accordance with the laws of the State of Florida and any applicable provisions of the Bankruptcy Code, without regard to conflict of laws principles.  In the event legal action shall become necessary under this Assignment, venue shall be in the United States Bankruptcy Court for the Southern District of Florida.

5.     Waiver.  No waiver of any of the provisions of this Assignment shall be effective unless it is in writing, signed by the party against whom it is asserted, and any such waiver shall only be applicable to the specific instance in which it relates and shall not be deemed to be a continuing or future waiver. Nothing contained in this Assignment shall be construed as a waiver of any of the rights or remedies set forth in, or arising from, the APA, the Sale Order or any other instrument or document delivered pursuant to the APA.

6.     Construction and Interpretation.  Neither party shall be considered the author of this Assignment since the parties hereto have participated in extensive negotiations and drafting of this document so as to arrive at the final Assignment; accordingly, the terms of this Assignment shall not be more strictly construed against either party based upon one party having initially drafted this Assignment, and this Assignment shall be interpreted as though each party contributed equally to its contents.

7.     Severability.  In the event any provision of this Assignment is held by a court of competent jurisdiction to be invalid or unenforceable, such ruling shall not affect the remaining portions of this Assignment and the remainder of this Assignment shall remain in full force and effect and shall be enforced as written.

8.     Captions.  The captions and paragraph headings contained in this Assignment are for reference and convenience only and in no way define, describe, extend or limit the scope or intent of this Assignment.

9.     Counterparts.  This Assignment may be executed in two or more counterparts, each of which will be deemed an original, and a complete set of which shall together constitute the same instrument.

10.     Additional Provisions. In addition to the foregoing, the following provisions contained in Sections 8.10 (Continuing Jurisdiction), 8.11 (Choice of Law), 8.13 (No Third-Party Beneficiaries), 8.14 (Prevailing Agreement Between the Parties), 8.17 (Mutual Drafting), 8.18 (Time of the Essence) and 8.19 (Waivers of Jury Trial) of the APA are hereby incorporated by reference into this Assignment, *mutatis mutandis*, and made a part of this Assignment as if set forth fully herein.

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

IN WITNESS WHEREOF, the parties hereto, intending legally to be bound, have caused this Assignment to be duly executed and delivered as of the day and year first herein above written.

ASSIGNORS:

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY INVESTMENT, LLC,**
a Florida limited liability company

_____
Printed Name of Witness

By: _____
        Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Investment, LLC, a Florida limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY MEZZANINE BORROWER,**
Signature of Witness                      **LLC,** a Delaware limited liability company

_____
Printed Name of Witness

By: _____
                    Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Mezzanine Borrower, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____
Signature of Witness

**BANYAN CAY DEV, LLC,**
a Delaware limited liability company

_____
Printed Name of Witness

By: _____
            Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Dev, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY RESORT AND GOLF, LLC,**
Signature of Witness                        a Delaware limited liability company

_____
Printed Name of Witness

By: _____
                Jerry McHale

Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Resort and Golf, LLC, a Delaware limited liability company, who produced _____ as identification.

_____
Notary Public

_____
Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY VILLAS, LLC,**
Signature of Witness                        a Delaware limited liability company

_____
Printed Name of Witness

                                            By: _____
                                                      Jerry McHale

                                            Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Villas, LLC, a Delaware limited liability company, who produced _____ as identification.

                                            _____
                                                  Notary Public

                                            _____
                                            Printed Name of Notary Public

My commission expires:

(SEAL)

[SIGNATURES ON THE FOLLOWING PAGE]

12349736-6

Signed, sealed and delivered in presence of:

_____          **BANYAN CAY MAINTENANCE, LLC,**
Signature of Witness                                     a Florida limited liability company

_____
Printed Name of Witness

                                                               By: _____
                                                                              Jerry McHale

                                                               Title: Chief Restructuring Officer

_____
Signature of Witness

_____
Printed Name of Witness

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by Jerry McHale, as Chief Restructuring Officer for Banyan Cay Maintenance, LLC, a Florida limited liability company, who produced _____ as identification.

                                                        _____
                                                        Notary Public

                                                        _____
                                                        Printed Name of Notary Public

My commission expires:

(SEAL)

               [SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

12349736-6

ASSIGNEE:

Signed, sealed and delivered in presence of:

_____

Signature of Witness

**USREC BANYAN CAY, LLC,**
a Florida limited liability company

_____

Printed Name of Witness

By: _____
Name: _____
Title: _____

_____

Signature of Witness

_____

Printed Name of Witness

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me by means of _____ physical presence or _____ online notarization, this _____ day of _____, 2023, by _____, as _____ for USREC Banyan Cay, LLC, a _____ limited liability company, who produced _____ as identification.

_____

Notary Public

_____

Printed Name of Notary Public

My commission expires:

(SEAL)

[END OF SIGNATURES]

12349736-6

# **<u>EXHIBIT B</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| BANYAN CAY RESORT & GOLF, LLC, *et al*[1] | Case No. 23-12386-EPK |
| | (Jointly Administered) |
| Debtors. | |
| _____/ | |

**ORDER APPROVING EMERGENCY MOTION TO (I) COMPEL DEBTORS TO COMPLY WITH PARAGRAPH 7 OF THE SALE ORDER; (II) AMEND THE SALE ORDER TO SUBSTITUTE LENDER'S APA; AND (III) AUTHORIZE U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP'S CREDIT BID [ECF No. ____]**

   **THIS CAUSE** came before the Court on August __, 2023 at _____, on the *Emergency*

*Motion To (I) Compel Debtors to Comply with Paragraph 7 of the Sale Order; (II) Amend the Sale*

*Order to Substitute Lender's APA; and  Amend Sale Order and Authorize U.S. Real Estate Credit*

*Holdings III-A, LP's Credit Bid* filed by U.S. Real Estate Credit Holdings III-A, LP ("U.S. Real

---

[1]   The Debtors are: (i) Banyan Cay Investment, LLC; (ii) Banyan Cay Mezzanine Borrower, LLC; (iii) Banyan Cay Resort & Golf LLC; (iv) Banyan Cay Dev. LLC; (v) Banyan Cay Villas, LLC; and (vi) Banyan Cay Maintenance, LLC. The address of the Debtors is 1900 Banyan Club Road, West Palm Beach, Florida 33401.

Estate" or the "Lender") seeking to: i) compel the Debtors to comply with Paragraph 7 of the Sale Order; ii) authorize the Credit Bid Transaction[2]; and iii) substitute the Lender APA attached as Exhibit "B" to the Motion for the Stalking Horse Agreement in the Sale Order. The Court, having reviewed and considered the Final DIP and Cash Collateral Order, the Sale Order, 11 U.S.C. § 363(k), the Motion and the argument presented in support of the Motion, as well as the Court record in this case, the Court:

**ORDERS** as follows:

1.    The Motion is **GRANTED**.

2.    The Debtors are compelled to cooperate with the Lender in consummating the Credit Bid Transaction and shall immediately execute and deliver to Lender the Lender APA in substantially the form attached to the Motion.

3.    The Credit Bid Transaction, as set forth in the Lender APA is approved and shall replace in its entirety the Stalking Horse Agreement attached to the Sale Order.

4.    For the avoidance of doubt and to support a swift Closing of the Lender APA, it is further **ORDERED, ADJUDGED AND DECREED, EFFECTIVELY IMMEDIATELY, AS FOLLOWS:**

      a.    Upon the Closing and subject to the conditions below, the Property transferred, sold and delivered to the Lender, its successors or assigns, shall be free and clear of all Claims and Encumbrances of any person or entity, pursuant to section 363(f) of the Bankruptcy Code.

      b.    The holders of Claims and Encumbrances and other non-Debtor parties who did not object to the Sale Order are deemed to have consented to this Order,

---

2  Capitalized terms used herein shall have the meanings proscribed in the Motion or Sale Order, respectively.

the Bid Procedures Order, the Sale and the Lender APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against the Lender, its affiliates, any agent of the foregoing or the Property to recover any claim which such person or entity has solely against Debtors or any of their affiliates, including the Claims and Encumbrances.

c.  The transfer of the Property to the Lender constitutes a legal, valid, and effective transfer and conveyance of the Property and shall vest the Lender with all of the Debtors' right, title, and interest in and to the Property described in and required by the Lender APA and this Order.

d.  Each and every term, provision and exhibit of the Lender APA, together with the terms and provisions of this Order, and the Sale Order shall be binding in all respects upon all entities, including, but not limited to the Debtors, the Lender, creditors, and members, equity holders, administrative agencies, governmental agencies, secretaries of state, federal, state and local officials and their respective successors or assigns, including but not limited to, persons asserting any Claim and Encumbrance against or interest in the Debtors' estates or the Property, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

e.  This Order: (i) is and shall be effective as a determination that, upon Closing in accordance herewith, all Claims and Encumbrances, including but not limited to mechanic's lien claims, existing as to the Property conveyed to the Lender have been and hereby are adjudged to be unconditionally released, discharged and terminated: and (ii) shall be binding upon and

3

govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental agencies or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property conveyed to the Lender. All Claims and Encumbrances of record as of the date of the Sale Order shall be removed and stricken as against the Property in accordance with and subject to the terms of this Order the foregoing.

f.  Upon Closing, the Lender, or its successors and assigns, shall not be deemed to be: (a) a successor-in-interest to the Debtors; (b) a party to a de facto merger of the Lender and the Debtors; or (c) a mere continuation of the Debtors. Without limiting the generality of the foregoing, and except as specifically provided in the Lender APA, the Lender shall not be liable for any claims against the Debtors or any of their predecessors, other than as expressly provided for in such Lender APA or this Order. Further, except as expressly provided in the Lender APA or in this Order, the Lender is not assuming nor shall it in any way be liable or responsible, as successor or otherwise, for any claims, liabilities, debts, obligations, or Claims or Encumbrances of the Debtors or their estates of any kind or character in any way whatsoever relating to or arising from the Property or the Debtors'

4

operation or use of the Property prior to the Closing, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, under the laws of the United States, any state, territory, or possession of the United States, the District of Columbia, or any other country or foreign jurisdiction.

g.  The Lender is purchasing the Property in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full rights, benefits, privileges and protections of that provision. The consideration provided by the Lender for the Property is fair and reasonable, and the Credit Bid Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

h.  The consideration provided by the Lender for the Property under the Lender APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Florida Uniform Fraudulent Transfer Act, and all other applicable laws.

i.  The Lender is not assuming any contracts or leases, except as provided in the Lender APA, and for the avoidance of doubt shall further not be responsible for any obligations to pay any contractors or materialmen under any contracts for any labor, materials or otherwise with respect to any contracts related to any construction relating to the Property.

j.  The Lender APA is authorized and approved in its entirety. The failure specifically to include any particular provisions of the APA or the Sale Order in this Order shall not diminish or impair the efficacy of such

provisions, it being the intent of the Court that the Lender APA (and any amendments thereto executed subsequent to the date of this Order) and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

k.  To the extent anything contained in the Sale Order conflicts with this Order or with a provision in the Lender APA, this Order and the Lender APA shall govern and control.

5.      From and after the date hereof, the Debtors and the Lender shall act in accordance with the terms of the Lender APA and execute and deliver all documents in connection therewith.

6.      This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.

7.      The automatic stay pursuant to section 362(a) of Bankruptcy Code is hereby modified, lifted, and annulled with respect to the Debtors and the Lender, to the extent necessary, without further order of this Court, to (a) allow the Lender to deliver any notice provided for in the Lender APA, and (b) allow the Lender to take any and all actions permitted under the Lender APA or this Order.

8.      This Court shall retain jurisdiction to interpret, implement and enforce the terms and provisions of this Order, the Sale Order, the Lender APA, all amendments thereto, and any waivers and consents thereunder, and each other document or agreement executed in connection therewith.

# # #

Submitted by:
Brian G. Rich, Esq.
*Attorneys for U.S. Real Estate*
313 Monroe Street, Suite 301
Tallahassee, FL  32301
Telephone No.  (850) 561-3010
Email:  brich@bergersingerman.com


*(Attorney Rich is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*